**EXHIBIT  2**

**Page 3**

1 - 9/11/00 Memorandum from K. Wykle To C. Hart Jr.   22
re Transfer of Legal Staff to the FMCSA

2 - Agenda for Residential Workshop for       78

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
1801 L Street, N.W., Suite 100
Washington, D.C. 20507

- - - - - - - - - - - - - - - x

ELAINE WALLS,      :

    Complainant,    :

             :

  v.          : EEOC No. 100-2005-

           :       00093X

           : Agency No. DOT 2-

           :      04-2061

NORMAN Y. MINETA, Secretary,   :

U.S. DEPARTMENT OF TRANSPORTATION, :

              :

    Agency.       :

              :

- - - - - - - - - - - - - - - x

Washington, D.C.

Thursday, August 11, 2005

Deposition of

       ELAINE WALLS

a witness of lawful age, taken on behalf of the Agency

in the above-entitled action, before Rita Hemphill,

Notary Public in and for the District of Columbia, in

Conference Room 8442, U.S. Department of

Transportation, 400 7th Street, S.W., Washington, D.C.,

commencing at 9:00 a.m.

---

**Page 2**

APPEARANCES:

On Behalf of the Complainant:

   CAMILLA C. McKINNEY, ESQ.
   Law Office of Camilla C. McKinney, PLLC
   1100 15th Street, N.W., Suite 300
   Washington, D.C. 20005
   (212) 861-2934

On Behalf of the Agency:

   DEBRA J. ROSEN, ESQ.
   Office of the General Counsel
   U.S. Department of Transportation
   400 7th Street, S.W.
   Washington, DC 20008
   (212) 366-9165

---

**Page 4**

1          P R O C E E D I N G S

2   Whereupon,

3         ELAINE WALLS

4 was called as a witness, and having been first duly

5 sworn, was examined and testified as follows:

6     THE REPORTER: Please state your full name for

7 the record.

8     THE WITNESS: My full name is Willys Elaine

9 Walls, and I'm called Elaine Walls.

10     THE REPORTER: Thank you.

11     EXAMINATION BY COUNSEL FOR THE AGENCY

12     MS. ROSEN: Ms. Walls, I'm Debra Rosen. I'm

13 the Agency representative in your EEO complaint, as you

14 know. I'm going to be taking your deposition today to

15 question you about the issues and allegations in your

16 complaint.

17     THE WITNESS: Okay.

18     MS. ROSEN: Okay.

19     BY MS. ROSEN:

20    Q Can you -- again, can you state your full name

21 for the record again and your current address?

22    A My full name for the record is Willys Elaine

Page 5

1   Walls. I'm called Elaine Walls. My address is 9905

2   Edgewater Terrace in Ft. Washington, Maryland.

3       Q Have you ever been deposed before?

4       A No I haven't.

5       Q Okay. Well, let me explain. Probably as an

6   attorney, I know you already probably know the ropes,

7   but let me explain that I'm going to be asking you a

8   series of questions, again, about the issues and

9   allegations in your EEO complaint. It's going to be

10  recorded by the court reporter, so you need to answer

11  orally. Nods or shakes of your head won't be adequate

12  to record your answers. So you have to answer with

13  words. Will you do that?

14      A Yes I will.

15      Q Okay. And it's important that you understand

16  all of my questions. If you don't understand a

17  question for whatever reason, will you please tell me,

18  and I can restate it, and I'll try to clarify?

19      A Yes.

20      Q And if you answer the question, will it be

21  fair for me to assume that you understood it?

22      A If I answer it, yes.

Page 6

1       Q And if you don't ask me to repeat a question,

2   will it be fair for me to assume that you heard it?

3       A Yes.

4       Q Okay. If you need a break, that's fine. but

5   if there's a pending question, please complete your

6   answer, okay?

7       A Okay.

8       Q If you could do that. And if you want to talk

9   to Ms. McKinney, that's fine. But please complete any

10  pending answer before you do so.

11      A Okay.

12      Q Are you taking any sort of medication today?

13      A Yes I am.

14      Q Does it affect your ability to comprehend the

15  questions I'm asking or for you to give answers?

16      A No it doesn't.

17      Q Okay. Has it affected your memory or ability

18  to understand or answer questions?

19      A No it hasn't.

20      Q And what did you do in preparation for this

21  deposition today?

22      A I discussed the procedures with my attorney,

Page 7

1   Ms. Camilla McKinney.

2       Q Did you bring any documents with you?

3       A No I didn't.

4       Q Now can you tell me where you're currently

5   employed?

6       A I'm currently employed at the Federal Motor

7   Carrier Safety Administration's Office of the Chief

8   Counsel in the Regulatory Development Affairs Division.

9       Q Okay. And what's your grade?

10      A My current grade is a GS-14.

11      Q And how long have you worked at Motor

12  Carriers?

13      A I worked at FMCSA since its inception in 2000.

14      Q And you've been in your current division the

15  entire time?

16      A Yes I have. But it used to have a former

17  name. The former name was the Enforcement and

18  Regulatory Affairs Division.

19      Q And why did it change names?

20      A Because the office went through a

21  reorganization.

22      Q And what happened to your division as a result?

Page 8

1       A As a result of our reorganization, the

2   enforcement functions were moved to another division.

3       Q And did any employees from the original

4   division go to the enforcement?

5       A Yes. Two of our female employees went to the

6   enforcement division. That was Ms. Jackie Cho and Ms.

7   Annmarie Ottman.

8       Q And those are attorneys?

9       A They are attorneys.

10      Q And how was it decided who would go to which

11  division?

12      A Our management decided.

13      Q What was it based upon?

14      A I have no idea.

15      Q Was it based upon who did more enforcement

16  type work?

17          MS. McKINNEY: Objection. She answered she

18  didn't know.

19          MS. ROSEN: Well, I'm asking her another type

20  of question.

21          MS. McKINNEY: You can go ahead. You can

22  answer.

Page 9

1     THE WITNESS: Could you repeat that, please?

2     BY MS. ROSEN:

3     Q Was it based upon the amount of enforcement

4 work that the individuals did in the office?

5     A Management never told their staff how they

6 decided who would move to the enforcement division.

7     Q Did you do much enforcement work in the

8 division?

9     A I did a lot of enforcement work until those

10 functions were moved to the new division.

11     Q Would you say that more than 50 percent of

12 what you did in that division was enforcement or

13 regulatory?

14     A Both. I would say about half.

15     Q Did some people in the former division do

16 exclusively enforcement work?

17     A No. All of us worked on enforcement and

18 regulatory affairs issues.

19     Q What about Joe Solomey?

20     A Joe Solomey did a lot of enforcement work, but

21 he also worked on regulatory issues as well.

22     Q Would you say that more than 50 percent of

Page 10

1 what he did was enforcement?

2     A I would say that more than 50 percent of what

3 he did was enforcement.

4     Q Would you say more than 80 percent?

5     A Oh, no, I wouldn't.

6     Q So right now, as the division currently is,

7 can you describe to me what your primary duties are?

8     A Currently, my primary duties are to work as

9 the legal contact on environmental issues that are

10 handled throughout the agency. I also work on a lot of

11 regulatory issues, regulatory development and review of

12 legal sufficiency for some of the regulatory documents

13 that are developed by the program office.

14     Currently, I'm also working as a COTR for the

15 division. I handle all the contracts and procurement

16 requests that come through our division. And I also

17 still handle some of the enforcement issues from time

18 to time if some of the new staff basically would like

19 to ask me questions on some of the work that I handled

20 in the past.

21     Q So you handle some of the enforcement issues

22 that arise in the other division?

Page 11

1     A Sometimes. At the very beginning I handled

2 more, but they're getting less and less.

3     Q Can you give me an example of --

4     A I'll give you an example. I was a contact for

5 all of the SBREFA issues.

6     Q How do you spell that?

7     A S-B-R-E-F-A.

8     Q What is that?

9     A It stands for Small Business Regulatory

10 Enforcement Fairness Act.

11     Q That continued after the split in the

12 division?

13     A It continued when the new attorneys came to

14 the division, enforcement division. And occasionally

15 they would have questions that they wanted to ask me

16 because I handled those issues exclusively.

17     Q So they would ask you questions. So beyond

18 answering their questions, what did you do to handle, I

19 think the word you used, to handle the enforcement --

20     A Well, they were responsible -- their

21 responsibility was to handle the matter.

22     Q Right.

Page 12

1     A But they were unfamiliar with the issues, so

2 occasionally I would tell them how to handle the matter

3 or give them some of the information that I had on

4 SBREFA issues in my file.

5     Q So you didn't actually handle them?

6     A No.

7     Q You gave advice and answered questions?

8     A No. No. It was their responsibility as

9 enforcement attorneys to handle the particulars.

10     Q Now who is your first level supervisor?

11     A My first level supervisor is Ms. Suzanne

12 O'Malley.

13     Q And your second level?

14     A Second level would be Ms. Judith Rutledge.

15     Q And the third level?

16     A Third level currently now is Ms. Suzanne Tobo.

17 At the time I filed my complaint, it was Brigham

18 McCown.

19     Q Now prior to Federal Motor Carriers, where did

20 you work?

21     A Prior to FMCSA, I worked at the Federal

22 Highway Administration.

Page 15

1 　Q How long did you work there?
2 　A I worked there since -- I worked there
3 sometime beginning in 1996 until I moved to FMCSA in
4 the year 2000.
5 　Q What was your grade while you were at Federal
6 Highway?
7 　A I was a GS-14.
8 　Q When were you promoted to a GS-14?
9 　A Years ago at the former Interstate Commerce
10 Commission.
11 　Q Years ago. More than ten years ago?
12 　A I would say so, yes.
13 　Q And when -- so prior to Federal Highway, you
14 worked at the ICC?
15 　A Yes I did.
16 　Q How long did you work there?
17 　A I was hired at the ICC in August of 1980.
18 　Q And while you were at the ICC, were you
19 promoted to a 14?
20 　A Yes I was.
21 　Q While you were at the ICC, did you request a
22 promotion to a 15?

