# EXHIBIT 7

Case 1:06-cv-01259-TFH-DAR   Document 17-8   Filed 10/17/2007   Page 1 of 15

UNITED STATES DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
DEPARTMENTAL OFFICE OF CIVIL RIGHTS

AFFIDAVIT

===========================================================================

DISTRICT OF COLUMBIA

CITY OF WASHINGTON
===========================================================================

I, Judith A. Rutledge, make the following statement freely and voluntarily pursuant to the written electronic request of Lisa C. Hetrick who has identified herself as an EEO Investigator for the U.S. Department of Transportation. I understand this statement may be used in evidence, is not confidential, and may be shown to any party who has an official interest in the issues related to Complainant's allegations.

===========================================================================

**Allegation:**
The Complainant, Elaine Walls, is alleging that she was discriminated against based on her race (African American), color (Black), sex (female), age (49, DOB 03-11-55) and reprisal (EEO activity) when: 1) in February 2004, she was denied a promotion to the GS-15 level; 2) management denied her participation into the Executive Potential Program (EPP); 3) she learned that her Caucasian male counterparts received higher performance ratings, awards, and bonuses. 4) on September 14, 2004, she was not selected for the position of Assistant Chief Counsel of Enforcement; and 5) pre-approved training was cancelled for her and two female co-workers while the training for their male counterparts was permitted one month before.
===========================================================================

1.  For the record, please state your race, color, age, sex, position, series and grade and how long you have been with the FMCSA.

**Response:** Caucasian, white, 54, female, Deputy Chief Counsel, SES, 4 years and 10 months.

2.  For the record, please list your chain of command.

**Response:** First level, Chief Counsel Brigham McCown;
Second level, Administrator Annette Sandberg

Page 1 of 14                                              Initials _____

3. For the record, please explain if you have had any prior EEO activity. Also, please identify if the Complainant was a party to or involved in any way in your prior EEO activity.

**Response:** I am not sure what the first statement means. If it is asking whether I have participated in an EEO activity as a complainant, the answer is no. If it is asking whether I have been a witness with information relevant to an EEO activity, the answer is yes. As to the second sentence in #3, the complainant provided an Affidavit in the same EEO activity that I was a witness in.

4. Please identify in what capacity you know or have known the Complainant and for how long.

**Response:** As I recall, I met Ms. Walls in mid-to-late 1996 when we both were transferred to the FHWA from the Interstate Commerce Commission (ICC). It is possible we met before 1996 in the course of our work at the ICC, but I do not recall that we did. I worked in Fort Worth, TX, while she worked in Washington, D.C. so our meeting was unlikely. While at FHWA, Ms. Walls and I were staff attorneys in different Divisions in the Chief Counsel's office. On occasion, we worked on the same rulemaking proceedings. Since October 2000, I have been Ms. Walls's second level supervisor in FMCSA's Office of Chief Counsel. I am the Deputy Chief Counsel, and Ms. Walls is a staff attorney in the Regulatory Affairs Division (formerly the Enforcement and Regulatory Affairs Division).

5. The Complainant states in her complaint that in the early part of 2000, her supervisor, Thomas Holian, recommended her for a promotion. Shortly afterwards, you approached her and asked if her would join you at the newly created FMCSA.

**A. Where you aware that Mr. Holian was putting her in for a promotion? Please explain in detail.**

**Response:** I was aware Mr. Holian was considering Ms. Walls's request to be promoted to a GS-15. To my knowledge, he never recommended her for a promotion. My knowledge is based on a meeting Mr. Holian and I had one day between March and October 1, 2000. Mr. Holian told me that Ms. Walls was requesting a promotion to a GS-15. Because her position was scheduled to be transferred to FMCSA, Mr. Holian wanted to know whether the promotion would create any problems for FMCSA. I told him Ms. Walls would transfer to FMCSA at whatever grade she held when the transfer occurred, so his evaluation of the promotion need not include consideration of its effect on FMCSA. Mr. Holian indicated FHWA had made no decision about promoting Ms. Walls to a GS-15 and that he was gathering information related to her request. I viewed Mr. Holian's inquiry as professional courtesy to the agency Ms. Walls would work for after October 1, 2000. We did not discuss Ms. Walls's qualifications for a GS-15.

