# EXHIBIT   8
# O'MALLEY PART 1 OF 2

# CONDENSED TRANSCRIPT AND INDEX OF THE TESTIMONY OF
# **SUZANNE O'MALLEY**

**Date:** August 17, 2005**Volume:**1
**Case: ELAINE WALLS v. NORMAN Y. MINETA**

SLR REPORTING
Phone: (301) 340-0042
Fax:  (301) 340-3082
Email:  SLRReprtg@AOL.COM

---

Page 1

1   U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
          WASHINGTON FIELD OFFICE
2
    - - - - - - - - - - - - - -x
3
    ELAINE WALLS,
4
          Complainant,
5
    vs              EEOC No. 100-2005-00093X
6                   Agency No. DOT 2-04-2061
7   NORMAN Y. MINETA, SECRETARY
    DEPARTMENT OF TRANSPORTATION,
8
          Agency.
9
    - - - - - - - - - - - - - - x
10                          Wednesday, August 17, 2005
                            Washington, DC
11
12  DEPOSITION OF:
13       SUZANNE O'MALLEY,
14  called for oral examination by counsel for the
15  Complainant, pursuant to notice and agreement of
16  Counsel, commencing at 10:22, a.m, taken at
17  the law offices of Camilla C. McKinney, 1100
18  Fifteenth Street, Northwest, Washington, DC, before
19  Maureen Donelson, Court Reporter, Notary Public in
20  and for the State of Maryland, when were present on
21  behalf of the respective parties:
22

---

Page 2

1   APPEARANCES:
2        On behalf of the Complainant:
3           CAMILLA C. MCKINNEY, ESQUIRE
4           1100 Fifteenth Street, Northwest,
5           Washington, DC 20005
6           (202) 861-2934
7
8        On behalf of the Agency:
9           DEPARTMENT OF TRANSPORTATION
10          OFFICE OF GENERAL COUNSEL
11          BY:  DEBRA J. ROSEN, ESQUIRE
12          400 7th Street, Southwest
13          Washington, DC  20590
14          (202) 366-9165
15
16  ALSO PRESENT:
17       Elaine Walls, the complainant
18
19
20
21
22

---

Page 3

               I N D E X
1
2   DEPOSITION OF SUZANNE O'MALLEY
3   EXAMINATION BY:                PAGE
4        Ms. McKinney---------    4, 336
5        Ms. Rosen------------     331
6
7        INDEX OF DEPOSITION EXHIBITS
8   EXHIBITS:                PAGE:
9   1 - Agency responses            14
10  2 - Memo dated 1/13/05         121
11  3 - Memo dated 10/17/00        133
12  4 - Performance Appraisal      150
13  5 - Performance Appraisal      157
14  6 - Performance Appraisal      157
15  7 - Motor Carrier document       168
16  8 - Affidavit           258
17  9 - Development goals           290
18  10 - Handwritten notes         293
19  11 - Typed notes               294
20  12 - Handwritten notes         297
21  (Exhibits attached to transcript)
22

---

Page 4

1                P R O C E E D I N G S
2   Whereupon,
3            SUZANNE O'MALLEY,
4   called for examination by counsel for the
5   complainant, and having been duly sworn by the
6   Notary Public, was examined and testified as
7   follows:
8       EXAMINATION BY COUNSEL FOR THE COMPLAINANT
9   BY MS. MCKINNEY:
10       Q.  Good morning, Ms. O'Malley.
11       A.  Good morning.
12       Q.  My name is Camilla McKinney.  As you
13  might be aware, I represent Ms. Elaine Walls in this
14  matter, in this case that she has brought against
15  the Department of Transportation.  I'm going to ask
16  you some questions about her case today and get your
17  sworn deposition testimony.
18       A.  Okay.
19       Q.  For the record, could you please state
20  your name and address?
21       A.  My name is Suzanne O'Malley.  And my
22  address is 3721 Merrimac Trail in Annandale,

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 5

1  Virginia, 22003.
2       Q.  As a preliminary matter, I have to ask
3  you whether or not there is anything that would
4  prevent you from being able to answer the questions
5  I'm about to ask you truthfully?
6       A.  No.
7       Q.  Is there anything that would impact
8  your ability to recall or recollect facts about this
9  case?
10      A.  No.
11      Q.  Are you on any medications or did you
12 ingest any alcohol or anything else that might
13 impair your ability to recall facts?
14      A.  No.
15      Q.  So there is nothing you can think of
16 today that would hinder your ability to give
17 deposition testimony today in this case?
18      A.  Not at all.
19      Q.  You understand that the court reporter
20 has placed you under oath?
21      A.  Yes.
22      Q.  And you understand that you have sworn

Page 6

1  to tell the truth and to give truthful testimony in
2  this case?
3       A.  I do.
4       Q.  You understand that perjury is one of
5  the possible penalties for failure to give truthful
6  deposition testimony?
7       A.  I do.
8       Q.  Please answer all questions verbally,
9  because the court reporter has difficulty taking
10 down nods of the head or nonverbal responses such as
11 um-hum or un-unh or something along those lines.
12 Okay?
13      A.  All right.
14      Q.  If you don't understand a question,
15 just let me know.  It's important that you
16 understand the questions I'm about to ask you,
17 because the reader of the transcript will assume
18 that you understood the question and answered it
19 appropriately.
20      A.  All right.
21      Q.  So just ask me to restate the question
22 if you have any problems understanding it.

Page 7

1       A.  All right.
2       Q.  If you need to take a break at any
3  time, just let me know.
4       A.  All right.
5       Q.  Have you been deposed previously in
6  any other cases?
7       A.  No, I haven't.
8       Q.  Is this your first deposition?
9       A.  Yes, it is.
10      Q.  Where are you currently employed?
11      A.  The Federal Motor Carrier Safety
12 Administration, office of chief counsel.
13      Q.  What is your position there?
14      A.  I am the assistant chief counsel for
15 regulatory affairs.
16      Q.  How long have you had that position?
17      A.  Since October of 2000.
18      Q.  What did you do prior to October of
19 2000?
20      A.  Prior to that I was an attorney in the
21 Federal Highway Administration's office of chief
22 counsel in their regulations and legislation

Page 8

1  division.
2       Q.  What was your position then?
3       A.  I was a staff attorney.
4       Q.  Currently in your position as
5  assistant chief counsel for regulatory affairs, what
6  is your GS level?
7       A.  Fifteen.
8       Q.  When did you obtain a GS-15?
9       A.  For the first time, in 1987.  At that
10 time I was working with the Interstate Commerce
11 Commission.
12      Q.  So when you were a staff attorney at
13 the Federal Motor Carrier, you were a GS-15?
14      A.  No.  I was a staff attorney at Federal
15 Highway Administration, which was the predecessor
16 agency to Federal Motor Carrier.
17      Q.  And you were a GS-15?
18      A.  Yes.
19      Q.  How long were you in the position as
20 staff attorney?
21      A.  I had been -- you know, I can't
22 honestly remember when I started in that position.

2 (Pages 5 to 8)

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 9

1   I came to the Department of Transportation Federal
2   Highways in April of 1996.
3           Originally I was not part of the
4   Office of Chief Counsel. And sometime in either
5   late '96 or 1997, I was transferred to the office of
6   chief counsel. I can't recall the exact month or
7   even the exact year, but I transferred from a
8   program office in Federal Highway Administration to
9   the chief counsel's Office.
10      Q.   What program office did you transfer
11  from?
12      A.   Office of Motor Carriers.
13      Q.   You said that was sometime in 1996 or
14  '97?
15      A.   Right. I started at the office of
16  Motor Carriers in April of '96. And it was an
17  attorney but it was located in the program office.
18  And then subsequently I was transferred to the
19  office of chief counsel in a structural change, but
20  I can't recall exactly when that realignment
21  occurred. I can check on that and let you know.
22      Q.   How long were you in the program

Page 10

1   office?
2       A.   That's what I can't recall. It
3   started in April of 1996.
4       Q.   So it was a short period of time?
5       A.   It was a brief period of time. I
6   would say around six months to a year.
7       Q.   What did you do prior to that?
8       A.   I was at the Interstate Commerce
9   Commission. Immediately prior to moving to Federal
10  Highways, I worked in the office of ombudsman at the
11  Interstate Commerce Commission as an attorney.
12      Q.   You were in the office of ombudsman.
13  Do you hold any other positions at ICC?
14      A.   Yes. Prior to the office of
15  ombudsman's position, I was in the office of
16  proceedings. I was a branch chief. And prior to
17  that I was a staff attorney in the office of
18  proceedings.
19      Q.   Did you discuss your appearance at the
20  deposition today with anyone?
21      A.   Yes.
22      Q.   Who?

Page 11

1       A.   I discussed with Debra Rosen from the
2   office of chief counsel. We met yesterday to talk
3   about the deposition, and she briefed me on what was
4   likely to occur, how the deposition would run.
5           I previously to that discussed with
6   Judith Rutledge in the office of chief counsel, who
7   is my immediate supervisor, the fact that I would be
8   deposed today, discussed with her materials that I
9   was providing to Debra Rosen in preparation for the
10  deposition.
11      Q.   Anyone else? Did you discuss with
12  anyone else the deposition today?
13      A.   I have advised everyone in my division
14  that I would be away giving a deposition so that
15  they would know my whereaabouts. I advised in a
16  staff meeting in the office of chief counsel for
17  division chiefs yesterday that I would be away
18  giving a deposition.
19          I didn't discuss the nature of the
20  deposition or the facts involved, but I did tell
21  them my whereabouts.
22      Q.   Did you review any documents in

Page 12

1   preparation for your deposition testimony?
2       A.   Yes.
3       Q.   What documents did you review?
4       A.   I reread the interrogatories,
5   responses to the interrogatories that we had
6   submitted. I looked at materials that I had
7   provided in response to the request for documents
8   from complainant. I reviewed performance appraisal
9   documents that I provided to the complainant over
10  the years while she's been in my division.
11          And I believe I reviewed -- I'm not
12  actually sure what the document was called, but it
13  was complainant's response to --
14          MS. ROSEN: It was something from ROI.
15          THE WITNESS: Yes, it was something
16  from the ROI where the complainant had provided
17  responses to some of the information that the agency
18  had provided. So I reread all of those over the
19  last couple of days.
20          BY MS. MCKINNEY: (RESUMED)
21      Q.   It was part of the report of
22  investigation?

SLR REPORTING
(301) 340-0042

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 13

1    A.  Yes.
2        Q.  And it was not something that was done
3    recently in connection with the Equal Employment
4    Opportunity case?
5        A.  I don't believe so.  It didn't have --
6    the copy I had didn't have a date on it, but it
7    appeared that it was responses that the complainant
8    had prepared to respond to materials that had been
9    prepared during the investigation.
10       Q.  Do you know whether or not it was her
11   affidavit that she submitted in the EEO case?
12       A.  No.  It might have been the same
13   information, but it didn't appear to be an
14   affidavit.  It was just responses.
15           MR. ROSEN:  It was a supplemental
16   affidavit.  It was part of the ROI.
17           BY MS. MCKINNEY:  (RESUMED)
18       Q.  Any other documents?
19       A.  Not that I can recall.
20       Q.  I would like this marked as Exhibit
21   No. 1.
22           (Document marked Exhibit No. 1)

Page 14

1        Q.  I just had the court reporter mark as
2    Deposition Exhibit No. 1 the agency's response to
3    complainant's interrogatories.
4            I would like you to look at that
5    document and let me know if that was one of the
6    documents you reviewed in preparation for your
7    deposition today?
8        A.  Yes, it is.
9        Q.  These interrogatories, and we can take
10   this up outside, are not signed.  They are not
11   verified by anyone in your agency.
12           MS. ROSEN:  They are signed by me.
13           MS. MCKINNEY:  Right.  An attorney
14   can't sign verification.
15           MS. ROSEN:  That's how I always do it
16   in the EEO complaint.  I can get you something else
17   if you want.
18           BY MS. MCKINNEY:  (RESUMED)
19       Q.  Are there any particular interrogatory
20   responses that you provided answers for?
21       A.  Yes.
22       Q.  Which ones?

Page 15

1        A.  All of these were collaborative, but I
2    assisted in providing responses to No. 1, No. 2,
3    Nos. 3, 4, 5 and 6, No. 7, No. 8, No. 9, No. 10,
4    No. 11, No. 20.  That's all.  Through No. 20.
5        Q.  You said this was a collaborative
6    effort.  Who else was involved?
7        A.  Deputy chief counsel Judy Rutledge in
8    terms of preparing our initial response, and then we
9    worked with Debra to provide the materials,
10   Debra Rosen.
11       Q.  Was McCowan involved?
12       A.  If he was involved, he didn't work
13   with me.  He may have consulted with Ms. Rutledge or
14   she may have conferred with him, but I haven't
15   spoken with him about these.
16       Q.  You mentioned earlier that you went
17   from the Federal Highway Administration to Federal
18   Motor Carrier; is that correct?
19       A.  Yes.
20       Q.  How did that come about?
21       A.  The Federal Highway Administration's
22   Office of Motor Carriers became the predecessor to

Page 16

1    the Federal Motor Carrier Safety Administration in
2    legislation that was enacted in 1999, the Motor
3    Carrier Safety Improvement Act.  The Federal Motor
4    Carrier Safety Administration was created.
5            And the functions that were part of
6    the Office of Motor Carriers, and some of the
7    functions in the office of chief counsel in the
8    Federal Highway Administration that related to Motor
9    Carrier work, were moved into the new organization
10   that became Federal Motor Carrier Safety.
11       Q.  And is that why you transferred over?
12       A.  Yes.
13       Q.  Did you want to transfer to the new
14   agency?
15       A.  I did.  It was in keeping with my
16   background in Motor Carriers, and it was an
17   opportunity in my case to have an assistant chief
18   counsel's position.
19       Q.  This was not going to be a promotion
20   for you, was it?
21       A.  No, it wasn't a promotion.  I was
22   already a grade 15, but it was a supervisory

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 17

1  position.
2       Q.  Prior to that time, did you hold a
3  supervisor position?
4       A.  Not immediately prior.  My position in
5  Federal Highway Administration was not supervisory,
6  but I had previously been a supervisor at the
7  Interstate Commerce Commission.
8       Q.  While you were with Federal Highway,
9  were you not a supervisor?
10      A.  Correct.
11      Q.  You did not regain that until they
12 changed over the functions?
13      A.  Correct.
14      Q.  Did you have a choice to transfer to
15 the new agency?
16      A.  I believe I did.  Some employees were
17 -- as I recall how the process worked, some
18 employees were identified as positions that would
19 definitely transfer from the Office of Motor
20 Carriers or the office of chief counsel to the new
21 organization.
22          I was not specifically named as one of

Page 18

1  the individuals who would transfer, but we were
2  advised in the office of chief counsel when it was
3  still part of Federal Highways, that if we were
4  interested in transferring we should make our
5  interests known, and that would be considered when
6  the final structure was created and decisions were
7  made who would move.
8          So I indicated to Edward Kussy, who
9  was the deputy chief counsel at Federal Highway
10 Administration, that I was interested in
11 transferring.
12      Q.  Why was your position not identified?
13      A.  I truly can't recall, or maybe never
14 knew exactly what kind of structural decisions were
15 being made.  I believe it had to do with an
16 assessment on the part of the management of the
17 office of chief counsel at FHWA what proportion of
18 time was spent in various offices working on motor
19 carrier issues as opposed to other issues that were
20 Federal Highway matters that would not be
21 transferring.
22          Once that assessment was made, as I

Page 19

1  understand it, numbers were called in terms of how
2  many attorneys specifically would move to Federal
3  Motor Carrier Safety; in other words, what
4  proportion of the workload would merit transfer of
5  those attorneys to continue handling motor carrier
6  functions.
7          I was working in a division of the
8  chief counsel's office in Federal Highways that
9  handled both motor carrier issues and other Federal
10 Highway matters.  And I wasn't part of the decision
11 making process, but we were advised -- staff
12 attorneys were advised at the time that once the
13 decision was made what proportion of the workload
14 involved motor carrier issues and would therefore
15 transfer to FMCSA, then decisions would be made
16 about which individuals were in those positions that
17 were identified as "motor carrier positions".
18      Q.  How much of your time was spent on
19 motor carrier issues?  Was it more than 50 percent
20 or less?
21      A.  I would have to say it was probably
22 right at the 50 percent level.  I spent a lot of

Page 20

1  time reviewing regulations and working with other
2  motor carrier program issues, but primarily I was in
3  a regulatory review area where we were also working
4  with all the other Federal Highway issues, whether
5  they be grant making, construction, and other
6  matters that were the primary issues that Federal
7  Highways was involved with.
8          So I would say certainly not more than
9  50 percent, but it would be hard at this point to
10 give you a more precise estimate than that.
11      Q.  But you believe you probably did at
12 least 50 percent in motor carrier work at that time?
13      A.  I would say not more than 50 percent.
14 I don't know if I would want to say at least,
15 because it fluctuated.  I think as the entirety,
16 maybe close to 50 percent would be the most I would
17 want to feel comfortable saying at this point.
18      Q.  Do you know of any attorneys who did
19 50 percent motor carrier work but were not
20 transferred over to the new agency?
21      A.  I believe there were some attorneys in
22 what was called the motor carrier law division of

SLR REPORTING
(301) 340-0042

Page 21

1   the office of chief counsel who by definition in the
2   motor carrier law division were handling motor
3   carrier law issues, but were retained at Federal
4   Highway because a decision was made that some of the
5   issues they worked on I guess best translated into
6   continuing Federal Highway work.
7          The only attorney I can think of by
8   name who was in that division who I believe stayed
9   in Federal Highway was Ray Kapril.
10      Q.   Can you think of any other attorneys
11  that did not transfer to the new agency?
12      A.   Any attorneys at all or any attorneys
13  who did motor carrier work?
14      Q.   Any attorneys at all who did not
15  transfer.
16      A.   Sure.  Let's see, there was Grace
17  Reedy.
18      Q.   Did she do motor carrier work?
19      A.   I don't know.  She wasn't in the motor
20  carrier law division, nor was she in my division.  I
21  mean, I can name a number of them, but of people who
22  did motor carrier work, the only one I can

