# EXHIBIT   8
# O'MALLEY PART 2 OF 2

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 173

1  staying within the office of chief counsel, that
2  Mr. McCowan would walk down the hall, and he pointed
3  to our administrator's office, and discuss making
4  Joe a 15 with the administrator.
5      That was how it was recounted to me.
6  My understanding of that conversation was that
7  because Joe was a valued employee in the office, and
8  Mr. McCowan wanted to retain his expertise, and
9  because at that point in time, which was late 2004,
10  the decision had been made to spin off the
11  enforcement division as a separate division.
12      My understanding of it was that
13  Mr. McCowan was considering discussing with the
14  administrator the possibility of creating a 15
15  position for Joe that would allow him to take a
16  leadership role or assumedly be the assistant chief
17  counsel in the enforcement division. That was his
18  expertise.
19      That latter part is my assumption
20  based on the conversation with Joe. But clearly
21  Mr. McCowan was not offering Mr. Solomey a grade 15
22  promotion at that time, because he wasn't in a

Page 174

1  position to do that for the staffing reasons and the
2  other reasons I've already discussed.
3      Q.  Did you ever discuss this conversation
4  concerning the offer of a GS-15 or the promise of a
5  GS-15 with Mr. McCowan?
6      A.  Not directly with Mr. McCowan, no.
7      Q.  Have you discussed it with
8  Ms. Rutledge?
9      A.  Yes.
10      Q.  What was the nature of that
11  discussion?
12      A.  As best I recall, I was lamenting the
13  fact that we were going to lose Mr. Solomey as a
14  very strong resource within the office. And I asked
15  Ms. Rutledge at one point if she thought -- having
16  heard that Mr. Solomey was planning to accept a
17  position elsewhere, if she thought there was any
18  possibility that we could in any way find a grade 15
19  position that would be appropriate to his expertise
20  or his skills.
21      That was a conversation that was just
22  my conjecture, gee, do you think there is anything I

Page 175

1  can do to keep a good employee, how can we avoid
2  losing this employee.
3      I believe after I heard from
4  Mr. Solomey that he had had the discussion that I
5  just described with Mr. McCowan, I also acknowledged
6  to Ms. Rutledge that I was aware that Mr. McCowan
7  had made the suggestion to Mr. Solomey that
8  Mr. McCowan might discuss with the administrator the
9  possibility of offering Mr. Solomey a position at
10  the grade 15 level.
11      And I lamented again to Ms. Rutledge
12  that even under those circumstances Mr. Solomey
13  wasn't interested in staying in the agency, that he
14  had made a firm decision to take employment
15  elsewhere.
16      Q.  Do you know whether or not Mr. McCowan
17  spoke to the administrator about creating a GS-15
18  position?
19      A.  I don't.
20      Q.  Was a GS-15 in fact later created, the
21  assistant chief enforcement position?
22      A.  It was created. I'm not sure if it

Page 176

1  was later. What I cannot recall at this point in
2  time is whether the decision to create that position
3  had already been made by December of 2004 when
4  Mr. Solomey was leaving.
5      I know by January of 2004, or close in
6  time to January of 2005, rather, that position was
7  created and Mr. Falk was put into that position in
8  an acting capacity.
9      I don't actually know the sequencing
10  of whether Mr. Solomey's discussion with Mr. McCowan
11  occurred after the administrator had already
12  approved creating the new division with an assistant
13  chief counsel at the grade 15 level or whether that
14  occurred subsequently.
15      Q.  Do you have any reason to believe that
16  Mr. McCowan was not serious about what he offered or
17  promised Mr. Solomey?
18      A.  I don't have any reason to believe he
19  wasn't serious about consulting with the
20  administrator. I do believe that he wasn't in a
21  position at that time to either offer or promise
22  anything, because it required structural changes

44 (Pages 173 to 176)

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 177

1  within the office, and it required the
2  administrator's approval and arrangements to be made
3  to create a position of that nature.
4      Q.  Do you know of any other employees
5  where an offer or a promise of a promotion was given
6  to them other than what you just discussed with
7  Solomey at any GS level?
8      A.  You mean do I know of any employees
9  who have been promoted within the office of chief
10  counsel?
11     Q.  Let me ask it a different way.  When
12  you talked about Solomey and the offer of promise
13  that was made by Mr. McCowan, do you know whether
14  any kind of similar offers or promises were made to
15  motor carrier employees?
16     A.  No that I am aware.
17     Q.  Would you say that was an unusual
18  offer or promise to be made to Mr. Solomey?
19     A.  I don't think it was unusual in the
20  context of what was going on in the chief counsel's
21  office at that time.  A decision was underway to
22  create a new division and to spin off the

Page 178

1  enforcement function into a separate function.
2      Mr. Solomey was far and away the
3  enforcement specialist within our division, and he
4  would have been the logical person to look to if you
5  needed to staff up a new division that was going to
6  focus on enforcement.
7      So because Mr. McCowan's focus at that
8  time was in getting a strong enforcement presence
9  and in creating a new division, I think it was not
10  unusual at all that he would want to retain the
11  employee who was definitely the strongest
12  enforcement specialist within the office.
13     Q.  You indicated earlier that you did not
14  recommend Mr. Solomey for a promotion?
15     A.  Correct.
16     Q.  How is it that his first line
17  supervisor had not recommended him for a promotion
18  but Mr. McCowan was making promises to him about
19  receiving a GS-15 promotion?
20     A.  First of all let me clarify again, I
21  don't think Mr. McCowan made a promise.  I think
22  Mr. McCowan's offer was to talk to the administrator

Page 179

1  and try and clear the way to consider Joe for a
2  grade 15 position.
3      The other important thing to remember
4  is my ability to consider Mr. Solomey for a
5  promotion was restricted by the fact that I would be
6  considering him for promotion to a nonsupervisory 15
7  position.
8      My understanding at the time that he
9  was having this discussion with Mr. McCowan was that
10  we were in the process of restructuring the chief
11  counsel's office, and that the position Mr. McCowan
12  was alluding to was the assistant chief counsel for
13  enforcement, a supervisory 15 position within the
14  office.
15     So two things had significantly
16  altered the circumstances.  One was that there was
17  now a position, at least an anticipated position to
18  be considered, which was a supervisory 15 position
19  heading up the new division that Mr. McCowan was
20  conceiving of.  That hadn't been available before.
21     The second thing is that the factors
22  that I would be looking for to promote an employee

Page 180

1  to a nonsupervisory 15, and the criteria that apply
2  within the office in general, in order for an
3  employee level at the 14 level to attain 15 are
4  different than those that are involved when you are
5  looking at a supervisory 15 position.
6      Q.  Do you know of any attorneys that have
7  been recommended for a GS-15 level in motor
8  carriers?
9      A.  Within the office of chief counsel
10  since 2000?
11     Q.  Yes.
12     A.  No, I don't.
13     Q.  Do you know of any attorneys that have
14  been promoted to the GS-15 level in motor carriers
15  since 2000?
16     A.  No, not within the office.  I know
17  that several of the assistant chief counsel
18  positions that have been filled since 2000 have
19  involved bringing employees on board at the grade 15
20  level.
21     I don't know, to be quite frank,
22  whether they came in as grade 15s from their

Page 181

1  previous position or whether they were 14s in a
2  previous position at another agency and then were
3  hired.
4         But within the chief counsel's office,
5  promoting anyone who is currently employed there as
6  a 14 to the grade 15 level, I am not aware of that
7  in any of the divisions.
8         Q.  You mentioned previously that one of
9  the first written or writeups of developmental
10  opportunities for Ms. Walls was done in March of
11  2004; is that correct?
12         A.  The actual written list of
13  suggestions?
14         Q.  Right, the first written list, was it
15  March of 2004?
16         A.  Yes, March of 2004, correct.
17         Q.  And then prior to that, as you
18  testified, you had not written up those discussions
19  with Ms. Walls?
20         A.  Correct.
21         Q.  Prior to giving Ms. Walls that written
22  documentation in March of 2004, do you recall having

Page 182

1  any meetings with her concerning promotability just
2  prior to that time?
3         A.  Yes.
4         Q.  How many meetings do you recall?  Let
5  me ask you, do you recall one in particular with
6  Ms. Rutledge?
7         A.  Yes, I do.
8         Q.  How many meetings were there with you,
9  Ms. Rutledge and Ms. Walls at that time period in
10  early 2004, late 2003?
11         A.  With the three of us together, I can
12  only recall one meeting, and I believe that was
13  February 10th of 2004.
14         Q.  Prior to the February 10, 2004
15  meeting, do you know whether Ms. Walls had had
16  conversations with Ms. Rutledge during this same
17  time period?
18         A.  My understanding is she did shortly
19  before our February 10 meeting.  She had a meeting
20  on February 6th, I believe it was, with both
21  Mr. McCowan and Ms. Rutledge.
22         Q.  Were there any other meetings with

Page 183

1  Ms. Walls, McCowan, or Rutledge during this time
2  period, late 2003, early 2004?
3         A.  On the subject of?
4         Q.  On the subject of promotability.
5  Let's start there.
6         A.  Not that I am aware.
7         Q.  Did you know if there were any
8  meetings with Ms. Walls, McCowan or Rutledge
9  concerning her interest in the, I believe it's EPP
10  or the EP?
11         A.  EPP.
12         Q.  The EPP training program?
13         A.  My understanding is that the February
14  6th meeting I mentioned, which included Mr. McCowan,
15  Ms. Rutledge, and Ms. Walls, was precipitated by
16  Ms. Walls' interest in being considered as a
17  candidate for the EPP program.
18         The promotability aspect of that
19  meeting came up, to my way of thinking,
20  inadvertently.  That wasn't the purpose of the
21  meeting as it was originally defined.
22         And although the issue did come up,

Page 184

1  and it precipitated our February 10 meeting, I
2  believe the main purpose of the meeting, when it was
3  originally set up, was for Ms. Walls to discuss her
4  interest in being considered as a candidate for the
5  EPP program with Mr. McCowan.  And Ms. Rutledge sat
6  in on that meeting as well.
7         Q.  Do you know whether or not Ms. Walls
8  had a meeting with Mr. McCowan alone concerning EPP
9  or a promotion?
10         A.  I am not aware that she did.  The only
11  meeting I'm familiar with around that time frame was
12  the one that Mr. McCowan and Ms. Rutledge were both
13  present for on February 6th.
14         Q.  What do you know about that meeting on
15  February 6th?  What transpired at that meeting?
16         A.  I wasn't there.  I do know that prior
17  to that meeting, I had actually had a prepatory
18  meeting with Mr. McCowan and Ms. Rutledge.  And we
19  specifically discussed that the purpose of the
20  meeting would be for Ms. Walls to talk with
21  Mr. McCowan about her interest in participating in
22  the EPP program.

Page 185

1    Because that was the -- at the time,
2    my understanding, and Ms. Rutledge's understanding,
3    was that was the sole purpose of the meeting.  It
4    was an affirmative determination on both the part of
5    Ms. Rutledge and Mr. McCowan that I need not be
6    present for that meeting, that it was something
7    concerning an office managerial decision beyond my
8    discretion as far as nominating an employee to the
9    EPP.
10    And while I had presented Ms. Walls'
11    interest in being a part of that program to
12    Ms. Rutledge, and she in turn had raised the issue
13    with Mr. McCowan, once they circumscribed the scope
14    of that meeting to discussing Ms. Walls' interest in
15    and possible participation in the EPP program, it
16    was determined that I need not be a part of that.
17    So that part I know as being part of
18    the prepatory discussion.  Everything else I know
19    about that meeting was recounted to me by either
20    Ms. Rutledge or Ms. Walls after the meeting had
21    taken place.
22    Q.  Did you recommend Ms. Walls for the

Page 186

1    EPP program?
2    A.  I didn't recommend her for it.  I
3    passed along her interest in participating to
4    Ms. Rutledge.  And it was in the context of
5    conferring with Ms. Rutledge about whether the
6    office of chief counsel would in fact be in a
7    position to nominate any employee for that program.
8    And I told Ms. Rutledge that if in
9    fact the office were going to consider making a
10    nomination for the program, that Ms. Walls wanted to
11    make herself a contender for that position and that
12    nomination.
13    Q.  So it's your testimony then that you
14    did not recommend her?  You just passed along her
15    interest?
16    A.  Right.  We were not in a position to
17    recommend any employee at that time, because a
18    decision needed to be made as a prepatory matter
19    whether the office would be making a nomination.
20    And ultimately the decision was that
21    we would not be in a position to nominate an
22    employee.  So we didn't even get to that level.

Page 187

1    I would not have been myself in a
2    position to nominate Ms. Walls until I had vetted
3    the possibility with participating in the program
4    with everyone within the division and solicited all
5    interest among all of my attorneys and then made an
6    assessment.
7    But we didn't even get to that point
8    because a decision was made -- after Ms. Rutledge
9    and Mrs. McCowan conferred, a decision was made that
10    the office was not in a position that year to
11    nominate anyone.  And they would not be sending
12    forth the name of a nominee to the committee that
13    made the selection.
14    Q.  How did this meeting come about with
15    Rutledge and McCowan where you expressed to them
16    Ms. Walls' interest in the EPP program?
17    A.  I only expressed it to Ms. Rutledge.
18    I expressed it to her directly.  I instigated the
19    meeting after Ms. Walls had presented me with her
20    interest in being a part of the program.
21    And at that point I was sufficiently
22    confident that the office would not be in a position

Page 188

1    to nominate an employee because of resource
2    constraints and because of the impracticality of
3    having a second employee two years in a row
4    participating in the program.
5    Mr. Solomey, as I mentioned, I had
6    nominated the previous year.  And he was in fact the
7    agency's prevailing candidate for that program.  So
8    he had just been selected the prior round the year
9    before as the agency's nominee.
10    I was concerned that, number one,
11    counsel's office, staffing constraints would not
12    allow us to two years in a row take the personnel
13    hit that is the obvious result of sending an
14    employee off for a year-long program that pretty
15    much involves a lot of rotational assignments
16    outside the office.
17    I was also aware, based on the prior
18    year's experience with nominating Mr. Solomey, that
19    if in fact we were going to nominate an employee,
20    that decision would have to be made through an
21    office wide process where every employee was given
22    an opportunity to indicate their interest, and we

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 189

1 would have an assessment among all the managers in
2 the office of who the one nominee would be.
3        And since none of that had occurred,
4 and I thought it might be highly premature to even
5 expect that that would occur, I went to Ms. Rutledge
6 and presented Ms. Walls' interests, but I did it
7 again in an exploratory fashion by way of saying I
8 have an employee, Elaine Walls, who is interested in
9 participating in the program. I know the call has
10 gone out for nominees, are we going to consider
11 making a nomination from the office this year.
12        And if we are going to consider making
13 a nomination, what will our process be as far as
14 picking one attorney, because it would be all of the
15 attorneys from all of the divisions being in
16 contention, or at least soliciting an interest from
17 all the attorneys before a decision was made.
18        It wouldn't be my recommendation. It
19 would be a collaborative recommenation of what the
20 office nominee should be.
21        Q.  What was Ms. Rutledge's response?
22        A.  Her response, as I recall was, she was

Page 190

1 expressing some skepticism that we would be able to
2 take the resource hit that would be implicit in
3 sending another employee off.
4        But even more importantly than that,
5 she said because this is an agency decision, our
6 office was in a position to nominate a candidate,
7 but the assessment about who would represent the
8 agency in this program was made outside of counsel's
9 office. And all of the prgram and support areas
10 within FMCSA would have an opportunity to put forth
11 a candidate.
12        She expressed a skepticism that the
13 agency would select an employee from the same office
14 two years in a row. So it was partially a practical
15 reaction on her part that we will have a very hard
16 time under our staffing limitations supporting
17 another nominee, but it was also a belief on her
18 part, I think, that that was almost an immaterial
19 consideration, because even if we were able to find
20 a way to make an employee available to the program
21 from our staff, it was highly unlikely that that
22 employee would be the successful nominee from the

Page 191

1 agency.
2        But she did say she would bring the
3 issue up and discuss it with Mr. McCowan. And in
4 fact presumably did so, which then involved the
5 suggestion that took place at the meeting with
6 Ms. Walls.
7        I don't recall whether that meeting
8 was instigated by Mr. McCowan or that meeting was
9 instigated by Ms. Walls. I'm not sure.
10        Q.  Just for the record, could you just
11 explain what EPP is?
12        A.  Sure. It stands for employee
13 potential program. And it is a developmental
14 training and rotational assignment program that is
15 available for employees, I believe at the GS-13 and
16 14 level.
17        Its purpose is to give those employees
18 exposure to management assignments and management
19 processes in different agencies, and to let them
20 acquire a perspective not only on their own agency's
21 processes with a view toward hopefully developing
22 themselves into management roles later in their

Page 192

1 career, but also to give them exposure to management
2 practices in other agencies so that they have a
3 sound basis for comparison.
4        Q.  So you said that the year previous
5 that Mr. Solomey was nominated, and that he in fact
6 was selected by the agency for EPP?
7        A.  Correct.
8        Q.  How did the process begin in your
9 office for Mr. Solomey?
10        A.  I honestly am not sure how the process
11 began. I do recall that my initial involvement in
12 the process was do confer with Mr. Solomey about his
13 interests in the program, and he confirmed that he
14 did wants to participate.
15        My next step was to provide a write-up
16 of his credentialing and his endorsement really of
17 his nomination, that I then provided to Ms.
18 Rutledge. And I believe that was submitted as a
19 joint document. I'm not sure whether Ms. Rutledge
20 signed it or I signed it, but it was presented as
21 the office's recommendation for his candidacy.
22        There were some informal conversations

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 193

1    I had with Ms. Rutledge while I was developing that
2    information. She gave me some suggestions and some
3    guidance about what sorts of things she thought
4    would be persuasive to include in the write-up.
5         I honestly cannot recall exactly how
6    that whole process was first initiated. I am
7    assuming, just as in the year that Ms. Walls
8    expressed an interest, it was triggered initially by
9    an e-mail that went out to all of the program
10   offices in the agency letting them know that the
11   program was going to be selecting a nominee.
12        And I remember very distinctly having
13   an informal conversation with Mr. Solomey to confirm
14   that he was interested in telling him that I had
15   talked with Ms. Rutledge and we would prepare a
16   nomination.
17        Q. So it began with Mr. Solomey making or
18   expressing an interest to you, and then you began to
19   do the write-up that would be necessary for his
20   nomination?
21        A. I honestly can't remember if the first
22   conversation was Mr. Solomey expressing an interest

