**EXHIBIT   9**

M82305.txt

1

1      U. S. Equal Employment Opportunity Commission

2                Washington Field Office

3      --------------------------------x

4      Elaine walls                    :

5            Complainant,              :

6                   v.                 :    NO.

7      Norman Y. Mineta, Secretary     :
       Department of Transportation,   :

8            Agency                    :

9      --------------------------------x

10

11                        Tuesday, August 23, 2005

12     DEPOSITION OF:

13                     Judith Rutledge,

14     a witness, called by counsel pursuant to notice,

15     commencing at 9:45 a.m., which was taken at Department

16     of Transportation,400 7th Street, S.W., Washington,

17     D.C.

18

19

20

21

2

1                     Appearances

2      Camilla C.McKinney, Esquire

3      Law Offices of Camilla C. McKinney, PLLC

4      1100 Fifteenth Street, N.W., Suite 300

5      Washington, D.C.  20005

Page 1

M82305.txt

3         A.   That's correct.

4         Q.   Was there a name for the position that she

5    occupied?

6         A.   Assistant Chief Counsel of Enforcement and

7    Regulatory Affairs.

8         Q.   Did that title exist prior to a

9    reorganization?

10        A.   No.  That is a structural title -- because

11   of the structure of the Chief Counsel's Office in

12   the Motor Carrier Safety Administration, we had two

13   divisions.

14             That is different from what was in Federal

15   Highway.  Different from any other agency.  This is

16   our organizational structure for our counsel's

17   office, MFCSA, two divisions, two Assistant Chief

18   Counsels at that time.  One of them was the

19   Enforcement Regulatory Affairs Division, which

20   combined.

21             Essentially Federal Highway the division

☐

34

1    that, Ms. Walls had been in and the division had

2    been in as staff attorney.  Those were combined into

3    one division.  Mrs. O'Malley was recruited to handle

4    that.  And the other division was general law.

5         Q.   When you came over as chief counsel?

6         A.   Deputy Chief Counsel.

7         Q.   Why wasn't that a promotion for you?

8         A.   The position was not structured as SES

9    position.

                    Page 26

M82305.txt

10     Q.   Why not?

11     A.   You'll have to ask the people who set up

12   FMCSA there.

13     Q.   All the other deputy chief positions were

14   SES positions in the Agency at the time?

15     A.   In the department?  Throughout the

16   Department of Transportation.  I believe that is

17   correct.

18     Q.   You don't know why yours was not?

19     A.   No, I do not.

20     Q.   Did you have any conversations with Ms.

21   Walls about her transferring to Motor Carrier?

35

1     A.   Yes.

2     Q.   Can you tell me about that conversation or

3   conversations?

4     A.   I recall dropping by her office on

5   occasion and talking about, was looking forward to

6   getting her over.  This is February to October,

7   where I was in Federal Motor Carrier, seeing how

8   things were organized.

9          So I met with Ms. O'Malley and the other

10   attorneys who were going to be transferred over on

11   different occasions to chat about what was going on

12   and how Counsel's Office was going to fit in with

13   the new rule making process, for example, the way

14   that FMCSA was going to handle its regulatory

15   development, those sorts of things.

16     Q.   Do you remember how many times you talked

Page 27

M82305.txt

13    general law than where she was.

14         Q.   Do you believe general law would have been

15    a faster route to GS-15 than what she currently did?

16         A.   I don't think there is any benefit one way

17    or the other.

18         Q.   Can you explain the basis for why you

19    don't believe there is a benefit one way or the

20    other?

21         A.   Because the standard for 15 -- it's about


                                                        58


1     the performance, the independence, the knowledge,

2     the expertise, the criteria just in one set of

3     substantive law versus another set of substantive

4     law.

5          We would think that Ms. Walls would have

6     to consider the learning curve she would face, if

7     she transferred to a totally different area of law.

8     That would certainly require her a longer investment

9     of time to get up to the experience level that would

10    match a GS-15.

11         Q.   This issue of cross training with general

12    law came up in connection with an employment law

13    course?