Page 15

1 　Q Okay. And where did you work in Federal
2 Highway?
3 　A I worked in the Legislation and Regulations
4 Division.
5 　Q Okay.
6 　A In their Chief Counsel's Office.
7 　Q What were your primary duties and
8 responsibilities there?
9 　A My primary duties and responsibilities there
10 were to handle all of the regulatory development
11 issues. I helped program staff develop rules. I
12 reviewed their rules.
13 　　We worked on FOIA issues as well, handling
14 employee testimony, FOIA Act, Privacy Act, Federal
15 Advisory Committee Act issues, as well as legislative
16 matters.
17 　　I developed legislative language for certain
18 bills. We also wrote testimony for some of our
19 management officials to handle some of the hearings
20 that were held up on the Hill.
21 　Q Was the regulatory work you did while at
22 Federal Highway similar to the regulatory work you do

Page 14

1 　A I didn't request it specifically, but my
2 managers wanted to promote me but they couldn't because
3 we were going through a reorganization, and all
4 personnel matters were basically frozen.
5 　Q Okay. And then what happened? How long were
6 they frozen?
7 　A They were frozen until its demise.
8 　Q And then what happened with you? Where did
9 you go?
10 　A Where did I go?
11 　Q Yes.
12 　A I was actually RIFed, so I had no job.
13 　Q And then you were picked up by Federal
14 Highway?
15 　A Yes I was.
16 　Q When you were picked up by Federal Highway,
17 was it contingent upon -- did you take that job
18 contingent upon getting a Grade 15?
19 　A No I didn't.
20 　Q So you worked at Federal Highway since 1996.
21 Is that about right?
22 　A Yes.

Page 16

1 now?
2 　A Quite similar, yes.
3 　Q So it's a similar job?
4 　A Yes.
5 　Q Now who was your first level supervisor at
6 Federal Highway?
7 　A Thomas Holian.
8 　Q And your second level?
9 　A Ed Kussy.
10 　Q Now what kind of supervisor was Mr. Holian?
11 　A He was a very good supervisor. He also gave
12 -- always gave advice on your projects. He basically
13 told us that we could engage in some of the legislative
14 projects and matters if we wanted to. We were never
15 hindered in our professional development.
16 　　We were able to go to training courses and
17 workshops, and basically, we could cross-train. We
18 worked with other divisions on general law issues, on
19 IT issues as well as Motor Carrier issues. The Motor
20 Carrier Law Division was separate and apart from the
21 Regulatory Division.
22 　Q So he was supportive?

**Page 17**

1   A He was very supportive.

2   Q And did you trust him?

3   A Yes.

4   Q You thought he had integrity and was a good

5   character?

6   A Yes I did.

7   Q In your complaint, you contend that Mr. Holian

8   had told you that he was making a recommendation to Ed

9   Kussy for a promotion for you to the GS-15 level. Is

10   that correct?

11   A That's correct.

12   Q When did he tell you this?

13   A He told me this a couple of months before we

14   transferred to the FMCSA.

15   Q And what was the context of him telling you

16   that? How did it arise?

17   A How did it arise?

18   Q Yes.

19   A Basically, we talked about my promotion, and

20   he indicated that he certainly would talk to Mr. Kussy

21   about it, and he thought I deserved it.

22   Q Did the conversation begin when you asked him

**Page 18**

1   for a promotion?

2   A Yes it did.

3   Q You asked him for a promotion. Okay. And did

4   anyone else witness this conversation?

5   A No one else witnessed it, no.

6   Q Okay. Do you have any documentation, e-mails,

7   anything in writing or anything at all relating to this

8   recommendation that you claim he made?

9   A No.

10   Q Now he told you he was going to make the

11   recommendation. And then what happened after he told

12   you that?

13   A Nothing happened. He just told me that he

14   talked to Mr. Kussy about it, and before I was

15   transferred over to Motor Carrier, he talked about it

16   again, and he said that Mr. Kussy was reluctant to

17   promote me because I was transferring to a new agency.

18   Q Okay. And then what happened?

19   A Then what happened?

20   Q Did you have any further conversations about

21   this?

22   A Not with Mr. Holian, but with Ms. Rutledge.

**Page 19**

1   Q Okay. But with Mr. Kussy or anybody, you

2   didn't have any further?

3   A No.

4   Q And you never discussed this again?

5   A Not with Mr. Holian.

6   Q So essentially, you were told no because you

7   were moving over to Federal Motor Carrier. Is that

8   correct?

9   MS. MCKINNEY: Objection to the extent that

10   that mischaracterizes her testimony.

11   BY MS. ROSEN:

12   Q Okay. Well, why don't you clarify that?

13   A The way I understood the conversation was that

14   Mr. Holian believed that I should be promoted to the

15   GS-15 level. The reason why the action was not made

16   because the promotion would not have gone through

17   before the transfer, nor would it have benefitted the

18   agency, because I was going somewhere else.

19   Q Did you look through the ROI, your ROI? Did

20   you see Mr. Holian's --

21   A Recently?

22   Q Just generally, did you see Mr. Holian's

**Page 20**

1   affidavit in the ROI?

2   A Yes I did.

3   Q Okay. And so you know he says under oath that

4   he didn't recommend you. Why do you think he said

5   that?

6   A I have no idea why he said that.

7   Q You testified before you thought he was an

8   honest man with integrity. Would he lie under oath?

9   MS. MCKINNEY: Objection to the extent you're

10   asking her to characterize someone else's state of

11   mind?

12   BY MS. ROSEN:

13   Q Do you think he was lying when he says that he

14   didn't recommend you?

15   MS. MCKINNEY: Same objection. You can

16   answer. Same objection.

17   THE WITNESS: People say things for various

18   reasons. Sometimes they can be under pressure by their

19   managers to make statements that they would not

20   ordinarily make.

21   BY MS. ROSEN:

22   Q Do you think you could have misunderstood Mr.

Page 21

1  Holian when he told you that he was going to recommend
2  you? Do you think you could have misunderstood his
3  trying to support you in your goals, that maybe he
4  didn't actually say he was going to recommend you?
5     A  No.
6     Q  It was a misunderstanding?
7     A  No.
8     Q  Now you talked a little bit about the transfer
9  from Federal Highway to Motor Carriers. Can you
10  explain how that happened? Why did you transfer? Was
11  there another restructuring? What happened?
12     A  Well, Congress created a new agency, FMCSA, to
13  handle all Motor Carrier safety issues. Everyone,
14  every attorney who was working at Federal Highway on
15  Motor Carrier issues had a right to transfer. There
16  was a percentage level of work, Motor Carrier work,
17  that you had to be performing, and if you were
18  performing at that level, you had a right to transfer.
19     Q  What do you mean, you had a right to transfer?
20     A  Normally in a restructuring or its functions
21  are moved from one agency to another, those employees
22  have a right to transfer to the new agency.

Page 22

1     Q  So this is a transfer function, right?
2     A  Yes it is.
3     Q  In a transfer of function, though, while you
4  might have had a right to transfer, what if you didn't
5  want to transfer? Isn't it true that the agency has
6  the right to terminate you if your position was
7  identified?
8     A  That was never, ever explained to us, that
9  they could have terminated us.
10     Q  So was your position identified to transfer?
11     A  Yes.
12     Q  And what was the percentage of work, do you
13  recall, doing Motor Carrier work?
14     A  I think it was 50 percent.
15     MS. ROSEN: Can I mark this as Agency Exhibit
16  1? Can we share this?
17        (Walls Deposition Exhibit 1 was
18         marked for identification.)
19     MS. ROSEN: I'm handing you what's been marked
20  as Agency Exhibit 1. Have you ever seen this? Have
21  you seen that document before?
22        (The witness examined the document.)

Page 23

1     THE WITNESS: No.
2     BY MS. ROSEN:
3     Q  You never saw that before?
4     A  I never saw it.
5     Q  Do you believe this is a true document and
6  identified the people who were performing more than 50
7  percent of the work who were identified to transfer?
8     A  I've never seen it.
9     Q  Do you think it's a true document, appears to
10  be what it is?
11     MS. McKINNEY: Objection. She answered your
12  question. How could she know whether this a true
13  document or not? She's never seen it before.
14     BY MS. ROSEN:
15     Q  Who is Kenneth Wykle?
16     A  He used to be the administrator.
17     Q  Okay. And Clyde Hart?
18     A  Used to be the acting deputy FMCSA.
19     Q  Now are the people listed on here the persons
20  who were in fact transferred with you?
21     A  Yes.
22     Q  Now you claim in your complaint and/or your

Page 24

1  affidavit you had a conversation with Ms. Rutledge
2  before transferring to Motor Carriers. Can you tell me
3  about that conversation?
4     A  Ms. Rutledge came to see all of the attorneys
5  who were designated to transfer to the new agency,
6  FMCSA, and their chief counsel's office. At that time
7  that Ms. Rutledge and I talked, she asked me what I
8  would be interested in doing if I transferred, and I
9  told her I would still like to work on the regulatory
10  work, but I also had an interest in general law.
11        And then we talked about my promotion to the
12  GS-15 level.
13     Q  How did that subject come up?
14     A  I brought it up.
15     Q  What did you say?
16     A  I told her that Mr. Holian had recommended me
17  to be promoted to the GS-15 level, and I asked her if
18  she would honor that if the transfer was made to Motor
19  Carrier.
20     Q  Did you tell her that Mr. Kussy had declined
21  to promote you?
22     A  Mr. Kussy did not decline to promote me.

Page 25

1  Q I thought you testified earlier that Mr. Kussy
2  had told Mr. Holian that he wasn't going to promote
3  you.
4     A Because was going to the new agency. But
5  that's not a decline in promotion. That's just saying
6  that because you're going somewhere else, the promotion
7  will not go through. It's different from I agree that
8  she should be promoted or I decline to promote you.
9     Q Okay. So you told Ms. Rutledge that Mr.
10 Holian had recommended you?
11    A Yes I did.
12    Q And what did she say?
13    A She said she would honor that promotion if I
14 transferred.
15    Q Didn't she say she'd honor it if you had
16 already been promoted?
17    A No. She said she would honor the promotion if
18 I would transfer to Motor Carriers.
19    Q You mean she would honor the recommendation?
20    A The recommendation to promote me.
21    Q Did anybody witness this conversation?
22    A It was just Ms. Rutledge and I.

Page 26

1     Q In your documents in the ROI, you say a number
2  of times that she made you an offer when she came to
3  see you. She came to recruit you. But then you just
4  testified in other places you said that she came to
5  discuss the transfer. You seem to imply that you had a
6  choice whether to transfer or not. Do you believe you
7  had a choice whether to transfer?
8     A Yes, I believe I had a choice.
9     Q Can you explain why?
10    A Because there was another individual who was
11 also designated to transfer because he was doing 50
12 percent or more of the Motor Carrier work, that he
13 talked with Mr. Kussy, and he didn't transfer. He
14 didn't want to go.
15    Q Who was that?
16    A Ray Cottrel.
17    Q How do you know that?
18    A Because he told me.
19    Q So what you're -- you're contending that you
20 would have had an opportunity to ask Mr. Kussy for an
21 exception?
22    A Yes.

Page 27

1     Q You don't for sure whether he would have
2  granted it?
3     A No, I don't know for sure. But I only know
4  that one of the lawyers who was designated to transfer
5  did not, and he said the reason why he was able to stay
6  at Federal Highway was because he had a conversation
7  with Mr. Kussy, and he told Mr. Kussy that he did not
8  want to transfer.
9     Q At the time Ms. Rutledge came to speak to you,
10 your position had already been identified. Is that
11 right? To transfer?
12    A Yes.
13    Q Let's move on. Can you tell me what the EPP
14 is?
15    A The EPP is an Executive Potential Program, a
16 management program that is offered to employees of
17 Federal Motor Carrier Safety Administration, I think if
18 they're within the grades of a GS-13 and above. It
19 gives them the opportunity to take management courses
20 and to be detailed to other agencies throughout the
21 Washington, D.C. metropolitan area, to gain management
22 experience.