Page 2 of 14                                                              Initials ____

**B. Did you approach the Complainant about joining FMCSA? Please explain in detail.**

**Response:** I did not approach her in the sense of recruiting her to join FMCSA. I did discuss the transfer to FMCSA with her after I learned FHWA had identified her position as one that would be transferred. With one exception, FHWA attorneys transferred to FMCSA were identified by the percentage of time spent on motor carrier functions that Congress moved from FHWA to FMCSA. The attorneys who spent over 50% of their time on motor carrier matters were transferred. Ms. Walls fell into this category, as did all other transferred attorneys except Suzanne O'Malley. I specifically recruited Mrs. O'Malley to join FMCSA as the Assistant Chief Counsel of Enforcement and Regulatory Affairs.

**C. Did you indicate or promise her a GS-15 when she joined FMCSA? Please explain in detail.**

**Response:** No, I did not. Before October 2000, Ms. Walls told me FHWA was putting her in for a GS-15 and she wanted to be sure she would keep it when she transferred to FMCSA. I told her FMCSA would honor the GS-15 when she transferred.

It was my understanding that the protocol governing transfer of functions ensured employees would retain their grade and salary. So I told Ms. Walls what I told Mr. Holian, that she would transfer at the grade she held at FHWA at the time of the transfer.

**D. Was the Complainant's promotion discussed at all prior to going to FMCSA or afterwards? Please explain in detail.**

**Response:** Before the transfer to FMCSA, my discussion with Ms. Walls consisted of the information in paragraph C. above. I do not recall other discussions before her transfer. Since Ms. Walls transferred to FMCSA, the only discussions about a GS-15 I recall occurred during February 2004. During a conversation on February 6, 2004, Chief Counsel McCown and I explained to Ms. Walls that no GS-15 position existed in the office and that she needed to enhance her performance to qualify for a GS-15 if one became available. I offered to work with her supervisor (Mrs. O'Malley) and her to identify performance areas that needed development and improvement and to design a plan to enhance her performance in those areas. Ms. Walls declined the offer. On February 10, 2004, I met with Ms. Walls and Mrs. O'Malley to discuss performance expectations for a GS-15 and again offered assistance identifying and addressing areas requiring improvement and development. Ms. Walls never requested the feedback, advice, or assistance regarding her career development that I offered at the February 10 meeting.

Page 3 of 14                                                                                      Initials _[signature]_

E. Please provide a list of GS-15's in your office and identify their race, color, sex and age.

| | Name | Race | Color | Sex | Age |
|---|---|---|---|---|---|
| Response: | Suzanne O'Malley | Caucasian | White | Female | 51 |
| | Mike Falk | Caucasian | White | Male | 56 |
| | Charles Medalen | Caucasian | White | Male | 62 |
| | Marc Rigrodsky | Caucasian | White | Male | 48 |
| | Brian Yonish | Caucasian | White | Male | 46 |
| | Shannon Watson | Caucasian | White | Female | 37 |
| | Charlene Sanders | Caucasian | White | Female | 47 |
| | Steve Farbman | Caucasian | White | Male | 58 |

F. Provide a list of all promotions since January 2001 and identify their race, color, sex and age.

| | | | | | |
|---|---|---|---|---|---|
| Response: | Kirk Foster | Caucasian | White | Male | 44 |
| | Annmarie Ottman | Caucasian | White | Female | 30 |
| | Jackie Cho | Asian | | Female | 30 |
| | Jackie Cambridge | African Am | Black | Female | 45 |
| | Trina Boyce | African Am | Black | Female | 28 |

6. She also states in her complaint that she spoke with Suzanne O'Malley in December 2003 about being nominated as a participant in the EPP. You informed her that she would not be nominated for 2004 because Joe Solomey had been nominated last year. You also advised her to speak with Brigham McCown regarding her interest in the EPP.

**A. What was Ms. O'Malley's opinion of the Complainant being nominated as a participant in the EPP? Please explain in detail.**

Response:    Mrs. O'Malley must provide this information.