Page 22

1   specifically think of is Ray Kapril.
2          There were a number of divisions of
3   attorneys in Federal Highway who stayed as part of
4   the Federal Highway chief counsel structure.  All of
5   the attorneys in the environmental division there,
6   all of the attorneys who handled financial and
7   planning issues, they were all part of other
8   divisions who were more closely aligned with the
9   rest of what Federal Highways did, not the motor
10  carrier piece.
11      Q.   So the only attorney who did motor
12  carrier work that you can recall is Ray Kapril?
13      A.   The only attorney who stayed, who had
14  been in the motor carrier law division, yes, was
15  Ray.
16      Q.   Was there someone else other than Ray
17  Kapril who stayed but you just can't recall that
18  individual's name or individuals?
19      A.   No, I can't recall any other attorneys
20  in motor carrier law who didn't transfer except for
21  Ray.  There may have been others.  That wasn't my
22  division.  But the ones I can think of either all

Page 23

1   transferred to FMCSA or Ray stayed behind as part of
2   the Federal Highway structure.
3      Q.   When did you first meet Ms. Walls?
4      A.   I believe it was 1980 or '81 at the
5   Interstate Commerce Commission.
6      Q.   Did you know her when you were at
7   Federal Highway?
8      A.   Yes.
9      Q.   How did you know Elaine at Federal
10  Highway?
11      A.   We both actually started working at
12  Federal Highway I think the same week, or possibly
13  even the same day, in April of 1996.  We were both
14  former employees of the Interstate Commerce
15  Commission who had been transferred into or renewed
16  our federal service respectively at Federal
17  Highways.
18          I was actually transferred from the
19  Interstate Commerce Commission as part of the
20  transition team onto Federal Highway Administration.
21  Elaine had been riffed from the Interstate Commerce
22  Commission and was reemployed, as I recall, at

Page 24

1   Federal Highways, but we both started within the
2   same week and were working in the same motor carrier
3   program area.  And then subsequently we both moved
4   to the office of chief counsel in Federal Highways.
5      Q.   You said you were not riffed, you were
6   transferred over?
7      A.   Yes.  Technically on paper I had been
8   riffed, but I was part of a transition team.  So
9   while I was part of the riff when the ICC was
10  terminated, my actual employment hadn't ceased yet
11  because I was moved into a transitional work force
12  that was part of the Interstate Commerce
13  Commission's effort to move functions to the
14  Department of Transportation.
15          So I continued in employment after
16  January first of 1996 at the ICC until April of 1996
17  when I was then moved into the Department of
18  Transportation, and I believe also translated into
19  changing my status from permanent federal employment
20  to temporary federal employment at the Department of
21  Transportation.
22      Q.   At any time prior to you moving over

Page 25

1 to the new agency, Federal Motor Carriers, did you
2 supervise Ms. Walls?
3     A.   Prior to moving over to FMCSA, no.
4     Q.   At the time you moved over, did you
5 have any supervisory authority over Ms. Walls?
6     A.   Yes.  When we moved to FMCSA, I was
7 designated as assistant chief counsel for what was
8 then the regulations and enforcement division.  And
9 Ms. Walls was an attorney in that division.
10     Q.   During the transfer of functions from
11 the Federal Highway to the new agency, were any
12 attorneys told that they would lose their jobs if
13 they did not go to the new agency?
14     A.   I can't recall that anyone was told
15 that.  And I don't know what the implications were
16 of refusing that sort of an assignment.  I don't
17 know that anyone was in that position.  So I can't
18 recall being told that or having anyone told that.
19 But I couldn't say it wasn't the case.  I really
20 don't know, because I wasn't in that position
21 myself.
22     Q.   Do you know whether it was voluntary

Page 26

1 or involuntary to move over to the new agency?
2     A.   I don't know for a fact.  My
3 impression was if your position was designated as
4 one that would move, it was something that was
5 involuntary.  If you were one of those, as in my
6 position, who wanted to volunteer to go, it was
7 something where you could make your interests known.
8        And while the transfer to the new
9 agency wasn't guaranteed, it was something that the
10 leadership at FHWA had said they would consider.  So
11 in that case I would say those were voluntary
12 positions.  The others I am assuming were
13 involuntary.  But since I wasn't in that position, I
14 don't know for a fact.
15     Q.   Who is Mr. Thomas Holian?
16     A.   Thomas Holian is the assistant chief
17 counsel for regulation and legislation in the
18 Federal Highway Administration's office of chief
19 counsel.  He was my supervisor prior to my moving to
20 FMCSA.
21     Q.   Did you ever have any discussions with
22 him or are you aware of any conversations that he

Page 27

1 had concerning promotion of Ms. Walls to a GS-15?
2     A.   I never had any discussios with Thomas
3 Holian about that, but I have had discussions with
4 Ms. Walls where she advised me that she had
5 discussed that with him.
6     Q.   What about Mr. Kussy, you mentioned
7 him earlier in your testimony, did you have any
8 discussions with Mr. Kussy about Ms. Walls being
9 promoted?
10     A.   No.
11     Q.   You said that Ms. Elaine Walls did
12 inform you of that; is that correct?
13     A.   She informed me of talking to Thomas
14 Holian.  I can't recall that she mentioned talking
15 to Ed Kussy.  It would have been logical that
16 conversation took place, but I only remember talking
17 to her about discussions with our immediate
18 supervisor, who was Tom Holian.
19     Q.   Do you recall when you had this
20 conversation with her?  Was that shortly after the
21 transfer?
22     A.   My recollection is we talked about it

Page 28

1 both before and after the transfer, that she had
2 informed me that she wanted to be promoted to a 15,
3 and that she would discuss that with Mr. Holian and
4 had discussed it with him.
5        I know for a fact that we also
6 discussed it after the transfer to FMCSA, because at
7 that point she was an attorney in my division.  And
8 she was advising me about prior discussions that had
9 occurred in the Federal Highway Administration when
10 she had spoken with Mr. Holian.
11     Q.   But you yourself never had any
12 discussions with Holian about that, particularly
13 when you became her supervisor?
14     A.   About Elaine's promotion to a 15?
15     Q.   Yes.
16     A.   No.
17     Q.   Do you have any reason to disbelieve
18 that such a conversation took place between Elaine
19 and Mr. Holian?
20     A.   No.
21     MS. ROSEN:  I object.  What
22 conversation?

Page 29

1     MS. MCKINNEY: The conversation we've
2  just been talking about with respect --
3     MS. ROSEN: You've been talking about
4  a number of conversations.
5     MS. MCKINNEY: I'll restate it.
6     BY MS. MCKINNEY: (RESUMED)
7     Q.  Did you have any reason to disbelieve
8  Ms. Walls when she told you she had conversations
9  with Mr. Holian concerning a promotion to GS-15?
10    A.  No.
11    Q.  Other than Ms. Walls, how many
12 employees did you supervise once you were
13 transferred over?
14    A.  I believe initially I supervised four
15 including Ms. Walls.
16    Q.  Has that changed?
17    A.  Yes.
18    Q.  When did it change?  Was this during a
19 reorganization?
20    A.  In part during a reorganization.  Some
21 of the employees -- well, we added employees as a
22 result of new hires after we were initially formed.

Page 30

1  I had four employees initially.
2          We hired additional employees, which
3  expanded the number I supervised.  And then there
4  was a reorganization which split off the enforcement
5  part of my division that was created as a separate
6  division of enforcement within the office of chief
7  counsel.
8          So the attorneys in my division who
9  were handling primarily enforcement matters were
10 transferred.  So that decreased the number.  \
11         And then subsequently to that, we have
12 hired new attorneys in the regulatory affairs
13 division.  So the numbers fluctuated over time both
14 for reasons of reorganization and rehiring, as well
15 as one attorney who has subsequently moved to
16 another position in another agency.  We we've had
17 ebb and flow.
18    Q.  Can you tell me about this
19 reorganization that you just mentioned.  You said
20 that there was a split of the enforcement part?
21    A.  Correct.
22    Q.  How did this reorganization come

Page 31

1  about?
2     A.  Over a period of time, when our
3  division, which was originally enforcement and
4  regulatory affairs, was established, I had had
5  discussions with Judith Rutledge about the
6  advantages and disadvantages of perhaps creating
7  enforcement into its own and separate division.
8          It seemed to me as we grew as an
9  office and as our responsibilities grew, that
10 enforcement and regulations were both very essential
11 parts of the office, and they really were both being
12 done a disservice if they were combined in the same
13 division.
14         We had originally organized the office
15 that way because the expectation was that
16 regulations would be a primary focus when the
17 organization was new, and that over time they would
18 become less of a demand on our resources.
19         That turned out not to be the case.
20 Once we established a regulatory structure for
21 FMCSA, it wasn't a finite process.  We learned that
22 regulations were always going to be a controlling

Page 32

1  interest in our division.  And as as result,
2  enforcement issues were unintentionally and very
3  unwisely needing to sort of take a back seat to
4  regulatory crises that developed.
5          And my recommendation to Ms. Rutledge
6  over a period of time had been that I thought the
7  office could operate more efficiently, and that both
8  regulations and enforcement could get the attention
9  they deserved if they were each dedicated to their
10 own division and had a deputy or an assistant chief
11 counsel responsible for each respective area.
12         We had talked about that as a matter
13 of organizational structure over a number of months,
14 if not years.
15         When Brigham McCowan became FMCSA's
16 first chief counsel, political chief counsel, and
17 arrived in July of 2003, he also had discussions
18 with me about the structure of the office and
19 recommendations that I had made in the past about
20 reorganizing it, and he was very receptive to that
21 and indicated that he had a particular interest in
22 enforcement and didn't want enforcement to be in any

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 33

1  way overshadowed or taking a back seat to regulatory
2  affairs.  And he understood the logic of separating
3  the two.
4       So it was something that had been
5  discussed with both the deputy chief counsel and the
6  chief counsel over a period of time.  And I believe
7  it was in late 2003 or early 2004 that Mr. McCowan
8  and Ms. Rutledge informed me that they were
9  seriously considering spining off enforcement into
10  itw own division.
11       And I can't pinpoint a date in which
12  that determination was finally made, but it was
13  during the late 2003, early 2004 time frame, as I
14  recall.
15       Q.  How did these discussions initially
16  arise with Ms. Rutledge?  How did that arise?
17  Before McCowan came, how did that come up?
18       A.  In the deputy chief counsel, assistant
19  chief counsel modes, we would have discussions about
20  office structure.  Because we were a new office, we
21  would periodically have touch base meetings where
22  she would confer with me and also with my assistant

Page 34

1  chief counsel counterpart in general law, which were
2  the two divisions at the time, in the structure.
3       And we would talk about how the
4  organization was working, what structural changes
5  might be merited in order to make things work
6  better, what kind of implications changes like that
7  would have for the office structure.
8       And periodically, I would say at least
9  on a quarterly basis, and maybe more frequently, she
10  would have regular discussions with us about all
11  sorts of resource needs, staffing implications,
12  structural implications for the office.
13       It was the kind of conversations that
14  occur when you have a new office and you're trying
15  to determine if things are being done properly or if
16  things could be done better.
17       Q.  And then McCowan joined as chief
18  counsel?
19       A.  Yes.
20       Q.  What changed with respect to those
21  conversations when he came on board?  Did it become
22  a more serious conversation?

Page 35

1       A.  I wouldn't say they became more
2  serious.  I think in view of the fact that he was
3  not only new to our office but completely new to the
4  Department of Transportation, he had a strong
5  interest in learning from existing staff how the
6  office functioned, what we thought we could do
7  smarter or better.
8       So his focus was on all sorts of
9  recommendations that had to do with office
10  organization and office processes.
11       And because I had already had this
12  sort of discussion with Ms. Rutledge on a periodic
13  basis, it was a natural outgrowth of those
14  discussions to pass along to him, that this was
15  something that we had had under consideration for
16  quite some time.
17       It was something that he was
18  particularly interested in because he personally had
19  a very strong interest in enforcement, and thought
20  that the enforcement mission of the agency and
21  counsel's part of the enforcement mission shouldn't
22  be understated.

Page 36

1       So he was particularly receptive to
2  and interested in recommendations that had to do
3  with elevating the enforcement function of our
4  office.
5       Q.  Did you make a recommendation?  For
6  example, did you make a written recommendation or
7  were these just oral?
8       A.  No.  They were very informal
9  discussions.  And none of them were uniquely focused
10  on that one issue about reorganizing to split off
11  enforcement and regulations.  All of the
12  conversations were pretty much exploratory in
13  nature.  They came up in the way of brainstorming,
14  suggestions of what we might consider.
15       Q.  So you never wrote any kind of
16  documentation or recommendations concerning the
17  reorganization that eventually occurred?
18       A.  Not that I can recall.  There were a
19  couple of occasions when Mr. McCowan was new when he
20  asked the division chiefs to present to him ideas.
21  And it's very possible that I might have included
22  that in a bulleted list of suggestions that I wanted

ELAINE WALLS                                                     SUZANNE O'MALLEY
VS. NORMAN Y. MINETA                                             AUGUST 17, 2005

Page 37

1    to discuss with him, but I never elevated it to any
2    sort of a written formal recommendation or
3    memorandum or anything of that sort.
4         Q.  Who was ultimately responsible for the
5    reorganization?
6         A.  For making the decision to reorganize?
7         Q.  Yes.  Who ultimately made that
8    decision?
9         A.  I would assume it was Mr. McCowan in
10   his capacity as chief counsel.  I know when I was
11   informed that the reorganization was to take place,
12   I hadn't been further consulted or part of any
13   advisory discussions in that regard.
14        I simply heard -- and I can't recall
15   whether I heard it directly from Mr. McCowan or
16   directly from Ms. Rutledge, but I was advised that
17   the decision had been made.  And in his capacity as
18   chief counsel at that point, I would assume that he
19   was the decision maker.
20        Because of the way processes worked,
21   I'm virtually certain it would have been something
22   that was vetted through and concurred in with the

Page 38

1    administrator of the agency as well, but I wasn't
2    part of those discussions.  That would just be
3    normally how that process would work for a decision
4    of that sort.
5         Q.  So you were not involved in the formal
6    decision making for the reorganization?
7         A.  Correct.
8         Q.  If I understand what you said, and you
9    can correct me if I'm wrong, part of the reason was
10   to make enforcement -- was to give more focus to
11   enforcement?  Was that the reason for the
12   reorganization?
13        A.  Correct, to make sure that both
14   enforcement and regulations received the proper
15   amount of focus and attention in the office of chief
16   counsel, because it had become clear by that point
17   that neither of those functions was going to wane in
18   terms of their importance or in terms of the demands
19   that they made on our resources.
20        Q.  As a result of the reorganization, did
21   you lose any of the attorneys that you supervised?
22        A.  Yes.

Page 39

1         Q.  Who did you lose?
2         A.  Jacky Chow, Ann Marie Ottman.  I
3    believe those were the only two.  They both
4    transferred from my division into the newly created
5    enforcement division.
6         Q.  Your title changed as a result of this
7    reorganization?
8         A.  My title stayed as assistant chief
9    counsel, but the name of my division changed.  So
10   instead of being assistant chief counsel for
11   regulatory affairs and enforcement, I became
12   assistant chief counsel for regulatory affairs.
13        Q.  Who became assistant chief counsel for
14   enforcement?
15        A.  Initially Mike Falk was an acting
16   assistant chief counsel until that position was
17   filled.  And then when it was filled, it was Brian
18   Yonish.
19        Q.  How long did it take to fill the
20   position with Yonish?
21        A.  I believe the division was created in
22   early 2004.  And to the best of my recollection,

Page 40

1    Mr. Yonish came on board in October of 2004.  So I
2    would say about eight or nine months.
3         Q.  Why did you lose Ms. Chow?
4         A.  She was one of the attorneys in my
5    division who primarily did enforcement work.  And so
6    both she and Ms. Ottman were identified as attorneys
7    whose workload included a preponderance of
8    enforcement work, and therefore it was logical that
9    they would move into enforcement and continue the
10   same work but in the context in which it was being
11   relocated.
12        Q.  Who determined which attorneys did a
13   preponderance of enforcement work?
14        A.  Ms. Rutledge conferred with me to just
15   verify the type of workload that was distributed
16   within my division and how the distribution was
17   playing out at the time.  And then subsequently, I
18   would say it was a collaborative determination.  My
19   information provided to Ms. Rutledge, and then her
20   assessment of how to best organize the office.
21        Q.  What about Ms. Walls, how much of her
22   time was spent on enforcement?

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 41

1    A.  I would say on an overall basis,
2  probably less than 20 percent.  That would be an
3  average over time, because obviously different
4  assignments at different points in time could be
5  more or less if you took a snapshot in time.  But
6  overall, I would say 20 percent or less.
7        Q.  When you were conferring with
8  Ms. Rutledge about who would be moved over to
9  enforcement, did you recommend that Ms. Walls be
10  moved over?
11        A.  No.
12        Q.  Why not?
13        A.  Primarily because her involvement in
14  the division at that point was largely focused on
15  other matters than enforcement.  She did a lot of
16  regulatory affairs work that didn't specifically
17  involve the enforcement program area.  And I thought
18  from a highest and best use perspective, it made
19  sense for her to stay in the regulatory affairs
20  division.
21        Q.  Other than Chow and Ottman, did you
22  recommend anyone else to go over to enforcement?