Page 194

1    to me or if it was my seeing the e-mail about the
2    program or Ms. Rutledge seeing the e-mail about the
3    program and thinking this is something that we may
4    want to look to an employee who would be a logical
5    participant.
6         And Mr. Solomey was the logical
7    participant given his grade level and given his
8    leadership and involvement in the office. I cannot
9    at this point in time swear whether he approached me
10   first or I approached him first.
11        I know there was a very informal
12   mutual conversation where he said yes, definitely I
13   saw the e-mail and I would like to do this.
14        I can't remember if he came to me
15   initially or if I had had the thought and just
16   confirmed with him did you see the e-mail, is it
17   something you would be interested in.
18        Q. So you're not certain who initiated?
19        A. Exactly. I truly can't remember this
20   far away from that point in time.
21        Q. After the idea was vetted, if you
22   will, then the next step was to start writing up his

Page 195

1    nomination?
2         A. Correct.
3         Q. When Mr. Solomey was being considered
4    for the EPP program, was resources a consideration
5    at all?
6         A. Resources is always a consideration in
7    our office, definitely. It was something that we
8    talked about.
9         And I remember very specifically one
10   of Ms. Rutledge's directives to me was to make sure
11   Mr. Solomey understood that if he wanted to
12   participate in the program, and if in fact he was
13   the prevailing candidate from the agency, that he
14   would need to be in a position to continue to give
15   support to the office even when he was away on
16   rotational assignments for the EPP program, that we
17   would need to, I think as Judy put it, reel him back
18   in when needed to work on things, to consult, to be
19   a presence, that he could not expect to be a part of
20   the program and just disappear for extensive periods
21   of time and have his sole focus be the EPP program.
22        He was going to need to keep an active

Page 196

1    role in the enforcement work of the office. Since
2    he had been the primary enforcement person all
3    along, we really couldn't afford to have him create
4    a void just by disappearing completely in order to
5    participate in the program.
6         And he said he understood that and he
7    accepted that as a condition of his being a part of
8    the program.
9         Q. Was he in fact gone for long periods
10   of time?
11        A. He had a couple rotational assignments
12   where he was I won't say gone for periods of time,
13   but he maintained his residency in the office for
14   most of that time. But his assignments were such
15   that he was pulled out of the office on a regular
16   basis to either work at other agencies or to meet
17   with -- a lot of EPP program is team based. And he
18   on a number of occasions would have to be pulled
19   away from the office to work on projects with his
20   EPP team.
21        He was also offsite on an overnight
22   basis for a couple training sessions, as I recall,

49 (Pages 193 to 196)

ELAINE WALLS
VS. NORMAN Y. MINETA

Page 197

1    that were actually out of the area.
2        Q.   Was his workload reduced as a result
3    of his participation in EPP?
4        A.   It was reduced, but it was not at all
5    eliminated.
6        Q.   Do you know whether or not anyone was
7    selected for the EPP program the year Ms. Walls
8    expressed interest in it?  Did the agency select
9    someone that year?
10       A.   I know that our office did not go
11   forth with a nominee.  I believe that there was an
12   agency nominee.  My recollection is that it was
13   Jeffrey Lofton, but I am not absolutely certain if
14   it was that year.  I believe it was.
15           But because we weren't involved in it
16   as a nominating office, I really didn't pay much
17   attention to how the process worked after we made a
18   determination not to put forth a nominee.
19       Q.   We've discussed this meeting with
20   Ms. Rutledge that you had concerning Ms. Walls'
21   interest in EPP?
22       A.   Yes.

Page 198

1        Q.   And then after that there was another
2    meeting that you were not involved in that was
3    sometime perhaps February 6, 2004, between McCowan,
4    Rutledge and Walls?
5        A.   Correct.
6        Q.   What is your understanding, if any, of
7    what transpired at that February 6th meeting?
8        A.   The part of the meeting that I heard
9    the most about actually involved promotability
10   rather than the EPP.
11           My understanding is Ms. Walls did
12   discuss her interest in and possible candidacy for
13   the EPP, and she was advised by Mr. McCowan and
14   Ms. Rutledge that the office would not be in a
15   position to put forth a nominee for the program
16   because of resource constraints.  And because of the
17   practical concern that even if we were in a position
18   to do so, the agency was highly unlikely to
19   seriously consider a second nominee from counsel two
20   years in a row.
21           Beyond that issue, apparently, and as
22   I said earlier, well beyond the scope of what the

Page 199

1    meeting had been described to me as intending to
2    cover, at some point in the meeting Mr. McCowan and
3    Ms. Walls did discuss her interest in a promotion to
4    the grade 15, and Mr. McCowan's assessment that she
5    was not ready to be promoted to a grade 15.
6            And he did indicate to her, I am told,
7    that in the view of her supervisor, that is myself,
8    she was not ready for a promotion to the grade 15.
9    The EPP and then the promotion issue were the two
10   major matters that came out of that meeting that
11   came to my attention, in any case.
12       Q.   And who brought it to your attention?
13       A.   Actually two people.  Ms. Walls
14   immediately after the meeting or soon after the
15   meeting told me that that's what Mr. McCowan had
16   said.
17           And then shortly either before or
18   after that, and I can't remember the sequence
19   Ms. Rutledge told me, that had been a subject of
20   discussion which was not suggest that I had
21   anticipated when the determination was made that I
22   not attend that meeting.

Page 200

1        Q.   Did Ms. Walls approach you after this
2    meeting with her concerning that you may have been
3    misquoted by Mr. McCowan?
4        A.   Yes.  She approached me and told me
5    what he had said.  I can't remember if she directly
6    asked me or if she in any way probed what my
7    reaction was, but clearly her interest was in
8    determining whether I had in fact said what had been
9    represented and attributed to me.
10       Q.   And did you in fact say what was
11   represented and what was attributed to you by
12   Mr. McCowan?
13       A.   I told her two things.  I was first of
14   all extremely upset that the meeting had had that
15   topic raised, because I had been specifically
16   assured in the pre-meeting that I had with
17   Mr. McCowan and Ms. Rultedge, that the only purpose
18   of the meeting was to talk about the EPP program.
19           And had the issue of promotability
20   been on the agenda, it would have not only been
21   logical but very appropriate and almost necessary to
22   include me as her immediate supervisor, since that's

Page 201

1  something that I should have direct input in.
2          So when she told me that the meeting
3  had included that issue, and that Mr. McCowan had
4  made the representation he had, I was extremely
5  upset. And I believe I expressed my complete
6  displeasure with the circumstance to Ms. Walls.
7          I also told her that I had been
8  assured that the meeting would not go to the issue
9  of promotability, and that if it had I should have
10 been included.
11         And I have distinguished for her what
12 apparently, or at least I gathered at the time
13 Mr. McCowan had not distinguished, which was it
14 sounded to me like he had attributed my assessment
15 of her promotability with some degree of finality
16 that I had never given it.
17         I had told him earlier that under the
18 requirements that prevailed in the office of chief
19 counsel for promotability to the grade 15, which are
20 extremely high and extremely demanding, that I
21 thought Ms. Walls still had some development ahead
22 of her before I would assess her as ready under the

Page 202

1  standards that were available.
2  I          But I did not tell him with any degree
3  of finality that she was not grade 15 material or
4  grade 15 ready or grade 15 caliber.
5          And I definitely said that she wasn't
6  -- I was not ready to nominate her or put her name
7  forth for a promotion at that time under the
8  standards that applied throughout the office of
9  chief counsel.
10         But the way his words were imparted to
11 me later in the meeting, it sounded as though he had
12 perhaps given a degree of finality to that that I
13 had not intended, and certainly a degree of finality
14 that I had not ever thought would be raised in that
15 meeting without me present.
16         So Ms. Walls and I had a very, I
17 thought, extended discussion about how I was
18 disappointed and very distressed that the meeting
19 had taken the turn it did without my being there to
20 clarify what I had actually said.
21         And I was disappointed that
22 Mr. McCowan would get into a significant issue like

Page 203

1  that and directly attribute something to me without
2  having me at the meeting.
3          Q.  Did you ever tell Ms. Walls that she
4  was not ready for a promotion to GS-15?
5          A.  I certainly told her what she needed
6  to do to qualify for a promotion to a 15. I can't
7  swear that I ever used the term, and I probably did
8  not use the term you are not ready for a 15.
9          My management style is to tell people
10 what they are and what they can become, not what
11 they are not.
12         And with Ms. Walls in particular,
13 because I knew her potential and I knew the strength
14 of her interest in becoming a 15, my conversations
15 with her about promotability always focused on what
16 she needed to do, what she could do in order to rise
17 to the level of a 15, what she would need to
18 accomplish in order to make my recommendation that
19 she become a 15, something that I could successfully
20 put forth in the office.
21         I don't believe I ever said to her you
22 are not ready to be a 15, but in my mind that's

Page 204

1  implicit in telling somebody what they do need to do
2  in order to achieve a goal.
3          If there is still something they need
4  to do or a list of things they need to accomplish,
5  the logical conclusion from that is that until those
6  things are done and until the accomplishments are
7  achieved, they would not be ready.
8          Q.  And you're saying you had
9  conversations with Ms. Walls prior to this time
10 period that we're talking about, early 2004?
11         A.  Correct. On a number of occasions, I
12 said, it was often coinciding with performance
13 appraisal time, but not always. Sometimes it may
14 have been informally as well.
15         But the conversations with her clearly
16 represented in my mind what was expected of any
17 attorney within the office of chief counsel who was
18 performing successfully at the grade 14 level but
19 wanted to move a notch up, wanted to qualify for
20 consideration at the grade 15.
21         And, again, going back to the
22 exploratory discussions I had with Ms. Rutledge

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 205

1 about what norms for promotability would be applied
2 across the board in the office, it was on the basis
3 of that information that I would impart to Ms. Walls
4 what needed to be happen or what was being looked
5 for at the next level, what kind of activities, what
6 kind of achievements, what kind of marks she needed
7 to make in the office in order to be a successful
8 contender for a grade 15 position if we could create
9 one in the office.
10     Q. So you've never told Ms. Walls that
11 you felt that she could achieve a GS-15 level
12 promotion?
13     A. No. I told her on a number of
14 occasions I thought she could achieve it. I told
15 her that it would not be something that would be
16 achievable until certain things were accomplished,
17 until she had demonstrated certain performance
18 attributes to make her a contender for a grade 15
19 position by showing that she was already performing
20 at the grade 15 level.
21     I certainly never told her that she
22 didn't have the potential to get there. I very

Page 206

1 firmly believe she did and does.
2     Q. Did you tell her during these
3 conversations that you had prior to February of
4 2004, that you felt she could be promoted to the
5 GS-15 level and that you would support that?
6     A. That she could be promoted?
7     Q. Right, and that you would support
8 that.
9     A. I told her that I definitely support
10 her in her goals to achieve a grade 15. That's why
11 I spend a lot of time explaining to her what's
12 expected of attorneys in order to reach that goal.
13     I told her that these are the type of
14 things, and a number of the things I have enumerated
15 in conjunction with these performance appraisals.
16 These are the type of activities, these are the type
17 of achievements, these are the type of successes
18 that we need to see on your record in order to make
19 you a viable contender for a grade 15 position if we
20 could create one.
21     Obviously if I had thought she didn't
22 have the potential to get there, I wouldn't have

Page 207

1 been using her time to suggest things she couldn't
2 attain. We clearly were focusing, or I was clearly
3 focusing, and I hoped the whole time that she
4 understood on what needed to happen to fit the
5 promotability expectations that the office of chief
6 counsel had in place.
7     Q. So you did tell her that you would
8 support her efforts for a GS-15?
9     A. That I would be very supportive of her
10 efforts to attain a 15. And at the meeting with
11 Ms. Rutledge on February 10th, I very specifically
12 remember telling her that not only would I support
13 that, but it would be considered a success on my
14 part if she got a 15, because our long-term
15 association as colleagues, long before we were ever
16 in a supervisory relationship, our association as
17 colleagues told me that as a supervisor I would
18 consider that a success for me, if one of my
19 employees was able to get a grade 15 in an extremely
20 challenging environment where across the board it's
21 very difficult to become a 15. There are a lot of
22 benchmarks you have to meet.

Page 208

1     And I told her that it wouldn't only
2 be a personal success on her part, that I would
3 consider it a personal accomplishment on my part if
4 she got there.
5     Q. What would your reaction be if you
6 were told that Ms. Walls has no recollection of any
7 discussions with you concerning developmental things
8 that she needed to do in order to obtain a GS-15?
9 What would your reaction be?
10     A. I would be very disappointed with her
11 as a listener, and I would be disappointed in myself
12 as a communicator, because I feel like we've had a
13 number of conversations that led in that direction.
14     We've had a number of very specific
15 conversations where we compared the requirements
16 that are applicable across the board in the office
17 of chief counsel with requirements that are in place
18 for grade 15s to nonattorneys outside the office of
19 chief counsel.
20     We've had collaborative conversations
21 about what's expected within the office, how these
22 norms are in place. And as high as they may be and

Page 209

1  as ambitious as they are, they are consistently
2  applied. And we just have no choice but to observe
3  them. And I would be astounded if she had no memory
4  of any of those conversations taking place.
5      Q. What specific recommendations or
6  requirements do you recall discussing with
7  Ms. Walls?
8      A. A number of them play up very
9  consistently. I have alluded to them when we
10 discussed earlier what are the expectations for a
11 grade 15.
12      Several that come to mind that are
13 particularly operative in her case have to do with a
14 high level of proactivity, ratcheting up her
15 involvement both within the office and with the
16 clients she served as far as her accessability.
17      Proactivity is a word and
18 accessability is a word that completely repeat
19 themselves in my recommendations to her almost every
20 cycle that we discuss this, because they are major,
21 major expectations in the office of chief counsel
22 for people performing at the 15 level.

Page 210

1      Another area is a high level of
2  programatic in-depth knowledge. And I have told her
3  that developing specialty areas where you become a
4  perceived national expert, and a go to person within
5  the agency is very critical.
6      One of the main reasons that her
7  involvement in the environmental impact study
8  process and the NEPA development process were so
9  important to me and to her is because I perceive
10 those as two niches of expertise that were not yet
11 filled by anybody in my division or within the
12 office.
13      And I very definitely saw her as
14 entering into areas where she could not only develop
15 the expertise but become really the sole expert in
16 the office. And I thought that would assist her
17 very measurably in attaining the level of expertise
18 and in-depth knowledge that she needed in order to
19 get one step in the door toward a 15.
20      Another area is the level of
21 independence that she exercises when she pursues an
22 assignment. And I told her that independence can be

Page 211

1  exhibited in a number of ways.
2      Obviously, the greater your in-depth
3  knowledge, the more you will be able to approach a
4  problem with the strong, analytical skills and the
5  degree of confidence that you need to pursue it
6  independently and to work with clients independently
7  without soliciting input from other experts, without
8  conferring on an excessive basis with supervosors or
9  managers, but simply going ahead and being proactive
10 and handling an issue.
11      And finally I talked to her about
12 something that's maybe less of a tangible skill area
13 than it is a performance indicator, but that would
14 be her attitude and her accessability, her perceived
15 support of program clients, her diplomacy in dealing
16 with program officials and with staff.
17      And I've told her that those are the
18 kind of things, probably more than anything, the
19 diplomacy and the people skills, speak volumes not
20 only to the people with whom she works outside the
21 office, but they speak excessive volumes to our
22 office of chief counsel leadership.

Page 212

1      And they affirm very definitely
2  whether an employee has the kind of intangible but
3  very important people skills to deal with clients
4  and to exercise the expertise and the independence
5  to develop their own client base and to be looked to
6  ultimately as a go to person, as a resource, and as
7  a supportive member of counsel's staff internally,
8  as well as a supportive counsel resource to the
9  agency.
10      All of those factors, although any one
11 conversation may not have included every one of
12 them, that is a consistent pattern that's been
13 hammered home to me by our office leadership and
14 what's going to be looked for before anyone within
15 the office can be assessed as ready for promotion to
16 a 15.
17      And I in turn have repeated those to
18 the employees I know are interested in a 15.
19      Q. But have you specifically told
20 Ms. Walls?
21      A. Yes, I have.
22      Q. What do you mean by accessability? How

Page 213

1  is Ms. Walls not accessible?
2       A.  I said she needed to improve her
3  accessability.  She is certainly accessible on many
4  occasions to her clients.  And I would say she's
5  becoming increasingly accessible, both in terms of
6  the attitude that she projects and her familiarity
7  with program areas that make her a resource to those
8  programs.
9       Some of the suggestions I've made to
10  her that involve accessability overlap into the
11  proactivity area.  I've told her that there is
12  nothing more important than having face-to-face
13  conversations with clients.
14       I think I've discussed the term don't
15  hide behind the e-mails, don't hide behind the door.
16  If you've got something that is causing an issue
17  with you, make comments on a document.
18       And if you want those comments to be
19  completely embraced and understood by the clients
20  you're serving, there is nothing better than sitting
21  down with those people across the table and
22  explaining to them what you want.

Page 214

1       I think I've used the term don't play
2  the e-mail game, don't send messages back and forth
3  that can either be perceived as directing someone to
4  do something without adequate support from you.
5       Don't send messages that might be
6  perceived as lacking in diplomacy or a little
7  prickly or giving orders.
8       It's much better to roll up your
9  sleeves and sit down with the clients and make sure
10  that they know that not only are you there to help
11  them with their work product, but that you are ready
12  to roll up your sleeves and be a part of that
13  product.
14       I think that's a very important way
15  for her to show that she has ownership of a program
16  area and that the clients in that program area will
17  develop a comfort level and a reassurance in coming
18  to her and seeking advice.
19       It all plays into the big picture of
20  being proactive and being perceived as a supportive
21  resource rather than being perceived as a barrier to
22  success, which sometimes attorneys are.