14         A.   Ms. O'Malley came in and said that Ms.

15    Walls wanted to take a employment law course, and

16    wanted to know -- Ms. O'Malley wanted to know

17    whether I would approve that course for Ms. Walls.

18    And I talked to Ms. O'Malley and explained in order

19    to provide that kind of training, the employee had

                        Page 45

M82305.txt
```
20    to do something that was related to that work in the
21    Agency; otherwise, the Agency was putting money into
```

59

```
 1    training that wouldn't benefit the Agency.
 2            So I asked Ms. O'Malley to probe with Ms.
 3    Walls whether as a cross training effort, she would
 4    want to make up an employment course.  If so, that
 5    could justify the training expense for the Agency.
 6        Q.   What happened?
 7        A.   Ms. O'Malley came back to me and said, no,
 8    Ms. Walls -- she said she couldn't pick up an
 9    employment course with her current case load.  So
10    the training did not move forward.
11        Q.   Her training was denied because she
12    wouldn't accept an employment law case?
13        A.   No.  The training was denied -- she
14    doesn't do employment cases for the Agency.
15    Therefore, in order to justify paying for a course
16    in employment law, Ms. Walls is going to have to do
17    an employment case.
18            Ms. O'Malley was perfectly willing to
19    shuffle her case load and let her pick up an
20    employment case, if Ms. Walls wanted to do that.
21    Ms. Walls didn't accept that alternative, which was
```

60

```
 1    offered to her in writing, as I understand, from Ms.
 2    O'Malley, in a subsequent performance statement that
```
Page 46

M82305.txt

3   Ms. Walls would not do that.  My denial of the

4   training was because Ms. Walls doesn't work in this

5   area.

6          If Ms. Walls wants the training, she's got

7   to take a case and help the Agency in this area of

8   law.  Otherwise, the Agency is just investing in

9   training for an employee in an area that is not to

10  the benefit of the Agency.

11         If Ms. Walls wants the cross training, we

12  are perfectly willing to support that.  But she's

13  going to have to do the work part that is associated

14  with getting the training.  I think that was the

15  message that Ms. O'Malley carried back.

16     Q.   You said it was her workload issues is why

17  she did not want to accept the employment law case;

18  is that correct?

19     A.   That's what Ms. O'Malley indicated to me.

20     Q.   Do you know what issues workload Ms. Walls

21  had at the time?


                                                61


1      A.   No, I do not.  Nor do I doubt that Ms.

2   Walls was carrying a full load at that time.  But

3   the issue was, things had to be shuffled so that Ms.

4   Walls had to be agreeable to picking up a employment

5   case, if she wanted to take that training.  And how

6   that was accomplished, as far as her workload was

7   concerned, was certainly between her and Mrs.

8   O'Malley.

9      Q.   Was Ms. Walls told that she had to take an

                         Page 47

M82305.txt

10    employment law course in addition to her current
11    workload that she was working on at that time?
12         A.   I don't know.
13         Q.   Do you understand the question?
14         A.   Would you repeat it again.
15         Q.   Was Ms. Walls told that she had to take an
16    employment law course -- that she had to take an
17    employment law case in addition or on top of, if you
18    will, her current workload at the time?
19         A.   I did not tell her that.
20         Q.   Do you know whether Mrs. O'Malley did?
21         A.   To my -- I don't know what Mrs. O'Malley

                                                    62

1     told her.  That is not the feedback I got back.
2          Q.   Did you have any direct conversations with
3     Ms. Walls?
4          A.   I did not.
5          Q.   So this was conversations between you and
6     Ms. O'Malley?
7          A.   That's correct.
8          Q.   You did not tell Ms. Walls she had to take
9     a course -- she had to take employment law case in
10    addition to her workload?  Was that the intent that
11    was communicated?
12         A.   My position, what I communicated was that,
13    Ms. Walls doesn't work in employment law.
14    Therefore, for her to take this training does not
15    benefit the Agency, and I can't authorize money for
16    that.  If Ms. Walls wants to pick up an employment
                        Page 48