Page 28

1     Q Is this a chief counsel program or an agency-
2  wide program?
3     A It was an agency-wide program.
4     Q And how are people chosen to participate?
5     A You would have to ask management about that.
6     Q How many persons in a year are chosen?
7     A You still would have to ask management.
8     Q You don't know that?
9     A No.
10    Q Didn't you ask to participate in the program?
11    A Yes I did.
12    Q But you didn't know how the nominations or how
13 participants were chosen?
14    A I know how they're chosen by their different
15 offices. Management usually determines who would
16 participate in the program.
17    Q And you didn't know how many people were
18 chosen from the whole agency?
19    A No I didn't.
20    Q In the previous years, had anyone been chosen
21 from the agency to participate?
22    A From the agency --

Page 29

1  Q  From the agency.
2  A  -- or from my office?
3  Q  From the agency, the whole agency.
4  A  From the agency, yes.
5  Q  How many people?
6  A  I have no idea.
7  Q  Now you're contending that management's
8  declining to nominate you is based upon discrimination.
9  Is that correct?
10  A  Yes it was.
11  Q  And can you explain why you believe that?
12  A  Because they had nominated a colleague of mine
13  the previous year to participate in the program. And
14  when I asked, I was denied that opportunity to even be
15  nominated.
16  Q  And why do you say that was based upon
17  discrimination?
18  A  Because they had allowed another individual in
19  my office to participate in the program. I wasn't
20  asking for to be accepted, because that decision is
21  ultimately I think by the administrator. But they
22  didn't even decide to nominate me or put my name in for

Page 30

1  that program.
2  Q  What did they tell you why they didn't want to
3  nominate you?
4  A  They told me that they didn't want to nominate
5  me because we had had an employee who participated in
6  the program the previous year, and that we were short
7  staffed, and that they couldn't afford to have me
8  detailed in this program for a full year.
9  Q  And why did those reasons seem to indicate
10  discrimination to you?
11  A  Because we were already short staffed the year
12  before, but they allowed Mr. Solomey to participate,
13  and all the individuals within my division helped to do
14  his work while he was doing other assignments through
15  this program.
16  Q  So Joe Solomey was the agency's EPP
17  participant in 2003?
18  A  Yes he was.
19  Q  Now he worked in the Chief Counsel's office?
20  A  Yes he did.
21  Q  And did he actually work in your specific
22  division?

Page 31

1  A  Yes he did.
2  Q  So how likely was it that the agency would
3  choose an attorney from not only the same office but
4  the same division two years in a row?
5  MS. McKINNEY:  Objection.  Again, you're
6  asking her to speculate as to someone else's knowledge.
7  You can answer if you can.
8  THE WITNESS:  That should have not inhibited
9  them from nominating me to participate in the program.
10  BY MS. ROSEN:
11  Q  Why?
12  A  Because it shouldn't.  I'm an individual, hard
13  working attorney just like Mr. Solomey, and I should
14  have had been afforded the same opportunities.
15  Q  How did you make your interest in the EPP
16  known?
17  A  I discussed it with my supervisor, Suzanne
18  O'Malley.
19  Q  And what did she say, and what happened after
20  you discussed it with her?
21  A  She thought it was a great idea and that she
22  would talk with her managers about nominating me for

Page 32

1  the program.
2  Q  And what happened?
3  A  What happened?
4  Q  What happened after that?
5  A  Nothing.
6  Q  Did you meet with the other managers?
7  A  Eventually I did.  Mr. McCown said he would
8  get back to me, but he never did.  So I requested
9  another meeting.  And in that meeting, I met with Mr.
10  McCown and Ms. Rutledge.
11  Q  Okay.  And what happened in that meeting?
12  A  They basically told me that they were not
13  going to nominate me for the EPP because they had
14  nominated Mr. Solomey the previous year, and my
15  division was short-staffed, and they could not afford
16  for me to be on a detail for a year.
17  Q  That seems logical, doesn't it?
18  A  No.
19  Q  During that meeting, isn't it a fact that Ms.
20  Rutledge suggested that you prepare for a future
21  nomination?
22  A  She never suggested that to me.

Page 33

1    Q  She never at that meeting or at any other
2  meeting indicated that a future nomination was a
3  possibility?
4    A  No she didn't.
5    Q  You also contend in your complaint that the
6  denial of your request to be promoted to a GS-15 was
7  based upon discrimination.  Can you explain the bases
8  for that allegation?
9    A  The bases for that allegation is the fact that
10  management had offered promotion to the GS-15 attorney
11  level to Mr. Joe Solomey.
12    Q  How do you know that?
13    A  Because he told me.
14    Q  What did he tell you?
15    A  That management had offered him a promotion to
16  the GS-15 level.
17    Q  When did he tell you that?
18    A  After the offer was made.
19    Q  And what did he say exactly?
20    A  He basically said that management had offered
21  him a promotion to the GS-15 level if he would not take
22  the job at RSPA.

Page 34

1    Q  Did he tell you that it was a bona fide offer?
2    A  He didn't say at that time it was bona fide or
3  not. He just said the offer was made.
4    Q  In fact, didn't he characterize it more as an
5  inducement rather than an actual offer?
6        MS. McKINNEY: Objection.  Trying to
7  mischaracterize her testimony to she already spoke to
8  what he said to her.  You can answer if you can.
9        THE WITNESS: Initially he told me it was an
10  offer.
11        BY MS. ROSEN:
12    Q  And then what happened after his initial
13  statement to you?
14    A  Well, I read the ROI where he said he thought
15  it was a promise to promote.
16    Q  Do you have any reason to doubt what he's
17  saying in the ROI?
18    A  I have no reason to doubt what he's saying in
19  the ROI if that's the way he believed that conversation
20  to go and that's the way he thought that Mr. McCown was
21  basically I guess expressing his concern to keep him
22  there. And he thought it was more like a promise in

Page 35

1  his ROI.  But when he initially told me and discussed
2  the issue with me, he said it was an offer to stay.
3    Q  Did you and Joe Solomey often discuss the
4  promotion policy in the office for 14s to be promoted
5  to a 15?
6    A  We often discussed our I guess desire to be
7  promoted to the GS-15 attorney level.  But to my
8  knowledge, there is no promotion policy in our office
9  for the attorneys.
10    Q  Did he express frustration with the management
11  style of the deputy chief counsel and chief counsel
12  regarding promotions to the 15s to you?
13    A  We talked about the issue numerous times, and,
14  yes, he expressed some disappointment in the fact that
15  he was not being promoted to the GS-15 level.
16    Q  So you commiserated together about being 14s
17  and not being able to be promoted to a 15 in the
18  office.  Isn't that right?
19        MS. McKINNEY: Objection to the
20  characterization of your testimony as the two employees
21  commiserating.  Objection to that.
22        BY MS. ROSEN:

Page 36

1    Q  Okay.  So can you explain what was the context
2  of your discussions with him about this?
3    A  We were colleagues.  We worked together.  We
4  worked together in the same division.  We talk just
5  like any other attorney would talk in an office about
6  numerous things, not just promotions.  We talked about
7  legal issues, family issues and other things as well.
8    Q  Did he ever express to you his frustration
9  about not being promoted?
10    A  Yes.
11    Q  Okay.  What other reason, other than the fact
12  that Mr. Solomey received this offer or inducement from
13  Mr. McCown, what other reasons support your contention
14  that you were discriminated against with regard to the
15  15?
16    A  Based on Mr. Solomey's situation or what?
17    Q  What other reasons besides the fact that Mr.
18  Solomey received an inducement or offer from Mr.
19  McCown, what other reasons do you have for thinking
20  that management's not promoting you to a 15 is based
21  upon discrimination?
22    A  Well, they promoted Bob Brown to the GS-15

Page 37

1  level after being --

2    Q What is the basis for that statement?

3    A A document that I have in my ROI that shows he

4  was promoted to the GS-15 level after being employed in

5  our office for only a year.

6    Q A document that's in the ROI. There's one

7  document that says that he's a 15. Is that what you're

8  referring to?

9    A Yes.

10    Q There's other documents that say that he was a

11  14. Isn't that true?

12    A Yes.

13    Q Documents could have mistakes on them.

14    A They could.

15    Q Are you aware that Mr. Brown accepted a 14 --

16  he had been a 15 before he came to Federal Motor

17  Carriers and then accepted a downgrade?

18    A No.

19    Q Is there any other reasons to support your

20  discrimination claim?

21    A Of not being promoted to the GS-15 level?

22    Q Yes.

Page 38

1    A Yes. I have numerous years of experience in

2  transportation law and Motor Carrier law, hazardous

3  materials law and commercial regulations law. I've

4  worked on numerous projects of an international and

5  national nature within the office. I've done a good

6  job on those projects, and I've received awards for

7  them as well.

8    And based on this work experience and my

9  commendations within my division, I feel like I should

10  be promoted to the GS-15 level.

11    Q Let's talk about specific projects or

12  assignments that you just mentioned that supported your

13  request to be promoted. Can you identify some specific

14  work or assignments that you've done that you believe

15  qualify you for a 15?

16    A For example, I worked on the NAFTA litigation

17  team, helped develop the NAFTA rules, and helped

18  develop the NAFTA environmental impact statement that

19  was required by the court.

20    Q Anything else?

21    A Yes. I helped develop the environmental

22  procedures for the National Environmental Policy Act of

Page 39

1  1969. It took me two-and-a-half years to get those

2  procedures done, but they're essential in our NAFTA

3  litigation, and furthermore in our rulemaking

4  development efforts because CEQ was insistent that the

5  agency have those procedures so that they could justify

6  environmental consequences of all of their actions. Do

7  you want me to continue?

8    Q Yes.

9    A In the NAFTA litigation arena, we also had to

10  develop an environmental planning report called the

11  REPA report for the deputy secretary within a week.

12  This was required because the deputy secretary wanted

13  to know how much money and time it would take for the

14  agency to develop a NAFTA EIS. And I was instrumental

15  in that procurement of a contractor to do that work, as

16  well as the documents that were -- the review of the

17  documents that were produced for the Secretary's

18  purposes.

19    Q Did you write the report?

20    A No, I didn't write the report. But I had to

21  review the report for legal sufficiency.

22    Q On the NAFTA litigation team, you also said

Page 40

1  that you helped develop rules in the EIS. Did you

2  write the rules in the EIS?