**B. Did Ms. O'Malley speak with you about nominating the Complainant? If so, what was the outcome? Please explain in detail.**

Response:    Mrs. O'Malley told me Ms. Walls wanted to be nominated for the program in FY 2004. We discussed the staffing situation in the Enforcement and Regulatory Affairs Division and the strain placed on limited resources when an employee is not available to work full-time on office assignments. Another attorney in the Division was FMCSA's EPP participant in FY 2003 and was required to spend significant time on detail to other agencies and on assignments related to the EPP program. His absence required other attorneys (including Ms. Walls) to pick up the extra work. From this experience, I determined that Counsel's office could not afford to have an

Page 4 of 14                                                                 Initials [signature]

employee in the program each year at its existing staffing level. I also knew the agency would not select its sole EPP participant from Counsel's office in consecutive years. For these reasons, I informed Ms. Walls that Counsel's office would not nominate a candidate for the EPP program in FY 2004. I suggested she prepare for a future nomination by soliciting and handling assignments that demonstrate her leadership qualities and by developing a plan to demonstrate her qualifications for the program. Mrs. O'Malley and I offered to work with Ms. Walls to prepare a plan of action, but she has not accepted the offer.

**C. When you called the Complainant into your office and indicated that MC-CC had already decided they would not recommend her for the EPP in 2004, what justification did you give her? Please explain in detail.**

**Response:** I did not "call the Complainant" into my office. Mrs. O'Malley, Ms. Walls, and I met in my office to discuss Ms. Walls's request. I explained exactly why Counsel's office would not be nominating a candidate for the EPP program in FY 2004. As stated in the response to paragraph B above, an attorney from the office participated in the program in FY 2003. His absence and limited availability created a strain on office resources, particularly those in the Enforcement and Regulatory Affairs Division. Ms. Walls is in the same Division. If Ms. Walls were nominated and selected, the Division would again be short-handed. I did not believe it served the Office or agency's interest to remove another attorney from the workforce in FY 2004 considering the amount of work falling on the Enforcement and Regulatory Affairs Division. I recommended she spend the year preparing for a future nomination, as related in the response to paragraph B. above.

**D. How often are employees nominated for the EPP? Please explain in detail.**

**Response:** The Executive Potential Program (EPP) is open to one FMCSA employee per year. FMCSA's training office solicits nominations annually from all offices. The Office of Chief Counsel has nominated only one candidate since the office was established in October 2000. That nominee was selected in FY 2003 as FMCSA's EPP participant.

**E. Was anyone nominated for 2004 or 2005?**

**Response:** Not by Counsel's office.

7. The Complainant alleges that on February 6, 2004, she met with you and Mr. McCown regarding her opportunity to participate in the EPP, other options for her professional development and her request for a promotion to the GS-15. During this meeting, you informed her that she was almost at the GS-15 level, but you needed to develop a plan to get her there.

Page 5 of 14                                                                                           Initials _____

**A. What sort of plan were you going to develop in order for the Complainant to attain the GS-15 and why? Please explain in detail.**

**Response:** I did not say I needed to develop a plan for Ms. Walls. I said I would help Ms. Walls develop a plan that identifies skills she needs to improve and assignments that provide an opportunity to improve those skills. In my opinion, Ms. Walls has not demonstrated the leadership and performance attributes essential for the GS-15 level. In addition, she has not shown any initiative to push beyond her current level of performance. My offer in February was to help Ms. Walls develop goals and objectives for raising her performance and an action plan to guide her.

I did not tell Ms. Walls if she followed a certain plan she would be promoted to a GS-15. The full performance level for Ms. Walls's position is a GS-14. Counsel's office did not then, and does not now, have a vacant non-supervisory GS-15 position. Without the billet, Counsel's office cannot promote Ms. Walls. Chief Counsel McCown and I explained this situation to Ms. Walls at our February 6 meeting.

**B. Why did you feel that she was almost at the GS-15 level? What does the Complainant need or need to do in order for her to obtain the GS-15? Please explain in detail.**

**Response:** Two things are required for Ms. Walls to obtain a GS-15 in Counsel's office. First, the office must have a vacant GS-15 billet to advertise. Second, Ms. Walls must apply and qualify as the best candidate for the job. At the February 6 meeting, Chief Counsel McCown and I addressed both issues with Ms. Walls. We explained that Counsel's office has no GS-15 billet and, although she performs at a solid GS-14 level, she does not meet GS-15 standards. We encouraged her to develop her skills so she would be prepared when a GS-15 opportunity arises.