Page 42

1    A.  I don't recall that I recommended
2  anyone.  I know Ms. Rutledge and I had a discussion
3  about whether Charles Medalen should move to
4  enforcement.  And we ultimately determined that it
5  would be best if he stayed in regulatory affairs.
6  But we did actively consider the idea of him moving
7  to enforcement.
8        The only other employee in my division
9  who would have considered as a logical person to
10  move to enforcement was Joe Solomey.  It became a
11  timing issue, however, because in late 2004, he
12  informed me that he had been offered a position in
13  another agency within the department and would be
14  accepting a position in their chief counsel's
15  office.
16        So what I can't recall at this point
17  in time is whether Ms. Rutledge and I had had any
18  active discussions about creating the enforcement
19  division before we knew that Mr. Solomey was going
20  to be accepting another position and leaving the
21  office.
22        If we had had discussions like that,

Page 43

1  he would have been a logical person to recommend to
2  move to enforcement.  But at this point I can't
3  recall whether those discussions actively took place
4  before or after he informed me that he would be
5  accepting employment elsewhere.
6        Q.  Did he ultimately accept employment
7  elsewhere in the agency?
8        A.  Elsewhere in the department.
9        Q.  In the department?
10        A.  Yes.
11        Q.  Where did he accept employment,
12  Joe Solomey?
13        A.  What was then the Research and Special
14  Programs Administration, and it has subsequently
15  become the Pipeline and Hazardous Materials
16  Administration.
17        Q.  You mentioned Charles -- I'm sorry, I
18  didn't get his last name, Medalen?
19        A.  Medalen, M-e-d-a-l-e-n.
20        Q.  Why were you considering him for
21  enforcement?
22        A.  We had talked about it because he had

Page 44

1  a very strong working knowledge of the program areas
2  that would be principally involved in enforcement.
3        He had been identified early on when
4  our division was created as a liaison for what was
5  called the Motor Carrier Safety Assistance Program
6  or MCSAP.  He worked closely with that program
7  office.
8        He had a very deep technical working
9  kowledge of enforcement regulations.  And he was one
10  of the primary attorneys in our division who handled
11  a lot of correspondence, a lot of legislative
12  issues, and a lot of technical regulatory matters
13  that dealt with enforcement issues.
14        So Ms. Rutledge and I logically looked
15  to him as someone who would bring a lot of
16  programatic expertise to the enforcement area.
17        Q.  Did he in fact do enforcement work?
18  Was his time spent principally on enforcement work
19  or regulatory work?
20        A.  His time was spent principally on
21  regulatory and to some extent legislative work.  But
22  the regulatory work that he did was focused on

SLR REPORTING
(301) 340-0042

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 45

1   enforcement regulations.
2        He did not do a high level or a high
3   quantity of enforcement investigative work or
4   litigation related work.  However, he had been
5   brought in the past.
6        When he was part of the Federal
7   Highway Administration in the office of Motor
8   Carrier law, he had been involved in a lot of
9   litigation matters.
10       And the enforcement division, as it
11  was going to be reidentified, would also be
12  principally responsible for litigation.  So it was a
13  combination of his enforcement programatic expertise
14  and his litigation support background that we
15  thought would make a good match for enforcement.
16       And we considered him actively as part
17  of the transfer, and then ultimately decided,
18  because of the other matters he brought to the
19  division and again ultimately concluding on a
20  highest and best use basis, that his value would be
21  best served if he stayed in the regulatory affairs
22  division.

Page 46

1        Q.  Did Ms. Walls work on regulatory
2   programs that had an enforcement aspect to it?
3        A.  To some extent, yes.
4        Q.  Have you heard of a term or a phrase
5   to describe the kind of work the attorneys did as
6   generalist?
7        A.  I've heard the term, yes.
8        Q.  What is your understanding of what
9   that means?
10       A.  My understanding is it would be
11  someone who has a broad working knowledge of a
12  significant number of legal and policy program areas
13  that perhaps doesn't specialize too deeply in any
14  one area, but has familiarity with and a working
15  knowledge of a broader range of areas.
16       Q.  Prior to the reorganization, were most
17  of the employees considered generalists, or
18  attorneys considered generalists?
19       A.  Most of the attorneys in the
20  regulatory affairs division at that time, or
21  enforcement and regulatory affairs?
22       Q.  Yes.

Page 47

1        A.  I would say it was about half and
2   half.  Some of them were considered generalists
3   either because they were relatively new to the
4   division or new to transportation law or because
5   they hadn't yet been involved in any particular
6   programatic area with a great degree of depth.
7        I would say about three members of the
8   staff at the time the transfer took place would be
9   in that category, and several who had developed
10  stronger areas of expertise would probably be
11  categorized as specialists in their respective
12  areas.
13       Q.  Did it make a difference whether
14  someone was a generalist or a specialist?
15       A.  In terms of whether they were
16  identified to transfer?
17       Q.  In terms of the kinds of work
18  assignments that they would receive, the kinds of
19  assignments and duties that they would receive.
20       Maybe I can rephrase it another way.
21  Was the point to have attorneys generalists or was
22  it the point to try to have attorneys specialize in

Page 48

1   a particular area?
2        A.  I see.  I would say there wasn't
3   really a point either way.  I think in terms of
4   staff development, the goal was for every attorney
5   over time to acquire some significant areas of
6   specialization.
7        But at the same time, because of our
8   short-staffed nature, we had to make sure that any
9   attorney on the staff at any time could be deployed
10  to handle an issue that might arise.
11       So the ideal situation would be to
12  have sufficient breath of specialty knowledge and
13  having respective attorneys involved in certain
14  specialty areas that we knew we could identify staff
15  members as go to people for certain issues.
16       At the same time, any particular
17  attorney needed to have the breath of knowledge on
18  the vast areas of program regulations that we could
19  be involved in, that they could pick up any piece of
20  work at any time and at least do a credible job of
21  handling it.
22       Q.  You mentioned that at the time of the

12 (Pages 45 to 48)

Page 49

1  transfer there were approximately three members that
2  you felt were generalists?
3       A.  Right.
4       Q.  Who were those three members or
5  attorneys?
6       A.  I would say Jacky Chow and Ann Marie
7  Ottman were generalists in the sense that while they
8  primarily focused on enforcement issues, they were
9  relatively new to the staff.  And so they were
10 acquiring specialty knowledge in the enforcement
11 area but had not reached a level of specialization
12 in any one area where they would be called an
13 enforcement specialist in a certain enforcement
14 expertise area.
15      I would for very different reasons, at
16 that point in time, I would categorize Ms. Walls as
17 a generalist, because she had exposure to both the
18 regulatory side of what we did, and to a more
19 limited but still a certain extent, to the
20 enforcement side.
21      And she was getting exposure to
22 certain expertise areas that we hoped would grow

Page 50

1  into specialties but at that point hadn't yet
2  reached that level.
3       Q.  You say that there were areas that had
4  not yet reached a specialty level.  Did you mean in
5  terms of the legislation, or what do you mean by
6  that?
7       A.  No.  In terms of her command of the
8  areas and her depth of involvement in those
9  particular areas.  They were relatively new areas
10 that our division was charged with in two cases in
11 terms of her exposure to the environmental side of
12 the regulatory process.  That was an area that she
13 was acquiring specialization in but hadn't yet
14 reached the specialty level.
15      And then in terms of her involvement
16 in some of the regulatory reporting areas that she
17 was involved in.  She was definitely the employee in
18 the division who was acquiring specialty focus in
19 those areas, and she was the employee that we looked
20 to acquire those specialties.
21      But because they were new developing
22 areas for both her and for the division, my

Page 51

1  assessment would be that at that point in time she
2  hadn't yet reached a specialist's level, the way I
3  would identify it with other employees who were in
4  different areas.
5       Q.  So that had not developed into a
6  specialty not so much of Ms. Walls but because of
7  the development of the law?  Is that what you're
8  saying?
9       A.  Because of the amount of time that she
10 had been exposed to that area, right.  The law
11 itself was fully developed, but our need to work in
12 that area of the law both as a division and as an
13 agency was new and developing, and she was part of
14 that development process.
15      Q.  What did she do prior to getting these
16 new areas that the agency was accepting or taking
17 on?  What did she do?
18      A.  You mean what were her functions
19 within the division?
20      Q.  Yes.
21      A.  She worked to evaluate regulations
22 that were provided to us for review by the program

Page 52

1  offices.  She worked both on supporting the
2  regulatory development teams that puts the
3  regulations together in terms of reviewing them for
4  legal sufficiency, reviewing them for format and
5  acceptability as part of a regulatory process for
6  publication.
7       She assisted in regulatory reporting
8  that our division was responsible for.  And that
9  included working with program staff and program
10 managers to look at the regulatory impact of their
11 program workload and report it to the office of the
12 secretary as requested.
13      On a periodic basis, the agency had to
14 submit reports about our regulatory activity.  And
15 she was largely responsible for working with the
16 program offices to acquire the information to
17 develop those reports.
18      She handled on an as-needed basis
19 inquiries that come in, whether by way of
20 correspondence, telephone, walk-in client requests
21 for assistance.
22      She worked with the development of the

Page 53

1 unified regulatory agenda, which is a semi-annual
2 report that's done to the federal government to let
3 them know what regulations that the agency has on
4 the table, how the regulations the agency has on the
5 table are progressing and what our regulatory
6 implementation plans would be.
7      Q.  Anything else?
8      A.  I think that pretty much covers the
9 general full responsibility levels.
10     Q.  So even prior to this, she didn't have
11 a specialty area?
12     A.  Not in terms of the Federal Motor
13 Carrier Safety Administration's program areas.  She
14 certainly had a specialty area in terms of being a
15 regulatory affairs attorney and working with the
16 review and development of regulations.
17          But in terms of a subject matter
18 specialty area of the type that we were involved in,
19 I would say not at that point.
20     Q.  That was because of the types of
21 assignments and duties that she was given?
22     A.  It was a combination of the background

Page 54

1 that she brought to the division and the types of
2 focus areas that she had in her background compared
3 with other attorneys in the division and their past
4 experience and past background in terms of other
5 focus areas that we were involved in.
6      Q.  But she had come from the previous
7 agency that existed?
8      A.  Exactly.
9      Q.  So I would assume if she was
10 identified as someone who had motor carrier
11 background and experience such that she would be
12 transferred, that she had to have a lot of motor
13 carrier experience to come over?
14     A.  Exactly.  And that's why I said she
15 definitely had a specialty area in terms of
16 regulatory affairs and motor carrier.  But comparing
17 her in terms of any complete in-depth working
18 knowledge of one or two specific programs that were
19 involved in motor carriers, I would say that she did
20 not have that type of in-depth expertise.
21          She certainly had regulatory affairs
22 experience.  And as a broadly defined working

Page 55

1 knowledge of how regulatory affairs should be
2 operated, she had full knowledge of that, both
3 acquired from her prior position at Federal
4 Highways, her work at the Interstate Commerce
5 Commission, and then the work that she was doing
6 once she transferred over to FMCSA.
7          But I'm distinguishing that kind of
8 specialty in terms of her working knowledge as a
9 regulatory affairs attorney with the programatic
10 specialty areas that some of the attorneys had in
11 certain motor carrier programs or certain areas of
12 motor carrier law.
13     Q.  You said Chow and Ottman were
14 relatively new?
15     A.  Relatively new to my division, yes.
16     Q.  How is it that you considered them a
17 specialist in enforcement if they were relatively
18 new?
19          MS. ROSEN:  I'm going to object.  She
20 didn't say that.  You can ask her to clarify.
21          THE WITNESS:  I didn't say they were
22 specialists in enforcement.  What I said was they

Page 56

1 were acquiring working knowledge of enforcement.
2 And of the work that they did, they were
3 predominantly involved in enforcement matters as
4 compared to other regulations.
5          Because they were relatively new, they
6 clearly didn't have the amount of exposure, again as
7 I have defined it, that I would categorize them as
8 specialists in enforcement, or any other area of
9 motor carrier law at that point.
10     BY MS.MCKINNEY:  (RESUMED)
11     Q.  So they were still developing a
12 specialty, if you will, at that time?
13     A.  Yes.
14     Q.  How did you determine again that they
15 should go over to the new enforcement area as
16 opposed to staying in regulations?
17     A.  Because the subject matter areas in
18 which they were principally involved and working
19 toward development of a specialty involved subject
20 matter areas that the enforcement division would be
21 inheriting.
22          In the case of Ms. Ottman, she was

ELAINE WALLS                                                    SUZANNE O'MALLEY
VS. NORMAN Y. MINETA                                           AUGUST 17, 2005

Page 57

1   working on driver permitting issues and drug and
2   alcohol issues.
3           Ms. Chow had a background in
4   litigation before she came to our division, and she
5   had been working on adjudication cases within the
6   office on a detail basis, which again had enhanced
7   her familiarity with the adjudicatory process and
8   the litigation process.
9           So in both of their cases, although
10  neither of them certainly had acquired a level of
11  specialty expertise within the agency, they were
12  both working in subject matter areas that were going
13  to transfer and become the primary responsibility of
14  the enforcement division.
15          So it made sense to identify them as
16  continuing to work in those areas in the new venue
17  that would be covering them.
18      Q.  Did you gain any attorneys as a result
19  of the reorganization?
20      A.  I didn't gain any attorneys within the
21  office. I was subsequently allowed to hire
22  additional attorneys to supplement the regulatory

Page 58

1   affairs staff. That wasn't only because of the
2   reorganization, but the fact that we had lost one
3   attorney to -- Mr. Solomey -- to transfer to another
4   agency and then provided two attorneys to handle
5   enforcement work left our division short.
6           So I was allowed to fill the vacancy
7   left by Mr. Solomey, and then subsequently an
8   attorney was hired on a temporary basis in my
9   division.
10          And an attorney was transferred into
11  my division from elsewhere within the organization,
12  meaning within Federal Motor Carrier Safety, and I
13  don't know for sure if that was before or after the
14  creation of the enforcement division.
15          But I have expanded my staff. So in
16  part as a result of the staffing implications of the
17  transfer, but primarily the expansion of my staff
18  had to do with replacing Mr. Solomey and adding
19  attorneys because of workload in the regulations
20  area rather than loss of attorneys because of
21  creation of enforcement as a separate division.
22      Q.  You said primary was to replace

Page 59

1   Solomey and to what?
2       A.  And to add additional attorney
3   resources because of the regulatory workload from my
4   division, not because of the siphoning off of staff
5   because of the creation of enforcement.
6       Q.  Who is the attorney that was hired on
7   a temporary basis that you mentioned?
8       A.  Frederick Wood.
9       Q.  Why was he hired on a temporary basis?
10      A.  He was hired to compensate for the
11  fact that two of our division attorneys in recent
12  months have been placed on an agency task force to
13  work on the hours of service regulation that is a
14  departmental priority and required both Charles
15  Medalen and Alan Strasser, who were members of my
16  division, to be assigned full time to the hours of
17  service task force for the agency, which meant that
18  they were not available on a continuous basis to
19  handle regulatory affairs work.
20          So to compensate for their service on
21  the task force, I was allowed to fill a temporary
22  position to assist in keeping the division afloat

Page 60

1   and to manage the workload while we were down
2   several members of the staff.
3       Q.  This is something that happened
4   recently?
5       A.  Yes. Mr. Wood came on board in April
6   of this year.
7       Q.  April of 2005?
8       A.  Yes.
9       Q.  And he is a temporary hire while these
10  two employees are working on the hours of service
11  task force?
12      A.  Right. He was actually put in a
13  position that was temporary not to exceed one year.
14  So there was some flexibility on how long he will
15  actually be part of the division.
16          One of the two employees, Mr. Medalen,
17  has since been reassigned back to the division.
18  Mr. Strasser for the time being is still full time
19  on the task force.
20          But we have Mr. Witt on board in sort
21  of the transitional mode, even though those
22  employees, one of them has returned and one of them

Page 61

1 may be returning in the near future.
2          But we do fully anticipate that this
3 hours of services initiative is going to continue
4 beyond the time that membership on the task force is
5 necessary.
6          It's going to siphon a lot of
7 resources. So the not to exceed one year allows us
8 the flexibility to keep him on board perhaps
9 slightly beyond the active hours of service task
10 force time frame, but to compensate for any hours of
11 service work and other regulatory involvement that
12 the two attorneys who were on the team will continue
13 to have to be involved in.
14          Q.  I'm sorry, this task force is agency
15 wide?
16          A.  Right. It includes attorneys that I
17 mentioned, as well as staff members from other
18 program offices within FMCSA.
19          Q.  When you had the two attorneys pulled
20 off for an agency wide program, you were able to
21 fill the gap, if you will, or fill the manpower need
22 with a temporary employee?

Page 62

1          A.  Right.
2          Q.  You mentioned another employee, an
3 attorney hired from somewhere else, I think is what
4 you said, from somewhere else in the agency?
5          A.  Right.
6          Q.  Who was that?
7          A.  Charlene Sanders.
8          Q.  Why was she hired?
9          A.  She was previously working for Julie
10 Serillo, who was the head of the agency prior to
11 administrator Annette Sandberg coming on board.
12 Charlene was assigned to the direct staff of
13 Ms. Serillo.
14          And when Ms. Serillo left the agency,
15 Charlene was then reassigned to counsel's office and
16 was placed in my division.
17          Q.  Did she have any regulatory background
18 or experience? I am assuming she did if she came to
19 your office?
20          A.  She did, yes.
21          Q.  Just for the record, Frederick Wood,
22 what is his race?