Page 215

1       I have told her some things as simple
2  as the equivalent of what I call office body
3  language; keeping your door open, letting people
4  know that you're there and you've got a walk-in
5  policy, and people can assess your availability to
6  ask a question or share information.
7       I have suggested to her, and some of
8  this is reflected in the list of items I presented
9  during the '04 performance appraisal, that she could
10  be involved much more proactively in knowledge
11  transfer with some of the clients she serves.
12       She has been acquiring a wealth of
13  expertise in regulatory development areas and in the
14  environmental area that is very key to any rule
15  making initiative the agency has.  And it's
16  something that a lot of employees don't have any
17  understanding of at all, a lot of employees outside
18  counsel's office.
19       And I've told her that proactivity
20  could easily be demonstrated by creating a manual to
21  help the offices in understanding what we require of
22  them when it comes to regulatory analysis or when it

Page 216

1  comes to Small Business Regulatory Enforcement
2  Fairness Act, when it comes to environment
3  requirements.
4       That having worked in these areas for
5  as long as she has and having established the
6  familiarity with them, that it would serve her well,
7  and it would serve the office well, to share that
8  information in some kind of a constructive
9  definitive way that she could put her name on and be
10  responsible for.
11       It would help her again contribute to
12  that in-depth knowledge, that expertise.  Those are
13  illustrative examples.  They are not exhaustive.
14  But those are the kind of things that I think would
15  play very definitely into what the office policies
16  are for acquiring 15 expertise and acquiring 15
17  performance attributes.
18       And I think they would play very
19  definitely into the type of things that she has made
20  inroads into.  And it would elevate them to the next
21  level, which is what we're looking for.
22       Q.  You mentioned a number of things.

Page 217

1    You've talked about independence, proactivity,
2    accessability, dealing with clients, things along
3    those lines; is that correct?
4        A.   Correct.
5        Q.   How do you measure those criteria?
6        A.   A lot of them are measured by seeing
7    the success and the progress of client interactions
8    within the office, seeing how smoothly a work
9    product moves through the office and how well the
10   clients feel that they are being served.
11       Q.   Is that basically your observations
12   then of her interactions with others?
13       A.   They would largely be my observations.
14   They would also be input that I received from others
15   both within the office and from client offices as
16   well, and just engaging with the employee herself.
17       Q.   Would you consider that a subjective
18   criteria, the things that you have mentioned?
19       A.   Many of them are subjective, not all
20   of them.  Some of them have to do with work product
21   quality or quantity.  Some of them have to do with
22   interactions that are, while they are not measurable

Page 218

1    on a quantifiable scale, they are certainly
2    determinative of whether something is a positive or
3    a negative interaction, for example, or a positive
4    or a negative result.
5        Q.   Have there ever been any negative
6    results from Ms. Walls' work?
7        A.   There have been some occasions when I
8    believe she has not handled interoffice or
9    interpersonal relationships as successfully as she
10   might have, or certainly at the level of proficiency
11   that you would expect of someone at a grade 15
12   position.
13       Q.   My question is a little bit more
14   specific than that.  You mentioned negative results.
15   She is an attorney.  She missed a deadline, dropped
16   the ball.  Has she done something that's been an
17   omission on her part that's had a negative impact?
18       A.   Have there been any indicators of
19   that?
20       Q.   Yes, in her performance.
21       A.   I would say yes.
22       Q.   Give me an example.

Page 219

1        A.   One example that comes to mind in
2    terms of recent analytic contributions to an item
3    was when she was consulted about the timing of
4    issuing an environmental assessment that related to
5    the hours of service rule.  And she was consulted
6    because of her expertise in the NEPA area and her
7    familiarity with the NEPA order that we had in place
8    that she had led in drafting, as well as her
9    expertise in NEPA in general.
10           And while I've already said that
11   that's a developing expertise, and she doesn't
12   completely corner the market in that area, it is an
13   area where she is looked to as one of the staff
14   members who knows a lot about that.
15           And at the time we consulted with her,
16   her first reaction was, because of the standards
17   that prevailed in NEPA, this hours of service rule
18   is a unique and precedent setting rule, and
19   therefore we need to have some time frames built in
20   for analysis of the environmental issues that we
21   might not otherwise need if the rule didn't have a
22   NEPA precedent setting nature.

Page 220

1        I subsequently conferred with
2    Ms. Rutledge with the conclusion that Ms. Walls had
3    presented, and Ms. Rutledge was very dissatisfied
4    with that as a conclusion.  And I told her that I
5    had some reservations that we would have to reach
6    that conclusion.  Maybe we could define the rule
7    differently.
8            And the result was that there were
9    follow-up meetings with both Ms. Rutledge and
10   another attorney staff member on the hours of
11   service team who did some follow-up research.
12           And the ultimate conclusion was, after
13   several meetings followed up, no, in fact, that
14   wasn't a final word, that unique and precedent
15   setting was a term of art that we might not have to
16   apply in this case, that we could define the hours
17   of service rule differently.
18           I don't want to trivialize this as one
19   example that completely shows a lack of expertise.
20   I think what this example shows is a readiness on
21   the employee's part to make some conclusions and not
22   fully vet an issue before a conclusion is made.

Page 221

1     And as a result of that, time was lost
2   in the process.  As a result of that, other people
3   were brought into conferring on something that
4   required draining expertise from other areas and
5   making it a multiple attorney process rather than a
6   one attorney process.  I would definitely
7   characterize that as a negative.
8       Q.  When did this occur?
9       A.  This was I believe in June or July of
10  this year.  And I'm referring to it because it's
11  clear in my mind and it's a recent example.
12      Q.  Can't attorneys differ with respect to
13  their interpretation of regulations and rules?
14      A.  Absolutely they can.  And that was
15  exactly my point, that this was something that could
16  easily have been looked at from several different
17  perspectives.  And ultimately, after attorneys
18  conferred, there were other perspectives.
19      And Ms. Walls agreed that another
20  perspective was a viable one.  And it actually
21  served the agency's interests better to adopt that
22  other perspective.

Page 222

1     My concern was not in the fact that
2   she had a difference of opinion with another
3   attorney.  My concern in using this as an example
4   was it was illustrative of her readiness to jump
5   into one conclusion that wasn't necessarily in the
6   agency's best interests without automatically and
7   fully exploring other possibilities, and presenting
8   to the agency a range of possibilities with a full
9   assessment of the resulting vulnerabilities and the
10  cause and effect of those possibilities.
11      So the agency could make a fully
12  informed decision which course of action they wanted
13  to take.  Had we stopped our inquiry on this subject
14  after Ms. Walls waited and with her definitive
15  response, the agency's interests could have been
16  jeopardized, because in fact another conclusion was
17  reached.
18      And it certainly is not a problem that
19  her initial reaction differed from that of another
20  attorney.  The point was that it wasn't offered as
21  one of several possibilities that she wanted to
22  assess with the agency.

Page 223

1     It was offered as here is a degree of
2   finality, here is a subject matter that I am
3   weighing in on that's sufficiently vetted that the
4   agency could make a decision on the basis of this
5   information.  And in fact that wasn't the only
6   information that was operative.
7       Q.  Who else could she have discussed it
8   with?
9       A.  She could have discussed it with the
10  attorney who ultimately was brought in to do some
11  supportive research on the issue.
12      Q.  Who was the attorney that was brought
13  in to do the supportive research?
14      A.  Alan Strasser, who was a member of the
15  hours of service team on detail from my division.
16      Q.  Who else in the office does
17  environmental issues?  Does Alan Strasser do
18  environmental issues?
19      A.  He has some environmental background,
20  but he specifically is working on the hours of
21  service team now.  So for now only with respect to
22  hours of service does he look at environmental

Page 224

1   issues.
2       Q.  Right, but he has not been tasked
3   specifically with environmental issues?
4       A.  That's correct.
5       Q.  Who other than Ms. Walls does
6   environmental issues in the division?
7       A.  In our division, no one.  But I think
8   what's not being explored here is this was not an
9   environmental issue so much as it was a policy
10  issue.  The environmental law indicated that the
11  standard was a unique or precedent setting action.
12      The question for consideration was is
13  this particular rule that is before us sufficiently
14  unique or sufficiently precedent setting that we
15  need to have the triggering time lines in place for
16  public comment on the environmental piece of this
17  rule.
18      So the question wasn't where do I find
19  an environmental expert.  The question is what is
20  unique or precedent setting in the environmental
21  context, and that could have involved some
22  independent research or some case searching.

Page 225

1    And then how does the standard for
2 unique and precedent setting pair up with what rule
3 making initiative the agency has underway. Is this
4 rule making initiative from a policy and an impact
5 perspective clearly unique and precedent setting.
6    Q.  But in order to determine whether it
7 was unique and precedent setting, you needed to
8 understand the environmental aspect of it; is that
9 correct?
10    A.  That was part of what you needed to
11 understand, correct.
12    Q.  And Ms. Walls is the only person in
13 the division that deals with these environmental
14 issues; is that correct?
15    A.  In the division, yes.
16    Q.  And then she drafted a memorandum with
17 respect to what she felt her conclusions were on
18 this issue with the anticipation of it going to you
19 and having discussions with it after?
20    A.  Right.
21    MS. ROSEN:  I object.  Are you asking
22 her a question?

Page 226

1    MS. MCKINNEY:  Yes, I am.
2    BY MS. MCKINNEY:  (RESUMED)
3    Q.  Was the memorandum that Ms. Walls
4 wrote, was that expected to go out as the agency
5 policy or was it to go out to you and Ms. Rutledge
6 for you guys to have a discussion about?
7    A.  First of all, let me clarify.  There
8 was no initial memorandum that Ms. Walls wrote.
9 This was an opinion that she had expressed
10 informally and perhaps in e-mails, but it was not an
11 exploratory memorandum.
12    What happened in the consequence of
13 her opinion was, when I shared that opinion with
14 Ms. Rutledge, and then when I probed Ms. Walls a bit
15 further and said, yes, one way to look at this may
16 be that it's a unique and precedent setting action
17 and here's what's required, but could we not look at
18 it from another perspective.
19    And that's when more resources were
20 brought to bear on the question.  Mr. Strasser did
21 some research.  And it was research that in fact
22 indicated that there was no finality or one clear

Page 227

1 way of looking at unique and precedent setting.
2 There was latitude to interpret it different ways,
3 and that the latitude to interpret it different ways
4 would have served the agency well had that been
5 presented at the outset.
6    Q.  So what you're talking about, this
7 entire project that you're taking about, essentially
8 was Ms. Walls sending you an e-mail on a topic, an
9 issue that had been raised; is that correct?  Yes or
10 no?
11    A.  An e-mail and conversations that
12 related to the same subject, yes.
13    Q.  It started out as an e-mail?
14    A.  Correct, or a conversation that was
15 followed up by an e-mail.  I honestly can't remember
16 which.
17    Q.  But I do know that one of my
18 responsive e-mails said can we not look at this more
19 broadly, can we not answer this differently, can we
20 not explore possibilities.  It opened up something
21 beyond the finality of this is what we're stuck with
22 and this is what the agency must observe.

Page 228

1    Q.  Right, but that wasn my question.  My
2 question is that the whole project that you just
3 discussed, and you've already answered, I believe,
4 started out as an e-mail.  She wasn't expected to
5 write up a memorandum or do any kind of
6 documentation or paperwork?
7    A.  Correct.
8    Q.  It was just an e-mail response?
9    A.  Correct.
10    Q.  We're going back again to the issues
11 that you talked about earlier.  You do agree that
12 the things that you were talking about in terms of
13 level of independence, proactivity, accessibility,
14 dealing with clients, those are things that you have
15 to measure subjectively based on your assessment of
16 how Ms. Walls performs?
17    A.  Correct, based on my assessment and
18 also based on input from others who are involved in
19 her work and who are the recipients of her services.
20    Q.  That's not a quantitative type of
21 measurement of performance?
22    A.  Correct.

Page 229

1  Q.  And it's not something such as writing
2  skills?
3  A.  Well, that is part of --
4  Q.  Or organizational skills, do you
5  consider it?
6  A.  I think organizational skills are part
7  of communication skills.  I mentioned oral and
8  written communications.  And clearly the ability to
9  organize thoughts, the ability to present thoughts
10  in a manner that can be understood by the audience
11  is part of that.  I would consider that to be sort
12  of an essential element of communication skills.
13  And, in fact, while the first items
14  you mentioned there, the level of independence, the
15  accessibility, the proactivity are areas that are
16  not readily quantifiable, certainly the writing
17  skills, and to some extent the quantity of work and
18  the level of difficulty of work when I talk about
19  in-depth expertise, those are far and away more
20  quantifiable.
21  So I think there is an array of
22  possibilities there when you go down the list.  Some

Page 230

1  of them are more quantifiable than others,
2  certainly.
3  Q.  When you're talking about the level or
4  the complexity of her assignments, you're the one
5  that gives her the assignments; is that correct?
6  A.  Yes.
7  Q.  We've discussed this February 6, 2004
8  meeting where you weren't present, but you had
9  discussed your understanding of what transpired at
10  that meeting?
11  A.  Correct.
12  Q.  In the February 6, 2004 meeting, was
13  there a discussion about giving Ms. Walls some sort
14  of plan to achieve a GS-15?
15  A.  I'm not certain if that happened in
16  the February 6th meeting.  I know it happened in the
17  February 10th meeting that we discussed the
18  possibility of her having benchmarks for achieving a
19  GS-15.
20  We've always maintained, and I still
21  maintain there is no such thing as a 15 promotion
22  plan, one size fits all, fill in the box type plan,

Page 231

1  but there are definitely strides that we would
2  recommend.
3  And I believe that Ms. Rutledge told
4  me that she thought in terms of Ms. Walls qualifying
5  at a later time and being considered as a nominee at
6  a later time for the EPP, that she had offered to
7  help her develop a plan toward the leadership and
8  accomplishment goals that would be helpful in
9  qualifying for the EPP.  I don't know if that was at
10  the February 6th meeting or after.
11  Q.  So there was a discussion which may
12  have occurred at the February 6, 2004 meeting about
13  a plan for the EPP program?
14  A.  May have.  I don't know for sure.
15  Q.  Tell me about the February 10th
16  meeting, how did that meeting come about?  Why was
17  it convened?
18  A.  After the February 6th meeting, as I
19  mentioned, both Ms. Walls and Ms. Rutledge told me
20  about the turn of events at that meeting, which was
21  unexpected, where the issue of promotability became
22  a focus in addition to the EPP issue.

Page 232

1  Ms. Rutledge confirmed that
2  Mr. McCowan had told Ms. Walls that I had told him
3  she was not ready to be promoted to a grade 15.
4  Ms. Rutledge told me that Ms. Walls became very
5  upset in the meeting, and that she suggested that it
6  was imperative that we have -- "we" meaning
7  Ms. Walls, Ms. Rutledge and myself -- have a
8  follow-up discussion to that meeting, so that we
9  could clarify the issue about her promotability and
10  provide her, Ms. Walls, with the information she
11  needed as far as moving toward promotability.
12  Q.  So the specific issue at the February
13  10th meeting was promotability?
14  A.  Correct.
15  Q.  And a plan was discussed of giving her
16  some sort of plan for a promotion?
17  A.  Steps were discussed toward that goal.
18  My recollection is that the meeting ended very
19  precipitously, because after some points of our
20  discussion Ms. Walls became visibly upset and
21  indicated that she didn't want to continue the
22  meeting at that time.

Page 233

1      But we had gotten to a point in the
2   meeting where we had told Ms. Walls that there were
3   steps she would need to take in order to elevate her
4   performance to the grade 15 level.
5      And there were specific things that
6   we, meaning Ms. Rutledge and myself, could envison
7   her doing that would position her well to qualify
8   for a 15.
9      Some of the specifics that I had
10  anticipated discussing at that meeting didn't come
11  about because we terminated the meeting earlier than
12  I would have liked. And the idea was that we would
13  continue at another point in time.
14      And an outgrowth of that meeting was
15  the tacked onto the March 18th performance appraisal
16  discussion that I had with Ms. Walls where I gave
17  her some logical points and activities that I
18  thought would logically feed into her building the
19  qualifications and performance attributes that would
20  position her for a 15.
21      Because that meeting followed the next
22  month, the performance appraisal meeting followed

Page 234

1   the next month, and we had not reconvened a meeting
2   of the nature of the February 10th meeting at that
3   time, I used the March occasion to present those
4   items that I thought complemented the information
5   that she was given and the general direction that
6   she was given in the February 10th meeting.
7      Q.   What made Ms. Walls upset at the
8   meeting that had ended early?
9      A.   I don't know specifically if it was
10  one thing or just the tension, the understandable
11  tension of being told in a meeting that something
12  that you are aspiring toward is not yet within
13  reach.
14      I do know that at one point in the
15  meeting Ms. Rutledge had asked me very directly to
16  tell Ms. Walls that at that point in time I did not
17  think she was ready for a promotion to the grade 15
18  level, applying the standards that were applicable
19  in the office of chief counsel, that Ms. Rutledge
20  wanted me very pointedly to make sure that I said to
21  that Ms. Walls, because based on Ms. Walls' reaction
22  in the earlier meeting with Mr. McCowan where she

Page 235

1   was provided with that information, she, in
2   Ms. Rutledge's mind as well, appeared to disagree
3   with that, disagree that it was my opinion that she
4   was not ready.
5      And Ms. Rutledge wanted me in
6   Ms. Rutledge's presence, to clearly tell Ms. Walls
7   that while I certainly supported her in her goal for
8   a 15, and while I certainly wanted to see her
9   succeed and was confident that she had the ability
10  to reach a 15, she was not yet there.
11      And she was not performing at a level
12  that would merit her promotion at that point in time
13  to a 15. Ms. Rutledge wanted to hear me say it to
14  Ms. Walls. And she in turn wanted to hear Ms. Walls
15  repeat it back to me.
16      At one point in the meeting when
17  Ms. Rutledge asked Ms. Walls to repeat back to me
18  something that I had said in relation to that topic,
19  Ms. Walls did not repeat it back with a level of
20  clarity or definitiveness that convinced either me
21  or Ms. Rutledge that she had actually heard what I
22  said in that way.