M82305.txt

17     law course, and do the cross training, that would
18     justify this course.
19              Now that was the context of the
20     discussion.  We weren't talking about whether cross
21     training and picking up the cases occurred today,

                                                        63

1      tomorrow, next year.  However, I would have expected
2      that that information be communicated to Ms. Walls
3      so that Mrs. O'Malley and Ms. Walls would work out
4      the logistics of, is the course appropriate now, is
5      the cross training proper now, how are the
6      assignments rearranged, how do you spring the time
7      for Ms. Walls to do that without adversely affecting
8      the work flow in the office.
9              That was the context.  And I'm very
10     confident that Mrs. O'Malley conveyed that
11     constructively to Ms. Walls.  That is my impression
12     of all of Mrs. O'Malley's communications with Ms.
13     Walls.
14          Q.   Did Ms. Walls want to take more than one
15     employment law class training or is it just a
16     particular training that she was looking at taking
17     at the time?
18          A.   On this particular instance that we are
19     talking about, my understanding is, there was an
20     employment law course she was wanting to sign up
21     for.

M82305.txt

64

1      Q.   So based on just one employment law case,
2   you felt it was necessary for her to take on an
3   employment law case and cross training in order to
4   justify a single course?
5      A.   Considering that Ms. Walls does not
6   practice employment law, I can't see how the Agency
7   can justify paying for her to be trained in an area
8   that she doesn't apply for the benefit of the
9   Agency.
10     Q.   If she had trained in that area, could she
11  have then been able to perhaps in the future take
12  additional courses or take other kinds of courses
13  that would have helped her toward doing more general
14  law work?
15     A.   That is way too speculative.
16     Q.   Have you ever conditioned any training
17  that was requested by an employee in a similar
18  manner as you have just described?  For example,
19  they had to take on a particular assignment, job
20  duties, responsibilities?
21     A.   I can't recall approving training for an


65

1   employee in an area that had absolutely nothing at
2   all to do with the work they were doing for the
3   Agency.  I recall never.  I don't recall ever
4   approving training for an employee in an area in
5   which they do nothing for the Agency.

Page 50

M82305.txt

6          That was the case with this training.  Ms.

7    walls does not perform employment law cases.  we

8    can't pay for her to do that unless, if there is

9    some commitment by her to take on an employment law

10   case.  And then we can work around it.

11         But that would be the same for any

12   employee.  I can never recall approving training for

13   any employee in an area of law that did not relate

14   to their duties with the Agency.

15        Q.   All right.  Do you recall ever

16   conditioning approval of training for an employee on

17   the employee performing some sort of task,

18   assignment, basically conditional approval such as

19   what you described with Ms. walls?

20        A.   I can never -- again, the conditioning

21   would only occur if someone were asking for training


66

1    in an area outside of their scope of responsibility.

2    I can't recall that happening; no.  I can't off the

3    top of my head.  I don't recall that.

4        Q.   what are Ms. walls' specific job duties or

5    responsibilities?  I know we touched on it.  If you

6    could elaborate on what they are.

7        A.   She performs legal sufficiency reviews of

8    rule making documents, reviews the regulatory

9    analysis, the environment analysis, those things

10   related to the reg development.  She handles any

11   sorts of issues that come along that Ms. O'Malley

12   assigns to her.

                      Page 51

M82305.txt

13    Q.    How long had Ms. Walls worked on -- how

14    long had she worked on the procurement aspects of

15    EIS?

16    A.    Months.  She had no subject matter

17    expertise to be able to critically evaluate

18    environmental standards, issues, what the law was,

19    how this court decision differed from the standard

20    that had been in place in other court's decisions,

21    which EPA and those agencies were telling us,

139

1    agencies that were in the environmental area were

2    telling us this decision was such a far departure

3    from what was typical from courts, that they were

4    appalled at the scope of the study that was going to

5    be required.

6         Now it takes someone who works in the area

7    to appreciate that context.  And that was the kind

8    of person we felt like we needed to have.  And since

9    we had never done that in FMCSA, and to my knowledge

10   Ms. Walls had not been involved in environmental

11   studies at FHWA, there is no reason to think she had

12   that sort of expertise.  In her work developing the

13   procurement work statements stuff, again, that was

14   process.