3    A I did not specifically write the rules, but I

4  had to review the rules. The rules are normally

5  written by the program staff, and then when they come

6  to our office, I help review them and help develop some

7  of the issues contained in those rules. Ms. Rutledge

8  put a team of lawyers together for that particular

9  project, and I was on that team.

10    Q Did you have a specific area that you focused

11  on in developing the rules?

12    A No. I didn't have a specific area. I

13  reviewed the rules in every aspect of regulatory

14  development in that particular instance. I was not

15  limited in my review.

16    Q Is there any other specific assignments that

17  you wanted to identify as being representative of GS-15

18  work?

19    A I also helped develop a NAFTA litigation task

20  force that consisted of a multi-modal administration

21  team. OSC was on that team, representatives from the

22  GC's office, my office, Federal Highway Administration,

Page 41

1    EPA and several other agency representatives throughout
2    the Washington metropolitan area, Washington, D.C.
3    metropolitan area.
4        On that team, our responsibility was to help
5    and develop issues that would be covered in that NAFTA
6    litigation. And we worked on that particular team for
7    numerous months.
8        Q  Did you head up the team?
9        A  Yes.
10       Q  You were the --
11       A  I was the head.
12       Q  -- head of that team?
13       A  Mm-hmm.
14       Q  What type of -- did you have any written work
15   product that resulted from this that you drafted?
16       A  Yes I did.
17       Q  What was that?
18       A  The work product consisted of several things;
19   how we were going to pursue litigation, some of the
20   issues we discussed in terms of how we would start to
21   develop the EIS and what should be covered, various
22   charts and tables and things were created on that

Page 42

1    project.
2        Q  You were the head of the team?
3        A  Yes.
4        Q  Any other items?
5        A  Did I discuss development of environmental
6    procedures?
7        Q  You said that you did that, yes.
8        A  Okay. I also worked on the mandamus rules,
9    basically to review and help develop the safety
10   performance rule making.
11       Q  Is that the documents that you provided to my
12   document request, there were some e-mails relating to
13   FMPRM or the rules of practice? Or is that something
14   else?
15       A  That's something different.
16       Q  Oh, okay. Excuse me. Tell me about what you
17   did for the mandamus rules.
18       A  I helped review and develop the safety
19   performance for drivers rulemaking. That was one of
20   the mandamus rules.
21       Q  What did you do when you say you helped?
22       A  Well, the program staff originally will do the

Page 43

1    initial draft. And then when the rulemaking comes to
2    our office, we review the rule for legal sufficiency,
3    and sometimes we will have to rewrite the rule. In
4    this instance, a significant rewrite was required, as
5    well as helping to develop some of the legal issues
6    that we had to expand on within that document.
7        Q  This mandamus rule when it came to your
8    office, were you the only attorney in your office who
9    was involved in reviewing it?
10       A  Yes.
11       Q  Likewise the NAFTA litigation team, were the
12   only attorney in the regulations division to work on
13   that?
14       A  Primarily, yes. Eventually other attorneys
15   within my office became involved, but I was the primary
16   lead attorney to help develop that team?
17       Q  On the NAFTA litigation?
18       A  Yes.
19       Q  In your complaint you list the projects you've
20   worked on, the ones that you've just talked about. You
21   also said the President's initiative to open the U.S.-
22   Mexico border.

Page 44

1        A  Yes.
2        Q  What did you do for that?
3        A  Those were the three NAFTA rules that were
4    developed to open the U.S.-Mexico border.
5        Q  And so that was part of NAFTA?
6        A  That was the initial project, right. And I
7    worked on that team to help develop those rules,
8    because the President wanted to open the border within
9    a specific time.
10       Q  So the President's initiative to open the
11   U.S.-Mexico border, the agency's NAFTA EIS, and the
12   REPA report, that was all part of NAFTA?
13       A  It was all part of it, but they were separate
14   projects.
15       Q  Is there anything else you can identify to
16   support your ability to work at a GS-15 level?
17       A  I helped -- I worked on a team to rewrite our
18   rules of practice under Part 386.
19       Q  Is that what I was just referring to?
20       A  Yes.
21       Q  The, what's that, Supplemental MPRM for Part
22   386 rules?

Page 45

1   A That's correct.

2   Q What was the significance of those documents

3 that you provided to me in the document request? They

4 weren't identified as what -- represented in the e-

5 mails that you gave to me regarding this MPRM.

6   A Basically just to show you that I worked on a

7 project and my managers from time to time would say

8 that you were doing a good job on that project or

9 whatever, commended me for various other efforts that

10 were being made.

11   Q Did you work on that project with any other --

12   A Yes I did.

13   Q Who else?

14   A I worked on that project with Jackie Cho.

15 She's an attorney within my office.

16   Q How is the division of labor between you two

17 for that project? What was the division of labor?

18   A The division of labor was about 50 percent.

19   Q What part did you assume working on that, and

20 what part did she assume?

21   A We assumed the full responsibility for working

22 on that project. We worked on it together.

Page 46

1   Q You didn't have a particular expertise that

2 you focused on?

3   A No. We both had similar expertise. She

4 worked on enforcement and regulatory issues and so did

5 I.

6   Q Okay. Is there anything else that you want to

7 tell me? Any other work assignments that you did or

8 that support your request to be a 15?

9   A Basically that's all I can remember right now.

10   Q How did you make your desire to be a 15 known

11 in Motor Carriers?

12   A I talked with my supervisor.

13   Q That's Ms. O'Malley?

14   A Ms. O'Malley.

15   Q When did you first raise the issue?

16   A I raised the issue every year since I've been

17 at FMCSA.

18   Q And what did Ms. O'Malley tell you?

19   A Ms. O'Malley basically said that initially

20 there was no money in the budget to make the

21 promotions, but she never said that she did not think

22 that I should get my 15.

Page 47

1   Q Did she ever advise you or give you guidance

2 about ways that you could improve your performance?

3   A She gave us things basically to do that she

4 thought would be impressive to Ms. Rutledge in terms of

5 what she was looking for to promote attorneys, but she

6 at no time ever thought that I was not eligible to be

7 promoted to the GS-15 level.

8   Q How do you know?

9   A Because she told me.

10   Q In your complaint, you say that, quote, "I

11 have been eligible to be promoted to the GS-15 level

12 since 2000." The year 2000. Why since the year 2000?

13   A Because of my experience in transportation and

14 Motor Carrier law for one thing. And for the other

15 thing, because of what Ms. Rutledge told me. She never

16 told me that she would not honor my previous employer's

17 recommendation to promote me to the GS-15 level.

18   Q Prior to 2000, you weren't eligible to be

19 promoted to a 15?

20   A I was eligible to be promoted to the 15 level,

21 but I only brought up that issue when I was leaving

22 Federal Highway and coming to Motor Carrier. I talked

Page 48

1 to -- well, actually, I didn't know before I talked to

2 Mr. Holian when we had that conversation we knew the

3 transfer was going to occur, and I talked to him at

4 that point about my promotion.

5   Q How many GS-15 positions have you applied for

6 since 2000?

7   A Normally I don't get a chance to apply for

8 many, but I've applied for some.

9   Q Why don't you normally get a chance to apply

10 for them?

11   A Because I'm normally busy at work. I have a

12 heavy workload, and I'm normally busy doing my work, so

13 I normally don't get a chance to apply for any

14 positions. I have applied for a few, though.

15   Q Can you identify a few of them that you have

16 applied for?

17   A I have applied for some enforcement positions

18 over at DHS, Department of Homeland Security. And

19 regulatory positions are not available, but from time

20 to time, they become available, and I apply for those

21 as well.

22   Q Where?

Page 49

1    A  Just at various agencies.

2    Q  Can you identify a few of the agencies?

3    A  I can't remember.

4    Q  So would you say since 2000 you've applied for

5  ten different GS-15 positions?

6    A  I've applied for some, yes.

7    Q  Let's talk about the various meetings you had

8  with your management to discuss your request for the

9  EPP and the GS-15 promotion. You had a number of

10  meetings that you talk about in your complaint. Did

11  you meet with Mr. McCown, Brigham McCown, separately at

12  any time to discuss either of those issues, EPP or 15?

13    A  I believe I may have met with him separately.

14    Q  And what was the context of that meeting?

15    A  I don't remember. I know we talked about my

16  promotion and we talked about the EPP program.

17    Q  And what did he tell you?

18    A  He told me he was under the belief that Ms.

19  O'Malley did not recommend me to be promoted to the GS-

20  15, and he didn't know much about the EPP program, but

21  he told me he would get back to me on that.

22    Q  And what did you say to him when he told you

Page 50

1  those things?

2    A  What did I say? I told him I would wait until

3  he contacted me on the EPP. But as far as getting my

4  promotion to the GS-15 level, I told him that Ms.

5  O'Malley had informed me that she never believed that I

6  shouldn't get my 15.

7    Q  And after the McCown meeting, did you have any

8  other meetings with him?

9    A  Yes I did.

10    Q  When was that?

11    A  In January '04.

12    Q  And tell me about that meeting. Who else was

13  at that meeting?

14    A  Ms. Rutledge was at that meeting.

15    Q  So it was you, Ms. Rutledge and Mr. McCown?

16    A  Yes.

17    Q  Okay. That wasn't the February 6th meeting

18  that you talk about in your ROI? There was another

19  meeting in January?

20    A  There was another meeting.

21    Q  It was a January meeting? Okay. Tell me

22  about the January meeting.

Page 51

1    A  In that meeting, we talked about my promotion

2  again to the GS-15 level. And we talked about Mr.

3  McCown and Ms. Rutledge recommending me to participate

4  in the EPP program.

5    Q  What did they tell you?

6    A  They told me some of the same things we

7  discussed before; that they had allowed Joe Solomey to

8  work in the program the previous year and they did not

9  think that they would accept another candidate from

10  their office this year, and so they weren't

11  recommending anybody from the Chief Counsel's office to

12  participate in EPP.

13    Q  Did your promotion request come up too?

14    A  Yes it did.

15    Q  And what did they tell you?

16    A  They basically said that -- well, maybe this

17  was -- I'll retract that. Maybe this was the first

18  meeting. I know I talked with Brigham sometime earlier

19  in the end of '03, and he never got back to me on the

20  EPP. So when I met with him the second time, I met

21  with him and Judy Rutledge.

22    Q  That was the February 6th meeting?

Page 52

1    A  That was the February 6th meeting.

2    Q  Okay.

3    A  No. There was a January meeting. That was in

4  January.

5    Q  In your ROI, you primarily focus on a Feb --

6  so there was two meetings with you, that you had with

7  Brigham and Judy. You talk about a February 6th

8  meeting.

9    A  No. I had one meeting with Mr. McCown.

10    Q  Right.

11    A  And then I had a meeting with Brigham and

12  Judy.

13    Q  On February 6th?

14    A  Yes. And then I had a meeting with Judy and

15  Suzanne.

16    Q  Okay. So the meeting with Brigham and Judy

17  was not in January? That was the February 6th meeting?