In my opinion, Ms. Walls needs to develop several aspects of her performance to reach the performance level required of GS-15s in the office. For example, she needs to expand her knowledge of FMCSA programs and regulations beyond her present familiarity. She needs to develop an awareness of the policy and political considerations related to those programs and apply that information during her review of rules and preparation of documents related to the programs. When receiving an assignment, she needs to improve her ability to identify the key issues and focus her work product on those issues without spending time on minor, insignificant aspects of the subject. She needs to open the lines of communication with our program clients and take the initiative to obtain information and perspectives from them about assignments. Overlaying these improvements, Ms. Walls must develop the ability to produce a final work product that addresses legal, policy, and program considerations and does not require substantial editing by her supervisor.

In summary, Ms. Walls can obtain a GS-15 by proving herself the best qualified if and when a GS-15 position is advertised and filled.

Page 6 of 14                                                                 Initials

C. Has any other employee been put on a plan in order to obtain a GS-15? Please explain in detail.

Response:   No employee in Counsel's office has been promoted to a GS-15 at FMCSA.

D. How did other employees qualify for their GS-15? Please explain in detail.

Response: All non-supervisory GS-15s in the office were GS-15s at FHWA before transferring to FMCSA. I do not know the circumstances under which they qualified for that grade. The four Division Chief positions are graded at the GS-15 level so the incumbents were hired at that level.

8.   The Complainant also alleges that at the meeting Chief Counsel McCown informed her that her immediate supervisor, Suzanne O'Malley, stated that she did not believe that the Complainant was qualified for the promotion.

A. Were you aware of Mrs. O'Malley making this statement? Please explain in detail.

Response:   Yes. Chief Counsel McCown, Mrs. O'Malley, and I met before the February 6 meeting to discuss Ms. Walls's performance. At that meeting, Mrs. O'Malley said she did not believe Ms. Walls's performance met the standards in Counsel's office for a GS-15.

B. Did Mrs. O'Malley ever make this statement or similar statement to you? Please explain in detail.

Response: On various occasions since 2001, Mrs. O'Malley and I have discussed the performance of her staff, including Ms. Walls. Mrs. O'Malley informed me periodically that Ms. Walls had raised the promotion request. We consistently agreed that Ms. Walls's performance did not warrant promotion to a GS-15.

C. Do you know why Ms. O'Malley would have made this statement? Please explain in detail.

Response:   The statement was made in response to a direct question posed to Mrs. O'Malley in a discussion about Ms. Walls's performance and qualifications for a promotion to a GS-15. The circumstances are described in my response to paragraph A. of this question 8.

9.   The Complainant goes on to allege that a second meeting took place on February 10, 2004, between her, Mrs. O'Malley and you. She explains that Mrs. O'Malley continued to support her in her effort to obtain a promotion in the meeting. You denied her request for a promotion and denied her request to be recommended as a candidate for EPP

Page 7 of 14                                                                                                                     Initials _____

program until both you and Mrs. O'Malley had a chance to develop a plan for her to accomplish this.

**My comment on the allegation:** Complainant's allegation presented in the second sentence suggests Mrs. O'Malley and I disagreed about whether Complainant should be promoted. As the questions below give me no opportunity to address the allegation, I note at this point that Mrs. O'Malley and I have always agreed Ms. Walls's performance does not meet office standards for a GS-15. To the extent Complainant is alleging we disagreed on this point, the allegation is not true.

**A. What was your justification for denying the Complainant's request for a promotion to the GS-15? Please explain in detail.**

**Response:** The full performance level for Ms. Walls's staff attorney position is a GS-14. She would like to be promoted to a GS-15. The Office of Chief Counsel does not have a vacant GS-15 staff attorney position. To accommodate Ms. Walls's request, the office would be required to upgrade her position or create a new position. Either action would require resources Counsel's office does not have. Ms. Walls was provided this information by the Chief Counsel and Deputy Chief Counsel during the February 6 meeting.

In addition, Ms. Walls's performance does not demonstrate her qualifications for a GS-15 position. She does not display the initiative, leadership, motivation, and analytical skills required at the GS-15 level. Her interaction with the office clients is passive. She shows no initiative for improving her skills and undertaking new, challenging assignments. She does not produce final products independently. Other necessary performance improvements are identified in the response to question 7 B. above. Overall, she has not demonstrated the ability to accept an assignment, identify the issues, coordinate with client offices, consider policy implications, and produce a final product without oversight, editing, and guidance from her supervisor.