Page 63

1          A.  Caucasian.
2          Q.  And I am assuming it's a male?
3          A.  Yes.
4          Q.  And Charlene Sanders, I assume it's a
5 female?
6          A.  Female. And she's also Caucasian.
7          Q.  We were talking about this
8 reorganization from regulatory affairs to
9 enforcement separating the two branches. Did
10 Ms. Walls have any input in where she would be
11 located in this reorganization?
12          A.  Not as I recall.
13          Q.  This is a decision that was made by
14 management where employees would be placed?
15          A.  Correct.
16          Q.  You mentioned that one of the reasons
17 Chow was given enforcement duties and
18 responsibilities and assignments was because she had
19 a background in litigation. What do you mean by she
20 had a background in litigation? What do you
21 consider a background in litigation?
22          A.  Before she came to Federal Motor

Page 64

1 Carrier Safety, she had been a clerk for a judge  I
2 believe it was a federal judge. I'm not sure about
3 that. But she had had clerking experience between
4 her graduation from law school and her affiliation
5 with our agency.
6          Subsequent to that, when she arrived
7 in my division as a newly hired attorney, we very
8 shortly in time after that needed attorneys to
9 assist in our adjudications process to do case
10 writing and to assist the adjudications counsel for
11 the agency in reducing a significant backlog of
12 cases that he had experienced.
13          And she was detailed to that
14 adjudications office to work on case writing and to
15 become one of the attorneys that we would
16 essentially crosstrain in that process.
17          So shortly after her arriving in my
18 division, she actually had started to acquire the
19 adjudications experience before she really had any
20 experience in regulatory affairs itself.
21          So at the time that the enforcement
22 division was created, her experience in FMCSA had

16 (Pages 61 to 64)

Page 65

1   been almost exclusively working in the adjudications
2   area.
3        So that coupled with her background as
4   a clerk is what I was considering when I said
5   litigation experience in general.
6        Q.   But you don't know whether or not she
7   was actually a litigator in the sense that she
8   handled cases and litigated cases in open court?
9        A.   I do not know that.  I was using the
10  term litigation broadly to cover handling cases,
11  working in a clerking capacity, understanding the
12  adjudicative process within the agency.
13       Q.   Do you consider yourself a litigator?
14       A.   No, not at all.
15       Q.   I guess just so I have a better sense,
16  your understanding of a litigator is someone who
17  handles cases?
18       A.   Right, who handles cases, whether it
19  be in the litigation stand up in court sense or
20  whether it be in the case processing decision making
21  part of litigation.
22        As we understand litigation in our

Page 66

1   agency, it's understood broadly to include internal
2   administrator or adjudicative litigation, as well as
3   actual court proceedings.
4        Q.   And you consider cases, obviously
5   administrative cases, adjudicative matters being
6   administrative matters as well?
7        A.   Being administrative matters that
8   involve adjudication cases, yes.
9        Q.   Yes.
10       A.   Yes.
11       Q.   You're not just limiting it to court?
12  You're also thinking about it in terms of
13  administrative?
14       A.   Right.  As you may or may not know,
15  our agency doesn't directly represent itself in
16  court proceedings.  We assist the Department of
17  Justice in handling any direct litigation.
18        The other side of what we do in terms
19  of processing cases is our own internal adjudicative
20  process for cases that are handled before the chief
21  safety officer of the agency.
22        And that's what our adjudications

Page 67

1   counsel does is provide decisions for the chief
2   safety officer to rule on for the agency.
3        So the work specifically that Ms. Chow
4   was doing when she was detailed to the adjudications
5   counsel was case writing and assessing the impact of
6   adjudications cases and helping to reduce the
7   adjudications case backlog for the agency.
8        Q.   When Ms. Charlene Sanders came on
9   board, did you have a manpower need for her?
10       A.   Yes.
11       Q.   How so?
12       A.   Actually, our division has been
13  chronically understaffed ever since the agency was
14  created.  I think the regulatory workload for the
15  agency was grossly underestimated when counsel's
16  office was created, and as a result we perennially
17  have the need for more attorneys to work with
18  regulatory development teams, to work in regulatory
19  review.
20        So when she came on board, she was a
21  welcome addition to the division.  And I would say
22  even though we have rammed up our staffing compared

Page 68

1   to the time the agency and our division was first
2   created, we nonetheless chronically have a staffing
3   need and a staffing shortage.
4        Q.   What GS level is Charlene Sanders?
5        A.   She is a GS-15.
6        Q.   Was she a GS-15 prior to coming to
7   regulatory affairs?
8        A.   Yes.
9        Q.   What about Frederick Wood, what is his
10  GS level?
11       A.   He is a GS-13.
12       Q.   Was he a GS-13 prior to coming to
13  regulatory affairs?
14       A.   He had no prior federal experience.
15  So he was hired as a first time attorney with the
16  department or with the government.
17       Q.   And you said that you needed to add
18  attorneys and that you had some vacancies that you
19  could fill.  Are any of these vacancies that you
20  could fill for GS-15 positions?
21       A.   No.
22       Q.   What level positions were you able to

17 (Pages 65 to 68)

Page 69

1  fill?
2       A.  The position that replaced
3  Mr. Solomey's was I believe announced as either an
4  11-12-13 or an 11-12-13-14.  I'm not sure how far
5  the announcement went in terms of GS level, but the
6  attorney who was hired to fill that position was
7  hired I believe at the GS-13 level.
8       Q.  Who was that?
9       A.  Alan Strasser.
10      Q.  Did you have any other positions or
11  vacancies other than Solomey that you replaced?
12      A.  No.
13      Q.  Who is Patricia Burke?
14      A.  Patricia Burke was formerly the acting
15  assistant chief counsel for general law in FMCSA's
16  chief counsel's office.  And she is currently an
17  assistant chief counsel in the Pipeline and
18  Hazardous Materials Administration.
19      Q.  So there is a general law aspect?
20      A.  General law is another division of our
21  office of chief counsel.  It handles any matters
22  that aren't regulations, enforcement or legislation,

Page 70

1  primarily.
2       Q.  You said she was former chief counsel
3  of general law?
4       A.  She was acting assistant chief counsel
5  for general law.
6       Q.  Did she become chief counsel at any
7  point?
8       A.  No.
9       Q.  How long was she in an acting
10  capacity?
11      A.  I believe she started when the office
12  was created in 2000.  I'm not sure whether she
13  immediately had the title of acting assistant chief
14  counsel or not.  I don't recall that.
15      But she was in that -- I believe she
16  did not originally.  She filled that position after
17  Thomas Lining, who was previously the acting
18  assistant chief counsel, converted to doing other
19  things.
20      And then Ms. Burke became acting
21  assistant chief counsel.  And I can't actually give
22  you a time frame for that.  But she was in that

Page 71

1  capacity until late 2004 when she accepted a
2  position in her current organization.
3       Q.  Who replaced her?  Who became chief
4  counsel?
5       A.  Assistant chief counsel.
6       Q.  Assistant chief counsel.
7       A.  Mark Rigadsky.
8       Q.  For the record, I am assuming Mark
9  Rigadsky is a male?
10      A.  Yes.
11      Q.  What is his race?
12      A.  Caucasian.
13      Q.  Do you know who is responsible for
14  hiring him?
15      A.  Ms. Rutledge.  And I am not sure -- I
16  have to think for a minute whether Mr. McCowan was
17  on board when he was hired.  I am actually not sure
18  if Mr. McCowan had already become chief counsel at
19  that point or not.  But definitely Ms. Rutledge was
20  part of that decision making process and perhaps the
21  sole part of that.
22      Q.  Other than when you transferred over

Page 72

1  and became assistant chief, and I guess during the
2  time when Patricia Burke served as assistant chief
3  for general law, have any other females served in an
4  assistant chief capacity?
5       A.  No.
6       Q.  And the assistant chief positions,
7  what GS level are they?
8       A.  Fifteen.
9       Let me clarify that answer.  We did
10  have a non-attorney who was the head of our
11  legislative affairs division who was a female, but
12  she is not an attorney.  So therefore she didn't
13  have the title assistant chief counsel.
14      Q.  She was head of what?  I'm sorry.
15      A.  The legislative affairs division,
16  which at the time she headed up that division, did
17  not have any attorney membership.  We subsequently
18  have an assistant chief counsel in that position.
19      But prior to filling that position
20  with an attorney, the head of the division was a
21  female.  She just wasn't an assistant chief counsel
22  by designation because she doesn't have a law

Page 73

1  degree.
2        Q.  What was her name?
3        A.  Shannon Watson.
4        Q.  And her race?
5        A.  Caucasian.
6        Q.  What was her title if she was not
7  assistant chief counsel?
8        A.  I think they referred to her as chief,
9  legislative affairs division.  She may have a more
10  formal title than that on her actual personnel
11  paperwork.
12        Q.  You said that the legislative affairs
13  did not have any attorneys?
14        A.  At that time, correct.
15        Q.  Do they currently have attorneys?
16        A.  They have since hired an assistant
17  chief counsel for legislative affairs who heads up
18  that division now.
19        Q.  And they have attorneys now?
20        A.  Just that one.  The head of the
21  division is an attorney.  The remaining staff is the
22  same as it was when Ms. Watson headed up the

Page 74

1  division.
2        Q.  What was the GS level that Ms. Watson
3  had?
4        A.  She was a 15.
5        Q.  I'm sorry, I'm sure you told me, but I
6  didn't write it down, who was hired as the chief
7  counsel?
8        A.  No, I didn't tell you, actually.
9  Richard Logazino.
10        Q.  When was he hired?
11        A.  Recently.  I believe he came on board
12  within the last several months.  I am going to say
13  June of 2005, give or take a few weeks.
14        Q.  And Richard Logazino, I am assuming
15  that's a male?
16        A.  Yes.
17        Q.  And his race?
18        A.  Caucasian.
19        Q.  So when they filled the position, they
20  filled it with Richard Logazino?
21        A.  Correct.
22        Q.  When they had to fill the general law

Page 75

1  position as we talked about earlier, they filled it
2  with Mark Rigadsky?
3        A.  Yes.
4        Q.  And then there was a vacancy in
5  enforcement, and eventually they filled that with
6  Yonish; is that correct?
7        A.  Correct.
8        Q.  Do you know whether Ms. Rutledge is
9  involved in all three of those decision makings?
10        A.  She was definitely involved in all
11  three of them, yes.  In some of them she may not
12  have been the principal.  It depends on whether
13  Mr. McCowan was on board or not.  But she was
14  definitely involved in all three.
15        Q.  And Mr. McCowan would have been
16  principal in at least two of the positions, the
17  legislative affairs and the enforcement?
18        A.  Certainly in the legislative affairs.
19  And I believe, yes, in enforcement as well.  I'm not
20  certain about the timing of Mr. Rigadksy's hiring.
21  That would depend on whether he came on board before
22  or after Mr. McCowan was appointed as chief counsel.

Page 76

1        Q.  All of these are GS-15 positions since
2  2000?
3        A.  Yes.
4        Q.  Have there been any other assistant
5  chief positions that have been filled since 2000?
6        A.  No.
7        Q.  And just so I can understand and make
8  sure I conceptualize this correctly, there is
9  enforcement, legislative affairs, regulatory affairs
10  and general law?
11        A.  Correct.
12        Q.  Are there any others?
13        A.  Enforcement is actually technically
14  titled enforcement and litigation.  But no, those
15  are the four divisions.
16              The only other piece of counsel's
17  office that isn't reflected in the division
18  structure is the adjudication's counsel, which is
19  part of chief counsel's office, but it doesn't
20  operate on a division structural basis.
21        Q.  Did Ms. Walls ever have any
22  discussions with you to indicate that she wanted to

Page 77

1 crosstrain for general law?
2      A.  Yes.
3      Q.  Can you tell me about those
4 discussions?
5      A.  She had mentioned to me on several
6 occasions that she was interested in crosstraining
7 for purposes of development experience.  She had
8 specifically mentioned at some point being
9 interested in the employment law aspect of general
10 law.
11      She had mentioned it both in the
12 context of either crosstraining or working out some
13 other kind of arrangement where she could get
14 exposure to and experience in some of the work that
15 general law did.
16      Q.  What happened with respect to those
17 discussions?  Is she allowed to take up those
18 development opportunities?
19      A.  She had presented me at one point with
20 an interest in taking an employment law course.  And
21 the specific instance I can recall in requesting
22 training in that area, I then approached

Page 78

1 Ms. Rutledge to get her take on whether that would
2 be an acceptable training exposure for one of our
3 employees.  And her discussion with me included
4 crosstraining as a response to that.
5      Ms. Rutledge had suggested that
6 because that wasn't at all job related to Ms. Walls'
7 involvement in regulatory affairs, if she was
8 interested in pursuing employment law as a training
9 piece of her development, that Ms. Rutledge expected
10 that she would work in a crosstraining capacity with
11 general law and work on an employment case of some
12 nature to supplement her exposure to the legal
13 education part of it.
14      I talked to Ms. Walls about that.  She
15 expressed concern that that would be very difficult
16 to manage and still juggle her existing workload at
17 the time and regulatory affairs.  I subsequently
18 mentioned that to Ms. Rutledge.
19      And as part of Ms. Walls'
20 recommendation for development in her next
21 performance appraisal period, I included the
22 suggestion that she could take an employment law

Page 79

1 course with the specific caveat that her workload in
2 regulatory affairs would be adjusted accordingly.
3      But because of her concern at the time
4 about workload implications of doing that, she
5 didn't follow-up on that with a discussion with me.
6 And to my knowledge, she didn't follow-up on it with
7 Ms. Rutledge or the general law division.
8      Q.  Isn't her request for training, was
9 that separate from the discussion that you had with
10 her concerning crosstraining?  I'm sorry the
11 training for the employment law?
12      A.  Yes.
13      Q.  Was that separate than the discussion
14 you had with her for crosstraining?
15      A.  It was actually a continuation of the
16 same issue, but it occurred at two different points
17 in time.  When she first broached the discussion
18 about taking the employment law course, it was
19 strictly in that context.  She had presented it to
20 me as a suggestion for employee development
21 training.
22      I in turn, as is always the practice,

Page 80

1 conferred with Ms. Rutledge about whether our
2 resources would allow for Ms. Walls to participate
3 in that course.
4      And it was at that point that
5 Ms. Rutledge responded because it wasn't directly
6 job related to Ms. Walls' current assignment, we
7 would want to explore the possibility of her
8 agreeing to take on in a training slash
9 crosstraining capacity an employment law course for
10 the agency and work with the general law division to
11 do that.
12      So then I went back to Ms. Walls and
13 explained that to her in the context of reporting
14 back to her what the response had been when I
15 broached the subject of her taking the employment
16 law course.
17      So the conversations occurred over a
18 period of time, but they were all prompted by and
19 related to Ms. Walls' request to take the employment
20 law course.
21      Q.  But didn't her request for the
22 crosstraining come up first?

Page 81

1    A.  She had on several occasions I think
2 when we had had employee discussions, employee
3 supervisor discussions, whether they be performance
4 appraisals or less formal opportunities to talk, she
5 had on a number of occasions expressed to me that
6 she was interested in crosstraining.
7        It was her request to take that
8 particular employment law course that precipitated
9 Ms. Rutledge's suggestion that we might actually
10 identify a specific crosstraining opportunity in
11 employment law.
12        But on a much more broadly defined
13 scale, Ms. Walls had told me on several occasions
14 she was interested in getting broader experience and
15 experience beyond the regulatory affairs division.
16    Q.  Was it presented to Ms. Walls at the
17 time when this training issue came up with the
18 employment law, was it presented as a crosstraining
19 opportunity, or was it presented to her that she
20 needed to take on some of employment law work or
21 cases in order to justify taking that particular
22 course?

Page 82

1    A.  I'm not sure I really understand the
2 distinction.  It was presented to her that she might
3 take on a case of an employment law nature.
4    Q.  Was the term crosstraining used or was
5 it simply you can take on this assignment or this
6 case in order to justify this particular training?
7    A.  I know when I provided her with a list
8 of suggestions, and specifically referenced the term
9 crosstraining in that list of suggestions which
10 followed our verbal conversation, I am not sure
11 whether I used the term crosstraining or whether
12 Ms. Rutledge had actually used the term
13 crosstraining when we discussed it.
14        But I do know that the understanding
15 was she would remain in the regulatory affairs
16 division and would receive guidance and direction on
17 the employment law case from the general law
18 division if she took that on.  So it would
19 definitely provide a crosstraining context for it.
20        I cannot confirm that we used the term
21 crosstraining except subsequently when I gave her a
22 written list of suggestions.  I did specifically use

Page 83

1 that term.  That may have been my invoking the term
2 rather than Ms. Rutledge.
3    Q.  But at the time the training issue
4 came up, crosstraining was not used?
5    A.  I cannot be sure whether it was used
6 or not.
7        MS. ROSEN:  She didn't say that.
8        BY MS. MCKINNEY:  (RESUMED)
9    Q.  You can't recall?
10    A.  I can't recall whether I specifically
11 used the term crosstraining at that time.  I know I
12 subsequently put it in writing when I was defining
13 for her what we meant.
14        And as a clarification point, because
15 of Ms. Walls' concerns about supplementing her
16 current workload, I specifically put in a
17 parenthetical that said your workload in regulatory
18 affairs would be adjusted accordingly.
19        And that was again the way a
20 crosstraining experience would work.  It wouldn't
21 completely remove an employee from their current
22 responsibilities in most instances, but it would

Page 84

1 supplement what they do with direction and
2 experience outside their immediate responsibilities.
3 And we would take into account when we assigned
4 their workload in their permanent job.
5    Q.  When the request for the training came
6 up for employment law, when you were talking about
7 the assignment in general law, it was in addition to
8 the duties she already had; is that correct?  It
9 wasn't a supplement?  It was in addition to?
10    A.  It wasn't discussed in that context at
11 all.  It was simply Ms. Rutledge had said would --
12 asked me if I would determine whether Ms. Walls
13 would be willing to take on an employment law course
14 by way of having on-the-job employment law
15 experience while she was taking an employment law
16 training course.
17        Although I don't think we got to the
18 point of discussing the logistics of how she would
19 take that on or what the ramifications would be, in
20 my mind, always when an employee takes on a
21 supplemental duty, appropriate adjustments are made
22 in their existing workload.