Page 236

1      And Ms. Rutledge asked me to tell her
2   again, and she asked Ms. Walls to repeat it back to
3   me. And my recollection is that it was at that
4   point in the meeting that things became excessively
5   tense and that Ms. Walls became extremely upset at
6   being put in that position.
7      Q.   Did you in fact tell Ms. Walls what
8   Ms. Rutledge wanted you to convey? Did you tell her
9   that?
10      A.   I told her that while I thought she
11  had the potential to become a grade 15 attorney,
12  that it was true that I had told Mr. McCowan and
13  Ms. Rutledge that at that point in time I did not
14  feel that she was ready to be promoted to a 15 under
15  the standards that were applicable in the office of
16  chief counsel, that Mr. McCowan's statement to her
17  on February 6th had been accurate, that I too
18  assessed her as not yet ready for a promotion.
19      Q.   And this is what you told Ms. Walls at
20  the meeting?
21      A.   At the February 10th meeting, yes.
22      Q.   You told her what you said essentially

Page 237

1   just now in your deposition testimony?
2       A.  Yes.
3       Q.  That's what you told her?
4       A.  Yes.
5       Q.  And how would you react to Ms. Walls'
6   understanding that you disagreed with what
7   Mr. McCowan said, that you had in fact said the
8   opposite, that you disagreed with his
9   characterization concerning the statement concerning
10  her promotability?
11          MS. ROSEN:  I object unless you
12  understand that question.  I certainly don't.
13          THE WITNESS:  Can I say what I think
14  it meant?
15          MS. ROSEN:  I would like you to
16  rephrase it.
17          THE WITNESS:  Would you please
18  rephrase that.
19      BY MS. MCKINNEY:  (RESUMED)
20      Q.  How would you respond, what would be
21  your reaction, if it was Ms. Walls' understanding
22  that you actually refuted what Mr. McCowan had said

Page 238

1   earlier in the February 6th meeting?
2       A.  I would think that Ms. Walls is
3   confusing two things.  In my reaction to what
4   Ms. Walls told me happened at the February 6th
5   meeting, I expressed extreme displeasure that the
6   issue about promotability had come up without my
7   being present, because I had received a direct
8   assurance from both Mr. McCowan and Ms. Rutledge in
9   advance of the meeting that that would not be an
10  issue.
11          And they affirmatively had decided in
12  my presence that I would not come to the February
13  6th meeting, because there would be no reason for me
14  to be there.  It was not to discuss a managerial
15  decision that I was part of.  I was part of any
16  decision that had to do with Ms. Walls'
17  promotability.
18          As her immediate supervisor, I would
19  be the first line person to recommend or not
20  recommend an employee for promotion.  Because
21  Ms. Rutledge and Mr. McCowan had assured me in
22  advance of that meeting that they would be talking

Page 239

1   about the EPP program, and that did not involve me
2   as a direct participant because it was an office
3   decision not to nominate someone for the EPP, my
4   presence was not deemed to be appropriate or
5   necessary.
6           Prior to the meeting that Mr. McCowan
7   and Ms. Rutledge had with Ms. Walls, when they were
8   speaking with me about her performance and about her
9   interest in the EPP program, they did directly ask
10  me if I thought she was ready at that point in time
11  to be promoted to a grade 15 and I had said no.
12          I also said very strongly to them, and
13  I had said to Ms. Walls on a number of occasions
14  that I did fully support her interest in becoming a
15  15, and I was fully convinced that she had the
16  potential to become a 15.
17          And if she insists that I said
18  Mr. McCowan misquoted me, my belief is she must be
19  confusing my support for her promotability to a 15
20  once she accomplishes certain benchmarks with my
21  assessment that she is currently not ready to be
22  promoted to a 15.

Page 240

1       Q.  As articulated or communicated to you
2   orally, not in writing by Ms. Rutledge of her
3   expectations of what she wants for motor carrier; is
4   that correct?
5       A.  Correct.  And not only what's
6   communicated by Ms. Rutledge, but my understanding
7   of the OPM standards, the standards that are in
8   place within the department that are set forth in
9   the interrogatory, all of those are consistent with
10  the standards that Ms. Rutledge has orally confirmed
11  to me will be the operative standards within the
12  office of chief counsel.
13      Q.  Did Ms. Rutledge ever say that she got
14  her standards from OPM?  Did she ever tell you that
15  she got it from OPM?
16      A.  Actually, yes, she has said that the
17  OPM standards are fully consistent with the
18  standards that she has in place.  In fact, at one
19  point in time she had me look at the OPM standards
20  and identified places in the OPM standards where the
21  references were consistent to this type of standards
22  we have in place.

Page 241

1     I actually had presented to her at her
2 request an annotated copy of the OPM standards that
3 identified in marginal notations areas where their
4 expectations married up with the ones that were on
5 her list of expectations for the office of chief
6 counsel.
7     Q.  But when she first told you about her
8 expectations, did she reference the OPM?
9     A.  No, not when we had those early
10 exploratory discussions she wasn't mentioning OPM.
11 They were presented as these are the logical
12 expectations that anyone would have of a grade 15
13 attorney.
14     Q.  And when did she express to you that
15 she got the standards from OPM?
16     A.  To my way of thinking, it was always
17 understood that these weren't her personal
18 standards, that these were related to acceptable
19 standards with OPM.
20         The only conversation I can
21 specifically recall where I did a point by point
22 assessment of OPM standards was much more recently

Page 242

1 than the 2004 discussions that's been within the
2 last recent period of time, since actually, I think,
3 just to make sure that we had all the documents that
4 relied upon, making sure in your discovery requests
5 that we had all the documents.  And that was one of
6 them.  And she said this is what I'm talking about,
7 is this what you're talking about?  Yeah.  Does this
8 completely marry up?  Yes.
9         And she has an annotated version that
10 I provided her just so we were on the same
11 wavelength, that when we were producing documents
12 for this or referencing documents in our
13 interrogatory, that we were talking about the same
14 piece of material.
15     Q.  So prior to this, prior to the
16 discovery process in this proceeding, OPM and its
17 regulations had never come up with respect to the
18 standards that Ms. Rutledge had?
19     A.  I didn't say they never came up.  I
20 said she never talked about her standards with
21 direct reference to OPM.  It was always understood
22 in my mind that of course we were enforcing

Page 243

1 operative government standards, departmental and
2 OPM, because that's what we do.
3     Q.  That's not my question.  I'm saying
4 specifically when she talked about her standards,
5 did she say I got this from OPM?  You're saying that
6 you inferred that it came from OPM but she never
7 said that?
8     A.  She did not reference OPM in all of
9 the early discussions we had about what will be the
10 prevailing norms and expectations for a grade 15.
11 She did not say these are the standards that will be
12 operative in the office of chief counsel because
13 these are the standards that are operative in the
14 office of personnel management.
15     Q.  That didn't come up until much later
16 in this proceeding?
17     A.  Right, as far as specific standards
18 and identifying a document, correct.
19     Q.  What are the agency's standards?  I
20 mean, you discussed what the OPM standards are, but
21 what are the agency's standards?
22     A.  The agency's standards for the office

Page 244

1 of chief counsel?
2     Q.  No, the agency's standards, the
3 Department of Transportation standards.
4     A.  Well, there is directive or guidance
5 from a former Department of Transportation general
6 counsel, which talks about standards for qualifying
7 attorneys at different levels.  I think it's
8 referred to in our interrogatories as the Kaplan
9 memo, perhaps, in reference to the chief cousel.
10     MS. ROSEN:  It's in the ROI.
11     THE WITNESS:  And those are the
12 standards that are operative at the department
13 level, which as I understand them and as I've
14 reviewed them, marry up with the ones operative at
15 OPM.  They very heavily focus on the kind of issues
16 that we focus on.
17         And our standards, meaning the
18 operative ones in the office of chief counsel,
19 comply with and marry up well with the OPM standards
20 and the Kaplan memo standards.
21     BY MS. MCKINNEY:  (RESUMED)
22     Q.  Did Ms. Rutledge ever tell you prior

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 245

1  to this proceeding that she based her standards on
2  the Kaplan memorandum?
3      A. Not that I am aware of. I don't
4  remember her referring to it as a Kaplan memorandum
5  basis for her standards. I think it was more of a,
6  these are items that are out there, both the OPM
7  directives and the departmental directives, and this
8  is how standards will be imposed in the office of
9  chief counsel.
10     Q. That's not my question. Did she ever
11 tell you prior to these proceedings on what she
12 based her standards, or did she just tell you these
13 are my standards?
14     A. No, not for attribution she didn't say
15 my sources for this are the following. She simply
16 said --
17     Q. These are my standards?
18     A. These are the expectations in the
19 office of chief counsel. And it wasn't so much
20 these are my standards. It was these are the
21 standards that the office will observe.
22     Q. And she didn't tell you where she

Page 246

1  attributed that from?
2      A. No.
3      Q. When did you first tell your employees
4  that these were the standards that they were
5  expected to achieve if they want a promotion to a
6  GS-15?
7      A. I would have discussed it on an
8  individual basis with the only two employees I had
9  for whom that was relevant. And that would be
10 Ms. Walls and Mr. Solomey. I didn't discuss it in a
11 public setting with the employees in general. I had
12 individual conversations at various points in time
13 with both Ms. Walls and Mr. Solomey when their
14 individual requests or interests in obtaining a
15 promotion would come up.
16     Q. Do you recall when you had these
17 discussions? Was it early 2000?
18     A. In Ms. Walls' case, it was clear from
19 very early on when she became a part of our
20 division, when our division was created, that she
21 was interested in a promotion.
22        And at least as early as one of the

Page 247

1  first performance appraisal discussions I had with
2  her in 2001, which was the first time we actually
3  did performance appraisals since the office was
4  created, at some point during that series of
5  discussions I'm sure it would have come up.
6         Because as soon as she had approached
7  me on promotability, I in turn had the exploratory
8  discussions with Ms. Rutledge, and in terms of
9  responding back to her what the standards would be
10 and what we were looking for. Those were the types
11 of issues that came up.
12        In Mr. Solomey's case, the same kind
13 of thing. I mean, I would have the discussions with
14 him on -- the logical occasion would be when we were
15 following up on his annual or semiannual performance
16 review, and we would logically proceed into the
17 issue of goals and activities for the upcoming
18 performance appraisal cycle.
19        I cannot specifically give you dates
20 or times for either one of those discussions with
21 either of the employees other than to track them
22 with the performance appraisal dates that are

Page 248

1  already in the interrogatories.
2      Q. But, again, as you testified earlier,
3  none of this was written?
4      A. Correct.
5      Q. And none of this was given in a group
6  meeting? These are all one on one meetings between
7  you and the individual employees?
8      A. Correct.
9      Q. At the February 10th meeting, you
10 testified earlier that Ms. Walls did not communicate
11 something back to you as you and Ms. Rutledge had
12 wanted her to. What did she not communicate back?
13     A. The exact words, obviously, I wouldn't
14 know. The purpose that Ms. Rutledge wanted me to
15 get across to Ms. Walls and to make sure that she
16 heard was that in my assessment as her immediate
17 supervisor she was not yet ready for promotion to
18 the grade 15 level, that there were things she
19 needed to do and performance attributes she needed
20 to demonstrate before she would be able to be
21 considered for a grade 15 promotion.
22        My exact words were not so imperative

62 (Pages 245 to 248)

Page 249

1 that she repeated back to me, but in the tone of the
2 meeting Ms. Rutledge wanted me to make sure that
3 that information was conveyed to her. And the only
4 way that Ms. Rutledge could satisfy herself that
5 that information had been conveyed was to ask
6 Ms. Walls to very clearly repeat back the
7 information to me.
8        And when in fact the first time she
9 provided her assessment of what I had said, it
10 didn't precisely marry up with the tone of my
11 message, Ms. Rutledge asked me to repeat the message
12 to Ms. Walls and then asked Ms. Walls to in turn
13 repeat the information back to her.
14      Q.   Why would you tell Ms. Walls this
15 given the time that you had worked with her? Why
16 was it necessary for you to bring this up at a
17 meeting and require her to repeat it back to you if
18 you've had ongoing conversations for the past five
19 years or four years, I guess at the time?
20      A.   Because of Ms. Walls' reaction at the
21 February 6th meeting when Mr. McCowan attributed the
22 not ready for a 15 assessment to me, Ms. Walls

Page 250

1 apparently had reacted by saying my supervisor does
2 support me for a 15, and she disagreed with
3 Mr. McCowan that I could have said that she was not
4 ready.
5        As a result of that, Ms. Rutledge met
6 with me and said I know you have been talking to
7 Elaine about the requirements for promotability, but
8 she apparently believes that you have not said to us
9 she is not ready for a 15, and I need to hear you
10 tell her in my presence so I know that she
11 understands and I know that you are properly
12 communicating it, that she is not yet ready for a
13 15.
14       And beyond that we will communicate to
15 her what will contribute to the performance
16 attributes that she will need to show in order to be
17 ready for a 15.
18       But the primary reason for the
19 meeting, as Ms. Rutledge represented it to me when
20 she was setting it up was, that she was not at all
21 satisfied -- that Ms. Rutledge was not at all
22 satisfied that Ms. Walls had actually understood me

Page 251

1 in the past when I told her what she needed to do to
2 qualify for a 15.
3        Ms. Rutledge wanted me to say it to
4 Ms. Walls directly and she wanted to hear Ms. Walls
5 say it back so there could be no misunderstanding
6 that I was in agreement that Ms. Walls was not yet
7 ready for a 15, but that I was going to work with
8 her to get her there.
9        The tone of the meeting, as it was
10 explained to me in advance of the meeting, and what
11 actually happened was Ms. Rutledge was concerned,
12 because she has a much more direct and bold
13 communication style than I do, and I think she was
14 concerned that I had, in an attempt to be supportive
15 of Ms. Walls, an attempt to tell her how she needed
16 to meet certain standards, as we discussed earlier I
17 had not projected that information in a way that
18 said you are not meeting those standards currently.
19       As I said earlier in this deposition,
20 my style is not to do that. My style is to tell
21 people the glass is half full, this is what you need
22 to do to make it full all the way up.

Page 252

1        What Ms. Walls was hearing apparently
2 when I was telling her that wasn't what to me is the
3 logical translation of that, which is here's what
4 you're not yet doing, here's why you are not yet
5 ready.
6        Under the standards that we have to
7 live with that are applied across the board in this
8 office, there are things that you are not yet doing.
9        You asked me earlier, I believe, if I
10 had ever told her she was not ready for a promotion,
11 and I think I said, no, I did not say that to her in
12 my recollection. What I would tell her is here's
13 what you need to do to be ready for a promotion, to
14 be qualified for a grade 15.
15       When I hear that kind of information
16 when it's imparted to me, my logical assumption is
17 that means if I have to do things to be ready, I
18 must not be doing all of those things right now.
19       It is perhaps the case that I was not
20 direct enough or bold enough in saying to her in
21 those terms you are not yet ready. I thought that
22 was understood.

Page 253

1    I thought the useful part of the
2 information I could give to her was it's fine to say
3 you're not yet ready, but what does that mean?  What
4 do I need to do?  What would get me ready?  That's
5 the kind of information that my management style
6 says I give to my employees.
7        It goes without saying if there are
8 yet things they need to do, that must mean that
9 those are things they are not currently doing.  And
10 if you are not currently meeting all of those
11 performance attribute benchmarks, you are therefore
12 not ready for a grade 15.
13        Ms. Rutledge wanted to hear me say
14 that to Ms. Walls in no uncertain terms.  And she
15 then wanted to hear Ms. Walls say it back so she
16 could be sure that she heard what I said and she
17 properly interpreted it for what it was.
18        Q.   So clearly Ms. Walls' reaction to
19 Mr. McCowan's February 6th comment was disbelief?
20        A.   Apparently it was.
21        Q.   Did you say very much during this
22 meeting, this February 10th meeting with yourself,

Page 254

1 Elaine Walls and Ms. Rutledge?
2        A.   I said quite a bit as I recall.
3 Ms. Rutledge took the lead in introducing the topics
4 at the meeting.  I think she made the lion's share
5 of the remarks at the beginning of the meeting.
6        I then followed up her remarks by not
7 only having the engagement that I just described
8 where I told Ms. Walls about her promotability to a
9 15 and the fact that I believed she was not yet
10 ready, and I had in fact imparted that information
11 to Ms. Rutledge and Mr. McCowan.
12        Following up on that, both
13 Ms. Rutledge and I, as I recall, shared the
14 information distribution when it came to assuring
15 Ms. Walls that our assessment that she was not yet
16 ready did not translate into an assessment that she
17 was not able to become ready or that she did not
18 have the potential to become a 15.
19        We very specifically assured her that
20 we saw the potential there and we would work with
21 her to develop that potential.  And as I recall,
22 Ms. Rutledge and I both shared that piece of

Page 255

1 information and both imparted that kind of
2 information in the second part of the meeting.
3        Q.   Did Ms. Rutledge state during this
4 meeting that you should no longer sugar coat the
5 issue or something along those lines?
6        A.   I don't know if she used that term.  I
7 don't recall her using that term, but clearly that
8 would have been in keeping with the tone of the
9 meeting, because Ms. Rutledge's direction to me
10 before the meeting was you need to be forthright,
11 you need to be direct, you can't mince words.  You
12 need to tell Ms. Walls exactly what she needs to
13 hear.  And I want to hear from her that she heard
14 it.
15        So saying something like not sugar
16 coating the meeting would certainly be in keeping
17 with the directives that I had with Ms. Rutledge
18 about being forthright and being blunt.
19        Q.   Did Ms. Rutledge also state that she
20 would call a spade a spade?
21        A.   I don't recall her using that
22 terminology at all.