15        That was not substantive knowledge that we

16   were seeing displayed.  Had she been interested, I

17   would have been happy for her to come and say it.

18   Short of that, we are looking for someone who has

19   the technical expertise.  That led us to

Page 108

M82305.txt

20    Mr. Stonefield, others I'm sure that we considered

21    or reached out for, ultimately landing with Ms.

                                                            140

1    Marchese, who when approached was interested.

2        Q.    Although Ms. Walls had worked on it for

3    months, you never considered her for the second

4    phase?

5        A.    Ms. Walls did not have the expertise.  We

6    knew that her experience in environmental law did

7    not have -- she did not have the knowledge in

8    environmental impact issues and conformity, clean

9    air conformity issues.  No one in the Agency did.

10       Q.    You don't think you could have developed

11   that expertise?

12       A.    Not during this project.  This project was

13   critical.  It had to move quickly.  It had all sorts

14   of sensitivities on it.  We didn't have time to

15   teach the substantive while you are spending

16   hundreds of thousands with a contractor.  You have

17   got to have someone monitoring the project.  Does it

18   analyze this properly?  Does it take the right

19   approach?  You can't learn on the job when you're

20   spending hundreds of thousands of dollars with the

21   contractor moving along.  That simultaneous learning

                                                            141

1    is a killer.  For the Agency.

2        Q.    What was Mr. McCown's involvement?

                        Page 109

M82305.txt

3      Q.    Other than the Assistant Chief Counsel

4    supervisory GS-15s, and other than Falk, Sanders,

5    and Farber, who is a GS-15, Mike Falk, Sanders and

6    Farber, who else is a staff level attorney as GS-15?

7      A.    Charles McCown.

8      Q.    Who else?

9      A.    If you give me the organizational chart.

10    Off the top of my head -- all the division chiefs.

11    Falk, Watson, McCown, Sanders -- that is who I

12    recall off the top of my head.  The best source

13    would be organizational chart.

14      Q.    Would it be correct to say, all the staff

15    attorneys who are GS-15s had that GS-15 level prior

16    to coming to Motor Carrier?

17      A.    That's correct.

18      Q.    Since your tenure no staff attorneys have

19    been promoted to GS-15?

20      A.    That's correct.

21      Q.    But there have been some GS-15 vacancies,

178

1    have their not.  Not staff attorneys.  Supervisory

2    attorneys?

3      A.    Yes.  Supervisory position vacancies.  Are

4    15sis because of the supervisory nature.

5      Q.    I think we already talked about some of

6    them.  We talked about the one for general law.  It

7    was a vacancy for GS-15 general law?

8      A.    That's correct.

9      Q.    And you mentioned I guess legislative?

Page 138

M82305.txt

190

1          A.   You have to look at the profile of the
2     office.  The fact that we are a fairly -- we are
3     just getting established.  A lot of our folks are
4     moving 13, 14.  Several of them are now at the 14
5     level.  They haven't been here all that long to
6     develop the knowledge, the expertise that's going to
7     be required to make that next benchmark 15.
8               So if you look at the development of the
9     office, an agency that is created in 2000, is not
10    staffed until 2001.  You're looking at four years.
11    It's understandable you are not going to have
12    promotions that take people that high.  We came with
13    a lot of 15 incumbents.
14              The staff will reach the level with
15    knowledge of the program and quality performance and
16    will be positioned for the 15.  If you look at the
17    profile of the office, I think it's self-explanatory
18    why there haven't been any real plays for GS-15s
19    yet.
20         Q.   You say Ms. Walls hasn't been with the
21    Motor Carrier long enough to develop to a point


191

1     where she could be considered for a GS-15?
2          A.   I don't think it's about time with Ms.
3     Walls.  I do think it's about the breadth of her
4     knowledge of the programs.  I think that is part of
5     her development process that she can focus on.