18    A  I can't -- I'm not exact on the dates. I know

19  that it was around January or February.

20    Q  I see. But you had one meeting with Brigham

21  alone, then in your ROI, you talk about a February 6th

22  meeting with Brigham and Judy. Does that sound right

Page 53

1  to you? You had one meeting with Brigham and Judy?

2     A And I had a second meeting. I had one meeting

3  with Brigham and Judy, and I had a third meeting with

4  Judy and Suzanne.

5     Q Right. Okay. So let's go back to the meeting

6  with Brigham and Judy. You were talking about that

7  one, right?

8     A Yes.

9     Q Okay. You talked about the EPP, the

10  promotion. What did they say about the promotion?

11  What was discussed?

12     A That's when he told me that he thought Suzanne

13  was under the impression that I was -- that I should

14  not be recommended to be promoted to the GS-15 level.

15     Q At that point was there any discussions about

16  what you needed to do to be ready to be promoted to a

17  15?

18     A No.

19     Q Didn't you ask why and what you needed to do

20  to be promoted to a 15?

21     A No.

22     Q Why not?

Page 54

1     A Because I didn't. I thought I should be

2  promoted already. I didn't ask at that meeting.

3     Q At that meeting, did the discussion about the

4  plan that you talk about a lot in your affidavit and

5  complaint, the so-called plan that Judy mentioned, did

6  that first arise in this meeting?

7     A No.

8     Q Are you sure about that?

9     A I'm sure about it.

10     Q So there was no discussion about a plan or

11  anything like that at the February 6th meeting with

12  Brigham and Judy?

13     A Not with Brigham and Judy.

14     Q And there was no discussion at that meeting

15  about any things that you had to do to improve to

16  become more qualified for a 15?

17     A No.

18     Q Okay. So that was a short meeting?

19     A Very short.

20     Q And then on February 10th, you had another

21  meeting with Elaine, Judy and Suzanne. Is that

22  correct?

Page 55

1     A With Suzanne and Judy, yes, I met with them.

2     Q Okay. Let's talk about that meeting. How did

3  that meeting arise?

4     A I think the purpose of that meeting was for

5  Suzanne to clarify some things with Ms. Rutledge.

6     Q What things?

7     A The fact that she never said that I should not

8  be promoted to the GS-15 attorney level, and to discuss

9  with Judy about my participation in the EPP and why

10  they were not recommending me this year to participate

11  in that program.

12     Q Did Suzanne clarify the issue?

13     A I think she tried to?

14     Q What did she say?

15     A She basically said that she at no point ever

16  said that I should not be promoted to the GS-15 level.

17     Q In her affidavit, doesn't she say that she did

18  not recommend you for promotion to the 15?

19     A Not to my knowledge.

20     Q Okay. So during that meeting, your testimony

21  is Suzanne indicated that she believed you should be

22  promoted to a 15?

Page 56

1     A Yes.

2     Q And what did -- did Judy agree with her?

3     A No.

4     Q Did they have a discussion about --

5     A We all had a discussion.

6     Q What did you discuss?

7     A Well, Ms. Rutledge basically said that she

8  wasn't going to sugar coat anything and she was going

9  to call a spade a spade, and I was nothing more than a

10  high level paid GS-14 attorney.

11     Q She said that and Suzanne witnessed her saying

12  that. Is that correct?

13     A Yes.

14     Q Did Judy and Suzanne, or just Judy, did they

15  offer to work with you at that point to work on some

16  areas so you could qualify for a 15?

17     A Ms. Rutledge indicated that while I was close

18  to getting my 15, I wasn't quite there. And she

19  offered to develop a plan for me to get my promotion to

20  the GS-15 level.

21     Q And what did you say to that offer?

22     A I told her that I didn't need a plan. I

Page 57

1  should -- I was already eligible to be a GS-15 attorney
2  based on my experience and based on the projects that I
3  had -- and assignments I had worked on within the
4  office.
5      Q Did Suzanne enumerate areas where you needed
6  to improve at that meeting?
7      A Not to my knowledge.
8      Q Your testimony is -- under oath -- is that
9  Suzanne did not enumerate any areas that you needed to
10  improve your performance?
11      A Not to my knowledge, not at that meeting.
12      Q There wasn't a time where Ms. Rutledge asked
13  you to repeat what Suzanne told you about areas that
14  you needed to improve?
15      A No.
16      Q So how was the meeting left? What did you --
17      A After she told me that she wasn't going to
18  sugar coat anything and the rest of that statement, I
19  ended the meeting. I was upset and I left.
20      Q When Judy said she wasn't going to, quote,
21  "sugar coat," what wasn't she going to sugar coat?
22      A You would have to ask Ms. Rutledge that.

Page 58

1      Q Did she go on to enumerate areas where she
2  thought you needed to improve?
3      A No.
4      Q There was never any discussion at that meeting
5  about any areas?
6      A No. No.
7      Q So that was in February 10th. Did you have
8  any other meetings on these issues with either Suzanne
9  -- did you have a follow-up meeting with Suzanne?
10      A I met with Suzanne around performance time.
11      Q And what did you discuss at that meeting?
12      A We discussed our -- the inability of me to
13  receive my GS-15 and at that time she presented me with
14  this list of things that she and Judy had discussed
15  where basically I could improve on I guess these
16  various aspects. One of them was the way that I
17  interacted with program staff.
18          And at that time I found out that management
19  refused to award me with an Outstanding for my
20  performance during that period. I didn't agree with
21  any of these things on this list and I didn't agree
22  with my performance rating. And that's how that

Page 59

1  meeting ended.
2      Q You didn't agree with any guidance that
3  Suzanne wanted to give you on how to improve your
4  performance?
5      A No, because it had never been mentioned to me
6  before. This only came up after my request to be
7  promoted to the GS-15 level and after I filed a
8  complaint, an EEOC complaint. At no time before this
9  had Ms. Rutledge or Ms. O'Malley ever discussed with me
10  any items where I needed improvement or that I was not
11  performing at the meets and exceeds level or above.
12      Q Well, I'm not talking -- we're not talking
13  here about whether you were performance at the meets or
14  exceed level as a GS-14. We're talking solely about
15  your performance to support a 15.
16      A At no time had Ms. Rutledge or Ms. O'Malley
17  ever talked about any items where I needed improvement
18  to be basically promoted to the GS-15 level, at no
19  time, until after I filed my EEOC complaint.
20      Q Suzanne -- your testimony under oath is that
21  Suzanne never talked to you in any way about areas that
22  you need to improve in in your work performance?

Page 60

1      A No.
2      Q Do you think you have any areas that you need
3  to improve in?
4      A I think everyone has areas where they need to
5  improve.
6      Q Well, I asked if you think you do.
7      A Yes.
8      Q In Ms. O'Malley's affidavit, she says -- do
9  you have your ROI? It's at Tab I, in her affidavit, if
10  you wanted to look at it -- she says, "I've suggested
11  to Ms. Walls should a GS-15 position become available
12  her prospects for favorable consideration could be
13  enhanced by presenting more draft work products that do
14  not require revision," and she goes on and lists a
15  number of things.
16          Is she lying that she has suggested these
17  things to you?
18      A You would have to ask Ms. O'Malley if she's
19  lying or not. She's never mentioned those things to me
20  before I filed my EEOC complaint.
21      Q So your testimony is, it's interesting, that
22  both Mr. Holian in Federal Highway and Ms. O'Malley,

Page 61

1  your first level supervisors, have recommended you for
2  promotion. Is that correct?
3      A  That's correct.
4      Q  And both of them say that they didn't. Isn't
5  that correct, in their affidavit?
6      A  In their ROI they say that they didn't.
7      Q  Why do you think there's this disconnect?
8      A  Because we're involved in EEOC litigation.
9      Q  Is it possible that you could misunderstand
10  your supervisors' attempts to be supportive of your
11  goals to be promoted? Is it possible that you could
12  misunderstand them and believe that they actually said
13  that you should be -- that they would recommend you for
14  promotion?
15      MS. McKINNEY: Objection. I think you're
16  asking her to testify as to someone else's intent and
17  motives.
18      MS. ROSEN: No, I'm not at all. I'm asking
19  whether she could have misunderstood them.
20      THE WITNESS: No.
21      BY MS. ROSEN:
22      Q  Your testimony it's impossible that you could

Page 62

1  have misunderstood them?
2      A  My testimony is that it's impossible that I
3  could have misunderstood them. When an attorney in DOT
4  talks to their managers about a promotion, you do not
5  misunderstand those conversations.
6      Q  Why?
7      A  Because it affects your livelihood. It
8  affects your professional development. Why would I
9  understand what was told to me by my managers?
10      Q  Sometimes people hear what they want to hear.
11      A  No. This is not that time.
12      Q  Let's talk about your nonselection for the
13  assistant chief counsel for enforcement. You contend
14  that you were retaliated against when you were not
15  selected for that position. Is that correct?
16      A  That is correct.
17      Q  So can you explain the bases for your
18  allegations?
19      A  I think I've already explained that. When I
20  went over some of the projects that I've worked on and
21  how I worked on enforcement issues for four years
22  before applying for that position. I had more Motor

Page 63

1  Carrier experience and I had more enforcement
2  experience than Mr. Yonish, and he was chosen for that
3  job.
4      Q  Where did you work on enforcement issues for
5  four years?
6      A  Within my division.
7      Q  Can you tell me -- please identify the
8  enforcement, some of the enforcement matters that you
9  were responsible for during those four years.
10      A  I had to review enforcement memos. I wrote
11  enforcement correspondence. I worked on enforcement
12  regulations. I had to review and help the program
13  office develop those regulations. I helped develop the
14  Part 386 Rules of Practice, MPRM, and numerous other
15  things from time to time. Our division was enforcement
16  and regulatory affairs.
17      Q  Can you name some specific enforcement actions
18  that you were responsible for?
19      A  I named those actions previously.
20      Q  No you didn't.
21      A  Yes I did.
22      Q  Can you repeat them again? I don't recall.

Page 64

1      A  I said I worked on all types of enforcement
2  issues while I was in the division from 2000 to 2004.
3      Q  Well, name some of the cases, the enforcement
4  cases.
5      A  There are cases, and if I worked on particular
6  cases, I can't remember them right now.
7      Q  So you can't identify any specific case,
8  enforcement case that you were responsible for?
9      A  Not specific, no.
10      Q  Wasn't Joe Solomey the primary enforcement
11  trial attorney in that office?
12      A  He was the primary trial attorney, yes.
13      Q  Were you responsible for any investigative
14  actions that were taking place as part of the
15  enforcement work?
16      A  I didn't do the investigative actions, but I
17  worked on investigative issues.
18      Q  Such as?
19      A  Such as anything that came up in the
20  enforcement arena.
21      Q  But you can't identify any specific
22  investigative issues that you worked on?