**B. Did you give the Complainant an indication of when these plans were to be put into effect and for how long? Please explain in detail.**

**Response:** As explained in the response to question 7A., there were no plans as described by Complainant.

**C. What kind of plan were you talking about putting the Complainant on to obtain her promotion? Please explain in detail.**

**Response:** As reflected in my response to question 7A., I did not propose to put the Complainant on a plan or to promote her. I suggested we develop a plan that would identify the skills Ms. Walls needs to develop and assignments that would help her develop those skills.

Page 8 of 14                                                                                   Initials *[signature]*

D. What kind of plan were you talking about putting the Complainant on to obtain a recommendation as a candidate for the EPP? Please explain in detail.

Response: As reflected in my response to question 6 B. and C., I did not propose to put the Complainant on a plan. I merely suggested she develop a work plan that identified the criteria applicable to candidate selection in the EPP and assignments she could perform to satisfy that criteria. By using this kind of goal-setting approach, Ms. Walls would have a better chance of being nominated and selected for the EPP program in my opinion.

E. Has any other employee been put on a plan in order for them to attain their GS-15? Please explain in detail and identify their race, color, sex and age.

Response: No employee has been promoted to a GS-15 in Counsel's office.

F. Has any other employee been put on a plan to be eligible and nominated for the EPP? Please explain in detail and identify their race, color sex and age.

Response: No.

G. Did Joseph Solomey have or need a plan to become eligible and nominated for the EPP? Please explain in detail.

Response: Joseph Solomey had already demonstrated his qualifications for the program by the time he was nominated for the 2003 EPP program. His performance had earned recognition throughout DOT. He received the 2002 Lawrence R. Schneider Award for outstanding professional abilities exhibited at DOT. This award is presented by the Secretary of Transportation annually to a DOT lawyer and has equal status with the Secretary's Award for Meritorious Achievement (Silver Medal). Mr. Solomey was nominated as FMCSA Employee of the Year in 2001 for his contribution to FMCSA's enforcement program. He received the Secretary's Team Award in 2001 for his work on the Hazardous Materials Reauthorization Task Force. These awards recognized performance that demonstrated Mr. Solomey's leadership potential, work ethic, and qualifications for the EPP program. Ms. Walls's performance, on the other hand, has not yet reflected the level of leadership and commitment required in an EPP candidate. For that reason, Mrs. O'Malley and I suggested Ms. Walls develop a plan, with our assistance, to demonstrate her qualifications for the program.

10. The Complainant further alleges that on September 14, 2004, she learned that she was not selected for the Assistant Chief Counsel of Enforcement position.

A. Were you the selecting official for this position?

Response: Chief Counsel Brigham McCown and I were the selecting officials.

Page 9 of 14                                                                                     Initials: [signature]

**B. Did you have any input into the selection of this position?**

**Response:**   Yes


**C. What was the justification for the selection? Please explain in detail.**

**Response:**   Our first choice for the position was a GS-14 Trial Attorney in FMCSA's Eastern Service Center. This attorney (female, Caucasian, white, 41) litigates cases involving violations of agency safety regulations and has a background in litigation from private practice. Her knowledge of the enforcement program and regulations, her familiarity with the DOT structure, and her knowledge of agency policies ranked her first among candidates for the position. But she declined the position when we offered it to her.