21 (Pages 81 to 84)

Page 85

1     And I would certainly have done that.
2     It was sort of an unspoken reality of what we were
3     talking about, that we would of course take into
4     account what she was working on in another division
5     when we set our expectations for her in her current
6     division.
7          Q.  Has this issue of crosstraining to
8     general law come up recently, I guess within the
9     past year or so?
10         A.  Not that I can specifically recall.
11         Q.  Do you recall any times when Ms. Walls
12    was told that there were no opportunities to
13    crosstrain because all the general law slots were
14    already filled?  Do you remember any conversations
15    to that effect?
16         A.  No.
17         Q.  How are work assignments made in the
18    office?
19         A.  Generally assignments come into the
20    chief counsel's office in -- by a support staff
21    member, a determination is made what division they
22    specifically related to; one of the four divisions

Page 86

1     generally.
2          They are then provided to the division
3     chief of that particular part of the structure, and
4     then the division chief makes a determination based
5     on existing workload, employee expertise, employee
6     availability, how they will be specifically assigned
7     within the division.  And that assignment is then
8     noted on a work log roster that's maintained in the
9     office.
10         Q.  So you're saying that it's the
11    division chief's determination?
12         A.  Correct.  There are occasions when the
13    division chief is consulted before an assignment
14    even reaches the division of the chief counsel or
15    deputy chief counsel becomes aware of a need within
16    the agency.
17         They may specifically request that the
18    division chief confer with them about how the
19    assignment should be made, and the implications of
20    the assignment will determine which attorney is the
21    appropriate one.
22         It may have have to do with something

Page 87

1     as simple as availability or what other workload
2     assignments are.  There are occasions for certain
3     assignments that there would be some kind of a
4     conference with the deputy chief counsel or the
5     chief counsel.
6          That would particularly be the case if
7     an assignment crosses over into more than one
8     division.  Some assignments aren't clearly a
9     regulations assignment or they are not clearly an
10    enforcement assignment.  They could be hybrid type
11    issues.
12         And in those cases, sometimes there's
13    more of an informal consultation before they go to
14    one particular division.  Sometimes a team of
15    attorneys is put on a particular case so that they
16    represent more than one division.
17         But the norm would be for the pure
18    vanilla type of assignment, it goes to a particular
19    division and the division chief makes the
20    determination which attorney will receive that
21    assignment.
22         Q.  Would you say the more high profile

Page 88

1     cases or projects, that the chief counsel have more
2     of a hand in determining where that assignment would
3     go?
4          A.  Not as a rule.  I mean, usually
5     regardless of the profile of the assignment, if it
6     clearly falls into the parameters of one division or
7     another, it would be at the discretion of the
8     division chief or the assistant chief counsel in
9     that division.
10         In instances where a high profile
11    assignment is sufficiently broad in its implication,
12    that it may have an impact on more than one division
13    and it may require the experience of more than one
14    division, at that point often the chief counsel or
15    deputy chief counsel confers with the several
16    division chiefs who would be involved and a
17    collaborative decision is made how it will be
18    handled.
19         But it's not so much the profile of
20    the assignment as it is the subject matter nature of
21    the assignment that that would determine that in
22    most cases.

22 (Pages 85 to 88)

Page 89

1    Q.  What role does Ms. Rutledge play in
2  this process of assigning cases?
3    A.  She would be, as I described, whatever
4  role the deputy chief counsel would play in those
5  instances, which are the exceptions rather than the
6  rule, that she would be involved at all in making
7  the assignment.
8        Usually she sets up an informal
9  discussion with the involved division chief or
10  chiefs, and an assessment is made what the time
11  frame involved would be, what the level of expertise
12  would be, what the nature of the expertise is.
13      And then an informal discussion takes
14  place who could best handle the assignment given the
15  requirements that the assignment would present to a
16  particular attorney.
17      But in those instances, it's generally
18  then the division chief who still confers with the
19  attorney, makes the assignment, sets up the
20  expectations and the parameters for what the
21  deliverables would be.
22    Q.  And you're saying those assignments

Page 90

1  are not the general vanilla kind of assignments?  Is
2  that what you said?
3    A.  Right.  That would be the exception
4  rather than the rule.  Normally something comes in
5  whether it's in written form or in a request from a
6  program client, and it goes directly to a division
7  chief who makes the decision.  And there is no
8  consultation with the deputy chief counsel or chief
9  counsel at all.
10    Q.  So then you would say it would be an
11  incorrect statement that Mr. McCowan is involved in
12  assigning most of the work to individual attorneys?
13    A.  Yes, that would be incorrect.
14    Q.  Would you say it would be incorrect
15  that Ms. Rutledge is involved in assigning most of
16  the work to individual attorneys?
17    A.  Yes.
18    Q.  But for these assignments that have
19  overlapping subject areas or high profile areas,
20  then they are actively involved in those types of
21  assignments?
22    A.  They are actively involved in deciding

Page 91

1  which division will have the lead and sometimes in
2  deciding which team of attorneys would be pulled
3  into play for a particular assignment.
4        It is often the case that the decision
5  stops at which division will take the lead.  And
6  even once that decision is made, still the division
7  chief decides within his or her division which
8  attorney will have responsibility for something.
9        So it's definitely the exception
10  rather than the rule that either the deputy or the
11  chief counsel would get involved at that level and
12  that kind of decision making.
13    Q.  In your office of regulatory affairs,
14  these kinds of assignments where Mr. McCowan and
15  Ms. Rutledge gets involved, how many of those
16  assignments have been given to Ms. Walls?
17    A.  They are so infrequent that they get
18  involved.  I can only think of one in particular
19  that was the type of assignment that the deputy or
20  the chief counsel would be involved in.
21        Those don't happen often.  I can think
22  of one which Ms. Walls was the lead attorney that

Page 92

1  had involved a preliminary consultation with the
2  office leadership.
3    Q.  What assignment is that?
4    A.  It was her work on the post litigation
5  environmental impact study for the NAFTA rules.
6    Q.  Can you tell me about that assignment?
7    A.  Sure.  FMCSA had received an adverse
8  decision from the Ninth Circuit Court of Appeals on
9  some of our regulations that involved implementing
10  the NAFTA and opening the southern border to truck
11  traffic.
12        The adverse decision primarily found
13  fault with the agency's determination that they
14  could go forth with rules to implement NAFTA without
15  doing an environmental impact study under the
16  National Environmental Policy Act.
17        The Ninth Circuit said that the agency
18  should have conducted an EIS.  We did not do that.
19  And because of the adverse decision, we went forth
20  and expeditiously needed to respond to that
21  litigation by putting the wheels in motion to
22  conduct an environmental impact study.

23 (Pages 89 to 92)

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 93

1   During that time, we were also
2   appealing the adverse decision of the Ninth Circuit
3   to the Supreme Court. Subsequently, we received a
4   favorable ruling from the Supreme Court, which in
5   turn resulted in our need to not follow up with this
6   environmental impact study that we had initiated.
7       But while we were proceeding with the
8   petition for certiorari to the Supreme Court, at the
9   same time on a parallel track we were conducting an
10  expeditious task force endeavor to do an
11  environmental impact study so that we would be
12  prepared in either case to get these rules in place.
13      Either we would receive a favorable
14  decision of the Supreme Court, as turned out to be
15  the case and we could call off this process, or we
16  wanted to be prepared in case the Supreme Court
17  agreed with the Ninth Circuit Court of Appeals, and
18  we wanted to be prepared nonetheless to do what was
19  needed to get these rules in place.
20      So the environmental impact study was
21  something that we had to initiate as an imperative
22  in case we weren't successful at the Supreme Court

Page 94

1   level.
2       Q.   What was Ms. Walls's role on this?
3   You called it a task force?
4       A.   Correct.
5       Q.   What was her role in this task force?
6       A.   It was a cross-disciplinary task
7   force. She was the lead attorney for the office of
8   chief counsel. She convened a cross-disciplinary
9   panel of both FMCSA agency representatives, office
10  of the secretary agency representatives,
11  representatives from outside the department who had
12  experience in implementing the National
13  Environmental Policy Act, and had experience in
14  conducting environmental impact studies.
15      She needed to put that team of people
16  together expeditiously in order to tap into
17  expertise from outside the agency, because we had
18  never done as an agency any kind of an environmental
19  impact study on the scale that was going to be
20  required for this particular initiative.
21      After convening that panel, she met
22  with them on a frequent basis to identify what would

Page 95

1   need to happen to conduct this environmental impact
2   study and to talk with them about how we would staff
3   the group of resource folks that would put that
4   study together.
5       Following onto that, she worked with
6   both our general law division and our procurement
7   office to identify a contractor and to put the
8   proper paperwork in place to solicit contract bids
9   to conduct this environment impact study, because we
10  knew we would need contract resources for the agency
11  to do that, since we didn't have the in-house
12  expertise to accomplish it.
13      She helped to put together, and
14  actually from our division's perspective, led the
15  initiative to identify what would be needed from
16  this contractor and to describe, based on the
17  expertise of the panel she had convened, how the
18  agency could best put this team in place to both
19  conduct the EIS and to manage the EIS.
20      Once all of that identifying process
21  was completed, the agency proceeded to identify a
22  contractor, put out bids. And Ms. Walls was part of

Page 96

1   the selection process to pick a contractor, and
2   subsequently conferred with the leadership of the
3   office to identify how we should handle the contract
4   in terms of project management.
5       Q.   Did she not work on the project after
6   the contractor was identified?
7       A.   Pretty much I think she would have
8   been in a consultative capacity, perhaps. But, yes,
9   once the contractor was identified and a project
10  manager was identified for the task, it was pretty
11  much spun off into a completely separate initiative
12  that didn't involve any of the divisions of
13  counsel's office who had previously worked on it.
14      It was primarily our division from the
15  regulatory process standpoint and from the
16  developmental standpoint, and then the general law
17  division assisting and backing up the contract
18  selection part of the process.
19      Both of those initiatives were pretty
20  much
21  and ic
22

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 97

1  the EIS was handled as a separate initiative
2  overseen by the chief counsel but not assigned to
3  either of the divisions in counsel's office that had
4  previously been involved in setting up the process.
5       Q.  Who was the project manager?
6       A.  April Marchese.
7       Q.  For the record, I assume it's a
8  female?
9       A.  Yes.
10      Q.  What is her race?
11      A.  Caucasian.
12      Q.  Where did April Marchese work?
13      A.  She was detailed from the chief
14 counsel's office of the Federal Highway
15 Administration where she had been an environmental
16 specialist.  And for the course of the EIS
17 development process, she was detailed to FMCSA's
18 counsel's office.
19      Q.  Why was a project manager selected
20 from outside of motor carriers?
21      A.  Primarily, as I said, we had no
22 expertise as an agency in developing EIFs.  Federal

Page 98

1  Highways does that all the time for Federal Highway
2  projects.  And the counsel's office at Federal
3  Highways is particularly involved.  They have their
4  own environmental specialists in an environmental
5  division.  And they get involved in environmental
6  impact studies on a regular basis, whereas for
7  Federal Motor Carrier Safety, it's an exception to
8  the rule.
9          This was the first one that the agency
10 had ever needed to do on that kind of a scale.  And
11 because we had to do it not only fully but
12 expeditiously in response to this litigation, we
13 needed to pull expertise from somewhere where we
14 could get a person who could hit the ground running
15 and bring the expertise to the job rather than think
16 about developing that within the agency.
17         We knew it was something that we
18 couldn't home grow in that short of a time period.
19      Q.  So the only person then from motor
20 carriers that was involved was chief counsel
21 McCowan?
22      A.  He was the overseer of the project.

Page 99

1  April Marchese as the project manager reported
2  directly to him.  And it was a direct report rather
3  than going through one of the divisions.
4          I think it would probably be an
5  exaggeration to say he was the only person who was
6  involved, because from time to time employees in
7  counsel's office and elsewhere within the agency had
8  to get consulted by either the contractor or the
9  project manager to work on this.
10         But definitely the only person in
11 counsel's office who was involved in an overseeing
12 or supervisory capacity was Mr. McCowan.
13      Q.  Was this when Mr. McCowan first came
14 on board as chief counsel, do you recall?
15      A.  He came on board in July of 2003, as I
16 recall.  And I believe it was shortly after his
17 arrival that the contractor was selected and the
18 project manager put in place and we went full steam
19 ahead to work on the EIS.
20         I can't actually pin down the exact
21 time, but I do believe in context it was shortly
22 after Brigham McCowan became chief counsel that the

Page 100

1  process actually went into high gear and we had the
2  team identified and went forth with the project.
3      Q.  I want to make sure I sufficiently
4  narrowed a question I may have asked you earlier.
5  What I meant was who was involved in the EIS after I
6  guess the project manager and consultant were hired?
7  Who was involved from motor carriers other than
8  McCowan?
9      A.  From motor carriers as the whole
10 agency, not just from the chief counsel in motor
11 cariers?
12      Q.  Well, chief counsel.  I guess the five
13 departments that we talked about, who was involved?
14      A.  To the best of my recollection,
15 because I wasn't directly involved in it, my
16 understanding is that the contractor, which was
17 obviously an independent outside contractor working
18 on the technical side of developing the EIS,
19 reported directly and received input and assignments
20 from April Marchese as the project manager, who in
21 turn reported directly to Mr. McCowan.
22         On occasion it would have been

Page 101

1  expected that either April Marchese, in her capacity
2  as project manager, or Mr. McCowan, might confer
3  with other members of counsel's staff for background
4  or support or consultative purposes.
5       And it wouldn't have been unusual for
6  them to confer with members of the general law
7  division for purposes of contract support issues or
8  procurement issues related to the management of this
9  contract.
10      Similarly, it would not have been
11 unusual for them to have contact with a member of my
12 division, either myself, Ms. Walls, or possibly Mike
13 Falk, who was the principal attorney involved in the
14 NAFTA litigation from our side.
15      But I quite frankly can't identify any
16 particular situations when that kind of contact
17 occurred. It would fall into the norm when you're
18 working with a contractor and a project manager for
19 them to request input from staff members and
20 counsel's office or from managers in counsel's
21 office.
22      But as far as running the program,

Page 102

1  overseeing the program and being the principals to
2  develop the EIS, it would have been the contractor
3  team, plus Ms. Marchese, plus Mr. McCowan, who was
4  the overseer of the process and the direct report.
5       Q.  If I understand what you're saying,
6  though, they still needed support from either
7  general law or regulatory affairs?
8       A.  It would be expected that they might.
9  I can't think of specific instances when they came
10 for support to a attorney or asked for a particular
11 piece of work to be done.
12      What I can recall in terms of a
13 general process is on occasion they would have
14 informal questions to ask. They might pass
15 something by me and say how did this work in the
16 litigation or what happened when you developed the
17 rule, what did this rule say for a certain
18 background piece of information.
19      But I can't recall being asked to
20 provide an actual work product for them, whether it
21 be research or an explanatory memo or an
22 interpretation or anything that definitive.

Page 103

1       Q.  What about Ms. Walls, did she have any
2  assignments or duties that continued after the
3  consulting?
4       A.  She had a major duty from the
5  perspective of our division, which was the logical
6  outgrowth of the environmental impact study was our
7  recognition that our agency did not have an order in
8  place to implement the National Environmental Policy
9  Act.
10      Since we had spun off from the Federal
11 Highway Administration, we needed to develop one
12 that was our own. And she was the lead attorney who
13 continued to oversee the development of that NEPA
14 order.
15      I consider those two things really
16 outgrowths of the same project and the same
17 assignment.
18      Once we got the EIS in place, the EIS
19 team in place to develop an environmental impact
20 study, we realized that just as good business, and
21 also as a defensive measure to avoid this type of
22 litigation in the future, we needed to get a policy

Page 104

1  statement that the agency could look to whenever we
2  developed rules in the future so that we would know
3  when we needed an environmental impact study, when
4  we simply needed an environmental assessment, and
5  when we could look to categorical exclusion of
6  certain of our rulemaking initiatives.
7       And so Ms. Walls then became the lead
8  attorney to develop the NEPA order that the agency
9  needed to have in place. So it was really a
10 continuum.
11      Having gotten the EIS process in full
12 gear and worked to convene the agency task force and
13 to make sure that the EIS was rolling along on its
14 parallel track, she then turned her sights to
15 working with other agency program officials to
16 develop the NEPA order.
17      Q.  But with respect to the EIS itself,
18 she no longer had a role in that? She worked on
19 something that was a spinoff off of that, if you
20 will?
21      A.  That's my recollection. I mean, as I
22 say, she could have been consulted on various

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 105

1    informational pieces that would supplement the
2    process that the EIS team had in place, but I'm not
3    aware of any specific assignments or anything in
4    particular certainly that came through me that would
5    have been an EIS development assignment.
6         Q.   So her role ended or stopped and then
7    she worked on a related or spinoff issue?
8         A.   Correct.
9         Q.   And the spinoff issue was to insure
10   that you had something in place if this
11   environmental impact issue ever came up in the
12   future?
13        A.   It was to insure that the agency had a
14   policy guidance out there so that in any rule making
15   initiatives in the future we had a policy to look to
16   to determine how we should assess the environmental
17   impact of that rule making initiative and to what
18   lengths we needed to go to make sure that we had
19   fully satisfied the requirements of NEPA.
20        Q.   So although she was still involved in
21   the general subject area, the only liaison, if you
22   will, for motor carriers was McCowan?

Page 106

1         A.   The only liaison with the
2    environmental impact statement task force.
3         Q.   Right.
4         A.   Yes.
5         Q.   Why was it McCowan and not Walls?
6         A.   Primarily because this initiative had
7    been identified as a top priority of our
8    administrator, Annette Sandberg, and she wanted the
9    direct report to be someone who was a direct report
10   to her.
11             She wanted to have complete, quick,
12   open lines of communication with one of her direct
13   reports, which would be Mr. McCowan.  And she wanted
14   him to be able to be directly involved in the
15   process and to be able to give her up-to-the-minute
16   briefings and full information at any point in time
17   on how the progress of the EIS task force was going.
18        Q.   Let's take a break.
19             (Brief recess was taken)
20             MS. MCKINNEY: Back on the record.
21        BY MS. MCKINNEY:  (RESUMED)
22        Q.   Before the break, we were talking

Page 107

1    about the EIS task force.
2         A.   Right.
3         Q.   Did Charlene Sanders have any role on
4    that task force?
5         A.   She had had a background in doing
6    environmental issues when she was an attorney with
7    the Federal Highway Administration.  And as I
8    recall, we asked her on occasion to be an extra pair
9    of eyes and ears looking at work products of the
10   task force, weighing in from the perspective of
11   someone who had previously been involved in
12   environmental litigation.
13             I would consider her a member of the
14   task force.  Although she wasn't a member of the
15   initial group that Ms. Walls convened, I don't
16   believe as an environmental expert from outside the
17   agency obviously.
18             She was an internal resource that we
19   used sort to bounce off work products and to bounce
20   off issues that arose in the decision making
21   process.  And she did have review responsibilities
22   for work products they were circulated among the

Page 108

1    task force.  They were also circulated to her for
2    evaluation and comment.
3         Q.   Did she have any role in the EIS once
4    the consultant was hired?
5         A.   Not that I am aware.
6         Q.   So she didn't continue to work on it
7    after that point?
8         A.   Not that I am aware, except possibly
9    in the same context that I mentioned for other
10   employees.  The contractor from time to time or the
11   project manager could confer with employees who had
12   previously been involved in the development stages
13   for follow-up information.
14             And she might certainly have been
15   approached for that sort of input, but I'm not aware
16   of any specific assignments that she handled.
17        Q.   What about Ms. Rutledge, what was her
18   role on the EIS task force, if any?
19        A.   Initially or after the project
20   started?
21        Q.   Let's start initially.
22        A.   Initially she was more of a

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 109

1   consultative role. She was involved in some of the
2   meetings when the panel of experts was convened. I
3   know she met periodically with both Ms. Walls and
4   myself to direct how the process was going to be
5   handled.
6           And because she oversaw both the
7   regulatory affairs division and the general law
8   division that were involved in the developmental
9   process, she would have invoked her role, as I
10  mentioned in some of these cross-disciplinary issues
11  that come up in the office of chief counsel.
12          This had a very definite general law
13  presence because of the contracting and the
14  procurement issues involved, and it had a very
15  definite regulatory presence because of responding
16  to the regulatory litigation involved.
17          So she was involved definitely in
18  overseeing the project and conferring with both the
19  heads of the general law and the regulatory division
20  as to how we would dispense assignments among our
21  respective employees and which division would handle
22  which aspect of the developmental process for the

Page 110

1   EIS.
2           Q.  And after the consultant was hired?
3           A.  After the consultant was hired,
4   Brigham McCowan pretty much, as I said, needed to be
5   a direct report between counsel's office and the
6   administrator's office. And so he was primarily the
7   liaison for the role of the EIS development in
8   counsel's office and the administrator's interest in
9   following it.
10          It's very possible that in her
11  capacity as his backup, Ms. Rutledge may have
12  provided some of those services as well, but it was
13  primarily Mr. McCowan who was responsible for the
14  liaison between counsel's office and the
15  administrator's office.
16          Q.  Previously we had talked about some of
17  the employees you supervised before the
18  reorganization. You mentioned that three of the
19  employees were kind of generalists, Chow, Ottman,
20  and you mentioned Walls as a different kind of
21  generalist, if you will. And you said the others
22  were specialists. Who were the other specialists?