Page 256

1        Q.   You don't recall her stating I'm going
2 to call a spade a spade and then sometime shortly
3 after that Ms. Walls becoming upset and leaving the
4 meeting?
5        A.   I don't.  My recollection is I know
6 Ms. Walls became upset.  And as I've just allowed,
7 my recollection was that she became upset when the
8 meeting got unusually tense and she was forced to
9 repeat back my words and then a second time forced
10 to repeat back my words with more clarity.
11        My remembrance is that's when the
12 meeting got excessively tense and she became visibly
13 upset.  I perceived it to be a sense that that is
14 kind of an unusual thing to be asked to do in a
15 meeting.
16        And my interpretation of her being
17 upset was that she was feeling put upon to repeat
18 words that were being presented to her and maybe
19 perceived it as a bit of an intense session or maybe
20 even something that she might have perceived as
21 badgering, when in fact it was just an attempt to
22 make sure that she understood and to make sure I had

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

---

Page 257

1  done my job of communicating.
2          But it seemed to me looking back that
3  the timing of her becoming upset related more to
4  that turn of events in the meeting that she was
5  being called upon to do something that you might
6  think was kind of irregular in a meeting of that
7  nature.
8      Q.  So it wasn't because Ms. Walls was
9  upset because of comments that she found offensive
10  by Ms. Rutledge?
11      A.  That was not my understanding.  And I
12  don't recall any comments that could have been
13  perceived as offensive.
14      Q.  Did Ms. Rutledge state something along
15  the lines during this meeting that Ms. Walls was
16  nothing more than a high paid GS-14 level attorney?
17      A.  Absolutely not.  That would have been
18  completely out of character of the meeting.  The
19  purpose of the meeting was to assure her that she
20  could be more.
21      Q.  Is it your testimony that that
22  statement was not made during the meeting?

---

Page 258

1      A.  Yes.
2      Q.  Has there ever been a similar type of
3  meeting with Ms. Rutledge and any other staff member
4  at motor carriers?
5      A.  Not in my division.  Beyond that I
6  wouldn't know.
7      Q.  I would like this document marked as
8  Deposition Exhibit No. 8.
9          (Document marked Exhibit No. 8)
10      Q.  I have just had the court reporter
11  mark as Deposition Exhibit No. 8, an affidavit which
12  was taken for the report of investigation in this
13  case.
14          Do you recognize this document?
15      A.  I do.
16      Q.  Is this your affidavit?
17      A.  Yes, it is.
18      Q.  Did you look at this affidavit in
19  connection with preparing for your deposition
20  testimony?
21      A.  I had it among the documents that I
22  collected related to this case.  I think I may have

---

Page 259

1  scanned over it, but not in any great detail.
2      Q.  Is it your contention that everything
3  in this affidavit is true and correct?
4      A.  Actually there was one point that
5  needed correction that I pointed out.  I believe at
6  some point in here I gave the wrong date for when my
7  supervisory responsibilities over Ms. Walls started.
8  And that was strictly because of my confusion at the
9  time.
10          I think I said January of 2000, and it
11  was in fact October of 2000.  At some point, I think
12  when I initially prepared this last year, I was
13  thinking in terms of the startup of the office of
14  chief counsel with Ms. Rutledge as opposed to the
15  time I actually became the supervisor over
16  Ms. Walls.  I need to find that now, but I believe
17  that's in here.
18          Otherwise, as best I can recall, it's
19  all correct.
20      Q.  Was a promotability plan discussed
21  during this February 10th meeting?
22      A.  No, there wasn't a plan discussed.  It

---

Page 260

1  was strictly Ms. Rutledge and I providing Ms. Walls
2  with assurance that we thought she had the potential
3  to achieve the grade 15 level, and our further
4  assurance that we would be available to work with
5  her to identify assignments and initiatives and
6  performance attributes that we thought would be
7  necessary for her to qualify for a 15 and would
8  enhance her prospects for achieving a 15 if we could
9  in fact promote within the office to that level.
10      Q.  So it wasn't a plan that was
11  discussed?
12      A.  It was not a plan per se of any
13  developmental guidelines or benchmarks.  AS I said
14  earlier, we don't have a check the box type plan if
15  you accomplish all of this, you become a 15.  It
16  doesn't work that way, and we didn't represent it
17  that way.
18      Q.  Looking at page 3 of your affidavit,
19  and I guess this is 6-B, the investigator asked you
20  what sort of plan is Rutledge going to develop in
21  order for the complainant to obtain a GS-15 and why.
22          And your answer to that was "this

---

Page 261

1  question should be posed to Ms. Rutledge."
2      Why did you respond in that way?
3      A.  Because the question was directed at
4  something that another person was going to do, and I
5  didn't feel that I was the appropriate person to
6  respond to it.
7      Q.  If no plan was discussed in the
8  meeting, why wouldn't your answer be there is no
9  plan that was discussed?
10     A.  It could have been, but as a matter of
11 propriety, since it specifically referred to
12 Rutledge, and knowing that she was providing her own
13 affidavit, I thought that she should be the one to
14 answer the question.
15     Q.  So you didn't feel that your response
16 should be that there was no plan?  You felt that
17 just refer to Rutledge who has a better answer?
18     A.  Correct.  The answer is there was no
19 plan would have been correct.  But in the context,
20 since this was my personal affidavit and someone
21 else's opinions or involvement were being invoked, I
22 thought they should be the one to respond to it.

Page 262

1      And I believe at a later point in here
2  when the issue of a plan came up, I did respond that
3  there was no such thing.  Under D, 6-D, I'm not
4  aware of any plans.  To the extent this question
5  implies that Ms. Walls was put on such a plan, I do
6  not agree.
7      Q.  I'm looking at your affidavit on page
8  4, 7-C.  You are asked if you believe that Ms. Walls
9  is qualified for a promotion to GS-15, and your
10 answer is that you don't believe she has fully
11 achieved a level of performance for GS-15 in the
12 estimation of her full MC-CC supervisory chain.
13     A.  Correct.
14     Q.  What did you mean estimation of her
15 full MC-CC supervisory chain?
16     A.  All the way up the line, myself,
17 Ms. Rutledge, Mr. McCowan.
18     Q.  Did you mean that there was some
19 disagreement within the MC-CC supervisory chain?
20     A.  No.  What I meant was that, as I said
21 earlier, as the initial supervisor my recommendation
22 is a factor, but it is not an independent

Page 263

1  determinator of whether someone will become a 15 or
2  not.
3      So in responding to this, I invoked
4  the entire supervisory chain, which started with me
5  and went through Ms. Rutledge and went through
6  Mr. McCowan.
7      And I based that on the conversation
8  that we all had had about Ms. Walls' qualification
9  back in February prior to the February 6th meeting,
10 and then the information that was imparted to
11 Ms. Walls of February 6th and the follow-on meeting
12 of February 10th where I ratified that information
13 for Ms. Walls.
14     Q.  So by full MC-CC supervisory chain,
15 you mean the entire chain?  You're not indicating
16 that there was a disagreement along the supervisory
17 chain?
18     A.  Correct.
19     Q.  Given the representations of the MC-CC
20 supervisory chain with respect to Ms. Walls and her
21 promotability to GS-15, would it have been futile
22 for Ms. Walls to apply for a GS-15 position?

Page 264

1      A.  I don't really think there is any such
2  thing as applying for a GS-15 position.  She made
3  her interests known in wanting a GS-15.  The next
4  step would be to have a formal recommendation from
5  her immediate supervisor put in place and to present
6  that recommendation to the second line supervisor,
7  which would be Ms. Rutledge.
8      I don't think there is a process where
9  an employee writes their own promotion papers and
10 puts them forth.  It has to be with the agreement
11 and instigated by the first line supervisor.
12     Q.  Let me try to ask this a different
13 way.  Obviously employees can apply for vacancy
14 announcements, job announcements; is that correct?
15     A.  Correct.
16     Q.  Would it have been futile for
17 Ms. Walls to apply for a position, a GS-15 position,
18 given the MC-CC supervisory chain's assessment of
19 her promotability to GS-15?
20     A.  If you're talking about a
21 nonsupervisory 15 position, had one been announced
22 and available in the office, I would assume that the

Page 265

1 same standards would be operative for a new position
2 as would be in place if we had been in a position to
3 promote an existing employee.
4     The only positions that I am aware of
5 that have ever been announced in the chief counsel's
6 office at a GS-15 level are supervisory attorney
7 positions.
8     And as I mentioned in discussing
9 Mr. Solomey's situation earlier, the standards are
10 different for looking at a supervisory 15 position
11 as looking at a 15 staff attorney position in a
12 nonsupervisory role.
13     Many of the qualifications and the
14 performance attributes are the same, but the role
15 that an attorney fills in a supervisory position is
16 different in some respects, and the expectations for
17 performance are different. Therefore the
18 qualifications are different.
19     So I think it would certainly depend
20 on whether we're talking about a nonsupervisory
21 position in my division, in which case I would say
22 not being able to qualify in being promoted from a

Page 266

1 14 to a 15 in your position would be tantamount to
2 not being qualified for a new nonsupervisory
3 position that was announced.
4     The announcement of a supervisory
5 position for a grade 15 in a different capacity
6 would have different factors to be considered. So I
7 would certainly say it would not be futile.
8     Q. For a supervisory position?
9     A. Correct.
10     Q. But it would be futile for a
11 nonsupervisory position?
12     A. If someone at a point in time is
13 determined not to qualify for a grade 15 in a
14 particular division, it would seem that the
15 conclusion would be the same whether they are
16 looking for a promotion in their current position
17 and a reclassification of their position to a grade
18 15 or whether they are applying for a job
19 announcement for a grade 15 staff attorney position
20 in that same division.
21     Q. Are the standards for a supervisory
22 GS-15 higher than that of a nonsupervisory position?

Page 267

1     A. No, I wouldn't say they're higher. I
2 think there are just different factors to be
3 considered. For both supervisory and a
4 nonsupervisory 15, there are very high expectations
5 at the performance level.
6     The nonsupervisory position doesn't
7 include a number of factors that would be considered
8 in a supervisory position; for instance, the
9 employee management piece of it.
10     Alternatively, I would say a
11 supervisory position doesn't have necessarily some
12 of the same expectations for in-depth subject matter
13 expertise in all of the areas that a staff attorney
14 position at the 15 level would have, because there
15 are different kinds of responsibilities involved in
16 both.
17     A supervisor at the 15 level
18 presumably is overseeing subject matter experts who
19 can fill some of that role. Whereas a staff
20 attorney at the 15 level is expected to have subject
21 matter in-depth expertise in several areas in order
22 to qualify for that 15 as a staff level 15.

Page 268

1     Q. Are there any other differences
2 between a supervisory and a nonsupervisory GS-15?
3     A. There certainly may be some. Those
4 are the ones that I would best articulate as the
5 most indicative that -- again, to reiterate, at the
6 supervisory position, you are focusing on things
7 like management abilities, interpersonal skills, and
8 other factors as opposed to having the focus that
9 you would have at the nonsupervisory 15 level, which
10 would be -- interpersonal skills are certainly key,
11 but management of other employees is not a factor.
12     Subject matter expertise and in-depth
13 matter subject familiarity is very much a factor in
14 the employee staff level 15. And it would not so
15 much be a determinative factor at the supervisory
16 15. So those are the major distinctions that I
17 would draw.
18     Q. At the February 10th meeting, did
19 Rutledge say that Ms. Walls is almost a GS-15 but
20 needed a plan to get there?
21     A. I can't recall if she used those words
22 or not. I know we told Ms. Walls that she certainly

Page 269

1    had the potential to become a 15.  I don't recall if
2    Ms. Rutledge said almost there.
3            And since we had already determined
4    that we don't have a performance plan for 15, I
5    don't think she would have used that terminology to
6    say needed a plan to get there.  I think she said
7    you need to demonstrate performance attributes that
8    we weren't yet seeing to get there.
9        Q.  The differences between the
10   supervisory and the nonsupervisory GS-15 that you
11   just testified about, has that ever been
12   communicated to staff?
13       A.  Not that I can recall in any context
14   that I've been involved in.  I mean, I'm sure if
15   someone had a reason to probe that issue, my
16   understanding is that's a pretty commonly understood
17   distinction between the two.
18           But I can't think of a time that we've
19   had any kind of a staff meeting or any kind of a
20   staff discussion that would involve those issues,
21   certainly not by me and certainly not within my
22   division.

Page 270

1        Q.  During the times that you talked to
2    your employees, I guess including Ms. Walls and
3    Mr. Solomey, since we've talked about this too,
4    you've never discussed that distinction with them
5    when they brought up their interest in being
6    promoted?
7        A.  Not that I can recall.  And it
8    probably wouldn't have come up in a discussion with
9    me because I don't have any supervisory 15 positions
10   to be at issue within my division.  I am the only
11   supervisor.
12           So the question of a 15 and
13   promotability in the context that it would always be
14   discussed with me would be qualifying for a 15 staff
15   attorney position within my division.
16       Q.  Just generally is there a written
17   policy concerning the difference between the two,
18   supervisory and nonsupervisory GS-15?
19       A.  Not that I am aware of.
20       Q.  How would an employee come to an
21   understanding about the difference?
22       A.  Well, there are certainly documents

Page 271

1    and resources that set forth what's expected of a
2    supervisor.  For instance, there are supervisory 15
3    position descriptions within the office of chief
4    counsel; mine being one.
5            Other division chiefs or assistant
6    chief counsels being such that you could look at a
7    position description for a 15 and very quickly
8    discern the distinction between what's expected of
9    them as performance norms and what's expected of a
10   staff attorney.
11           I would imagine, although I haven't
12   focused on this, that supervisory responsibilities
13   are also articulated just as the attorney positions
14   are and the distinction between the different grade
15   levels.  I would assume that they are also
16   articulated in OPM materials and items of that
17   nature.
18           I haven't specifically looked at that,
19   but it would seem that there would certainly be
20   resources for someone to consult if they were
21   interested in determining what the difference is
22   between a staff level 15 and a supervisory 15.

Page 272

1        Q.  But there is no documents that explain
2    it?
3        A.  Not within the office of chief counsel
4    that's been prepared as a guidance.
5        Q.  So you would have to look at position
6    descriptions or other kinds of materials and then
7    make that inference?
8        A.  Correct.
9        Q.  Would any of the employees you
10   supervise have access to the types of PD's that you
11   just described?
12       A.  Anyone could have asked me for mine
13   and I would be happy to share it.
14       Q.  Ordinarily do they have access to that
15   type of PD?
16       A.  Our administrative officer for the
17   office keeps PD's on file, and there is nothing
18   proprietary about them.  So yes, I would say they
19   would.
20       Q.  Did Ms. Rutledge ever tell you at some
21   point, and I don't know whether it was at the
22   February 10th meeting or not, that she didn't know

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 273

1   why Ms. Walls wanted to be promoted to the GS-15
2   level because she already made enough money?
3       A.  No.  She asked me if I knew why
4   Ms. Walls was so interested in being promoted to a
5   15, and she said is it the salary that's driving her
6   interest.  But she did not say that she already made
7   enough money or Ms. Rutledge didn't understand why
8   she would want to be promoted.
9           She asked me if I could clarify what
10  the driving force was behind Ms. Walls' interest.
11  And it wasn't at the February 10th meeting.  I think
12  it was at some point prior to that when we were
13  discussing the general issue of promotability.
14      Q.  Who else was present during this
15  conversation?
16      A.  I just remember it being a one on one
17  with Ms. Rutledge and myself.
18      Q.  Did you ever talk to Ms. Walls about
19  that conversation with Ms. Rutledge?
20      A.  I may have recounted that to her.  I
21  may have in terms of eliciting information from her,
22  Ms. Rutledge is curious why you are so interested in

Page 274

1   being a 15.  And I could certainly speculate on my
2   own behalf what was driving her interest, but I
3   imagine I very well might have shared that question
4   with Ms. Walls in an attempt to get her specific
5   response to it so I could provide the information to
6   Ms. Rutledge.
7       Q.  So you didn't tell Ms. Walls that
8   Ms. Rutledge essentially said why does Ms. Walls
9   want to be promoted, she already makes enough money?
10      A.  It certainly wasn't a she already
11  makes enough money thing.  It may very well have
12  been something like why does she want to be
13  promoted, is it just the salary.  There really isn't
14  a lot of difference in many instances between a high
15  step at the grade 14 and an introductory step at a
16  grade 15.
17          And although I can't specifically
18  recall whether Ms. Rutledge commented on the salary
19  level at all, her curiosity about what was driving
20  Ms. Walls' interest certainly could have reflected
21  that, you know, is it just the salary.  But she
22  never said anything like she already makes enough

Page 275

1   money.
2       Q.  Has Mr. McCowan ever said anything to
3   the effect that he can hire and promote whoever he
4   wants to?
5       A.  He's never said to me.  I'm not aware
6   that he said that.
7       Q.  What about Ms. Rutledge,, has she ever
8   said she can hire and promote whoever she wants to?
9       A.  She has not said that to me in those
10  words either.  On one occasion when we were hiring
11  attorneys, she remarked that because attorneys are
12  in the accepted service, the conditions for hiring
13  are very different than they are for people who are
14  in the regular civil service, and that we don't have
15  to conform to the same norms about announcing
16  positions or going through the same selection
17  process.
18      Q.  For the record, can you explain what
19  accepted service is, or perhaps explain how it
20  differs from civil service?
21      A.  You know, I really can't with any
22  degree of authority.  I know attorneys in the

Page 276

1   government are considered members of the accepted
2   service.  And part of that is that there are certain
3   rights that civil servants have that attorneys
4   don't, and by the same token there are factors that
5   need to be observed in hiring someone into the
6   regular civil service that don't need to be observed
7   in hiring someone into the accepted service.
8           But beyond that, that's more of a
9   general law question, and it's way outside my realm
10  of expertise.
11      Q.  Have you ever been involved in a
12  promotion process for an accepted service employee?
13      A.  Yes.
14      Q.  Were you given a set of guidelines,
15  policies and procedures that you were to follow in
16  terms of the selection process for the accepted
17  service employee?
18      A.  Well, since it's a promotion process,
19  it really isn't a selection process.  The only
20  involvement I've had in promotions for accepted
21  service attorneys would be dealing with one
22  individual attorney who was qualified with respect

69 (Pages 273 to 276)

Page 277

1  to time and grade for a promotion, and then making
2  an assessment as the first line supervisor whether
3  that attorney was or was not qualified to be put
4  forth and recommended for a promotion.
5          But it wasn't a competitive selection
6  process where one attorney under my supervision was
7  competing with another attorney for promotion into a
8  position.
9          Q.  Who was that attorney that you were
10  involved in promoting?
11          A.  When AnnMarie Ottman was in my
12  division, she had met her time and grade for a
13  promotion.  And I believe she was hired at the grade
14  12 level when she initially affiliated with the
15  office, and she met her time and grade to be
16  considered for a 13.  That was one process.
17          And I believe that Jacky Chow, who was
18  also under my supervision when she first came to the
19  office of chief counsel, she was hired also I
20  believe at a grade 12.  And she reached her time and
21  grade to be promoted to a grade 13.
22          Q.  Did Ms. Ottman receive the promotion?