                       Page 148

M82305.txt

6          Q.    So would Ms. Walls be an exception to you

7     saying that the staff attorneys generally have not

8     developed along far enough to be promoted to the 15

9     simply because the Agency has been --

10         A.    It's not about being an exception.  She

11    has been around the Motor Carrier since her days at

12    Federal Highway.  She has had more years exposed to

13    this program than the attorneys who joined this

14    Agency in 2002, 2003, 2004.  Ms. Walls worked on

15    rules from the Motor Carrier office back in 1997,

16    1998, 1999.  Those are the rules that I worked with

17    her on as a staff attorney back at Federal Highway.

18              So her exposure has been over a long

19    period of time.  And her engagement in learning the

20    substance of the programs that those regulations

21    touched is the kind of -- that's where the learning

                                                         192

1     knowledge, the whatnot can be improved.

2          Q.    Does Ms. Walls have similar seniority as

3     Mike Falk, similar number of years federal

4     government service?

5          A.    I don't know how many years of service

6     they have.

7          Q.    Do you know whether she has similar number

8     of years of experience as Charles Medalen?

9          A.    No, I don't.

10         Q.    Does she have similar number of years of

11    experience as Charlene Sanders?

12         A.    I don't know.  How many years does Ms.

                       Page 149

M82305.txt

20    the EPP at Ms. Walls' request.  That was the meeting

21    about the EPP.

230

1         Q.    What transpired at the meeting?

2         A.    I explained to Ms. Walls why the office

3    would not be nominating anyone for the EPP program

4    in 2004.  And that was because we had had

5    Mr. Solomey participate in 2003.  Program requires

6    the employee to be out of the office for substantial

7    rotations and it creates a staff shortage.

8              Coming off of the 2003 year staff shortage

9    I did not think the office could stand to lose

10    another resource during the 2004 year.  So I

11    explained that we would not be nominating in 2004.

12    And I suggested that Ms. Walls position herself by

13    performance and assignments to demonstrate that she

14    was the best qualified to be selected for the EPP

15    program the next time we nominated someone.

16        Q.    Was anything else discussed?

17        A.    That was my recollection of it.

18        Q.    Was anything discussed specifically with

19    respect to performance development?

20        A.    Yes.

21        Q.    What was discussed?

231

1         A.    I think we talked about that it would be

2    help for Ms. Walls to set some goals she wanted to

Page 179

M82305.txt

20      with her on developing a plan that set goals,

21      identify assignments, training, whatever was

                                                   239

1       necessary.

2           Q.    Was there ever a similar type of meeting

3       about EEP when Mr. McCown was present?

4           A.    Yes.   Ms. Walls asked to meet with Mr.

5       McCown.   Mr. McCown asked me to join the meeting.

6           Q.    Is that a different meeting than this one

7       with Ms. O'Malley?

8           A.    Yes.

9           Q.    Can you tell me about the meeting with Mr.

10      McCown and yourself and Ms. Walls?

11          A.    As I recall, Ms. Walls wanted to talk

12      about the EEP program.   We revisited the reason for

13      not having a successive nominee in 2004 -- staff

14      shortages.   And it basically took the same

15      direction, that we would be glad to work with her.

16              And then it got into some of the

17      performance development that we thought Ms. Walls

18      needed.   And from there it went into her promotion

19      qualifications for the 15, because the, some of the,

20      you know, performance areas that we were developing

21      paralleled the EEP program participation, as well as

                                                   240

1       what needs to be undertaken for the GS-15 promotion.

2               So we talked about that.   And that we did

                        Page 186

M82305.txt

3    not think Ms. Walls was ready for a GS-15.  And that

4    we needed to have some, see some improvements in

5    different areas to take her to that next level,

6    GS-15.

7        Q.   What areas did you tell her she needed

8    improvement?

9        A.   I think we just touched on, in general --

10   I can't be certain how much at that meeting we

11   talked about versus what we talked about on the next

12   meeting February 10th.  I'm not sure.

13            In that February 6 meeting, I'm not sure I

14   can distinguish what we talked about there from what

15   we talked about on February 10th.  Generally, I

16   suppose it would have focused on the level of

17   knowledge and expertise and the communication

18   skills, the ability to interact with others

19   effectively and work independently.