Page 65

1  A  Not right now, no.

2  Q  **What litigation experience do you have?**

3  A  I've worked as an assistant United States

4  attorney at the Department of Justice.

5  Q  **When was that?**

6  A  That was sometime in the '90s.

7  Q  **For how long?**

8  A  For about six months. For about six months.

9  Q  **That was a detail?**

10  A  That was a detail.

11  Q  **Mm-hmm.**

12  A  I worked in the enforcement division at the

13  former Instate Commerce Commission, handling sometimes

14  administrative hearings and issues arising within that

15  office. I also worked on several enforcement rules

16  while I was in that particular division. And since

17  I've started working at the Department of

18  Transportation, I worked on several enforcement rules

19  while I was employed by Federal Highway Administration.

20  Q  **How is that litigation?**

21  A  It's not really litigation, but litigation was

22  involved in those particular instances.

Page 66

1  Q  **I asked what litigation, actual litigation**

2  **experience you have.**

3  A  Litigation experience is that I've worked on

4  rules involving litigation. I've worked on several

5  cases while I was employed with Federal Motor Carrier

6  Safety Administration in the litigative arena. For

7  instance, the NAFTA EIS litigation and the mandamus

8  litigation.

9  Q  **You weren't the litigation attorney on those**

10  **things?**

11  A  I wasn't the litigation attorney, as we said

12  before, Mr. Joe Solomey. He was the lead attorney in

13  litigation in the enforcement division.

14  Q  **Okay. What management or supervisory**

15  **experience do you have?**

16  A  From time to time when my supervisors are

17  unavailable in the office, I act as the acting chief

18  counsel in whichever division I've been employed.

19  Q  **Anything else?**

20  A  That's it.

21  Q  **Can you identify specifically any other type**

22  **of leadership positions you've had say in the last five**

Page 67

1  years?

2  A  Leadership. I sometimes have been the lead

3  attorney on some of the regulatory development teams

4  that we've had at the agency.

5  Q  **Such as?**

6  A  Such as some of the various rules that I've

7  worked on.

8  Q  **And is that the NAFTA?**

9  A  NAFTA rules.

10  Q  **You were the lead attorney on NAFTA?**

11  A  I was not the lead attorney. But on several

12  regulatory development teams.

13  Q  **You were the lead attorney?**

14  A  Yes.

15  Q  **Such as? Which --**

16  A  Such as, for instance, the certification rule.

17  Q  **You were the lead attorney on the**

18  **certification rule? What did you do as the lead**

19  **attorney?**

20  A  As the lead attorney, I basically give that

21  team advice on legal issues, and I help them to develop

22  all of the regulatory documents that they have to

Page 68

1  produce to basically publish that initial rule, which

2  is a notice of proposed rulemaking, and the final

3  document, the final rule.

4  Q  **What other regulatory and develop team were**

5  **you the lead attorney on?**

6  A  There were several other teams involving

7  enforcement rules. I'm trying to think of one. The

8  rules of practice rulemaking. I assisted --

9  Q  **You were the lead attorney?**

10  A  No. I wasn't the lead attorney. There was no

11  lead attorney. I worked with another attorney on that

12  particular rule. Safety performance history for

13  drivers. I was the lead attorney --

14  Q  **You were the lead attorney?**

15  A  I was the lead attorney on that rule.

16  Q  **-- on safety.**

17  A  And I could name others. That's just a few.

18  That's all I can remember right now.

19  Q  **Any other leadership type activities you've**

20  **been involved in?**

21  A  Yes. I've had to be the lead for my division

22  in the absence of Ms. O'Malley.

Page 69

Q In your current position, do you often have to advise and work with top management?

A Yes I did.

Q Can you give me some examples please?

A From time to time, I have to attend the regulatory development meeting in my supervisor's absence, and I have to report on all of the rulemakings and other documents that are within Chief Counsel's Office at that time and I have to provide them with status reports.

Q Who was holding this meeting?

A Generally it's our regulatory ombudsman, Ms. Sue Halliday, and from time to time, the deputy administrator may be at those meetings, which is Mr. Haine, Warren Haine.

Q Any other times?

A Yes. From time to time, we have to brief the administrator, deputy administrator, or the regulatory ombudsman on some of the rulemaking documents or other issues that are basically assigned to our division.

Q And do you ever on your own go and brief the administrator and deputy administrator?

Page 70

A Not on my own, no. I have briefed the deputy administrator before in a meeting on several other issues, environmental issues as well as paperwork issues.

Q Other than your belief that your qualifications were superior to Mr. Yonish --

A Right.

Q -- what else supports your allegation of discrimination?

A The fact that I've constantly been denied other opportunities for professional development. I was told my Ms. Rutledge that I did a very excellent job in my interview with her and Mr. McCown, yet I was not chosen for that position. Several other individuals were chosen first before they picked Mr. Yonish, so it was obvious that I was discriminated against by their choices for that job.

Q How was it obvious?

A Well, the first individual they chose was a female colleague of mine that works in the field, Ms. Sue Wallace. She had not even applied for that job, yet she was offered the position.

Page 71

Q How do you know she didn't apply for the job?

A Because my colleagues told me that she didn't apply.

Q Who told you?

A Mr. Solomey told me.

Q How did he know?

A I have no idea.

Q So you're basing it on something Mr. Solomey told you?

A Yes.

Q What else supports your contention?

A My experience in the area. My experience dealing with Motor Carrier issues and enforcement issues. My knowledge of the agency and our mission and our function. And my overall experience, legal experience.

Q How did you go about applying for the position?

A When the announcement came out, I basically met the requirements by sending in my resume and desire to --

Q And then did you have an interview?

Page 72

A Yes I did.

Q Who did you interview with?

A I interviewed with Mr. McCown, Ms. Rutledge and Mr. Falk.

Q How many interviews did you have?

A I had one interview.

Q How long was it?

A I really can't remember.

Q What did you discuss in your interview?

A We discussed the position. We talked about my qualifications for the job. And it was basically a normal interview.

Q How did you think the interview went after you finished?

A I thought I did well. Ms. Rutledge told me I had done well as well.

Q Did you tell Ms. O'Malley -- did you talk to Ms. O'Malley about it after the interview?

A Yes I did.

Q Were you positive about it?

A Yes I was.

Q Was there anything in the interview which

Page 73

1 suggested that you were being treated differently from
2 other people under consideration?
3     A In the interview?
4     Q Yes.
5     A Not to -- no.
6     Q So that nothing was said during the interview
7 or subsequently that led you to believe that your
8 nonselection was based upon reprisal or any other type
9 of discrimination?
10     A Not in the interview, no.
11     Q Did anything happen since, other than the
12 nonselection, that has led you to believe that your
13 nonselection was based upon reprisal or any other kind
14 of discrimination?
15     MS. McKINNEY: Objection. That's not really
16 clear. If you can answer it, then --
17     THE WITNESS: I don't understand that. Has
18 anything happened since.
19     BY MS. ROSEN:
20     Q Has anybody said anything to you, or has
21 anything happened since you heard you were not
22 selected, which has led you to believe that your

Page 74

1 nonselection was based upon discrimination?
2     A No one has said anything to me that would lead
3 me to believe that, no.
4     Q What's the basis for your claim that Ms.
5 O'Malley recommended you for an Outstanding for your
6 2003 performance appraisal?
7     A She told me.
8     Q She told you that she recommended you?
9     A Yes.
10     Q When was that?
11     A During the time she came and talked to me
12 about it.
13     Q And what did she tell you?
14     A That Ms. Rutledge wouldn't agree to it.
15     Q You also contend in your affidavit that you
16 said Mr. McCown tried to lower your 2004 individual
17 cash award. What's the basis for that claim?
18     A Most of my colleagues in the office were
19 talking about it because the administrator wanted to
20 talk with management about the awards, and it was told
21 to us that Mr. McCown was trying to lower some of the
22 awards.

Page 75

1     Q So not just yours specifically? He was trying
2 to lower a number of people's awards?
3     A I heard mine specifically.
4     Q Anybody else's?
5     A Not that I know about, no.
6     Q And who told you this?
7     A Just people in the office. I don't remember
8 any specific person.
9     Q Was your individual cash award lowered?
10     A No it wasn't.
11     Q In your amended complaint, amended for
12 retaliation, you say, quote: "Management continues to
13 hinder my professional development in any way they
14 possibly can." What exactly has management done to
15 continue to hinder your professional development?
16     A They have denied my training requests.
17     Q Which training requests?
18     A Numerous ones.
19     Q Can you identify them?
20     A I asked to attend an employment law course,
21 and I was basically denied the opportunity to attend
22 that course. Some of my colleagues were scheduled to

Page 76

1 go to Destin, Florida. We were denied that opportunity
2 to go to Destin, although the same opportunity had been
3 offered to two male attorneys in my office.
4     I've asked for security training, law training
5 that's been offered by several groups, and I was denied
6 that training. So there's just continuous effort on
7 management's part to deny me the opportunity for
8 management training and other law areas I guess of my
9 concern.
10     Q Let's talk about your request for the EEO
11 training. Do you do EEO work?
12     A No I don't.
13     Q Why did you want that training?
14     A Because I wanted to see if I wanted to do
15 legal EEO work.
16     Q Didn't Ms. Rutledge suggest that you might
17 want to cross-chain with a general law office and take
18 on an EEO case?
19     A No. She didn't suggest that I cross-train.
20 That was not her recommendation. Her condition was
21 that I take on some EEOC work. So she didn't have any
22 doubt whether or not I could handle it. But she wanted

Page 77

1 me to take on the additional work as a condition for
2 attending that course.
3     Q She wanted to make sure that there was a
4 reason for you to take the class.
5     MS. MCKINNEY: Objection. That
6 mischaracterizes her testimony.
7     MS. ROSEN: I'll withdraw that.
8     BY MS. ROSEN:
9     Q The Florida training. Isn't it true that that
10 was canceled because of a hurricane?
11     A It was canceled initially because of a
12 hurricane, but we had the opportunity to reschedule,
13 and Ms. Rutledge said that we couldn't reschedule for
14 that course.
15     Q Now didn't two of your colleagues already
16 attend the course?
17     A Yes.
18     Q That was Mr. Falk and Mr. Medalen?
19     A Yes.
20     Q What did they say about the training when they
21 came back?
22     A When they came back, they said that the

Page 78

1 training was not for attorneys in their opinion. It
2 was for support staff.
3     MS. ROSEN: Okay. This was in the ROI. But
4 it's hidden because the ROI is so disorganized. So why
5 don't we mark this as Agency Exhibit 2. It was
6 attached to Ms. Rutledge's affidavit, which is kind of
7 buried in the ROI.
8     (Walls Deposition Exhibit 2 was
9        marked for identification.)
10     BY MS. ROSEN:
11     Q Have you seen this before?
12     A Yes.
13     Q And can you just for the record say what it
14 is?
15     A It's the agenda for the Residential Workshop.
16     Q What does it say? What is the title of it?
17     A The title of it is for the Administrative
18 Support Staff.
19     Q So Residential Workshop for Administrative
20 Support Staff?
21     A Right.
22     Q Can you tell me once you saw this agenda,

Page 79

1 which Falk and Medalen brought back, and they indicated
2 the course really wasn't for attorneys, why would you
3 want to attend it?
4     A Why would I want to attend it? Ms. Rutledge
5 encouraged her staff to sign up for this training. She
6 wanted us to attend it. She knew what was entailed in
7 that agenda, but yet she offered it to everyone to
8 attend, from attorneys down to support staff.
9     Q But once the two attorneys came back and said
10 it wasn't quite what they thought and they saw it was
11 designed for administrative support staff, and they
12 said it wasn't good, why would you want to -- why would
13 you want to attend it?
14     A Because we all knew that it was for
15 administrative support staff because that's the title
16 as it reads. The reason why the travel was basically
17 set forth by Ms. Rutledge was for us to go to boost
18 morale. That was exactly what she said. And if the
19 male attorneys could go, the female attorneys should
20 have been afforded those same opportunities.
21     Q But Ms. Rutledge didn't have the agenda until
22 Medalen and Falk returned. Isn't that right?