By interview and experience, Mr. Yonish demonstrated the attributes we desired in the person serving as Assistant Chief Counsel for the Enforcement and Litigation Division (MC-E). (1) The scope of responsibility includes advising top management at FMCSA and DOT about legal and policy implications of actions related to the FMCSA enforcement program. Mr. Yonish has 10 years of experience performing a similar function in the Inspector General's office at the Department of Defense on policies and actions related to DOD programs. As Special Assistant to the General Counsel of the Navy for 3 years, he advised the highest civilian executives and uniformed officials on a variety of legal matters including statutes, regulations, and policies. This experience trained Mr. Yonish to perform the duties required of the Assistant Chief Counsel. (2) As head of MC-E, Mr. Yonish will supervise field attorneys who work daily with investigators to document and prosecute violations of agency safety regulations. As Associate Deputy General Counsel (Inspector General) at DOD, he worked extensively with investigators and understands Counsel's role as an advisor during investigations. He led many teams and task forces to accomplish investigations for the IG and for Congressional committees. This experience demonstrates leadership skill and an ability to work as part of a team. The interpersonal skills and investigative experience will enable him to understand the issues facing field attorneys and advise them on the proper course of action. (3) A significant responsibility for MC-E is representing FMCSA in litigation. Working with DOT's General Counsel and the Department of Justice, Mr. Yonish will be the lead proponent of FMCSA's policy and position on issues raised in litigation. This role requires strong analytical and writing skills, as well as the ability to deliver a complete product under tight deadlines. Mr. Yonish is well-familiar with this role. He performed similar duties as a Litigation Attorney in the U.S. Navy where he assisted DOJ attorneys in litigation before Federal trial and appellate courts. (4) The Assistant Chief Counsel of Enforcement and Litigation must address Congressional inquiries and issues related to FMCSA's enforcement program. This role requires diplomacy in communications with Congressional staff and the ability to prepare cogent responses on technical programs and procedures. During the last 15 years, Mr. Yonish has prepared and reviewed Congressional

correspondence, drafted legislation, and briefed Congressional staff and White House officials on many DOD issues and programs. His experience prepared him well for the duties in MC-E.

This narrative demonstrates how well-qualified Mr. Yonish is for the Assistant Chief Counsel position and why we selected him.

**D. What was the race, color, sex and age of the Selectee?**

**Response:** Caucasian, white, male, age 46.

**E. Are you aware if the Selectee has had prior EEO activity? Please explain in detail.**

**Response:** I do not know.

**F. What knowledge, skill or ability does the Selectee have that the Complainant needed to be selected for this position? Please explain in detail.**

**Response:** Complainant has not demonstrated an ability to gain the confidence of agency leadership or to lead and motivate those around her to perform. She has not demonstrated the analytical ability to extract key issues from information and focus on resolving those issues. As a result, her work requires review and, at times, significant editing to become the product needed for the assignment. Ms. Walls has not shown initiative to interact with staff in program offices to build a partnership and working relationship. Her tendency to remain in her office and communicate by email, instead of walking down the hall and speaking face to face, isolates her from broader exposure to agency business and programs. In general, her work demeanor does not signal an openness to clients who need Counsel's assistance. These comments do not mean Ms. Walls is not courteous and helpful when approached. They simply mean her actions do not demonstrate an interest in leading people and programs or her ability to do so.

11.     The Complainant contends that on September 14, 2004, you and Chief Counsel McCown abruptly cancelled a pre-approved trip to Destin, Florida for training for her and two other female employees. A. What reason was given for the training to be abruptly cancelled? Please explain in detail. B. What was the identical training her two male colleagues attended in New Orleans a month earlier? Please explain in detail. C. Why were the male colleagues allowed to go to their training and the females not? Please explain in detail. D. What is the race, color, and age of her female colleagues? E. What is the race, color, and age of the male colleagues? F. To your knowledge, have any of her colleagues, male or female, had any prior EEO activity? Please explain in detail.

**Response:** The Chief Counsel and I did not cancel the training scheduled in Destin, FL, for September 14-17, 2004. Complainant's training in Destin, FL, was cancelled by the training provider (U.S. Department of Agriculture) because a hurricane caused substantial damage to the conference resort and to Destin, FL. I am informed that notice of the cancellation was provided by phone call to the registrants. The training was rescheduled for October 19-22 but cancelled again by USDA. (See Attachment 1).

This training was advertised on a USDA poster that our Administrative Officer displayed in the office. The course title was "Rejuvenate Your Career," and the poster suggested the course would focus on work and life quality issues. The course was offered in several cities, including New Orleans, LA, and Destin, FL. I told the Division Chiefs that Counsel's office had training money to send employees to the seminar. They relayed the information to office staff, and seven employees registered for the course. Mike Falk (male, Caucasian, white, 56) and Charles Medalen (male, Caucasian, white, 62) elected to attend the course in New Orleans, LA, from July 27-30, 2004. Complainant (female, African American, black, 49), Jackie Cho (female, Asian, 30), Rosemary Dettling (female, Caucasian, white, 39), Dolores Hodge (female, African American, black, 51), and Trina Boyce (female, African American, black, 28) registered for the course in Destin, FL, from September 14-17, 2004.