Page 111

1           A.  Charles Medalen, Mike Falk and Joe
2   Solomey.
3           Q.  Charles Medalen, what did he
4   specialize in?
5           A.  He had several areas of expertise.
6   One was the MCSA program, motor carrier safety
7   assistant program. And he served as our direct
8   liaison with the motor carrier assistant program
9   staff in the agency, legislative analysis and
10  providing technical assistance to legislative
11  committtees.
12          He was the primary attorney who
13  handled any legislative inquiries, any request for
14  technical assistance, any legislative drafting, and
15  supported the work of the legislative affairs
16  division, which previously was not part of counsel's
17  office. It had previously been lodged in a program
18  office.
19          He was the attorney who was the
20  liaison to our legislative affairs division. That
21  division was subsequently moved into counsel's
22  office. And because, as I mentioned earlier, they

Page 112

1   did not have any attorney staff members on that
2   division until recently, he served as the legal
3   counsel, if you will, working with any kind of
4   legislative affairs issues that came through
5   counsel.
6           He is also very much an expert in some
7   of the technical regulations of the motor carrier
8   program. By technical, I mean regulations that have
9   to do with operational and vehicle safety issues.
10          Q.  Anything else?
11          A.  I think that's pretty much it.
12  Vehicle safety covers a pretty wide range of things
13  like driver qualifications, medical certification,
14  issues that relate to vehicle safety, but that's a
15  generic term for a lot of his program expertise.
16          Q.  And what about Michael Falk, what was
17  his specialty?
18          A.  Primarily commercial regulation. He
19  had transferred to Federal Highway and then
20  subsequently to FMCSA from the Interstate Commerce
21  Commission, where he had been a regional counsel.
22          And largely his work involved

28 (Pages 109 to 112)

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 113

1  commercial regulatory matters; licensing,
2  registration, insurance, any kind of issues that
3  have to do with the commercial oversight and
4  regulation of motor carrier industry as opposed to
5  the operational safety side, which was what
6  Mr. Medalen was primarily involved in.
7      Q.  Anything else?
8      A.  I think that pretty much covers it.
9      Q.  And Joe Solomey, what was his
10 specialty?
11     A.  Joe Solomey was the enforcement
12 specialist in the division.  He worked very closely
13 with the field attorneys who were involved in the
14 agency's enforcement.  He worked very closely with
15 the enforcement program office in terms of
16 developing enforcement related regulations.
17     Some of that involves operational
18 safety.  Some of it involved the exemption program
19 for drivers.  Some of it involved the field attorney
20 issues that arose out of our adjudications and
21 enforcement process.
22     And he primarily was the liaison

Page 114

1  between our division and the field attorneys, who
2  actually implemented the enforcement program in the
3  field and were located in service centers throughout
4  the country as opposed to being stationed at
5  headquarters.
6      Q.  Anything else?
7      A.  I think that pretty much covers it.
8      Q.  And Charles Medalen, I am assuming
9  that's a male?
10     A.  Yes.
11     Q.  What is his race?
12     A.  Caucasian.
13     Q.  And Mike Falk, I am assuming that's a
14 male, and what's his race?
15     A.  It is a male and also Caucasian.
16     Q.  And Joe Solomey, I am assuming he is a
17 male?
18     A.  Correct.
19     Q.  What is his race?
20     A.  Caucasian.
21     Q.  You said Charles Medalen had worked at
22 ICC?

Page 115

1      A.  No, Mike Falk had worked at the ICC.
2      Q.  Any of the other employees?
3      A.  In my division --
4      Q.  I'm sorry, out of Mike Falk, Charles
5  Medalen and Joe Solomey?
6      A.  No.
7      Q.  Mike Falk was the only one?
8      A.  Just Mike, correct.
9      Q.  So he had been in motor carrier for a
10 long period of time?
11     A.  He had been in motor carrier law, and
12 specifically ICC regulation for a considerable
13 period of time.  I think he had been at the ICC
14 since the early to mid 1970s.  When the ICC was
15 terminated as an agency, he too transferred to
16 Federal Highways, and then subsequently to FMCSA.
17     Q.  What is his GS level?
18     A.  Fifteen.
19     Q.  And Charles Medalen, how many years
20 had he worked for the agency, do you know?
21     A.  I believe he started with the
22 department in Federal Highway Administration as part

Page 116

1  of the chief counsel's motor carrier law division.
2  I believe he started working sometime in the early
3  1990s.  I don't know the exact date.
4      Q.  1990s?
5      A.  I believe so.
6      Q.  And what is his GS level?
7      A.  Fifteen.
8      Q.  And Joe Solomey, when did he start
9  working in that area?
10     A.  I believe he too started working with
11 the office of chief counsel in the Federal Highway
12 Administration.  He was part of the motor carrier
13 law division there.  And I believe he started
14 working in the early 1990s, maybe around 1993,
15 approximately, or 1994.
16     Q.  What was his GS level?
17     A.  At the time he was in my division, he
18 was a GS-14.
19     Q.  And his level now?
20     A.  I believe he is a GS-15 now.
21     Q.  He is in another agency?
22     A.  Correct.

SLR REPORTING
(301) 340-0042

Page 117

1      Q.  When he went to the other agency, did
2   he get his GS-15?
3      A.  Yes.
4      Q.  Did the general law division always
5   exist?
6      A.  Yes.  It was one of the two divisions
7   that when the office of chief counsel was originated
8   in FMCSA, there were two divisions, general law and
9   then the combined division of enforcement and
10   regulatory affairs.
11      Q.  In enforcement and regulatory affairs,
12   who did a lot of the general law work?  Who did the
13   general law work before the reorganization occurred?
14   Who did the general law work before the general law
15   division?
16      A.  So as part of Federal Highway
17   Administration who did the general law work?
18      Q.  Yes.
19      A.  I believe that Federal Highway
20   Administration also had a division that was either
21   called general law or served the function of a
22   general law division.

Page 118

1          I wasn't part of that group, but my
2   understanding is that they had their own group of
3   attorneys that handled all of the matters that are
4   general law issues.  It's generally finance,
5   personnel issues, contracting and procurement
6   issues.
7      Q.  Was general law within FMCSA created
8   at some point in time?  You were saying it always
9   existed.
10      A.  Right.  My understanding is when we
11   started as an organization, there were a
12   differentiation of functions between two primary
13   areas; general law being one and my division of
14   enforcement and regulatory affairs being the other.
15      Q.  Who is Patricia Burke?
16      MS. ROSEN:  Objection.  You've already
17   asked that question, but go ahead and answer it
18   again.
19      THE WITNESS:  She was the acting
20   assistant chief counsel for general law for a period
21   of time when she was in FMCSA's counsel's office.
22   She's currently an assistant chief counsel for the

Page 119

1   Pipeline and Hazardous Materials Administration.
2      BY MS. MCKINNEY:  (RESUMED)
3      Q.  Did she have any attorneys working
4   under her?
5      A.  When she was acting chief counsel, she
6   did for general law, yes.
7      Q.  How many attorneys worked under her?
8      A.  I'm thinking.  I can think of two
9   right now.  There may have been others.  It wasn't
10   my division, but I can think of two who were
11   involved in general law when she was acting as the
12   head of that division.
13      Q.  Who were they?
14      A.  Florian Chess and Rosemary Detling are
15   the two that I can think of.  There was an attorney
16   who was in the general law division by the name of
17   Sonya White, who is no longer there.  I think she
18   may have been in the division when Ms. Burke was the
19   acting chief, but I can't be positive about that.
20          She was in the division for a period
21   of time and then went to a different agency.  And
22   I'm not sure whether her tenure coincided with Pat

Page 120

1   Burke's heading up the division or not.
2      Q.  Did Ms. Walls do any work in general
3   law with Patricia Burke?
4      A.  As a member of the general law
5   division?
6      Q.  Did she have any assignments that came
7   out of the general law division that she did with
8   Patricia Burke?
9      A.  Not that I can recall.  She did work,
10   as we've discussed, on the environmental impact
11   study project, and that was in collaboration with
12   some of the general law attorneys.  And I think
13   Ms. Burke was the head of general law during at
14   least part of that period, but the assignments
15   didn't emanate from that division.
16          Ms. Walls would have worked closely
17   with general law attorneys on the staff.  Actually,
18   if I can clarify or amend what I just said, I can
19   think of one other attorney who was in the general
20   law division who again is no longer there.
21      Q.  Who was that?
22      A.  Robert Brown.  Again, I can't be sure,

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 121

1  but his tenure as a staff attorney in general law
2  probably overlapped with Ms. Burke's position as
3  acting chief of that division.
4      Q.  I would like this marked as Deposition
5  Exhibit No. 2.
6          (Document marked Exhibit No. 2)
7      Q.  I've just had this marked as
8  Deposition Exhibit No. 2.  It's a memorandum to
9  heads of operating administrations and chief
10  counsels from Norman Mineta.  The subject is
11  attorney promotion policy in DOT.  The date is
12  January 13, 2005.
13          Do you recognize this document?
14      A.  I do.
15      Q.  What is the policy that this document
16  represents and what policy is outlined by this
17  memorandum from the secretary?
18      A.  Basically it's a policy that advises
19  heads of the different modes within the Department
20  of Transportation and the chief counsels for the
21  various modes of considerations that should be in
22  effect in order to promote attorneys to the position

Page 122

1  of GS-15.
2      Q.  Isn't it true that the secretary
3  wanted to promote or I guess I should say advance
4  attorneys so that the agency could be competitive
5  with the salaries that are given to attorneys in
6  private practice?
7      A.  I think it specifically says that we
8  can't expect to match those salaries, but it is a
9  consideration to make us as competitive as possible
10  with private sector employment.
11      Q.  The purpose was to advance the
12  agency's I guess promotion rate so that the agency
13  attorneys would be competitive, or at least that was
14  the intent; is that not correct?
15      A.  I can assume that that was part of the
16  intent.  Since this didn't originate with me, I'm
17  reacting to what it sounds like to me.  And, yes, it
18  does sound like a consideration is making our
19  positions for attorneys competitive with the private
20  sector.
21      Q.  Did you receive this Deposition
22  Exhibit No. 2?

Page 123

1      A.  Yes.
2      Q.  How did you receive it?  Was it in a
3  meeting?  Was it sent to you directly?
4      A.  I cannot remember exactly.  I believe
5  I received it electronically, but I don't know who
6  originated the e-mail.  And then I also believe
7  subsequently to that it was provided to staff within
8  the office of chief counsel.  And in all likelihood,
9  it was during a division chief's meeting, but I
10  honestly can't remember exactly how it fell into my
11  hands the first time.
12      Q.  Isn't it the intent that the policy is
13  that attorneys should be promoted based on merit,
14  that if based on merit they deserve a 15, then
15  managers should encourage their promotion efforts
16  and should allow the employee to be promoted to the
17  15 level?  Isn't that the intent of this policy?
18      A.  Can I reread it?  I mean, I haven't
19  read it word for word.
20      MS. ROSEN:  I don't think she can
21  speak to the the intent of the policy.  She can read
22  what it says.  She didn't write the policy.

Page 124

1      MS. MCKINNEY:  She is a manager in
2  your agency.  She should have an understanding of
3  what the intent of the policy is.  It's coming from
4  the secretary.  She should have an understanding.
5      THE WITNESS:  Since it directs that we
6  should take appropriate steps to promote meritorious
7  attorneys, I would say it's advocating to agency's
8  legal management that we should consider attorneys
9  as possible contenders for grade 15 positions when
10  their job performance merits that kind of
11  consideration.
12      BY MS. MCKINNEY:  (RESUMED)
13      Q.  When you received this memorandum,
14  were you given any kind of explanation, directive?
15      A.  It was provided to us more just as an
16  awareness piece.  Here's something that has come
17  obviously from the secretary of the department, so
18  obviously it's something that's deserving of our
19  consideration, but there was no specific discussion
20  about it or specific discussion beyond the scope of
21  the memo itself.
22          It was just handed out and indicated

31 (Pages 121 to 124)

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 125

1   that this is something that as part of the office of
2   chief counsel management we should be aware of,
3   because it did represent a policy directive that
4   came from leadership and it was specifically
5   directed to chief counsels.
6          So clearly the assistant chief
7   counsels are part of that management team and should
8   be aware of it and should consider implementing it
9   as appropriate for their divisions.
10      Q.   Has motor carriers done anything to
11  implement this policy?
12      A.   I would say yes in that it was
13  distributed within the office of chief counsel, and
14  it was an awareness piece that was provided to all
15  the assistant chief counsels, as well as leadership
16  with counsel's office.
17      Q.   I'm talking about something beyond
18  just being handed this memorandum.  Was there
19  something done in motor carriers to implement this
20  policy other than just making the chief counsels
21  aware of it and yourself, the assistant chief
22  counsel, aware of it?

Page 126

1       A.   Well, implicit in making us aware of
2   it I would say is making it part of our decision
3   making process when we are considering eligibility
4   of our employees for promotion.  This is one of the
5   factors in terms of a departmental directive that we
6   would be required to consider.
7       Q.   Did Rutledge tell you that that's
8   something that you should take into account in your
9   decision making?
10      A.   She provided us with the memo and told
11  us to be aware of this as this is now the policy for
12  the department.
13      Q.   Did she state that?  Did she make any
14  kind of explanation?  Did she give you any kind of
15  directive or did she just hand you the memo and say
16  be aware of this?
17      A.   She provided the memo and said be
18  aware, and she said this is what her understanding
19  of the memo was, that it continues to indicate that
20  it's the meritorious performance that we need to
21  focus on, that promotion -- and I believe it says so
22  in here, promotion to a grade 15 is not an

Page 127

1   entitlement, but that we need to be aware in
2   assessing eligibility of our employees that this is
3   the departmental policy and we should factor that
4   into our consideration when we assess someone's
5   merit to be promoted.
6       Q.   Is that what you assumed or designed
7   from her handing you the memo, or did she actually
8   state words to that effect when she handed you the
9   memo?
10      A.   I believe she provided the memo or
11  perhaps did not hand us the memo but told us that
12  the memo was coming around to us and that we needed
13  to be aware that this policy had been sent out to
14  all the chief counsels within the department, that
15  it was something that she wanted the assistant chief
16  counsels, as part of her management team, to be
17  aware of.
18         And she emphasized again that the memo
19  says that it is still meritorious performance that
20  we're looking to and not entitlement.  But those
21  were factors, and this policy was a factor that we
22  need to be aware of when we assess our employee's

Page 128

1   eligibility for promotion.
2       Q.   What about McCowan, what did he say
3   about the memorandum?
4       A.   I don't remember him having any
5   conversations specifically about it.
6       Q.   How did she communicate this to you?
7   Was it a conversation?  Was it by e-mail?  How did
8   she communicate this to you?
9       A.   It wasn't by e-mail.  I remember
10  possibly receiving this memo electronically, but I
11  can't remember from whom.  I do remember, though,
12  after the memo was made available, that Ms. Rutledge
13  mentioned to me, and I believe to other division
14  chiefs in the context of a division chief's meeting,
15  that this memo was out and that it was something
16  that we should be aware of.
17         It wasn't the subject of any kind of a
18  special meeting or any kind of a directed
19  discussion.  It was simply an awareness piece and
20  her assessment of what the memo said in a very
21  summary fashion.
22         She simply told us, again, it still

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 129

1 requires meritorious performance. It requires us to
2 be aware that promotion to the 15 level is not an
3 entitlement. But when we assess promotability
4 issues within our respective divisions, we should be
5 aware that this policy is in existence.
6     Q. And McCowan, to your knowledge, had no
7 comment?
8     A. I don't believe he was involved in
9 that presentation or discussion.
10     Q. What role do you have in promotion
11 decisions in your job duties and responsibilities?
12     A. For members of divisions, as a first
13 line supervisor, I would be responsible for
14 assessing their performance at their current level,
15 assessing their performance at a projected elevated
16 level, and making recommendations when I thought
17 appropriate to upper level management that a
18 particular employee should be considered for a
19 promotion and merits a promotion.
20     Q. Do you have authority to promote your
21 subordinates, the employees?
22     A. Independently?