Page 278

1          A.  Yes, she did.
2          Q.  Was there another occasion when she
3  was denied a promotion?
4          A.  Not that I am aware of.
5          Q.  Do you know of any female attorneys
6  that have been denied a promotion to any GS level in
7  MC-CC?
8          A.  In any of the office not under my
9  supervision?
10          Q.  Yes.
11          A.  I have heard that RoseMary Detling was
12  not promoted from a grade 13 to a grade 14.
13          Q.  Anyone else?
14          A.  Not that I am aware of.
15          Q.  So you're saying that when Ms. Ottman
16  initially asked to be promoted to a GS-13 level,
17  that her promotion request was not denied by
18  management?
19          A.  No.
20          Q.  Do you know of any males in --
21          A.  Actually that answer should be yes.  I
22  am saying that her promotion request was not denied

Page 279

1  by management, that is true.
2          Q.  Right.  She was promoted?
3          A.  Correct.
4          Q.  And she was promoted the first time
5  around?
6          A.  Correct.
7          Q.  So there was never any denial, to make
8  the record clear?
9          A.  Correct.
10          Q.  And the only person that you can think
11  of who is a female who's been denied is Detling?
12          A.  That's the only instance that I am
13  aware of in our office, yes.  And as I say, that's
14  strictly hearsay.  Ms. Detling did not tell me
15  herself.  I heard within the office that that has
16  been the subject of another EEO action that's
17  ongoing, but I didn't have any direct knowledge of
18  it.
19          Q.  Are you aware of any males in the
20  office MC-CC that have been denied a promotion?
21          A.  Other than my experience with Joe
22  Solomey, who had approached me to consider a

Page 280

1  promotion, no.  I don't know if you would call that
2  denial of a promotion, because I did not put his
3  promotion papers forward so there was a formal
4  denial.
5          But he has not been recommended within
6  the office for promotion, although he had the time
7  and grade satisfied and he had approached me to
8  consider him for a promotion.
9          But I am not aware of anyone who has
10  actually been put forth for a promotion and been
11  denied.
12          Q.  So Joe Solomey, again, was not put
13  forth for a promotion?
14          A.  Correct.
15          Q.  Was Ms. Ottman required to write up a
16  justification for her promotion or something along
17  those lines?
18          A.  She was asked to provide -- I don't
19  know if the term justification was used.  The
20  purpose of the write-up, which she was asked to
21  provide, was to highlight her accomplishments and
22  her contributions during the time that she had been

Page 281

1  in the office and performing at the grade 12 level.
2       And that document was something that I
3  asked her to provide to me in order to use that as
4  part of the assessment of her current performance
5  level to ensure that she was in fact performing at
6  the level to which she desired to be promoted at the
7  grade 13.
8       Q.  What about Chow, was she also asked to
9  give a write-up for her promotion?
10      A.  Yes.
11      Q.  Do you recall any other employees that
12 were asked to give write-ups for their promotion?
13      A.  Those are actually the only two
14 employees I've had who have been in a promotion
15 context that have met the time and grade and been
16 under my supervision when the time for their
17 consideration came up.
18      So I am not aware of whether other
19 employees in other divisions have been asked to do
20 something similar.  My understanding was, after
21 conferring with Ms. Rutledge about what would be
22 required of Ms. Ottman and Ms. Chow, that that was

Page 282

1  office policy.  But I am not directly familiar about
2  how that's been handled in other divisions.
3       Q.  So you don't know whether other
4  employees have been required to do a write-up in
5  order to receive their promotion?
6       A.  No, I don't, not beyond my division.
7       Q.  You are aware of an EEO complaint
8  filed by Ms. Detling?
9       A.  Yes.
10      Q.  Other than Ms. Walls, have any other
11 employees ever throughout your career filed an EEO
12 complaint where you were essentially the subject or
13 the supervisor?
14      A.  No.
15      Q.  Are you familiar with training that
16 was approved for Ms. Walls and some other employees
17 in the office?  It was an ITS workshop, I believe.
18 Are you familiar with that?
19      A.  Yes.
20      Q.  Did Ms. Walls in fact end up being
21 able to attend the ITS workshop?
22      A.  No, she didn't.

Page 283

1       Q.  Why not?
2       A.  She was scheduled to attend one of the
3  workshop sessions that I believe was set for Destin,
4  Florida as the location.  And when the workshop was
5  first scheduled to occur, there were bad weather
6  conditions, I believe hurricane conditions down
7  there.  And the workshop was rescheduled.
8       We learned, because other employees in
9  the office had attended a similar workshop in a
10 different location but with the identical agenda and
11 the identical format, that in fact the workshop was
12 targeted to what were called I believe
13 administrative assistance or administrative
14 professionals.
15      And once we learned that, the Destin,
16 Florida workshop, which was rescheduled, did not
17 seem appropriate for the employees who had
18 originally been targeted to attend, at least not
19 appropriate for Ms. Walls or any other attorney.
20      And so as a consequence, they were not
21 re-registered and sent to the subsequent rescheduled
22 workshop.

Page 284

1       Q.  For the record, I want to be certain
2  what my original question is.  What we're talking
3  about is the training in Destin, Florida that
4  Ms. Rutledge -- she was approved to take that
5  training, was she not?
6       A.  Correct.
7       Q.  Were there other females who were
8  approved to take this training?
9       A.  I believe there may have been others.
10 I do know that Delores Hodge in the office and
11 RoseMary Detling were scheduled to attend, I believe
12 it was the same session that Ms. Walls was planning
13 to attend in Florida.
14      There may have been others.  Ms. Walls
15 was the only female under my supervison who was
16 scheduled to attend one of those workshops.
17      Q.  Right, but they had previously been
18 approved?
19      A.  That's my understanding, yes.
20      Q.  But then the approval was revoked or
21 changed?
22      A.  Yes.  I don't know if you call it

Page 285

1  revoked or if it just wasn't renewed when the
2  workshop was rescheduled.  But in any case, they did
3  not end up attending the rescheduled workshop.
4      Q.   And the male attorneys were allowed to
5  go for the workshop earlier on, the other attorneys?
6      A.   Two that I am aware of in my division
7  did attend a similar formatted workshop in New
8  Orleans run by the same organization and with the
9  same agenda.
10     Q.   This training, was it announced to all
11 staff by Ms. Rutledge?
12     A.   Ms. Rutledge actually announced it to
13 the division chiefs, as I recall, in a division
14 chief's meeting, and then it was in turn the
15 division chiefs who provided that information to
16 their respective staffs, at least that's how it
17 worked in my division.
18     Q.   Did she encourage employees to sign up
19 and to attend this training?
20     A.   She did.
21     Q.   And she encouraged attorneys to sign
22 up and take this training?

Page 286

1      A.   She did before we knew what the
2  targeted audience for the training was.  We did not
3  realize until after the first two attorneys attended
4  the New Orleans workshop and reported back that this
5  was in fact a training that was targeted at
6  administrative assistants.  And we were not aware of
7  that when the training initially was planned and
8  when people were encouraged to sign up for it.
9          It was only after we had two attorneys
10 on the scene at the New Orleans workshop that they
11 both worked for me and both reported back to me,
12 that they were not really a part of what was the
13 intended target audience.
14     Q.   Was the agenda posted when the
15 employees signed up to take the training?
16     A.   Yes.  As I recall, there was a
17 brochure posted on the office bulletin board.  And I
18 directed people to look at the brochure and indicate
19 if they were interested.
20     Q.   And this brochure didn't indicate that
21 it would not be appropriate for attorneys?
22     A.   You know, not that any of us noticed.

Page 287

1  I don't have access to that brochure any longer.
2  Obviously if it had made it clear that the target
3  audience was administrative professionals, we
4  wouldn't have been encouraging attorneys to go.
5          It could be that if you are familiar
6  with what ITS is or if you are familiar with this
7  particular organization, there might have been some
8  language on the brochure that would suggest that,
9  but it clearly did not appear to be targeted at any
10 one job description or any one group of office
11 professionals or semi-professionals.
12     Q.   I want to make sure that the record is
13 clear.  I think there was another training that
14 Ms. Walls was interested in that was in Miami,
15 Floria, in a workshop in Miami, Florida.
16 Are you familiar with that one?
17     A.   Not offhand.  That doesn't ring any
18 bells.  Maybe if I knew the subject matter or
19 something.
20     Q.   It was in 2001.  I believe it actually
21 was an ITS workshop in Miami.
22     A.   That does not strike any recollection

Page 288

1  with me.
2      Q.   ITS Technology?
3      A.   I don't have any memory of that.  It's
4  certainly possible that -- we have a lot of training
5  opportunities that come into the office either in
6  terms of solicitations or brochures or materials
7  that I keep on hand in my office for people to look
8  at and things that come into the office generally
9  that employees are welcome to look at.  It's very
10 possible that there was something like that.  I'm
11 just not specifically familiar with that particular
12 one.
13     Q.   Do you recall whether Mr. Florian
14 Chess was allowed to attend training in Miami,
15 Florida, ITS technology training?
16     A.   Mr. Chess was in the general law
17 division and didn't work for me.  I do recall that
18 he did attend some training.  I couldn't tell you if
19 it was in Florida.
20          It's logical that it would be ITS
21 training, because he did have some work in that
22 area.  But I honestly can't specifically recall.  I

Page 289

1    do remember him getting some training and traveling
2    for some training.
3        Q.   Do you recall Ms. Walls wanting to
4    attend that training but Mr. Chess instead being
5    allowed to go?
6        A.   I do have some memory of both
7    Ms. Walls and Mr. Chess being involved in some
8    respects in the agency's ITS program, conferring
9    with ITS clients and that sort of thing.  Certainly
10   that's plausible that they would have both been
11   interested in the same type of training on that
12   basis, but I honestly can't remember.
13       And since they both didn't work for
14   me, the only time that would have really made sense
15   is if I had to decide between two of my employees
16   going somewhere.  I honestly -- it's logical that
17   that may be the case, but I just don't have any
18   specific memory of that particular training or
19   with Mr. Chess's agenda in attending.
20       Q.   Ms. Walls, as you just mentioned, she
21   did handle ITS technology matters; is that correct?
22       A.   Right.  She had worked on some of

Page 290

1    those issues in the division, sure.  As I recall,
2    she had some involvement with that in Federal
3    Highways, although I didn't supervise her at the
4    time.
5        I seem to recall her working on that
6    area in Federal Highways as well.  I should say ITS
7    issues, intelligent transportation system issues,
8    are one of the hybrid type issues I mentioned where
9    largely they involve general law, but on occasion if
10   they are related to regulations they would also
11   involve someone from our division.
12       Mr. Chess was a general law attorney.
13   Ms. Walls was a regulatory affairs attorney.  It's
14   very likely that they both worked on similar issues
15   or different sides of the same issue.  But it's
16   primarily technology issues and primarily general
17   law issues.
18       Q.   I would like this document marked as
19   Deposition Exhibit No. 9.
20       (Document marked Exhibit No. 9)
21       Q.   I've just had the court reporter mark
22   as Deposition Exhibit No. 9 a document entitled

Page 291

1    "Elaine Walls, suggested 2004 development goals".
2        Do you recognize this document?
3        A.   I do.
4        Q.   Is this the document that you were
5    referring to earlier when you said that you gave
6    Ms. Walls a document setting forth some
7    developmental goals in March of 2004?
8        A.   Yes.  This was at the performance
9    appraisal discussion for her 2004 appraisal.  And I
10   developed these and provided them to her as
11   suggestions of things that she might focus on and
12   initiatives she might undertake as part of the
13   developmental process to qualify for a grade 15.
14       Q.   Whose handwriting, if you know, is on
15   deposition Exhibit No. 9?
16       A.   I don't know, but it's not mine. I'm
17   not sure whose it is.
18       Q.   This is not your notes or your
19   handwriting on here?
20       A.   No.
21       Q.   You don't know whose it is?
22       A.   I truly don't.

Page 292

1        Q.   You already testified to this, but you
2    don't have anything similar to Deposition Exhibit
3    No. 9 suggesting developmental goals?  You've never
4    done anything like this prior to this March of 2004
5    memorandum?
6        A.   Not in terms of providing written
7    bulleted assessment to give to the employee at the
8    time, no.  This was the first time I tried that.
9        And every time we have a performance
10   appraisal cycle, I experiment with different ways of
11   getting information across.  This was one of them
12   that I was trying that year.  As I mentioned
13   earlier, in large part one of the factors weighed
14   into my decision to take this approach was the fact
15   that we had had the February 10th meeting that
16   seemed to be terminated before we got to a full
17   discussion of actual undertakings that Ms. Walls
18   could focus on.
19       Because she was upset, because the
20   meeting terminated prior to I think the time it
21   would have been productive to have it terminated, I
22   thought it was all the more important to give her

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 293

1  some of the things that we would have elaborated
2  upon at that meeting if we had had the chance.
3      Q.  I would like this document marked as
4  Exhibit No. 10.
5          (Document marked Exhibit No. 10)
6      Q.  I have just had the court reporter
7  mark as Deposition Exhibit No. 10 a handwritten
8  note, dated February 10, 2004.
9          Do you recognize this document?
10     A.  No, I haven't seen this before.
11     Q.  This is not your handwriting?
12     A.  No, it's not.
13     Q.  Do you know whose handwriting it is?
14     A.  I don't.  It looks like it's the same
15  handingwriting that's on this piece, but I'm really
16  not sure.  I should say it looks like the same
17  handwriting that's on No. 9, just to clarify that.
18  But I don't recognize it.  It's certainly not mine.
19     Q.  And you don't recognize it?
20     A.  I don't.
21     Q.  I would like this document marked as
22  Deposition Exhibit No. 11.

Page 294

1          (Document marked Exhibit No. 11)
2      Q.  I have just had the court reporter
3  mark as Deposition Exhibit No. 11, a document
4  entitled, "Elaine Walls - performance appraisal
5  notes, prep for discussion 7/28/05."
6          Do you recognize this?
7      A.  I do.
8      Q.  What is this document?
9      A.  These are the talking points that I
10  referred to earlier that I prepared for myself in
11  preparation for the performance appraisal discussion
12  that I had with Ms. Walls in July of 2005, her most
13  recent performance appraisal discussion.
14         As I mentioned at the time, and as I
15  said recently, I try different things with different
16  performance cycles to see what works.
17         In this case, I went through each of
18  the critical elements in Ms. Walls' performance
19  appraisal, which are three.
20         They are identified here; program
21  support, commercial vehicle safety, leadership,
22  communication and accountability.

Page 295

1          When I was assessing her performance,
2  I went through and just to frame the discussion and
3  hopefully to make it more productive than a free
4  form discussion, I went through and identified areas
5  of accomplishment in each of those critical
6  elements.  And then I in turn identified areas
7  within each of the critical elements that I thought
8  I could recommend to her as further developmental
9  goals.  And that's what's reflected here.
10         I had these notes in front of me
11  during our performance appraisal discussion.  And I
12  referred to them as I was guiding my own discussion,
13  but I didn't actually distribute them as a follow-up
14  piece of information.  They were more there to
15  refresh my memory in things I wanted to make sure I
16  touched on and focused on during the discussion.
17     Q.  So these were prepared obviously
18  before the discussion?
19     A.  Yes.
20     Q.  And these are things that you wanted
21  to address?
22     A.  Yes.