20            But I don't recall that meeting on the 6th

21   with Mr. McCown and Ms. Walls and me being an

☐

241

1    in-depth evaluation of her performance in the same

2    way that the following meeting on February 10th with

3    Ms. Walls and Ms. O'Malley and myself were.  I

4    just -- I can't be sure what we talked about in

5    specific.

6        Q.   You are saying the meeting with Mr.

7    McCown, yourself and Walls happened first in time?

8        A.   Yes.

9        Q.   There was another meeting between

Page 187

M82305.txt

```
 3    supervisor, dropped by my office one day when he was
 4    at headquarters.  And we were talking about
 5    enforcement issues.  And he said that Sue Lawless
 6    had indicated that she might apply for that
 7    position.  And I said great.  When I saw the
 8    certificate list, and went through the applications,
 9    it was obvious she hadn't applied.
10            One day in the building I was walking down
11    the hall, and Ms. Lawless was walking down the hall.
12    I said hello.  She was there from over from the
13    Eastern Service Center office in Glen Burnie,
14    Maryland.  And she's working on some project.  She
15    was there walking down the hall.  Hi.  I thought you
16    were going to apply for the position.  Ron told me
17    you were going to apply.  She said, I heard it was
18    wired.  So I decided not to; it's a waste of time.
19            I said it's not wired.  So whoever the
20    best candidate is.  She said, is it too late for me
21    to apply?  I said, I don't know.  I will check with
```

277

```
 1    HR.  That's when I checked with HR.  Called her
 2    back.  Said exactly what HR said.  Send in your
 3    application.
 4        Q.   Was anyone present when you had this
 5    conversation with Miss Lawless in the hallway?
 6        A.   No.
 7        Q.   Your first selection was Miss Lawless?
 8        A.   That's correct.
 9        Q.   Why did you interview her on more than one
```

Page 215

M82305.txt

10    occasion?

11        A.   We interviewed everybody on more than one

12    occasion.   That was Mr. McCown's way of doing

13    things.

14        Q.   Did you interview Ms. Walls on more than

15    one occasion?

16        A.   No.

17        Q.   Why not?

18        A.   Because she didn't make the final cut.

19        Q.   Why didn't she make the final cut?

20        A.   Because we had four people that we thought

21    had qualifications that exceeded hers.


278

1        Q.   Who made the final cut?

2        A.   Miss Wallace, Snyder, Yonish and Kirk.

3    When I said we interviewed everybody twice, we

4    interviewed those who made the cut twice.   We don't

5    hire without interviewing twice.

6        Q.   So these four individuals were interviewed

7    at least twice?

8        A.   That's correct.

9        Q.   Why didn't Ms. Walls make the cut?

10        A.   The Assistant Chief Counsel position is

11    about leadership, interacting with Agency leaders,

12    the associate administrator at that level.   It's

13    about litigation working in the Department of

14    Justice and General Counsel's office defending the

15    Agency.

16             It's about enforcement policy, the overlay

Page 216

M82305.txt

17    of policy with whatever the program office is trying
18    to implement in the way of new programs.  It's about
19    understanding the investigator enforcement construct
20    and enforcement Agency.  It's about providing advice
21    to leaders and being accepted as, you know, credible

☐
279

1    knowledgeable, someone that can reach out and build
2    bridges.
3           Those sorts of attributes are what the
4    Assistant Chief Counsel was being looked to do.  And
5    with Ms. Walls we felt like she has not demonstrated
6    an ability to communicate well with the Agency
7    heads.  She doesn't have the experience in
8    litigation with working with the Department of
9    Justice and dealing with the kind of litigation
10   issues that in the collaborative Agency, General
11   Counsel, Department of Justice, triumph that has to
12   work, she's not been involved in that.
13          She's not perceived by the Agency as
14   someone who can lead a program, can recognize key
15   issues.  I don't view her -- I don't view her as
16   having demonstrated the ability to understand the
17   scope of the Agency and how to take strategic plans,
18   policies and ensure they are furthered in a program
19   context.
20          Those are the sorts of things.  Then you
21   add to that, that she has no particular expertise in