Page 80

1     A That's incorrect.
2     Q She had the agenda?
3     A She had the agenda, and she posted it up on
4 the board. And when no one signed up for it in a week
5 or two, she came back and asked Ms. Hodge to send out
6 another e-mail encouraging us to sign up for the
7 training.
8     Q So it's your testimony that it was this actual
9 agenda, not another form that described the training,
10 this agenda was posted?
11     MS. MCKINNEY: Objection. That's not her
12 testimony.
13     MS. ROSEN: Okay. Well, clarify, please.
14     MS. MCKINNEY: She said that that was the --
15 what was posted.
16     MS. ROSEN: Let's clarify.
17     THE WITNESS: What was posted was I guess some
18 booklet or leaflet that Ms. Rutledge had for the
19 training in Destin. It's my understanding that this
20 agenda was also included. It was definitely not on the
21 front of that brochure, but it may have been somewhere
22 inside. Because I have seen the agenda before.

Page 81

```
 1      BY MS. ROSEN:
 2      Q  If your colleagues came back and said that
 3   they didn't -- it wasn't what they thought. It was
 4   designed for administrative support staff. It wasn't
 5   appropriate for attorneys, I'm going to ask you again,
 6   why would you want to go?
 7      A  We all knew that before we basically signed up
 8   for the trip. Ms. Rutledge knew it and we knew it as
 9   well.
10      Q  Is it your testimony -- correct me if I'm
11   wrong -- that your testimony is that you wanted to go
12   to boost your morale?
13      A  You're incorrect. I never said that.
14      Q  Okay. I'm asking why you would want to attend
15   a residential workshop for administrative support
16   staff.
17      A  Because we all knew what the training was
18   about. Even the men knew. They attended it and they
19   knew it was for support staff, so we should have been
20   afforded that same opportunity to attend it as well.
21      Q  So your testimony -- tell me if I'm wrong --
22   your testimony is that you wanted to attend it because
```

Page 82

```
 1   the men got to attend it?
 2      A  No. I wanted to attend it because it was a
 3   training opportunity that was available to all of the
 4   staff. You shouldn't allow some people to go and some
 5   people not to go. Ms. Rutledge knew exactly what the
 6   agenda was for this course before she even agreed to
 7   let us go on the training.
 8      Q  But once you discovered that it was designed
 9   for administrative support staff, why would you want to
10   go?
11      MS. MCKINNEY: Objection. I think that
12   mischaracterizes her testimony. You're stating that
13   she didn't find out about it until after she signed up
14   for it. You can answer the question if you can.
15      THE WITNESS: The training was offered to
16   everybody. If it was just for lawyers, then everybody
17   wouldn't have been able to go, I don't think. Ms.
18   Rutledge knew what the agenda was when she authorized
19   the training.
20      BY MS. ROSEN:
21      Q  I didn't ask about Ms. Rutledge. I'm just
22   asking why you would want to attend this training once
```

Page 83

```
 1   you saw an agenda like this. That's my simple
 2   question.
 3      A  Why would I want to attend? Because we didn't
 4   think it was just for administrative and for
 5   professional staff. We thought there were others --
 6      Q  Once you saw this -- and once you saw this and
 7   Medalen and Falk told everybody that, why wouldn't you
 8   believe them?
 9      A  Because they went. It doesn't matter whether
10   I believed them or not. The training was authorized.
11      Q  So you wanted to go because it was authorized?
12      A  Yes. Why not? If your boss tells you you can
13   go to one of five resort areas for training and then
14   she says I'm putting this up for everybody to boost
15   morale, and then two people can go but the other people
16   can't go, when the female -- women signed up for
17   Destin, we couldn't go. That's not fair.
18      Q  You have family in Florida, don't you?
19      A  Yes I do.
20      Q  Were you plan on visiting your family?
21      A  I visited my family the week before this
22   workshop was planned.
```

Page 84

```
 1      MS. ROSEN: Let's take a short break.
 2      (A brief recess was taken.)
 3      BY MS. ROSEN:
 4      Q  I want to go back a little bit to discuss
 5   guidance that has been provided by Ms. O'Malley and/or
 6   Ms. Rutledge to you in areas to improve to become
 7   eligible for a 15.
 8      And I think you testified that Ms. O'Malley,
 9   the only time Ms. O'Malley actually gave you specific
10   suggestions of where you could improve was in the last
11   performance appraisal meeting. Is that correct?
12      A  Not our last one, but the one that occurred
13   right after I filed my complaint.
14      Q  In all your previous meetings when she's given
15   you a performance appraisal, do you have discussions?
16      A  Yes.
17      Q  And during all those meetings, she's never
18   pointed out areas that you could improve in?
19      A  No.
20      Q  What do you discuss during those meetings?
21      A  We talk about basically my work that I've
22   handled over the last performance period.
```

Page 85

1    We talk about her separate writeups that she's
2 made, because the existing evaluation sheet does not
3 really provide them with an opportunity to explain in
4 detail some of the work that her staff is currently
5 doing in that period.
6    And in those writeups, she basically gives a
7 more in-depth, detailed discussion of the individual
8 attorney's workload and how she thinks they did in that
9 performance period. And at no time did she ever
10 basically discuss with me any of those issues that were
11 presented after I filed my EEO complaint.
12    Q In that February 10th meeting with Ms.
13 O'Malley and Ms. Rutledge that you had.
14    A Yes.
15    Q Was there any discussion by your managers --
16 did they provide you any examples of skills and work
17 patterns that you could change to reach the GS-15
18 standard?
19    A I don't remember, but to my knowledge, no.
20    Q Was there any --
21    A Once Ms. Rutledge said what she said, then as
22 far as I was concerned, the meeting was over.

Page 86

1    Q You ended the meeting immediately after that?
2    A Yes, because I was so upset, I left the
3 meeting.
4    Q Prior to that, did Ms. Rutledge or Ms.
5 O'Malley, did you discuss anything like your analytical
6 skills?
7    A No ma'am. Never.
8    Q And was there ever any discussion in that
9 meeting or any other meeting about improving your
10 communication skills?
11    A No ma'am.
12    Q Your diplomacy?
13    A No ma'am.
14    Q And it's your testimony that neither Ms.
15 Rutledge or Ms. O'Malley encouraged you to identify
16 your goals or offered to work with you to identify your
17 goals?
18    A No ma'am.
19    Q In your complaint you also contend that you
20 were discriminated against in awards and bonuses.
21 What's the basis for that allegation?
22    A The basis for that is just you will see

Page 87

1 through the evidence that I received less in monetary
2 awards and bonuses throughout the office and other
3 incentives than the men in our office.
4    Q Is that your only basis?
5    A That's all I have to base it on, and what they
6 told me.
7    Q And what who told you?
8    A The individual male colleagues within my
9 office.
10    Q What did they tell you?
11    A They told me that sometimes they would receive
12 Outstandings and what they got for that. And also that
13 they received monetary incentives and bonuses.
14    Q And the only reason for a male employee to
15 receive a higher award than you has to be
16 discrimination?
17    A Yes.
18    Q Why is that?
19    A Because we perform some of the similar work,
20 and I perform -- I do projects, work on projects and
21 different cases that are basically of the same
22 difficulty, and I work just as hard as they do

Page 88

1 throughout the office, and I should be commended for my
2 performance in the same manner.
3    Q What was your last performance award?
4    A It was $1,500.
5    Q Wasn't that one of the highest in the office?
6    A It may have been at that time, but it
7 certainly is not the highest that has been awarded in
8 that office, and I think I deserved more for the two-
9 and-a-half years that I worked on that project.
10    Q So the $1,500 wasn't enough?
11    A Not in my opinion.
12    Q Does your EEO complaint also include Equal Pay
13 Act?
14    A Yes it did.
15    Q And what are your bases for claiming that, the
16 Equal Pay Act allegation?
17    A That I received less in monetary awards and
18 bonuses than the male employees in my office, and that
19 some of my younger male attorneys were also either
20 offered or promoted to the GS-15 level and I was not
21 offered those same opportunities.
22    Q Other than Robert Brown, who you believed was

Page 89

1 promoted to a 15 because of a sheet of paper in the
2 ROI, and Mr. Solomey, who was offered a promise of a
3 15, is there anyone else in the office who was promoted
4 to a nonsupervisory GS-15?
5      MS. McKINNEY: Objection to the
6 characterization of these promotions. I think those
7 are issues that are in dispute. You can answer the
8 question, but I don't think that accurately
9 characterizes what my client has said with respect to
10 the promotions of those individuals.
11      BY MS. ROSEN:
12      Q Other than Brown and Solomey, are there any
13 other individuals that you claim have been promoted to
14 a nonsupervisory 15?
15      A There are no other individuals that I'm aware
16 of.
17      Q Isn't it true that the office policy is pretty
18 tough when it comes to promotions?
19      A The office has no policy as far as I know for
20 promoting their attorneys.
21      Q Are attorneys promoted easily in the office or
22 often?