When Mr. Falk and Mr. Medalen returned from the July course in New Orleans, they provided the disturbing news that this course was designed for Administrative Support Staff. (See Attachment 2). According to their feedback, the course was not worthwhile for attorneys. This information concerned me because the training provided less benefit to the office than originally anticipated. In spite of my reservations, I did not change plans for the registered employees to attend the course in Destin, FL.

When Hurricane Ivan caused USDA to cancel the course, however, I informed the Assistant Chief Counsels that their staff should not reschedule that particular seminar because it offered inadequate value to the agency. I suggested the staff look for other training which was more appropriate for their positions.

In summary, the males attended the course in New Orleans because it was held on schedule in July and was our first exposure to the curriculum. The females would have attended in Destin if USDA had not cancelled the course due to Hurricane Ivan. Once the course was cancelled by USDA for FY 2004, I acted on my judgment that we should spend training funds on courses that provide greater benefit to the employees and agency than this course. In short, I took the opportunity to correct the mistake we made registering anyone for this course.

I know that one employee scheduled to attend the Destin course, Rosemary Dettling, is a party in an EEO activity. I do not know whether other employees scheduled to attend the training have been involved in an EEO activity.

Page 12 of 14                                                                                     Initials _____

12. The Complainant also contends that she learned that her Caucasian male counterparts received higher performance ratings, awards, and bonuses.

A. What was the Complainant's last performance rating?

Response: "Meets Requirements" in FY 2004

B. What were the performance ratings of her male counterparts?

Response: If "male counterparts" means male attorneys in Complainant's Division, they received a rating of "Meets Requirements" just like Complainant.

C. What awards and bonuses were received by the male counterparts?

Response: If "male counterparts" means male attorneys in Complainant's Division, one male received a Quality Step Increase for annual performance and a $750 Special Act award. Another male attorney received a $1,000 performance award and a $1,400 Special Act award.

D. Did the Complainant receive any awards/bonuses?

Response: Yes. She received a $1,500 Special Act cash award.

E. Please identify the ratings of the females in the office and the ratings of the males in the office.

Response: All employees were rated as "Meets Requirements."

**12 E continued:** Also please identify any awards or bonuses given and the race, color, sex and age of the recipients.

### FY 2004 Awards (Annual Performance=PA; Special Act= SA)

Response:

| Name | Race | Color | Sex | Age | Award |
|---|---|---|---|---|---|
| Charles Medalen | Caucasian | White | M | 62 | QSI (PA); $750(SA) |
| Mike Falk | Caucasian | White | M | 56 | $1000 (PA), $1400(SA) |
| Marc Rigrodsky | Caucasian | White | M | 48 | $750 (SA) |
| Steve Farbman | Caucasian | White | M | 58 | $750(SA) |
| Tom Vining | Caucasian | White | M | 57 | $750 (SA) |
| Kirk Foster | Caucasian | White | M | 44 | $500(SA) |
| Bryan Downey | Caucasian | White | M | 34 | $500(SA) |
| Shannon Watson | Caucasian | White | F | 37 | $600(PA) |
| Brenda Brown | African Am | Black | F | 45 | $1000(SA) |
| Suzanne O'Malley | Caucasian | White | F | 51 | $900(SA) |
| Julie Bergling | Caucasian | White | F | 35 | $800(SA) |
| Trina Boyce | African Am | Black | F | 28 | $500(SA) |
| Jackie Chu | Asian | | F | 30 | $800(SA) |
| Rosemary Dettling | Caucasian | White | F | 39 | $500(SA) |
| Elaine Walls | African Am | Black | F | 49 | $1500(SA) |
| Judy Rutledge | Caucasian | White | F | 54 | $2500 (PA) |
| Dolores Hodge | African Am | Black | F | 51 | $500(SA) |
| Suzanne Newhouse | Caucasian | White | F | 27 | $750(SA) |

**13.** Based on the allegations accepted for investigation, do you believe that the Complainant was discriminated against?

**Response:** No, I do not.

**14.** Are there any other comments you would like to make at this time?

**Response:** Not at this time.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the information contained in this Affidavit is true and correct. I also understand that the information I have provided is not to be considered confidential and may be shown to the interested parties in this matter.

Signature: *Judith A. Rutledge*   Date: 12-15-04
Judith A. Rutledge, Affiant

Page 14 of 14                                                    Initials: _JAR_