Page 130

1     Q. Yes.
2     A. No. I only have authority to
3 recommend a promotion to upper level management.
4     Q. What is this policy if it's a policy?
5 I'm not certain that it is, but what is it in terms
6 of your recommendation? How does that process go?
7 What is the procedure? Is it something that comes
8 up regularly as part of a performance process or
9 performance evaluation process, or is something
10 formalized?
11     A. No. It's circumstantial depending on
12 the particular employee, their level at their
13 current GS position, their eligibility for or their
14 interest in promotability. And it isn't something
15 that's discussed on any kind of a routine basis.
16         If you're referring to, for example,
17 the performance appraisal system itself, that's done
18 on an annual basis, but that does not equate to
19 discussion of promotability. They are two separate
20 issues.
21         And promotability is determined by
22 each particular employee's current status and their

Page 131

1 grade level, their time and grade, their eligibility
2 for promotion, their indicated interest in receiving
3 a promotion or being considered for a promotion, and
4 then obviously the level of performance.
5         In order to be considered for a
6 promotion, you need to be actually performing over a
7 sustained period of time at the level to which you
8 want to be promoted.
9     Q. So then it's essentially at your
10 discretion when to make that recommendation?
11     A. Correct.
12     Q. It's not part of a formal process?
13     A. Correct.
14     Q. Other than at your discretion, is
15 there any other way that this kind of conversation
16 or process would come up?
17     A. Well, it's certainly something that
18 the employees can initiate. There are minimum norms
19 that need to be met by employees at certain grade
20 levels before their eligibility for promotion is
21 even a factor to be considered. And that
22 specifically has to do with time and grade.

Page 132

1         Beyond those minimal performance
2 requirements of time and grade at the various
3 levels, then it becomes more of a discretionary
4 factor.
5         An employee who might be performing at
6 a level for the next grade but has not served the
7 minimum time and grade requirements would be
8 precluded for being eligible for a promotion. And
9 so that would limit my discretion.
10         But beyond the time and grade
11 requirement, then it becomes discretionary. And in
12 my case, I assess the particular employee's
13 performance, as well as their announced and
14 demonstrated interest in being promoted.
15         So it becomes something that I factor
16 in to my personnel assessments of my individual
17 staff. And it's something that obviously is an
18 issue for consideration if the staff member has
19 indicated their interest in promotability and I have
20 assessed that they either have achieved that level
21 or I have assessed that they need to do things to
22 work toward that level, and I will collaboratively

33 (Pages 129 to 132)

Page 133

1    work with them to meet those goals.
2        Q.   What are the time and grade
3    requirements that you have mentioned?
4        A.   I believe for certain GS levels, it's
5    a minimum of a year at that particular grade.  And I
6    believe for the GS-14, to be promoted to a GS-14,
7    it's 18 months is the recommended or departmental
8    policy.  And to be promoted to a GS-15, it may be
9    two years.
10           And I believe those latter two time
11   frames, the 18 months and the two years, my
12   understanding is that is recommended departmental
13   policy, not an OPM requirement.  I believe the OPM
14   requirement is a year and a grade as a minimum for
15   any level.
16       Q.   I would like this marked as Exhibit
17   No. 3.
18           (Document marked Exhibit No. 3)
19       Q.   I've just had marked as Deposition No.
20   3, a memorandum from Rosalind Knapp, acting general
21   counsel.  Subject is promotion policy for attorneys.
22   And the date is October 17, 2000.

Page 134

1            Do you recognize this document?
2        A.   Actually, I do.  And obviously this
3    says a year and grade for the 15.  I think when I
4    said two years, I was relying on a departmental
5    policy that I had seen by a previous chief counsel
6    that had that as a guideline.  But, again, as I say,
7    the OPM guidelines are a year in grade.  And I would
8    assume that those control departmental policy as far
9    as a floor.
10           This appears to say, or it does say,
11   that attorneys are eligible to be considered for
12   promotion after one year and grade.  And it doesn't
13   specify GS levels in making that determination.
14       Q.   Had you seen Deposition Exhibit No. 3
15   before today?
16       A.   I think I saw it when I was reviewing
17   some of the submissions that were made in this case,
18   but this wasn't something I had introduced.  So I
19   don't recall.  I'm sure it came to my attention.  I
20   don't recall seeing it before.  And it was something
21   that was put into the record by someone other than
22   myself.

Page 135

1        Q.   So the time and grade then would be
2    one year?
3        A.   That's how I read this.
4        Q.   If you recommend an attorney for a
5    promotion, who has to concur with that decision?
6        A.   I would make my recommendation to the
7    deputy chief counsel, Judith Rutledge.  And
8    presuming there is a chief counsel in residence at
9    that time, it would go from Ms. Rutledge to the
10   chief counsel, and then would also need to be
11   approved, as I understand it, by the administrator,
12   because it obviously has staffing and resource
13   implications.
14           I do believe that promotions also have
15   to be cleared by the general counsel, but I'm not
16   sure of that.
17       Q.   So if you have a recommendation, you
18   have to take it to Rutledge and then it goes up the
19   chain of command?
20       A.   Correct.
21       Q.   What attorneys in your division have
22   you recommended to be promoted to the GS-15 level?

Page 136

1        A.   None.
2        Q.   So you've been working since 2000?
3        A.   Yes.
4        Q.   So in that five-year period, you have
5    recommended no employees?
6        A.   Correct.
7        Q.   Why is that?
8        A.   When we first were created as a
9    division, I had a number of exploratory background
10   discussions with Ms. Rutledge about what the office
11   policies would be for promotability from a grade 14
12   to a grade 15.
13           I had two employees on my staff at the
14   time; Ms. Walls and Joe Solomey, who were both
15   attorneys at the 14 level whose time and grade would
16   have allowed them to be considered for a promotion
17   to a 15.
18           They both had expressed interest to me
19   on a number of occasions about their desire to be
20   promoted.  And I believe that they qualified for
21   promotability.
22           We were a new agency.  We had started

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 137

1  up as a new office and didn't have any specific
2  norms in place at that time for what our criteria
3  would be for promotability from a 14 to a 15.
4         So I had exploratory conversations
5  with Judy Rutledge on several occasions, mentioning
6  the interest of certain employees in promotability,
7  but these conversations were not focused initially
8  on individual employee's qualifications.
9         They were strictly determinative of
10  what policies would be in place within the
11  organization across the board to entitle someone to
12  consideration for a 15, not necessarily to entitle
13  them for promotion to a 15.
14         Having learned what Ms. Rutledge
15  believed were the appropriate expectations for grade
16  15 attorneys and having assessed my attorneys
17  against those standards that were operative
18  throughout the office, I determined that at that
19  point in time neither of my employees would fully
20  meet the requirements for promotion within the
21  office of chief counsel.
22         And as a result of that assessment and

Page 138

1  as a result of the learning conversations with
2  Ms. Rutledge about the norms that we would have in
3  place, I switched my focus from discussing the
4  promotability of any individual employee with her to
5  discussing with the employees what the office
6  expectations were for performance at the grade 15
7  level, and trying to impress upon them what would be
8  expected of them in order to demonstrate performance
9  at that level and therefore merit my recommendation
10  that I thought would be successful for a promotion.
11         As a supervisor over the years, I have
12  always operated on a theory that you don't do any
13  kind of a service to an employee to recommend them
14  for a promotion prematurely in the eyes of the
15  agency policy. It's better to put forth a
16  recommendation when you have a degree of confidence
17  that it will succeed.
18         And having explored with upper level
19  management in the office of chief counsel what
20  policies were in place across the board for
21  qualifying for a 15, it was my determination that a
22  recommendation of promotion for either one of my

Page 139

1  employees who were at the grade 14 level would not
2  be successful.
3         And I would do a better service to
4  them to mentor, coach, guide, direct and encourage
5  them to reach levels of performance that would then
6  qualify them for promotability within the office.
7      Q.  What standards did Ms. Rutledge
8  communicate to you when you had these exploratory
9  conversations with her?
10      A.  A large part of the expectation had to
11  do with subject matter expertise, sufficient depth
12  of knowledge, as well as breath of knowledge in
13  program areas that the employee, in order to say
14  they were performing at a grade 15 level, would need
15  to be essentially a go to a person within the
16  agency, an expert of national stature in a specific
17  range of program areas where their knowledge was
18  sufficiently deep that they were looked to as
19  experts both by personnel in the office of chief
20  counsel and in the agency in general.
21         A second factor was the employee's
22  ability to communicate very effectively at an

Page 140

1  executive level both orally and in writing, to be
2  able to work very effectively and productively both
3  with upper level management in the office and in the
4  department, as well as program level staff, to be
5  perceived as readily accessible by program area
6  staff, to be perceived as extremely proactive and
7  involved in the program areas that they assisted as
8  clients, to be recognized as someone who was
9  supportive fully of the initiatives that the office
10  of chief counsel took on, supportive of agency
11  initiatives, and very, very familiar with the big
12  picture policy implications of the program areas
13  they served.
14         All of those factors were things that
15  Ms. Rutledge and I discussed at great length when
16  the office was relatively new as benchmarks for
17  assessing performance at a grade 15.
18         They are things that have never
19  changed. They are still applied pretty much across
20  the board, and they are factors that are reflected
21  in the kind of discussions I have with employees who
22  are at the grade 14 level seeking promotion to a

Page 141

1 grade 15.
2        Q.  Did you have these communications with
3 anyone else other than Ms. Rutledge, or I guess I
4 should say was anyone else present during these
5 communications?
6        A.  No.  Generally in the initial
7 exploratory conversations I had with her, it was one
8 on one meetings between Ms. Rutledge and myself.  As
9 time progressed and we have had individual
10 discussions with particular employees about their
11 promotability from time to time, they've been
12 involved with these discussions as well, either with
13 me individually or with me and Ms. Rutledge.
14        Q.  You said you had been a supervisor
15 previously with the ICC?
16        A.  Correct.
17        Q.  And then you did not become a
18 supervisor again until the new motor carrier agency
19 was up and running?
20        A.  Correct.  I was not a supervisor
21 previously within DOT.
22        Q.  At ICC, when you were a supervisor,

Page 142

1 were you involved at all in promotions of employees?
2        A.  Yes.
3        Q.  Were you involved in similar
4 promotions of employees from GS-14 to 15?
5        A.  No.  The employees that I supervised
6 at the ICC were generally employees whose highest
7 performance level was moving from a 13 to a 14, as I
8 can recall.  I don't recall supervising any 14s who
9 were promoted to 15s.
10        Q.  During your career, have you ever
11 heard of any standards articulated such as
12 Ms. Rutledge articulated with respect to the
13 promotability of 14s to 15s?  Have you ever heard of
14 anyone articulating it in that manner?
15        A.  I've heard of standards that she
16 articulated being very typically those that are
17 expected of a grade 15.  I've never been in a
18 situation personally where it was an issue in
19 assessing one of my own employee's promotability
20 from a 14 to 15.
21        So I've never had that kind of
22 specific discussion before with one of my

Page 143

1 supervisors.  But I have certainly seen those
2 specific types of standards represented in, for
3 example, OPM materials and elsewhere where the
4 expectations for a grade 15 attorney performance is
5 spelled out.
6        Q.  Are you aware of any other agency,
7 department, office, whatever in DOT that has
8 articulated such standards of promotability?
9        A.  Not specifically, no.  As I say, they
10 are articulated in OPM materials, and I can only
11 assume that other offices have reflected similar
12 standards, but it would be other counsel's offices.
13        And I have never been employed by
14 another counsel's office other than the Federal
15 Highway Administration within DOT.  And at that time
16 I wasn't a supervisor, so it wasn't really something
17 that I ever explored specifically with upper level
18 management until I became a supervisor in FMCSA.
19        Q.  What OPM regulations are you referring
20 to?
21        A.  I don't think they're regulations.  If
22 I said that, I apologize.  OPM publications.  And

Page 144

1 one of the documents, I believe --
2        MS. ROSEN:  I think we've cited in our
3 interrogatories we gave you the website for the OPM
4 document that she's referring to.
5        THE WITNESS:  Right.  It is mentioned
6 in the interrogatories.  And I can't cite it by
7 name, but I can find it in here if you'd like.
8        BY MS. MCKINNEY:  (RESUMED)
9        Q.  If you can look at Deposition Exhibit
10 No. 1.  I think it's the interrogatory.
11        A.  Yes.  And I know it is cited in here.
12 I'm just not exactly sure where.  It was a website
13 as well as a name, I believe.
14        In response to interrogatory No. 8, it
15 is a website reference
16 www.OPM.gov/fedclass/gs0905-pdf.  It's on page 9 of
17 the interrogatories.
18        Q.  These standards that Ms. Rutledge
19 communicated to you, are they written?  Are the
20 standards that she communicated to you, are they
21 written?
22        A.  No, they were not written.  The

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 145

1  website that I referenced has OPM standards that are
2  written, and they do refer to the same type of
3  considerations, but Ms. Rutledge's conversation with
4  me was strictly that. It was a discussion. And we
5  didn't have any kind of a written directive to
6  attorneys.
7      Q.  Has it ever been written?
8      A.  Not that I am aware of.
9      Q.  So it's just oral communications that
10 you had with her?
11     A.  Correct.
12     Q.  You say that you communicated what
13 Ms. Rutledge said with respect to promotability to
14 your employees?
15     A.  Correct.
16     Q.  Did you ever write a written
17 memorandum for Joe Solomey recommending his
18 promotion to a GS-15?
19     A.  No.
20     Q.  Did you ever write any kind of similar
21 memorandum discussing his promotability and the
22 things that he had done that shows his strengths, if

Page 146

1  you will, or accomplishments that he had, let's say
2  supposedly made, that would support him being a
3  GS-15?
4      A.  No. I've written memorandums that
5  were complimentary of Mr. Solomey for other
6  purposes, but not for purposes of recommending him
7  for a promotion.
8      Q.  Have you ever written any memorandums
9  for Joe Solomey that set forth what he had
10 accomplished with an eye toward something along the
11 lines of it being the types of things that would
12 help him be promoted or --
13     MS. ROSEN:  She just answered. You're
14 mischaracterizing what she did.
15     MS. MCKINNEY:  I don't hear an
16 objection.
17     MS. ROSEN:  That's an objection.
18 BY MS. MCKINNEY:  (RESUMED)
19     Q.  Have you written such a memorandum to
20 Joe Solomey basically setting forth the things he
21 had accomplished or things he had done which would
22 demonstrate competence at a GS-15 level or anything

Page 147

1  along those lines?
2      A.  I've written complimentary memoranda
3  concerning his performance. The purpose of those
4  was not to recommend him or suggest that he was
5  promotable to a grade 15. They had other purposes.
6      Q.  What memorandums do you remember?
7      A.  I can remember writing a
8  recommendation for his participation in the EPP
9  program. And I can remember writing a
10 recommendation for his nomination to be considered
11 for the Schneider award, which is a departmental
12 award that goes to an attorney who has been in
13 practice 10 years or fewer.
14     Both of those set forth his strengths
15 as an attorney and his contributions to the office
16 and the department as a whole, but they weren't in
17 anywhere related to his recommendation for a grade
18 15 promotion or they weren't developed with an eye
19 toward credentialing him as qualified for a grade
20 15.
21     Q.  Any other recommendations you can
22 remember writing for him?

Page 148

1      A.  Not that I can recall.
2      Q.  Ms. Walls has come to you expressing
3  an interest in being promoted to a GS-15, has she
4  not?
5      A.  Yes, she has.
6      Q.  And she has since the formation of the
7  motor carrier agency, the new agency?
8      A.  Yes.
9      Q.  So since 2000?
10     A.  Correct.
11     Q.  She's been having discussions with you
12 about that?
13     A.  Correct.
14     Q.  And in what context have these
15 discussions come up, if you can recall?
16     A.  I can't recall specific context. I
17 know my response to her interest in promotability,
18 the logical time for them to be discussed, is during
19 either her interim or her final performance
20 appraisals.
21     And in virtually all, if not all of
22 those sessions, which occur on a relatively biannual

37 (Pages 145 to 148)

Page 149

1  basis, every six months or close to every six
2  months, we have discussed her performance at her
3  current level.
4          And because I know on a number of
5  occasions she has expressed to me in a promotion,
6  and that's a very sincere and strong goal of hers, I
7  automatically customize those kinds of performance
8  discussions to what I know particular employees have
9  on their personal development agenda.
10          And in her case, I know that getting
11  promoted to a 15 is a major part of that agenda.  So
12  the logical time, and the most frequent time, I
13  think, in which we have these kind of credentialing
14  discussions about attaining the skills and
15  demonstrating the performance required for a 15
16  would be during either her semiannual or her final
17  performance appraisals.
18          I'm sure that there have been
19  references to her interest, and we've had informal
20  discussions on other occasions, about her desire for
21  a promotion and her understanding and my
22  interpretation of office policies about what needs

Page 150

1  to happen in order for a promotion to be within the
2  realm of consideration.
3      Q.  I would like this marked as Exhibit
4  No. 4.
5          (Document marked Exhibit No. 4)
6      Q.  I've just had the court reporter mark
7  as Deposition No. 4, Ms. Elaine Walls' performance
8  appraisal form for the appraisal period October 1,
9  2001 to September 30, 2002.
10      Do you recognize this document?
11      A.  I do.
12      Q.  Is this one of the annual performance
13  appraisals that you give Ms. Walls?
14      A.  Yes.
15      Q.  And you were the first line supervisor
16  with respect to this performance appraisal?
17      A.  Yes.
18      Q.  Could you point out to me where in
19  this document you advised Ms. Walls of things that
20  she needs to do to develop her promotabitliy to a
21  GS-15?
22      A.  I'll look at this document.  I don't

Page 151

1  anticipate that it's within the four squares of this
2  document, because these performance appraisals that
3  are written assess the employee's performance at
4  their current level, which in her case is a grade
5  14.
6          The narrative portion of this, which
7  is the last two pages, would, if it's typical, and I
8  suspect it is, would highlight her accomplishments
9  and her achievements as a grade 14 attorney in the
10  division.
11          The conversations that usually
12  accompany performance appraisals that are written
13  are the more informal piece of the process where,
14  after completing the employee's performance
15  appraisal for the year that has just concluded, it's
16  part of the norm to look at how they would expect to
17  achieve, develop, over the coming performance
18  appraisal year.
19          And when I referenced the performance
20  appraisal discussions that we have, I said that was
21  the context in which we would normally discuss her
22  interest and promotability.  That's different from

Page 152

1  putting it in a written appraisal which is to assess
2  her performance at the grade 14 level.
3          What we're looking for when we talk
4  about promotability is the employee's performance
5  with regard to their ability to, their interest in
6  and their demonstrated success in performing at the
7  level to which they want to be promoted.
8          And that doesn't factor into assessing
9  their performance at their current level.  So that
10  wouldn't be something that you would assess an
11  employee under in order to develop their performance
12  appraisal for the past performance appraisal year.
13          I will look over just to see
14  specifically about this narrative, because I
15  honestly don't recall what this said.  And perhaps
16  there is something in this that would pick up on
17  developmental goals, but that wouldn't be the norm.
18          (Witness reading document)
19          Yes, as I suspected, this is pretty
20  much an assessment of her accomplishments and her
21  contributions to the division during the performance
22  appraisal year and her success as a GS-14 attorney.