Page 296

1      Q.  Did you in fact address all of these
2  issues?
3      A.  To the best of my recollection, I
4  actually went through and identified each of them as
5  I was reading down the list.  So hopefully I touched
6  on all of them.  That was my intention and that was
7  my plan.
8      Q.  Is it possible that you did not
9  discuss these issues with Ms. Walls at the
10  performance appraisal in July of 2005?
11     A.  It's not at all possible that I didn't
12  discuss the vast majority of these issues.  If I
13  didn't discuss every one of them, it was strictly an
14  oversight, because this was the outline that guided
15  my discussion.  And I purposely worked my way down
16  the outline to try and touch on everything.
17     Q.  So it's your testimony you made this
18  prior to the meeting and not after the meeting?
19     A.  Yes.  I had it in front of me on my
20  desk as we were having the discussion.
21     Q.  If Ms. Walls were to testify that she
22  does not recall discussing these issues with you,

Page 297

1   what would be your response to that?
2       A.   I would have to reiterate that she
3   would be demonstrating to me that she wasn't being
4   an effective listener, and I would have to suggest
5   that maybe I was not being an effective
6   communicator.  But since this was the full outline
7   for my discussion, it would be impossible for me to
8   believe that someone sitting through that discussion
9   would not hear these items as we went through them.
10      Q.   I would like this document marked as
11  Deposition Exhibit No. 12.
12           (Document marked Exhibit No. 12)
13      Q.   I have just had the court reporter
14  mark as Deposition Exhibit No. 12, a four-page
15  document.  The first one says "preparation notes for
16  2/10 meeting."  It's a series of handwritten
17  documents.  As I said, it's four pages long.
18           Do you recognize this document?
19      A.   I do.
20      Q.   What is this?
21      A.   These are notes in my handwriting that
22  I prepared in preparation for the February 10th

Page 298

1   meeting that Ms. Rutledge and Ms. Walls and I had.
2       Q.   What do you refer to when you say B&J?
3       A.   Brigham and Judy; Mr. McCowan,
4   Brigham, and Ms. Rutledge, Judy.
5       Q.   There is another reference to a BAM.
6   I'm not sure of that.
7       A.   That's Brigham A. McCowan.
8       Q.   These are notes that you prepared
9   prior to the meeting, not afterwards?
10      A.   Yes.  I prepared them in anticipation
11  of going into the meeting and having the discussion.
12      Q.   On the second page, what do you mean
13  when you say "even got the same mixed signals in our
14  conversation, two views, program office, only within
15  CC."
16           What did you mean by that?
17      A.   I was identifying how -- because
18  Ms. Rutledge had approached me after she had the
19  February 6th meeting with Ms. Walls and indicated to
20  me that Ms. Walls clearly had reacted in that
21  meeting in a manner that suggested to her that
22  Ms. Walls had not been clearly hearing me when I

Page 299

1   said she was not ready for a grade 15 promotion.
2            Ms. Rutledge was insistent that in
3   preparing for the February 10th meeting with
4   Ms. Walls, that I discuss with her my views, which
5   were consistent with those of Ms. Rutledge and
6   Mr. McCowan, that she was not yet ready for a
7   promotion to a grade 15.
8            I wanted to put that in context with
9   all of the discussions that had gone before.  And I
10  was trying to explain to Ms. Rutledge, and in turn
11  have it available to explain to Ms. Walls, how I
12  thought she might have received mixed signals from
13  me.
14           As I said before, I think Ms. Walls
15  confused my vehement support of her in wanting her
16  to get a 15 within the standards that were
17  applicable in the office of chief counsel with my
18  inability at that point in time to recommend her for
19  a 15 or to ascertain that she qualify for a 15.
20           And what I set forth here was my
21  explanation both from Ms. Rutledge's benefit and
22  Ms. Walls' benefit how she could have reached a

Page 300

1   conclusion.
2            And what I said was the mixed signals
3   may have come from conversations I had had with
4   Ms. Walls before where I had agreed with her that
5   there were really different standards operating, one
6   within the office of chief counsel and one within
7   the program offices in the Federal Motor Carrier
8   Safety Administration.
9            Ms. Walls and I had conversed on a
10  number of occasions, and I was very much in
11  agreement with her and sympathetic to her view that
12  employees in the program offices could receive grade
13  15 promotions with far less demonstrated in terms of
14  performance attributes than was expected of
15  employees within the office of chief counsel.
16           And what I said out here were the two
17  views:  Number one, program office.  Those were the
18  expectations that were clearly very different from
19  the expectations that had been set forth for
20  attorneys, and then the second one is only within
21  chief counsel, CC meaning chief counsel.
22           The standards that operated only

Page 301

1 within chief counsel were definitely different from,
2 and to my way of thinking and I think in Ms. Walls'
3 way of thinking, they were definitely higher than
4 the standards that prevailed in the program offices.
5        And what I wanted to set out for her
6 was yes, we have had many discussions where I have
7 probably said to you if you were in a program
8 office, if you were one of the clients that you
9 serve instead of being one of the attorneys in the
10 office of chief counsel, you very likely would be
11 promoted to a 15 right now.
12        But within the office of chief
13 counsel, applied across the board in this office,
14 the standards are very different and they are very
15 specific to attorneys, and quite honestly attorneys
16 have to answer to a higher expectation.
17        And I spelled it out here so that I
18 could trigger my memory when I got into the meeting
19 with Ms. Walls and Ms. Rutledge why I wanted
20 Ms. Walls to understand that I wasn't being
21 disingenuous when I had discussions with her in the
22 past about promotability, that I had completely

Page 302

1 agreed with her, that standards operative in the
2 program office were in fact different.
3        And that was why I set out the one and
4 two and comparison within CC and outside CC.
5        Q.  Why are program office standards
6 different?
7        A.  Because program office staff members
8 are not attorneys.  They are either technical folks
9 or fill other kinds of roles other than attorney
10 roles.  And the prerogative of each office is to set
11 their standards and their norms.
12        As long as they are uniformly applied
13 within that office and appropriate to that office,
14 it's each office's prerogative to set those
15 standards.  And the program offices in some cases,
16 not necessarily all, but certainly in some cases,
17 the expectations for what credentials someone to
18 become a 15 are very different from, and in my mind
19 not necessarily as high, as some of the expectations
20 that prevail in the office of chief counsel.
21        And Ms. Walls and I had acknowledged
22 that in earlier conversations.  And quite frankly

Page 303

1 both of us had to amend to that a little bit.  Some
2 of the clients we work with are grade 15s, but they
3 are from client offices where different standards
4 have been operative, which allowed them to get their
5 15s.
6        Q.  What did you mean in this same
7 Deposition Exhibit No. 12, on that same second page,
8 that you got mixed signals from Brigham?
9        A.  That had to do with the issue of
10 raising the question of promotability.  Prior to the
11 February 6th meeting, and I believe it was
12 immediately prior while Ms. Walls was waiting
13 actually to go into that meeting, she had told me
14 that she was planning to, in addition to discussing
15 the EPP, she was planning to mention to Brigham that
16 she was interested in a promotion.
17        And my response to her at the time
18 was, I hope you will do that, because Brigham was
19 relatively new as our chief counsel at that point.
20 And although, as I suggested, I had had numerous
21 discussions with Judy Rutledge about the
22 expectations for promotion to a 15, I had never had

Page 304

1 the opportunity to have a discussion directly with
2 Mr. McCowan about that.
3        And because Ms. Walls' raising that
4 issue or bringing up that issue with Mr. McCowan
5 would invite I presumed his response on what his
6 expectations were for 15 promotability, I had said
7 in an encouraging way I hope you will raise that
8 because it will get some clarification for all of us
9 whether there is going to be any change in the
10 expectations or the standards.
11        Ms. Rutledge, after the meeting with
12 Ms. Walls and Mr. McCowan on February 6th, one of
13 the things Ms. Rutledge had recounted to me was that
14 Ms. Walls said in the course of the meeting
15 something to the effect that her supervisor had
16 always supported her in her interest in getting a
17 promotion, and in fact had encouraged her to bring
18 up her request for a promotion in that meeting.
19        And I wanted to make sure that
20 Ms. Walls understood that my encouraging her to get
21 clarification from Mr. McCowan about what the
22 standards were for a promotion within the office was

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 305

1  not the same thing as my encouraging her to say that
2  she was there representing me as recommending her
3  for a promotion. I was distinguishing the two
4  things.
5      And this note was to myself to remind
6  me, and once again to take some responsibility
7  perhaps for Ms. Walls not understanding the
8  distinction and to try and make it more clear for
9  her so she would understand why I wasn't intending
10  to be disingenuous or in any way misdirecting her.
11      Q.  You mentioned earlier the clients in
12  the program offices, does an attorney have more
13  credibility and a higher reputation in their
14  estimation if that attorney is a GS-15 as opposed to
15  a GS-14?
16      A.  In the eyes of the clients does an
17  attorney have more credibility?
18      Q.  Yes.
19      MS. ROSEN: I object. How can she
20  speak about the eyes of somebody else or some
21  abstract client? Who are you talking about
22  specifically?

Page 306

1      MS. MCKINNEY: You mentioned earlier
2  that there is a difference between the GS-15 in the
3  program offices and CC, the chief counsel's office.
4      What I'm asking you as a follow-up to
5  that is that when the GS-15s, who are clients in the
6  program offices, deal with attorneys who are not
7  also GS-15s, do the attorneys that are not 15s
8  generally have less credibility with the clients?
9      MS. ROSEN: I object, but go ahead and
10  answer if you can.
11      THE WITNESS: I would think not.
12  First of all, I don't think many clients are not
13  necessarily aware of what the grade levels of the
14  attorneys they are dealing with would be.
15      I think the only credibility may come
16  at the position of the attorney; in other words, are
17  they a staff attorney or are they an assistant chief
18  counsel or a deputy chief counsel.
19      I think the job title and the position
20  within the office may have some -- may factor in
21  there in ways that understanding of the grade level
22  does not.

Page 307

1      In fact, I have had -- on several
2  occasions, I've had program staff express surprise
3  to me that every attorney that they deal with is not
4  a 15. I think many of them fully expect that some
5  of the attorneys -- that staff attorneys in the
6  office of chief counsel may be 15s.
7      On several occasions people have
8  registered surprise that that wasn't the case when
9  it's come up.
10      BY MS. MCKINNEY:  (RESUMED)
11      Q.  Right. And by the same corollary,
12  then, if they are expressing surprise, aren't they
13  expecting that the attorneys that they interact with
14  and deal with are GS-15s, and if they learn
15  otherwise, then they have a lower estimation of that
16  attorney's ability?
17      A.  Not necessarily. I mean, I think you
18  could look at it the other way too. If they don't
19  even know that the person they're dealing with is
20  not a 15, I think their reaction and their
21  expression of surprise may indicate something else,
22  that an attorney is an a attorney is an attorney,

Page 308

1  and they are both attorneys who are employees with
2  some degree of stature.
3      Q.  But the surprise could also mean the
4  opposite?
5      A.  That's why I'm speculating, because I
6  really think it depends on the individual and what
7  they're reacting to, and I really can't know that.
8      Q.  How would Brigham McCowan know whether
9  or not Ms. Walls should be promoted given the fact
10  that he was relatively new to the office?
11      A.  Obviously he relied, I am assuming to
12  a considerable degree, on information that he
13  elicited from me or Ms. Rutledge, but he did have
14  some direct dealing with Ms. Walls.
15      It's not as though he wasn't familiar
16  with her as a staff attorney. He did have some
17  contact with staff attorneys and was in a position
18  to see them interact either with himself directly or
19  with others within the office.
20      Q.  What contact did he have with
21  Ms. Walls?
22      A.  At the February time frame?

77 (Pages 305 to 308)

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 309

1    Q.  Yes, at this early time frame.
2    A.  Well, at that point he had been in the
3  office a little over six months.  I believe he came
4  in July of 2003.  So he had been in the office about
5  seven months.
6        He had worked extensively with some of
7  the issues that Ms. Walls was directly involved in,
8  particularly the environmental impact study project
9  that we mentioned.  So in some respects I would say
10  he had more familiarity perhaps with her involvement
11  and issues that she worked on specifically than he
12  might have with other staff attorneys.
13        I think, however, given his oversight
14  responsibilities within the office, and the fact
15  that he was two levels above Ms. Walls in terms of
16  the supervisor chain, I would imagine that most of
17  his information or his perceptions would have been
18  formulated by information he got secondhand rather
19  than working with her directly.
20    Q.  So his knowledge would then be based
21  on what you or Ms. Rutledge told him essentially?
22    A.  Myself, Ms. Rutledge, perhaps others

Page 310

1  who worked with Ms. Walls in other context.
2    Q.  Who is Brian Downey?
3    A.  Brian Downey was a staff attorney in
4  the general division.  He no longer works at FMCSA,
5  but that was his previous position.
6    Q.  Did you ever tell Ms. Walls that
7  Mr. Downey would probably be the type of person that
8  would be promoted by Ms. Rutledge to the GS-15
9  level?
10    A.  Not that I recall.  I know he was well
11  received in the office and he was recognized as a
12  real go getter.  It's possible I could have invoked
13  him as an example, but I don't recall specifically
14  saying that.
15    Q.  Do you know Ms. Sue Cellini?
16    A.  Yes, Sue Cellini, yes.
17    Q.  How long has she worked at FHWA?
18    A.  You know, I can't really say.  I know
19  she came to the office of legislation and
20  regulations in the chief counsel's office, FHWA,
21  after I started working there.  But I honestly don't
22  know her exact report date.  She still is in that

Page 311

1  position and works in that office.
2    Q.  Did you talk to her about applying for
3  that position?  Did you say assistant chief counsel
4  and legislative position?
5    A.  Yes, I did.
6    Q.  Did she apply for it?
7    A.  I believe she applied for it the first
8  time it was announced.  The position was not filled
9  on the basis of the first announcement.  And I had a
10  subsequent conversation with her when the second
11  announcement was posted.  And at that time she told
12  me she did not think she would reapply.  But I don't
13  know for a fact whether she did or not.  I don't
14  believe she did the second time.
15    Q.  But you encouraged her to apply?
16    A.  I did.
17    Q.  Why did you encourage her to apply?
18    A.  I knew that she had had a lot of
19  legislative affairs experience in Federal Highways.
20  I knew she was the kind of person who I thought
21  would enhance our team as being somebody that was
22  someone we could work well together with.

Page 312

1        I had worked with her when I was in
2  Federal Highways briefly.  And I liked her work
3  ethic.  I thought she had some strong people skills.
4  I thought she would be an asset to the office of
5  chief counsel.
6        And I knew at the time that the
7  position we were filling was a grade 15 position,
8  and I did not know but I thought she had not been
9  promoted to a 15.  I thought she was a staff
10  attorney at the 14 position.
11        I subsequently learned that she had
12  been promoted to a 15 within Federal Highways.  And
13  at that point the incentive to move into a new
14  position in terms of promotability was no longer
15  there for her.
16        And in follow-up discussions with her,
17  I very specifically remember saying to her, you
18  know, as much as you might be an asset to the
19  office, I'm not sure that there would be any
20  incentive for you in changing positions at this
21  point, because it would not have turned out to be a
22  promotion for her.

Page 313

1    Q.  So she wasn't interested in the
2  position?
3    A.  The second time around.
4    Q.  The second around time she was not
5  interested?
6    A.  She expressed concerns to me that
7  while she liked the subject matter of the position
8  and she liked the idea of having a managerial
9  position, she was disenchanted by the fact that she
10  would not be able to have a flexible work schedule
11  within the office.  She could not get a regular day
12  off schedule, because the policy in our office is
13  for assistant chief counsels not to have RDOs.  That
14  was very important to her.
15        And she told me that that might be a
16  stopper.  And she also said that moving into that
17  position would no longer represent a promotion
18  opportunity for her, she didn't have the same
19  incentive as she would have if she had been moving
20  from a 14 to a to a 15.
21    Q.  I'm sorry, you're talking about the
22  second time she applied?

Page 314

1    A.  She didn't apply.  The second time she
2  could have applied but was deciding whether to
3  resubmit her paperwork or not.
4    Q.  I'm sorry, let me try to clarify my
5  questions to make sure the record is clear.
6        The first time Ms. Cellini did apply?
7    A.  Yes.
8    Q.  Is that correct?
9    A.  She did apply the first time it was
10  announced, yes.
11    Q.  And that would have been a promotion
12  to the GS-15 at that time?
13    A.  I thought it would be a promotion,
14  because when I had worked with her in Federal
15  Highways, she was a grade 14.  And I did not become
16  aware into well the application process at the
17  second round that she had already been promoted to a
18  15.
19        At the time I first had the discussion
20  with her, I was advising her to apply on the basis
21  of my understanding that she was still a grade 14.
22  I'm not sure at what point she had become a 15.

Page 315

1        I didn't find out about her promotion
2  to a 15 until the application round the second time
3  and she mentioned to me that it wouldn't at that
4  point represent a promotion for her because she was
5  already a 15.
6        The only thing it would represent was
7  a movement of a nonsupervisory to a supervisory
8  position.  But I don't know at what point in the
9  entirety of the process she had become a 15..
10    Q.  When was the first time she applied,
11  do you recall generally the date, the first time she
12  applied?
13    A.  You know, I honestly don't, because
14  the position wasn't filled at the time.  I will say
15  it was during Mr. McCowan's tenure within the office
16  of chief cousel, because I know he was involved in
17  the interview processes.  And I will estimate
18  roughly it was in probably mid 2004.  It was during
19  2004, but I couldn't pin it down to an exact month.
20    Q.  When was the second time that she
21  applied?
22    A.  The second time she could have applied

Page 316

1  but did not, I believe.  It was after the first
2  vacancy announcement was out, Mr. McCowan had some
3  interviews and did not fill the position.
4        I then was told that the position was
5  being reannounced.  And I would say that it was in
6  either late 2004 or early 2005.  But, again, I can't
7  pinpoint the exact month or time period.
8    Q.  Was she given an offer the first time
9  when she actually did apply?  Was Ms. Cellini given
10  an offer at that time?
11    A.  No.  My understanding is she was not
12  given an offer, but my understanding was that no one
13  was made an offer and that's why the position was
14  reannounced, that the search the first time didn't
15  yield what Mr. McCowan was looking for, and he
16  readvertised the position in order to elicit more
17  applications.
18    Q.  Do you recall if Ms. Walls dealt with
19  security issues as part of her job duties and
20  responsibilities?
21    A.  She did.
22    Q.  Do you recall her seeking a training

79 (Pages 313 to 316)

Page 317

1   program involving securities?
2       A.  I do remember her request.  And this
3   is relatively recently, within this past year.  She
4   sent me some information that she had received about
5   a security training program.  And she inquired about
6   that as a training possibility.
7           And at the time, my response was I was
8   not sure that it would be received as sufficiently
9   job related.  Although she did deal with some
10  security issues, it was not a primary focus of our
11  division.
12          And her involvement with security
13  issues had been much more intense when the
14  Transportation Security Administration was part of
15  the Department of Transportation, and she was
16  involved in some of the regulatory issues in setting
17  up that organization and giving them some technical
18  support.
19          The Transportation Security
20  Administration has subsequently moved outside of the
21  Department of Transportation and was part of the
22  Department of Homeland Security.

Page 318

1           And this was relatively recently when
2   Ms. Walls advised me about the availability of
3   training involved in security issues.  And my
4   reaction was that it was not likely to be considered
5   sufficiently job related to merit the amount of time
6   that was involved in it.
7       Q.  Didn't Ms. Rutledge ask for a detail
8   to TSA?
9       A.  Ms. Walls?
10      Q.  Yes.  Ms. Walls, did she ask for a
11  detail to TSA?
12      A.  I don't know if she asked for a
13  detail.  Not that I recall.  She did ask to be
14  identified as someone who would work on I believe it
15  was a task force or an interagency kind of support
16  that involved TSA.  And she did in fact have
17  assignments that related to that task force.
18          I don't remember an opportunity for a
19  full fledged detail.  She certainly had an interest
20  in that, and it was something she had worked in.  So
21  it's possible that that would have come up.  I don't
22  have any memory of it.