—

M82305.txt

280

```
 1     the enforcement area.  No good grasp of MCSAP, CDL,
 2     drug and alcohol.  There was nothing that gave her a
 3     clear advantage either in the management,
 4     leadership, communication arena or in the
 5     substantive arena.
 6            I'm sure there is a more articulate way of
 7     evaluating that and assessing that in one of my
 8     affidavits or interrogatories.  The fact is, there
 9     wasn't so much of a strength on either of those
10     sides that it took her to the final cut.
11        Q.   So substantive area, knowledge of
12     enforcement issues as it relates to Motor Carrier.
13     Is that an important part of the person that you
14     wanted for the position?
15        A.   The person we wanted, the ideal person,
16     the Sue Lawless person is the one who has all the
17     program stuff and the policy stuff.  But also has
18     demonstrated the leadership, the impressing, the
19     assistant administrator because she knows the
20     enforcement program and she knows the policy and she
21     can articulate how one overlays as a practical
```

281

```
 1     trickle down effect to the field.  She had both.
 2        Q.   Which is more important?
 3        A.   No; it's not more important.  It's both.
 4        Q.   You needed both?
 5        A.   The gold standard.  You get both with her.
```

Page 218

M82305.txt

```
17        A.   I might have.   I don't specifically recall
18   it.
19        Q.   Did you say Ms. Walls did a good job in
20   the interview?
21        A.   If I talked to her, that's what I would
```

                                                                288

```
 1   have said.   Because Ms. Walls did a good job in the
 2   interview.
 3        Q.   Did you base your decision to not select
 4   Ms. Walls on how she did in the interview or what
 5   you knew about her from working with her over the
 6   years?
 7        A.   Both.
 8        Q.   Can you clarify that?   What do you mean?
 9        A.   I knew Ms. Walls' communication issues
10   with her, it's way that folks perceive her
11   communication.   I know that she has not stepped out
12   as a leader in the office to draw people to her, to
13   draw management to her, that she's not demonstrated
14   an ability to see big pictures, manage big programs.
15   Not demonstrated the initiative to learn the
16   programs that have been out there.
17            She's been very much focused on
18   assignments and not shown initiative beyond that.
19   Shows things sure, they come in.   They come in.   I
20   knew that her knowledge of the safety program
21   commercial regs program while it was more than some
```

M82305.txt

289

1    of the other candidates, it was far from being so

2    much as to clearly make her an authority.  So that

3    suddenly when you're balancing management versus

4    substantive knowledge, you got the sufficient

5    knowledge way up on the scale.  So those are the

6    kind of things that play into --

7        Q.    That was based of your knowledge of her

8    experience and working with her.  That was some of

9    the factors that played into your decision making?

10       A.    Yes.

11       Q.    Lawless was with Department of

12   Transportation.  She was an employee of DOT; right?

13       A.    That's correct.

14       Q.    Snyder was not?

15       A.    That's correct.

16       Q.    And Yonish was not?

17       A.    Right.

18       Q.    And I think you said Kirk was from private

19   practice.  So he was not.

20       A.    Right.

21       Q.    why did you select someone from outside

290

1    the Agency?

2        A.    Mr. Yonish?

3        Q.    Of the four people that made the cut, if

4    you will, the only person from the Agency was

5    Lawless.  why were you more impressed with people

Page 225

M82305.txt

6    remind me that Phyllis Young and Florian Chess, that

7    he provided a lot of service to their office.  That

8    would have been the IT office at that time I think.

9    But that would explain why she asked him to go.  But

10   I don't know what function Ms. Walls would be

11   performing in the IT area to have been -- this is

12   about --

13        Q.   Do you recall -- technology.

14        A.   I don't know what she did in technology

15   that would have triggered her interest.

16        Q.   Do you recall when Mr. Chess started at

17   the Agency?