Page 90

1      A The male attorneys are promoted easier than
2 the female attorneys are promoted.
3      Q Who?
4      A Who? The male attorneys who have been
5 promoted.
6      Q Which ones?
7      A Kirk Foster.
8      Q What was he promoted to?
9      A A GS-14. And Rob Brown, GS-15. And the offer
10 to Mr. Solomey at the GS-15 attorney level.
11      Q Now your claim for compensatory damages,
12 you've said in your discovery it's based upon health-
13 related matters?
14      A Yes. I've had some.
15      Q Can you describe those health problems?
16      A Over the last year, based on the amount of
17 stress that I have had to endure by going through this
18 EEOC process, I've injured my foot, fractured my toe,
19 and I've also had numerous hip and back problems.
20      Q How is the injury to your toe related to the
21 compensatory damages?
22      A Well, because of the stress that I've endured,

Page 91

1 I've also had other health problems related to
2 hypertension. And I think all of it is related to how
3 I live and how I react with my family in life, and I
4 think if I did not have this stress, some of these
5 illnesses would not have happened because I would have
6 been able to better take care of myself.
7      Q How did you injure your toe?
8      A I injured my toe on the steps of my home.
9      Q And how did your injure your hip, you said?
10      A It just started hurting.
11      Q And have you had a -- you've seen a doctor?
12      A Yes I have.
13      Q Are there any other health concerns other than
14 your hip and your toe?
15      A Well, my general health, my general health and
16 my general well being. I've experienced a lot of
17 severe pain and distress, anxiety over this whole
18 process, and I think it's all related.
19      Q And have you seen anybody for your anxiety?
20      A I haven't had a chance to.
21      Q You are claiming humiliation and interference
22 with your reputation?

Page 92

1      A Right.
2      Q Can you explain how your reputation has been
3 harmed?
4      A Well, in our profession, the way we are
5 promoted or the way we're recognized by our managers
6 means a lot to the legal profession. And sometimes
7 when you're held up from reaching those goals or
8 achievements, you're looked upon, upon your peers as
9 well as your colleagues, differently. They treat you
10 differently. And I feel like I've basically had to
11 endure this harassment and type of outlook for my
12 colleagues I guess because of this.
13      Q Harassment?
14      A Well, harassment from management as well as I
15 guess my colleagues looking upon me in a different way
16 because I haven't received -- I haven't achieved that
17 GS-15 promotion.
18      Q Can you explain which way your colleagues have
19 been looking upon you?
20      A Well, sometimes they come in the office and
21 they ask for my opinion on various things, but they go
22 back to their supervisor and they want another opinion,

**Page 93**

1 and they come to maybe one of the senior attorneys as
2 if they don't really respect my opinion. So you're
3 looked upon differently by even the program staff.
4    Q And you think that's all because of the fact
5 that you're not a 15?
6    A Yes. Or that you're not recognized for the
7 work that you've achieved. You're looked upon -- when
8 you work in an office and your managers do not respect
9 you or basically turn you down from opportunities, you
10 know, like the EPP, yes, I really believe that that's
11 significant in this instance.
12    Q How has your stress or humiliation and so
13 forth, how has that affected your relations with your
14 family?
15    A Well, my family has seen my experience on the
16 job and what I'm going through in the EEOC process and
17 basically having to be retaliated against by management
18 officials has really affected how I interact with them.
19    They have seen the change. They've seen the
20 change in my mood in terms of how I feel about my job
21 and my work environment. And they're really concerned,
22 and they hope that eventually that all of this will be

**Page 94**

1 concluded.
2    Q Now, other than seeing the doctor for your
3 toe, you have not seen a doctor for any other reason
4 related to your compensatory damages. Is that correct?
5    A No, it's not correct.
6    Q Oh, I'm sorry. Who else have you seen?
7    A I've seen the same doctor for my back pain.
8    Q And your hip?
9    A In my hip and my back, yes.
10    Q What is wrong with your back?
11    A I basically was having back pains and strained
12 it. The doctor gave me certain medication to take for
13 that and I had to stay in the bed for a week.
14    Q How did you strain your back?
15    A I strained my back I guess just basically from
16 my activity, my strenuous activity.
17    Q What strenuous activity?
18    A Strenuous activity at work and home.
19    Q What strenuous activity at work?
20    A Well, I constantly have a heavy workload and
21 due to the stress I think of this case, my health is
22 deteriorating.

**Page 95**

1    Q But I'm trying to understand how that -- what
2 strenuous activity led to your back pain?
3    A Strenuous activity just from involvement in
4 the arena upon which I work, upon the stress that's
5 upon me in the office. I think all of this has
6 contributed to my health problems.
7    Q Do you do heavy lifting in your job to impact
8 your back?
9    A I can at times. I have to lift several things
10 during the day. Some of my case -- cases are heavy.
11 Some of my work material may be heavy.
12    But I just think it's the stress that's been
13 upon me from this whole activity, this whole EEOC
14 atmosphere, the retaliation that I have received among
15 my managers, and the way I'm looked upon, upon my peers
16 and my colleagues.
17    All of that affects your health and your
18 livelihood and your well being. And I just think it's
19 all associated.
20    Q Has the stress you're undergoing affected your
21 ability to perform your job?
22    A No. I've always performed my job. And even

**Page 96**

1 during the time that I was restricted to the bed, I
2 asked my supervisor could I still, you know, work on
3 some of the cases and some of the projects that were
4 assigned to me. And as long as I got my doctor's
5 approval, she said it was okay.
6    Q Are there any other costs that you're claiming
7 as part of your damages claim?
8    A I'm claiming attorney's fees as well as
9 compensatory damages. I think that's it. And anything
10 else that my attorney believes that I should claim
11 during the process.
12    Q I want to go back a little bit to the EPP.
13    A Mm-hmm.
14    Q Are you putting together information to -- for
15 a future nomination?
16    A I am not.
17    Q Why not?
18    A Because I do not believe management would
19 allow me to be nominated for that program.
20    Q Why?
21    A Because they denied me in the past. They've
22 denied me every opportunity for training that I asked

Diversified Reporting Services, Inc. (202) 467-9200

Page 97

1  for.
2    Q  Didn't Ms. Rutledge suggest that you prepare
3  for a future nomination?
4    A  No.
5    Q  But if their reasoning for not allowing -- for
6  not nominating you previously was that Mr. Solomey had
7  just gone the previous year, had just been a
8  participant the previous year, wouldn't that suggest
9  that if you let some time go, you may be able to
10  participate in the future?
11    A  Suggest to who?
12    Q  To you.
13    A  No.
14    Q  Why?
15    A  Because they denied my request for other
16  training. I had no reason to believe that they would
17  ever nominate me.
18    Q  Let me make sure I understand. The other
19  training that they denied was the administrative
20  support staff training in Florida, the EEOC training.
21  Is that correct? Are those two the two trainings that
22  they denied?

Page 98

1    A  That's two of them.
2    Q  And what were the others?
3    A  I asked to attend some security training.
4    Q  And why did they deny that?
5    A  My supervisor told me that Ms. Rutledge
6  thought that these groups were private individuals who
7  were seeking some type of financial gain, and she just
8  didn't believe that she should let us go to those
9  courses.
10    Q  So she thought there was an ethical problem?
11    A  I guess. I believe you'd have to ask her.
12    Q  You had reason to doubt her explanation?
13    A  Yes.
14    Q  Did others in your office go to this training?
15    A  I have no idea. But whatever training they
16  asked to go to was normally approved.
17    Q  Is there any other training that you've been
18  denied?
19    A  There's probably others, but I'd have to think
20  about it.
21    Q  Why didn't you want to take on an EEOC case
22  since you were interested in EEOC training?

Page 99

1    A  Because I had a heavy workload at that time.
2  I was working on environmental procedures for the
3  agency, and I had other regulatory work that I was
4  currently working on. So I couldn't handle the EEOC
5  cases as well.
6    Q  How did you -- would you have time to go
7  attend EEOC training then?
8    A  Attending the training is different from
9  handling an important law case. And she didn't say a
10  case. It could have been cases. And added onto my
11  current workload, I couldn't handle that at that time.
12  But nobody else had these conditions placed on them.
13      So I thought it was unfair to place them on
14  me. All I wanted to do was attend the training to see
15  if I wanted to basically work on employment law cases
16  in the future.
17    Q  Did she allow anyone else who did not do
18  employment law to attend this training?
19    A  I do not know.
20    Q  Can you identify anybody else in your office
21  who attended training that was not related to their
22  work?

Page 100

1    A  I do not know what they attended, unless they
2  would tell me.
3    Q  I want to go back to your conversation with
4  Ms. Rutledge before transferring to Motor Carriers to
5  make sure I understand your testimony. She came to see
6  you after you were identified as coming over to her
7  shop. Is that correct?
8    A  That's correct.
9    Q  So why do you say that she came over to
10  recruit you? Was it actually a recruitment meeting?
11    A  Well, we didn't have to go. We had a right to
12  go, but it was my understanding that we didn't have to.
13    Q  So she actually came over and said I'm coming
14  over to see if you will come to my shop, I want you to
15  come to my shop? She asked you to come to her shop?
16  It wasn't a done deal?
17    A  No, it wasn't a done deal.
18    Q  So you actually would call it a recruitment
19  meeting?
20    A  Yes.
21    Q  Are you aware that under OPM regulations, if
22  you declined to transfer in an official transfer of

Page 101

1  function, the agency could have terminated you?

2  A  No, I'm not aware of that.

3  Q  But your testimony earlier was you think that

4  you had a choice whether to transfer or not because you

5  could have asked Mr. Kussy to stay?

6  A  Yes.

7  Q  Because somebody else did?

8  A  Not because somebody else did.  That's not the

9  only reason.

10  Q  What other reason?

11  A  Because I think if I had asked him to stay, he

12  would have let me stay.

13  Q  But you never did ask him to stay.  Is that

14  right?

15  A  No.

16  Q  Why did you decide to go over to Motor

17  Carriers?

18  A  Because I wanted to go to Motor Carriers.  I

19  had been working on Motor Carrier issues over the last

20  three-and-a-half years since I had been at Federal

21  Highway, and I saw it as a great opportunity for

22  advancement.

Page 102

1  Q  You thought you'd get your 15.  Isn't that

2  right?

3  A  Not only my 15, but they were creating new

4  sections, new divisions.  Who knows what would have

5  happened in Motor Carriers?  It was a new agency.  It

6  was just beginning.  So, you know, I looked at it as a

7  new opportunity to do other things, not just to get my

8  15, but to do other things as well.

9  Q  You continued doing similar work when you went

10  to Federal Highway -- excuse me, when you went to Motor

11  Carriers.  Isn't that right?

12  A  Yes.

13  Q  From what you did at Federal Highway?

14  A  Yes.

15  MS. ROSEN:  I don't think I have any more

16  questions.  I don't know if you want to ask your --

17  MS. McKINNEY:  No, I don't have any redirect.

18  MS. ROSEN:  Okay.  Reading and signing?

19  MS. McKINNEY:  Yes.

20  MS. ROSEN:  You will read?

21  MS. McKINNEY:  Yes, read and sign, yes.

22  MS. ROSEN:  Thank you.  We're off the record.

Page 103

1  (Whereupon, at 11:19 a.m., the deposition of

2  ELAINE WALLS was concluded.)

3  (Signature not waived.)

4  * * * * *

Diversified Reporting Services, Inc. (202) 467-9200