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 153

1  It doesn't specifically relate as a write-up to what
2  would be expected of her to perform at the next
3  level.
4      Q.  How many conversations have you had
5  with Ms. Walls where she expressed an interest in
6  being promoted?
7      A.  I would say at a minimum eight to ten.
8  It could be more than that.  I mean, I'm thinking in
9  terms of the rhythm of performance appraisal
10 discussions.  I'm thinking in terms of the informal
11 dealings that we had with one another as conducting
12 division business and how they might come up.
13      And I would say since 2000 when we
14 were part of FMCSA chief counsel's office, there had
15 been at least eight or ten.
16      I know that prior to our affiliating
17 with FMCSA, when we were colleagues in the Federal
18 Highway Administration, she also advised me of her
19 interest in getting a grade 15 and having
20 discussions with upper level management within chief
21 counsel's office of highways.
22      That was obviously in a very different

Page 154

1  context.  That was colleague to colleague, but
2  expressing her interest in promotability.  But it
3  goes back a number of years.  And I would say as
4  only a rough estimate, which is the best I can give,
5  at least ten times.
6      Q.  This has been an ongoing concern of
7  Ms. Walls?
8      A.  Absolutely.
9      Q.  She articulated this to you even
10 before you became her supervisor when you were
11 colleagues?
12     A.  Yes.
13     Q.  Would you say it was a major concern
14 that she had when she came under your supervision?
15     A.  A major concern that --
16     Q.  Of hers?  Not of yours but of hers?
17     A.  Oh, yes, absolutely.  I think her goal
18 has been very clearly stated for a long time that
19 she wants to achieve a grade 15 attorney position.
20     Q.  Are you familiar with Ms. Walls'
21 position description?
22     A.  Yes.

Page 155

1      Q.  Does her position description in any
2  way limit her to a GS-14 level?
3      A.  My understanding is that the position
4  description is written for a position that goes no
5  higher than a GS-14.  That's the billet that we have
6  identified in the office for the position that she
7  currently holds.
8      Q.  Does the position description explain
9  duties and promotability?
10     A.  I don't believe it explains
11 promotability.  It explains expectations for
12 performance at the level in which the position is
13 currently identified.
14     I'm not familiar with any reference in
15 it to promotability.  But I would be happy to review
16 a copy and confirm that.  I have never seen a
17 performance description, position description, that
18 actually identified what needed to be done to move
19 into a different performance level.
20     There are position descriptions that
21 cover a range of GS levels.  And an attorney at one
22 of those levels may in fact have the same position

Page 156

1  description for an attorney at a higher level, but
2  it covers or it very specifically is defined as
3  covering a range of activities for different grade
4  levels.
5      Because her position goes no higher
6  than a 14 the way it's identified, I haven't
7  reviewed that position description for some time,
8  but I can't imagine why it would make any reference
9  to a grade 15 performance since the position isn't
10 identified beyond a 14.
11     Q.  But is it one of those position
12 descriptions, as you've mentioned, that would be
13 applicable for either a 14 or a 15?
14     A.  No.  I believe it stops at a 14.  We
15 don't have any nonsupervisory 15 positions
16 identified in counsel's office for attorneys who did
17 not come into counsel's office as a grade 15.
18     As I say, I haven't seen her
19 description in some time.  So if you have it, I
20 would be glad to look at it or I would be glad to
21 check and get back to you.
22     Q.  I would like this document marked as

SLR REPORTING
(301) 340-0042

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 157

1    Exhibit No. 5.
2         (Document marked Exhibit No. 5)
3         Q.  I've just had the court reporter mark
4    as Deposition Exhibit No. 5 a performance appraisal
5    form for Elaine Walls.  And the appraisal period is
6    October 1, 2002 to September 30, 2003.
7         Do you recognize this document?
8         A.  I do.
9         Q.  Were you the first line supervisor
10   with respect to this performance appraisal?
11        A.  Yes.
12        Q.  Does anywhere in that performance
13   appraisal set forth expectations or development for
14   Ms. Walls for a promotion to a GS-15?
15        A.  No, it doesn't.  And for the same
16   reason that the 2001 performance appraisal did not.
17        Q.  I would like this marked as Exhibit
18   No. 6.
19        (Document marked Exhibit No. 6)
20        Q.  I have just had the court reporter
21   mark as Deposition Exhibit No. 6 a general work
22   force performance appraisal record for Elaine Walls

Page 158

1    for the rating period October 1, 2003 to June 30,
2    2004.
3         Do you recognize that document?
4         A.  Yes, I do.
5         Q.  Were you the first line supervisor for
6    this performance appraisal?
7         A.  I was.
8         Q.  Could you show me anywhere in the
9    performance appraisal you set forth, if you do, if
10   you set forth mentoring developmental plans or
11   anything like that to assist Ms. Walls in her
12   promotability?
13        A.  That's not included within this
14   performance appraisal, again for the same reasons
15   it's not appropriate to a performance appraisal for
16   a performance at a GS-14 level to describe what
17   needs to be done to achieve a higher level of
18   performance.
19        MS. MCKINNEY:  Let's go off the
20   record.
21        (Recess was taken)
22        MS. MCKINNEY:  Back on the record.

Page 159

1         BY MS. MCKINNEY:  (RESUMED)
2         Q.  I believe just before the break I
3    asked you in Deposition Exhibit No. 6 if there is
4    anywhere in there that you wrote up your
5    developmental conversations with Ms. Walls, and you
6    said that you did not?
7         A.  Correct.
8         Q.  Is there anywhere that these
9    conversations that you had with her were written up
10   with respect to giving her guidance on her
11   promotability?
12        A.  On one occasion that I wanted to
13   specifically reference in clarifying Exhibit No. 5,
14   although I correctly said that there was nothing in
15   the four squares of this performance appraisal that
16   gave her any kind of developmental guidance for a
17   promotion, at the same time that we discussed this
18   particular performance appraisal in March of 2004, I
19   did provide her with a supplemental list of
20   suggestions that had to do with focus areas that
21   were my recommendation of things that would be
22   consistent with expectations for her performance at

Page 160

1    the 15, and were areas that I thought she could make
2    some significant strides and some significant
3    headway in showing expertise, showing competence,
4    and showing an attitude of support for the office
5    that would help to credential her for the things
6    that she needed to do to get a 15 and that would
7    hopefully grab the attention of others in the
8    management chain who were assessing her
9    promotability.
10        That was a one-page document that had
11   some items, and I believe it's included with the
12   documents that were produced.  So while it's not
13   within the four squares of the performance
14   appraisal, it was concurrent in time and did have
15   that purpose.
16        Your question asks for things written
17   up.  On another occasion, in her most recent
18   performance appraisal, which was in July of this
19   year, 2005, I had written up some talking points for
20   myself to reference during our performance appraisal
21   discussion.
22        They really served a purpose as a map

Page 161

1   or a guideline for me.  They were really more
2   talking points for me to make sure that I could
3   reference them during the course of our conversation
4   and not leave out things that I wanted to mention to
5   her.
6          It wasn't something that I provided to
7   her as a written supplement to her performance
8   appraisal as I had done during the 2004 appraisal
9   cycle.  But it basically did cover a number of
10  suggestions that again would help to enhance her
11  performance, and in my mind help to bring it up to
12  the next level where she needed to be in order to be
13  considered for a 15 position if there were one
14  created in the office.
15         Q.  Prior to March of 2004, had you ever
16  given her any kind of written guidance for
17  development for promotability?
18         A.  I don't recall any written guidance.
19  I remember frequently having those kind of
20  discussions in the context of following on to her
21  performance appraisals, but I don't remember ever
22  having written guidance that I supplied her with.

Page 162

1          Q.  So it was all oral discussions prior
2   to March of 2004?
3          A.  As best I can recall, yes.
4          Q.  You said that you gave her guidance in
5   the event that a position were created?
6          A.  Correct.
7          Q.  What did you mean by that?
8          A.  Currently, as I said, Ms. Walls is in
9   an attorney billet within our office that does not
10  go beyond the grade 14 level.  Other than
11  supervisory 15 positions, the only attorneys
12  currently in the office of chief counsel who were in
13  15 positions have billets that are identified as
14  such.  Any other attorney who is at the grade 11
15  through 14 level is in a position that terminates at
16  the 14 level, or at least no higher than the 14
17  level.
18         And in order for a nonsupervisory
19  attorney to move into a grade 15 position, assuming
20  no movement of current staff that are already in 15
21  positions, a position would have to be created at a
22  higher level than currently exists.

Page 163

1          Q.  So you're saying that you can't
2   promote from a GS-14 to a GS-15 unless there is an
3   open position?
4          A.  Unless there is an open position that
5   goes to the GS-15 level, correct.
6          Q.  We talked about Deposition Exhibit
7   No. 2.  That doesn't give the agency the authority
8   to promote an employee to a 15 if they deserve it
9   based on merit?
10         A.  As it's been explained to me, this has
11  to do with promotability.  It does not have to do
12  with agency resources or staffing constraints.  And
13  irrespective of this memo, I have been told that
14  this memo does not give us authority to change the
15  nature of a position.
16         That involves office and agency
17  resources and personnel staffing conversations that
18  go beyond the scope of this memo.  This memo has to
19  do with credentialing an employee to be considered
20  for a 15, but it does not in and of itself create a
21  15 position within the office.
22         That involves budget considerations,

Page 164

1   personnel considerations, resource conversations
2   that go well beyond the issues discussed in this
3   memo.
4          Q.  So it's your testimony then that if a
5   GS-15 position is not available, you can't promote
6   an employee to that level?
7          A.  That's what I've been told by our
8   office leadership, correct.
9          Q.  Who told you this?
10         A.  Ms. Rutledge.
11         Q.  Anyone else?
12         A.  Not directly, no.  Just Ms. Rutledge.
13         Q.  So Mr. McCowan did not tell you that?
14         A.  No, I haven't discussed that with him.
15  I understand from conversations with Ms. Rutledge
16  that he had discussed that with her, but he didn't
17  have any direct discussions about resource issues
18  with me.
19         Q.  Have you ever seen any written policy
20  stating that there has to be other resources
21  available?
22         A.  A written policy, no.  It's just been

41 (Pages 161 to 164)

Page 165

1  in discussions I've had with our office leadership,
2  Ms. Rutledge in particular.
3      Q.  So similar to the criteria that you
4  outlined to me, the issues with respect to
5  resources, is also oral and there's no written
6  policy or procedure that you are aware of?
7      A.  There may very well be a written
8  policy that has to do with agency budget or resource
9  personnel considerations.  There is no written
10  policy that's ever been shared with me.  It's
11  strictly been information that was imparted to me by
12  Ms. Rutledge when we talked about resource
13  constraints within the office.
14      Q.  How would you find out whether there
15  was such a policy?  Have you asked to see anything
16  written on it?
17      A.  No, I haven't.
18      Q.  You've taken Ms. Rutledge at her word?
19      A.  Yes.
20      Q.  You mentioned Mr. Robert Brown
21  previously.  I think you said he was one of the
22  employees that was in the general law division?

Page 166

1      A.  Correct.
2      Q.  Was he promoted to the GS-15 level?
3      A.  No.
4      Q.  How do you know that?
5      A.  Conversations that I had with him when
6  he was an employee in the office, and also since
7  that time Ms. Rutledge has confirmed in repsonse to
8  a direct question I asked her.
9      Q.  What did you ask her?
10      A.  At some point I noticed that one of
11  complainant's allegations was that Mr. Brown was a
12  grade 15 or had been promoted to a grade 15 within
13  the office.  And I did not believe that was the
14  case.  But because I wasn't his supervisor, I
15  wouldn't necessarily be in a position to know that.
16      So I asked Ms. Rutledge if in fact I
17  had missed something and he in fact had been
18  promoted.  And she assured me that no, he had not.
19  He was a grade 14 for the entire time he worked in
20  the office.
21      Q.  Have you ever seen any written
22  documentation indicating that he was a GS-14 the

Page 167

1  entire time he was in the office?
2      A.  No, I haven't.
3      Q.  So what you've based this on is
4  conversations with Ms. Rutledge?
5      A.  And with Mr. Brown before he left.
6      Q.  Mr. Brown told you he was a GS-14?
7      A.  He actually told me that he had
8  previously -- I believe he said he had previously
9  been a 15 prior to coming to FMCSA, and his hope was
10  to acquire a GS-15 somehow having returned to
11  government.  But he indicated that he had not been
12  able to get rehired as a grade 15 when he came to
13  FMCSA.
14      And he told me that one of the reasons
15  he was looking at employment possibilities outside
16  the agency is because he was anxious to get his
17  grade 15 back.  The direct inference of that is he
18  didn't have a grade 15 in the office.  That was one
19  of the motivations for looking elsewhere for
20  employment.
21      Q.  When did you have this conversation
22  with him?

Page 168

1      A.  I would say within a month or so prior
2  to his leaving FMCSA and taking another job.  And I
3  believe he left sometime in 2003.  I can't be sure
4  exactly when.  But it was briefly before he
5  departed, when he was discussing with me his reasons
6  for wanting to leave the agency.
7      Q.  How did this discussion come up?
8      A.  We were friends from working together
9  in the office on various things.  He would
10  occasionally stop by my office and let me know what
11  his plans were.
12      I believe he asked me at one point if
13  he needed a reference for his job search would I be
14  willing to be one of his references.  And in that
15  context, he was discussing with me his reasons for
16  needing to look for employment elsewhere.
17      And among them was the fact that he
18  was hoping to reacquire his grade 15 that he had had
19  when he was previously in government service.
20      Q.  I would like this document marked as
21  Exhibit No. 7.
22      (Document marked Exhibit No. 7)

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 169

1     Q. I have just had the court reporter
2 mark as Deposition Exhibit No. 7 a chart that's
3 entitled Federal Motor Carrier Safety Administration
4 Office of the Administrator. And it lists a number
5 of employees, their job title and GS level.
6         Have you seen this document before?
7     A. Not that I can recall. I think I've
8 heard reference to it in a discussion about
9 documents that were involved in this ongoing case,
10 but I don't believe I've actually --
11     Q. Is this something that's regularly
12 produced, to your knowledge, by the agency, Federal
13 Motor Carrier Safety Agency?
14     A. It looks like something that would be,
15 but not for the kind of purposes I'm involved in.
16 So it's nothing that I would routinely get. It
17 looks more like a personnel or a staffing or budget
18 document as opposed to anything that would be
19 provided as a roster. But no, I don't routinely see
20 these.
21     Q. Do you know in what context this would
22 have been created by the agency?

Page 170

1     A. I am assuming because of the way it's
2 identified as budgeted positions and funded FTEs and
3 that sort of thing, as I say, it looks more like a
4 budget or a human capital resource type document.
5 And as a consequence, it certainly looks like
6 something that would be routinely produced, but it's
7 nothing that comes to my attention on a routine
8 basis.
9     Q. What GS level does it list Mr. Brown
10 as being?
11     A. It says, I believe, GS-090515.
12     Q. Do you have any reason to believe
13 that's incorrect?
14     A. Yes.
15     Q. What basis do you believe that's
16 incorrect?
17     A. For all the foregoing reasons I've
18 discussed. Mr. Brown himself told me he wasn't able
19 to get his 15 within the agency. Ms. Rutledge has
20 since confirmed that he was not promoted to a 15.
21 And I am assuming this is nothing more than a typo.
22     Q. Do you have any knowledge as to

Page 171

1 whether or not it's a typo?
2     A. No direct knowledge other than it
3 doesn't square with all the other information that I
4 have. So that would be the logical explanation.
5     Q. And the other information that you
6 have is oral conversations with Mr. Brown and
7 Ms. Rutledge?
8     A. Correct.
9     Q. You have not seen anything written
10 with respect to his GS level?
11     A. No.
12     Q. Are you aware of whether or not
13 Mr. McCowan has ever offered Joe Solomey a promotion
14 to the GS-15 level?
15     A. I am aware that Mr. Solomey told me
16 that he and Mr. McCowan discussed the possibility of
17 his promotion. My understanding is that Mr. McCowan
18 independently wasn't in a position to offer that at
19 the time they had the discussion.
20     Q. Can you tell me what you were told
21 about this conversation between Mr. Solomey and
22 McCowan?

Page 172

1     A. Sure. Mr. Solomey, as I mentioned
2 earlier, had been offered a position in another
3 agency within the Department of Transportation. And
4 that position was an assistant chief counsel's
5 position at the grade 15 level.
6     At the time he was offered that
7 position, he was in my position as a grade 14
8 attorney.
9     And, again, as I discussed previously,
10 he had expressed interest on several occasions on
11 being promoted within our office to a grade 15, and
12 that had not been possible at the time, because he
13 did not meet the standards that are applicable
14 within the office of chief counsel for a promotion
15 to a 15 when we had previously discussed it.
16     When Mr. Solomey was offered a
17 position within another agency, he visited
18 Mr. McCowan as a courtesy to advise him that he was
19 accepting employment at another agency.
20     And as Mr. Solomey recounted that
21 meeting to me, as best I can recall, he said that
22 Mr. McCowan had told him that if he would consider

43 (Pages 169 to 172)