Page 319

1       Q.  So her request to attend the security
2   training was denied, or was it denied?
3       A.  I honestly can't remember how -- she
4   did not attend it.  I don't remember that it was a
5   request so much as a probing do you think this is
6   something I could do.  And I said I don't think it
7   would be received as sufficiently job related.
8           But she did not attend it.  So whether
9   it was denied or whether she proceeded on the basis
10  of my reaction not to pursue it.  I remember that it
11  came up during a time when we were advising
12  employees it was nearing the end of the fiscal year
13  and there might be some opportunity for training and
14  training funds available, so to let us know what
15  their interest was.
16          Shortly after I put out the call to my
17  employees about that, I received a follow-up
18  advisory that we in fact did not have the amount of
19  training money that we had anticipated having.
20          And as a consequence, we were no
21  longer in a mode of soliciting training requests
22  from people who were in a mode of being highly

Page 320

1   selective in the training dollars we could spend.
2           And to the best of my recollection,
3   that particular course was one of the casualties of
4   our having a reduced budget beyond what we had
5   anticipated having for training.
6           So I know she didn't take the course.
7   And my recollection is it sort of died on the vine
8   as a request because we clarified that in fact we
9   don't have the kind of funds available that we
10  thought we would.
11      Q.  So it's your recollection then that it
12  was denied because of lack of funding, her request
13  for this training?
14          MS. ROSEN:  I object.  She just
15  answered that she doesn't recall whether it was
16  denied or not.  I think she answered that five
17  times.
18          THE WITNESS:  I don't recall whether
19  it was ever really put forth as an official request
20  for training.  I know my reaction to it was at the
21  beginning a bit skeptical and expressing concern
22  that, well, I'm not sure that this is the kind of

ELAINE WALLS                                                    SUZANNE O'MALLEY
VS. NORMAN Y. MINETA                                             AUGUST 17, 2005

Page 321

1  thing that would be perceived as sufficiently job
2  related.
3          At that point in time, I believe
4  Ms. Walls and I actually exchanged e-mails about it
5  because she had forwarded to me some information
6  about the class via e-mail. And my response, I
7  believe, was in an e-mail where I expressed concern
8  that it might not be received as a training request
9  that would qualify it as sufficiently job related
10 given her current responsibilities.
11         Just to reiterate, I don't recall her
12 ever then reputting forth that as a formal request
13 for training. I think it was simply something where
14 the circumstances in the office changed.
15         And instead of soliciting requests for
16 training so that we could use up our training budget
17 effectively, we found ourselves in the reverse
18 situation of having to tell employees that requests
19 for training would have to wait until the next
20 budgetary cycle because we had less money than had
21 been projected for training.
22         And the timing of her request in that

Page 322

1  particular course, I believe, fell right into that
2  time period when there was a change from the
3  position of having money to not having money.
4       Q.  Do you recall denying any other
5  training requests during that time period when
6  things changed from having money to not having
7  money?
8       A.  I did deny a request for Mike Falk in
9  my division who wanted to take, I believe it was a
10 legal editing and writing course. And his request
11 came again in response to the expectation that we
12 would have training funds available.
13         And subsequently when I learned that
14 we weren't, I advised him that his request was one
15 of the ones that would not be or could not be
16 honored at that time. And he could reconsider if it
17 was something that was offered on the next budget
18 cycle, that we would certainly reconsider.
19      Q.  Anyone else?
20      A.  Those are the only two I'm aware of.
21      Q.  Do you recall when this time period
22 was?

Page 323

1       A.  I want to say that this whole thing
2  unfolded within the last several months, probably
3  June and July of 2005, but I don't have a specific
4  date. It was roughly within that time period.
5       Q.  Have any employees in MC-CC complained
6  that the environment in that office is a hostile
7  work environment? Have they complained to you about
8  that?
9       A.  As far as filing something?
10      Q.  No, just discussions with you,
11 communications to you. Has anyone made any
12 complaints to you about it being a hostile work
13 environment in the office?
14      A.  I'm not sure if they used the term
15 hostile. I certainly heard people complain that it
16 was not family friendly, not -- I'm trying to think
17 of some of the terms that have been used. On
18 occasion, not pleasant, but I can't recall anyone
19 using the term hostile.
20      Q.  Joe Solomey left. Did he leave
21 because he was uncomfortable working in the office?
22 Was he unhappy there?

Page 324

1       A.  I think he was unhappy. I wouldn't
2  say he was uncomfortable. I think he was unhappy
3  that his career was not advancing in terms of
4  promotion within the office. And I think he felt
5  underappreciated by some of the managers in the
6  office.
7       Q.  Bernadette Nuch, did she ever express
8  to you dissatisfaction with the office?
9       A.  Yes, she did.
10      Q.  What did she say?
11      A.  She was a secretary for our office up
12 until I believe July of 2004. During her time of
13 employment there, she was one of the ones who had
14 told me she thought the office environment was not
15 family friendly, that she felt a high degree of
16 pressure within the office, and a high degree of
17 negativity.
18         She was definitely not happy there,
19 and in fact she chose to terminate her employment
20 because of her unhappiness.
21      Q.  Patricia Matthews, did she ever
22 indicate to you any unhappiness, dissatisfaction

81 (Pages 321 to 324)

Page 325

1 with the office?

2    A. Yes.

3    Q. Can you tell me about that?

4    A. She was Bernadette Nuch's predecessor
5 in the secretarial position. She subsequently
6 accepted a position working as a secretary for an
7 administrative law judge in the department. And in
8 discussing with me why she was leaving, she
9 expressed a lot of frustration about the work
10 environment, again not feeling appreciated. And she
11 indicated she wanted to go to an environment where
12 she thought she would be more appreciated and where
13 she would find herself in a more positive work
14 environment.

15    I subsequently, on at least one
16 occasion and possibly two, since she took her new
17 position, have run into her and inquired how she was
18 doing. And she said "I like my new position much
19 better. I feel like it's a much more positive place
20 to work."

21    Q. Other than Joe Solomey, any other
22 attorneys who have left the office, who when they

Page 326

1 left expressed to you that they were unhappy in
2 working there?

3    A. Robert Brown, who left the general law
4 division, Patricia Burke, who left the general law
5 division. Those are the only two I can specifically
6 recall in addition to Mr. Solomey, who left. And in
7 addition to the two secretaries that I previously
8 mentioned.

9    Q. What was Mr. Brown's dissatisfaction?

10    A. The issues that he discussed with me
11 had largely to do with his frustration about how the
12 general law division had to interact with a
13 procurement office that he thought was staffed by
14 incompetents, basically.

15    And he expressed complete frustration
16 that his awareness of the incompetence that
17 prevailed in the procurement office was not readily
18 accepted by some of the leadership in the office of
19 chief counsel, that there seemed to be in
20 Mr. Brown's mind anyway, a questioning of whether it
21 was truly incompetence on the part of the
22 procurement office or whether it was in fact

Page 327

1 Mr. Brown's inability to work productively with that
2 office.

3    And he felt very frustrated that he
4 clearly was convinced in his own mind that the
5 procurement had some serious lapses in expertise and
6 some serious staffing problems, and that he was
7 largely doing their work for them.

8    And he did express frustration that he
9 was only a grade 14 when he had previously been a
10 grade 15 in other federal employment and didn't see
11 his ability to get a 15 within the office.

12    Q. What about Patricia Burke, what was
13 her concern?

14    A. I think largely her concern was that
15 she did not feel that she would -- she had been
16 acting as the assistant chief counsel for general
17 law. And she was not selected in a permanent
18 capacity for that position.

19    And I think she felt frustrated by not
20 being selected, and she felt that that was a
21 reaction to her personally. And she felt that the
22 workplace had some negativity, and from time to time

Page 328

1 she expressed to me frustration that she was not
2 treated as a manager would expect to be treated in
3 terms of having decision making authority, that a
4 lot of her managerial actions were either second
5 guessed or overridden by office leadership.

6    Q. For the record, Patricia Burke, what
7 is her race?

8    A. She is Caucasian.

9    Q. Did Ottman leave the office?

10    A. Yes, she did.

11    Q. Did she express any complaint or
12 dissatisfaction when she left?

13    A. Not to me. Her reason for leaving the
14 office had to do with family circumstances. She
15 gave birth to a child after she had been in the
16 office for I think about a year and a half.

17    And after her daughter was born,
18 although she originally had intended to return to
19 work, she did in fact try to return to work when her
20 daughter was approximately six months old and
21 actually had an extremely difficult time for the
22 first couple days that she attempted to return, and

Page 329

1  a few days later submitted her resignation to
2  Ms. Rutledge.
3          She just said it wasn't working in the
4  office, or working anywhere at that point in time
5  wasn't compatible with taking care of her daughter.
6  And she couldn't work out acceptable child care
7  arrangements.  So she decided to stay home.
8          She subsequently was able to work on a
9  part-time basis temporarily in our Eastern Service
10 Center, which was in Maryland and very close to her
11 home.  And while a lot of the staff attorneys in the
12 Eastern Service Center was recovering from surgery,
13 she filled in for him during his illness and
14 recovery.
15         And that worked better for her because
16 of the proximity to home and the fact that it was a
17 part-time job.  But when that opportunity terminated
18 and we needed to have the position to fill in
19 somebody who could be at headquarters and working
20 full time, she chose to resign.
21         But her expressions to me about the
22 reason for resignation had nothihng to do with

Page 330

1  unhappiness.  It had strictly to do with family
2  reasons.
3      Q.  What about Brian Downey, he left the
4  office; is that correct?
5      A.  Yes, he did.
6      Q.  Did he ever express any concerns or
7  dissatisfaction with the office?
8      A.  Not to me personally.  I really didn't
9  have kind of a close relationship with Brian.  He
10 was in the general law division, and I knew him as a
11 colleague.  But we didn't tend to have discussions
12 about personal issues or personal attitudes.
13         So if he had concerns about the
14 office, he did not represent those to me.  His
15 discussion with me when he told me he was leaving
16 strictly had to do with a professional opportunity
17 that he thought matched up better with his skills
18 and his future interests.
19         It was in a security related field,
20 working I believe for the Department of Treasury in
21 an area that involved security issues.  And that was
22 closer aligned with what he had done in the past and

Page 331

1  what he wanted to do in the future.
2          MS. MCKINNEY:  That's all I have.
3          MS. ROSEN:  I have some redirect.
4      EXAMINATION ON BEHALF OF THE AGENCY
5      BY MS. ROSEN:
6      Q.  Can you just clarify your testimony
7  from earlier concerning what Ms. Rutledge said about
8  Ms. Walls taking on an EEO case with regard to
9  justify EEO training?
10     A.  Sure.  Ms. Walls had approached me
11 about taking an employment law course.  And when I
12 vetted that possibility with Ms. Rutledge, her
13 reaction was a course of that nature was not
14 sufficiently job related given Ms. Walls'
15 responsibilities within the division of regulatory
16 affairs.
17         So Ms. Rutledge had suggested that I
18 broach with Ms. Walls the possibility of her taking
19 on an employment case within the office as a means
20 of complementing her involvement in that course with
21 some practical experience within the office on a
22 project or a case that would be related to that.

Page 332

1      Q.  So she didn't suggest that Ms. Walls
2  take on a whole caseload?  It was just one case; is
3  that correct?
4      A.  No.  As I recall, she said would she
5  be willing to take on an employment case.  And,
6  again, as I said before, I don't know if
7  Ms. Rutledge used the term crosstraining, but the
8  clear implication was that Ms. Walls would take on
9  something that would normally be the responsibility
10 of the general law division, a particular employment
11 case that was ongoing at the time in order to
12 justify her involvement in a full fledged EEO type
13 employment law case -- course.  She took on a case
14 in order to justify her involvement in a course.
15     Q.  What was Ms. Walls' response to a
16 suggestion that she may take on a case in a
17 crosscutting mode?
18     A.  When I first mentioned it to her
19 informally, just to follow on to her request about
20 taking a course and I got back to her after I had
21 broached the issue with Ms. Rutledge, and I
22 explained to Ms. Walls that the reaction was not no,

83 (Pages 329 to 332)

Page 333

1  you can't take the course, but the reaction was
2  there would be a condition.
3       And the logical condition in
4  Ms. Rutledge's mind seemed to be would Ms. Walls be
5  in a position to take on a case that the general law
6  division was handling so that she could in essence
7  crosstrain while she was learning the field.
8       She would also have some practical
9  experience under the direction of the general law
10 division. Ms. Walls reacted to it in a way that
11 suggested to me she thought her workload was much
12 too heavy in order to accommodate an additional
13 course -- an additional case. Sorry.
14      However, we didn't follow up with that
15 with any firm discussion about whether her answer
16 was yes or no until a while later when her
17 performance appraisal for that current year came up.
18      And because Ms. Walls had expressed
19 skepticism to me that she could possibly take on
20 another workload item in the way of an EEO case that
21 was already going on in the office and do it as a
22 crosstraining, I put in her suggestions for 2004

Page 334

1  performance goals that she could crosstrain in an
2  EEO case.
3       And that as an understood if she took
4  on that, that her workload in regulatory affairs
5  would be adjusted accordingly to compensate for the
6  fact that she would be taking on another case from
7  another division.
8       Q.  Was she receptive to that?
9       A.  After we had our initial discussion in
10 response to my vetting this issue with Ms. Rutledge,
11 when I provided her with the written suggestions of
12 her performance appraisal, she -- to my knowledge,
13 we didn't follow-up up on any further discussion
14 about it.
15      But she did not again broach the EEO
16 or employment law course that she had originally
17 suggested, nor did she at least approach me about
18 doing any crosstraining. I am only assuming this
19 since the crosstraining didn't happen, that she also
20 didn't approach Ms. Rutledge or the head of the
21 general law division as far as soliciting work in
22 that regard.

Page 335

1       Q.  The EPP program, can you just clarify
2  how many individuals are selected from the entire
3  agency per year?
4       A.  My understanding is it's just one.
5       Q.  Can you also clarify, did you ever
6  tell Ms. Walls that you would recommend her for a
7  promotion to a GS-15?
8       A.  No.
9       Q.  The Destin, Florida training that was
10 canceled because of a hurricane, can you just
11 clarify, that wasn't an ITS training?
12      A.  No.
13      Q.  What is ITS training again?
14      A.  Intelligent transportation system
15 training, at least that's my understanding of it.
16 It has to do with the electronic modes.
17      Q.  The ITS training was not the same
18 training in Destin, Florida that was canceled
19 because of a hurricane, just to clarify for the
20 record?
21      A.  Correct.  The ITS training was what we
22 discussed in the context of Mr. Florian Chess taking

Page 336

1  the training as a general law representative and
2  Ms. Walls had indicated, at least by the question
3  that I got, that she was also interested in the same
4  training.
5       I believe the Destin, Florida training
6  did have a vendor associated with it that sounded
7  similar to ITS, but it didn't involve that subject
8  matter.
9       MS. ROSEN:  I don't have any more.
10      FURTHER EXAMINATION ON BEHALF OF
11 THE COMPLAINANT
12 BY MS. MCKINNEY:  (RESUMED)
13      Q.  Do you believe that Ms. Walls is not
14 deserving of a GS-15 promotion?
15      A.  At this time I believe she's not
16 deserving of GS-15 promotion in the office, that's
17 correct.
18      Q.  With respect to the training for the
19 employment law class, do you know of any other
20 employees who requested training and were given
21 similar conditions placed on them before the
22 training request would be approved?

84 (Pages 333 to 336)

ELAINE WALLS
VS. NORMAN Y. MINETA

SUZANNE O'MALLEY
AUGUST 17, 2005

Page 337

1  A. Not in my division. I don't recall
2  any employees in my division requesting training
3  that was related to employment law or anything
4  completely outside the scope of their current
5  responsibilities, however.
6  Q. Right, but the question is I guess
7  more general than that, not just employment law,
8  training in general. Any employees requested
9  training and then they were given positions before
10  the training would be approved or allowed?
11  A. No.
12  Q. Did one of the employees in the chief
13  counsel's office, did he take a $4,000 course at
14  Harvard?
15  A. Charles Medalen in my division did
16  take a course at Harvard last fall. I believe the
17  tuition for that course was somewhere in the $3,000
18  or $4,000 range, but I don't know exactly what it
19  was.
20  Q. By last fall, you mean the fall of
21  2004?
22  A. Yes. I believe it was in October of

Page 338

1  2004.
2  Q. What kind of training was it at
3  Harvard?
4  A. It was a regulatory study course that
5  involved using basically the Harvard Business School
6  approach to studying cases as a way of getting to
7  the issue. But instead of studying business cases,
8  which normally is how the business school operates,
9  they were studying federal or state regulatory
10  situations and cases and using them as models for
11  regulatory decision making.
12  Q. How is that related to his area of
13  expertise?
14  A. That's exactly what our division does.
15  It develops regulations, assess agency policy in a
16  regulatory context, and determines how the agency
17  can best use its regulatory presence to enforce its
18  mission, which is motor carrier safety in our case.
19  But looking at regulations and
20  applying them in a legal and practical and policy
21  context is exactly what the course was designed to
22  do.

Page 339

1  Q. Do you know of any other employees in
2  the chief counsel's office that have been able to
3  take a course of that nature and of that cost?
4  A. That's the first time that I ever was
5  aware of that course. I don't know of any employees
6  in our office in any of the divisions who have taken
7  a course like that.
8  As far as courses of that cost, I
9  would imagine that some of the executive development
10  courses that individuals take are in that price
11  range, but I'm not specifially familiar with that.
12  So I wouldn't want to speculate beyond just what I
13  would suppose.
14  MS. MCKINNEY: That's all I have.
15  Thank you.
16  MS. ROSEN: She will waive.
17  (Thereupon, signature having been
18  waived, the deposition was
19  concluded at 6:15, p.m.)
20
21
22

Page 340

1  CERTIFICATE OF STENOTYPE REPORTER - NOTARY PUBLIC
2  I, Maureen Donelson, Court Reporter, the
3  officer before whom the foregoing deposition was
4  taken, do hereby certify that the witness, SUZANNE
5  O'MALLEY, was duly sworn by me; that the foregoing
6  transcript is a true, correct and complete record of
7  the testimony given; that said testimony was taken
8  by me stenographically and thereafter reduced to
9  typewriting by me; and that I am neither counsel
10  for, related to, nor employed by any of the parties
11  to this litigation and have no interest, financial
12  or otherwise, in its outcome.
13  IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my notarial seal this 23rd day of
15  August, 2005.
16  My commission expires:
17  August 3, 2008
18  NOTARY PUBLIC IN AND FOR
19  THE STATE OF MARYLAND
20
21
22