18        A.   In late 2000, 2001, something like that.

19        Q.   Do you recall whether or not Ms. Walls was

20   the legal contact for all ITS issues in Motor

21   Carrier at one time?

309

1        A.   For IT issues?

2        Q.   Yes.

3        A.   I don't recall that.

4        Q.   Do you know who handled that before chess

5    came on board?

6        A.   No, I'm not aware that we had anybody

7    designated for that.

8        Q.   Tell me about the training in Florida.

9    Did you approve all employees to attend that

10   training in Dustin, Florida?

11        A.   All who wanted to go.  I did originally

12   approve that because we had plenty of travel money.

Page 240

M82305.txt

13    So yes.

14         Q.    Did you encourage employees to take the

15    training in Dustin, Florida, if they were

16    interested?

17         A.    I told the Assistant Chief Counsel that we

18    could -- Dustin.  It was take this course.  Offered

19    in a lot of different places.  And we told the

20    Assistant Chief Counsel at a staff meeting that they

21    could let their employees know that we had the

                                                    310

1    money.

2              This seemed to be lifestyle dealing with

3    stress sort of pitch.  And that although it was

4    somewhat soft we thought that, you know, it's a good

5    stress reliever.  All that stuff.  So yes, assuming

6    coverage in the office, we did make it available.

7         Q.    Did you have any information, flyer,

8    brochure, about the training in Dustin, Florida

9    before you made that decision?

10         A.    We had poster that the administrator

11    officer had put up.  She's the one that brought it

12    to my attention.  Posted in the office.  Talks about

13    the wellness, whatever, lifestyle whatever.

14    Unfortunately, didn't say anything about, this is

15    for administrative assistants.  If you go, it will

16    be all administrative assistants, and the agenda is

17    going to be that.  Unfortunately, that poster didn't

18    say that.  And that was the new information that

19    came back.

                        Page 241

M82305.txt

20      Q.   Where did you get that information from?

21      A.   From the one of the attorneys who had gone

311

1    to the course in New Orleans in July.  One of the

2    first offerings of the course two attorneys had

3    signed up, two male attorneys signed up for that and

4    went.  When they came back, they had the agenda and

5    it clearly showed this is administrative assistants

6    stuff.  And one of the attorneys, Mike Falk, said

7    you know, this is so totally inappropriate for us.

8        Q.   Is he one of the attorneys that did go to

9    the training?

10       A.   He's the one who came back with the agenda

11   and said this is so totally inappropriate for us.

12       Q.   Who was the other male employee?

13       A.   Charles Medalen.

14       Q.   Did you counsel attorney after that?

15       A.   No.  What I said was; okay, we are on the

16   hook.  We are going to let the folks go to Dustin.

17   I won't cancel it, as bad as I thought that was, I

18   said we promised them to go.  Let's let them go.

19       Q.   Then what happened?

20       A.   The hurricane came along.  Course was

21   canceled once.  It was postponed.  Then they

312

1    canceled altogether because the facilities were

2    wiped out.  And once it was canceled, and then USDA

Page 242

M82305.txt

3      said, we'll offer it next year, then I said, tell

4      your staff to sign up for something different.  We

5      are not going to fund it now.  It's totally

6      inappropriate for attorneys.  I was disappointed

7      that the attorneys frankly didn't think of

8      complaining it themselves.

9          Q.    Why were you disappointed?

10         A.    Once you're on notice this is for

11     administrative assistants, you pretty much are

12     taking the government for a ride.

13         Q.    Why do you think they are taking the

14     government for a ride?  You allowed the other two

15     male employees to go.

16         A.    Before we knew about it.

17         Q.    It's your testimony the information you

18     had about it when you approved it was not sufficient

19     for you to know that it was not appropriate for

20     attorneys.  Is it your testimony?

21         A.    It's my testimony that I didn't know it

313

1      was for administrative assistants until the two

2      attorneys came from New Orleans with agenda that

3      clearly showed it was for administrative assistants.

4      And when the attorney also told me it was improper

5      for attorneys, that's when I knew.

6          Q.    You didn't have that on your poster at any

7      information that you had?

8          A.    I can't make it clearer than that.  I had

9      no knowledge about the administrative assistant

Page 243