# EXHIBIT   10

# CONDENSED TRANSCRIPT AND INDEX of the Testimony of
# BRIGHAM McCOWN

## CASE: ELAINE WALLS v. NORMAN Y. MINETA

**Date:** October 19, 2005
**Volume:** I

SLR REPORTING
Phone:(301) 340-0042
Fax:(301) 340-3082
Email:SLRreprtg@aol.com

Case 1:06-cv-01259-TFH-DAR    Document 17-12    Filed 10/17/2007    Page 3 of 46

ELAINE WALLS                                    BRIGHAM McCOWN
vs. NORMAN Y. MINETA                            OCTOBER 19, 2005

## Page 1

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
- - - - - - - - - - - - - - - -x
ELAINE WALLS,                          :
              Complainant,             :
                                       :
v.                                     : EEOC No.
                                       : 100-2005-00093X
NORMAN Y. MINETA, SECRETARY,           :
DEPARTMENT OF TRANSPORTATION,          : Agency No.
                                       : DOT 2-04-2061
              Agency.                  :
                                       :
- - - - - - - - - - - - - - - -x

                       Wednesday, October 19, 2005
                       Washington, D.C.
DEPOSITION OF:
              BRIGHAM McCOWN
      a Witness in the above-entitled cause,
called for examination by counsel for the
Complainant, pursuant to notice and to agreement of
counsel as to time and place, at the offices of U.S.
Department of Transportation, 400 Seventh Street,
Southwest, Washington, D.C. 20008, commencing at
1:17 p.m., before Marney Alena Mederos, RPR, a
Notary Public in and for the District of Columbia,

## Page 2

1  when were present on behalf of the respective
2  parties:
3
4  APPEARANCES:
5        CAMILLA C. McKINNEY, ESQUIRE
         ROSANNA LOPEZ, ESQUIRE
6        Law Offices of Camilla C.
         McKinney, PLLC
7        1100 Fifteenth Street, N.W.
         Suite 300
8        Washington, D.C. 20005
         (202) 861-2934
9        On behalf of the Complainant.
10       DEBRA J. ROSEN, ESQUIRE
         Office of the General Counsel
11       U.S. Department of Transportation
         400 Seventh Street, S.W.
12       Washington, D.C. 20008
         (202) 366-9165
13       On behalf of the Agency.
14
15  ALSO PRESENT:
16       Elaine Walls, Complainant
17
18            * * *
19
20
21
22

## Page 3

C O N T E N T S

1
2  WITNESS:          EXAMINATION BY:    PAGE:
3  Brigham McCown        Ms. McKinney       4
4                        Ms. Rosen        160
5                        Ms. McKinney     163
6
7
8  E X H I B I T S
9  NO.  DESCRIPTION                    PAGE:
10  1   Handwritten list of names       80
11
12  2   8/6/04 memorandum              109
13
14  3   5/6/94 memorandum              142
15
16  4   10/17/00 memorandum and 1/13/05  146
17      memorandum
18
19  (Exhibits attached.)
20
21
22

## Page 4

1              P R O C E E D I N G S
2   Whereupon,
3            BRIGHAM McCOWN
4       a Witness, called for examination by counsel
5   for the Complainant, having first been duly sworn,
6   was examined and testified as follows:
7       EXAMINATION BY COUNSEL FOR COMPLAINANT
8            BY MS. McKINNEY:
9       Q   Good afternoon, Mr. McCown.  My name is
10  Camilla McKinney and I represent Ms. Elaine Walls in
11  this matter.
12          The purpose of our meeting here today
13  is to take your deposition testimony -- your sworn
14  deposition testimony in Ms. Walls's case against the
15  agency.  I'm going to ask you some questions about
16  the litigation and her claims against the Department
17  of Transportation.
18          Do you understand?
19      A   Yes.
20      Q   Okay.  Is there anything that would
21  prevent you from being able to answer the questions
22  I'm about to ask you truthfully?

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM MCCOWN
OCTOBER 19, 2005

Page 5

1     A     Not to my knowledge.
2     Q     Okay. Is there any medications, did
3  you ingest any alcohol, or anything else that would
4  impair your ability to remember facts?
5     A     Not to my knowledge.
6     Q     All right. So you're saying that
7  there's nothing that would impair your ability to
8  answer questions truthfully and to the best of your
9  knowledge and recollection?
10    A     Yes.
11    Q     Do you understand the court reporter
12  has just placed you under oath?
13    A     Yes.
14    Q     All right. You've sworn to tell the
15  truth and are going to give truthful testimony in
16  this case?
17    A     I have.
18    Q     All right. Do you understand that
19  perjury is one of the possible penalties for failure
20  to give truthful deposition testimony?
21    A     I think I'm aware of that.
22    Q     All right. Please answer all questions

Page 6

1  verbally, because it's very difficult for the court
2  reporter to take down nods of the head and nonverbal
3  answers such as uh-huh or huh-uh. So, again, if you
4  could answer all questions verbally, I would
5  appreciate that.
6         Do you understand?
7     A     Yes.
8     Q     If you don't understand a question, let
9  me know and I'll try to rephrase it. I'll try to
10  state the question in a manner that you can
11  understand it. It's very important that you answer
12  the question -- that you understand the question
13  before you answer. The reader of the deposition
14  transcript will assume that you understood the
15  question and answered appropriately.
16        Do you understand?
17    A     I understand, with the right to review
18  the transcript when it's finished for errors.
19    Q     Do you understand that you have to
20  understand the questions before answering them?
21    A     I will answer the questions to the
22  utmost of my ability.

Page 7

1     Q     All right. If you need to take a
2  break, just let me know.
3     A     Thank you.
4     Q     For the record, would you state your
5  name?
6     A     My name is Brigham McCown.
7     Q     Would you give your address for the
8  record, please?
9     A     400 Seventh Street, Southwest,
10  Suite 8410, Washington, D.C. 20590.
11    Q     Can I have your home address, please?
12    A     10143 Marshall Pond Road, Burke,
13  Virginia 22015.
14    Q     What is your current employment status,
15  Mr. McCown?
16    A     I'm employed with the U.S. Government.
17    Q     In what position? What capacity?
18    A     I'm the deputy administrator and acting
19  administrator of the Pipeline and Hazardous
20  Materials Safety Administration of the U.S.
21  Department of Transportation.
22    Q     How long have you held that position?

Page 8

1     A     Since June of this year.
2     Q     You've been both deputy administrator
3  and acting administrator since June 2005?
4     A     That's correct.
5     Q     Tell me what are your job duties and
6  responsibilities in that position?
7     A     I'm the chief executive officer and
8  chief operating officer of the agency.
9     Q     All right. But that doesn't explain to
10  me what you do on a daily basis. What are your job
11  duties and responsibilities?
12    A     I oversee the safe and secure
13  transportation of all hazardous materials in the
14  country and the operation of all liquid and gas
15  pipelines in the country.
16    Q     What is your level?
17    A     I'm a member of the Senior Executive
18  Service.
19    Q     What level?
20    A     There is no level any longer to the
21  SES. It's all one level.
22    Q     When did you become an SES employee?

ELAINE WALLS                                          BRIGHAM MCCOWN
vs. NORMAN Y. MINETA                                  OCTOBER 19, 2005

Page 9

1      A    July of 2003.
2      Q    What was your position prior to being
3 the deputy administrator and acting administrator?
4      A    I was the chief counsel of the Federal
5 Motor Carrier Safety Administration here at the U.S.
6 Department of Transportation.
7      Q    How long did you hold that position as
8 chief counsel?
9      A    Twenty-three months.
10     Q    From what time period to what time
11 period?
12     A    July of 2003 until June of 2005.
13     Q    Was that a promotion for you?
14     A    It's a different assignment. It's
15 still -- I'm still a member of the SES, so --
16     Q    All right. When you became chief
17 counsel, was that a promotion for you?
18     A    It's a political appointment in the
19 President's administration.
20     Q    What did you do prior to becoming chief
21 counsel?
22     A    I'm a lawyer.

Page 10

1      Q    What did you do?
2      A    I worked for a private law firm in
3 Dallas, Texas.
4      Q    How long did you work at this law firm?
5      A    Two-and-a-half years.
6      Q    What position did you hold in this law
7 firm?
8      A    Attorney.
9      Q    Were you a partner? Were you an
10 associate? What position did you hold, sir?
11     A    Senior associate.
12     Q    What was the name of the law firm that
13 you worked at?
14     A    Winstead, Seachrest & Minick.
15     Q    All right. Going back to your time as
16 chief counsel for Federal Motor Carrier, what were
17 your job duties and responsibilities?
18     A    I was responsible for overseeing the
19 legal and legislative program of the agency.
20     Q    Anything else?
21     A    Not that I can think of currently.
22     Q    Were you responsible for managing or

Page 11

1 supervising any employees?
2      A    Yes.
3      Q    How many employees did you supervise?
4      A    I either had direct or indirect
5 supervision of between 35 and 50 employees. I don't
6 really recall the exact number.
7      Q    Prior to this time, did you have any
8 supervisory or management experience?
9      A    Yes, I did.
10     Q    In what capacity?
11     A    I have previously supervised government
12 employees as well as private sector and military
13 employees.
14     Q    Your experience managing government
15 employees, was that limited to the military?
16     A    Yes.
17     Q    And in the private sector, what was the
18 maximum number of employees you supervised prior to
19 becoming chief counsel?
20     A    Probably three in the private sector.
21     Q    What rank did you obtain in the
22 military?

Page 12

1      A    I currently hold the commission of
2 Commander in the United States Navy.
3      Q    All right. And as part of your direct
4 or indirect supervision of the 30 or 50 employees
5 when you were chief counsel, were you responsible
6 for hiring any employees?
7      A    Can you define responsible?
8      Q    What does responsible mean to you?
9      A    I'm just here to answer the questions,
10 not ask them.
11     Q    Right. What does responsible mean to
12 you?
13     A    Okay. I would like to know what you
14 mean by the context.
15     Q    No. I'm not going to answer that
16 question, sir.
17         You tell me what responsible means to
18 you, and that will be the definition. What does
19 responsible mean to you?
20     A    Responsible can mean lots of things.
21 It could be direct or indirect hiring, partial
22 hiring, full hiring.

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM McCOWN
OCTOBER 19, 2005

Page 13

1 Q Did you ever hire any employees in your
2 capacity as chief counsel, sir?
3 A Yes, in consultation with others.
4 Q Were you the hiring authority?
5 A I would say, yes, in consultation with
6 others.
7 Q Was your signature necessary in order
8 to make a hire within motor carrier?
9 A My signature was one of those necessary
10 for hiring, yes.
11 Q What other signatures were required?
12 A Concurrence of the general counsel of
13 the department.
14 Q Any other signatures required?
15 A Signatures? Not that I recall.
16 Q Any other authority required?
17 A Not that I recall.
18 Q Were you involved in the evaluation of
19 any employees?
20 A Yes.
21 Q What employees?
22 A Well, I would be responsible for the

Page 14

1 direct evaluation of some employees and reviewing
2 the evaluations of other employees. For example, I
3 would do the initial evaluation on all employees
4 that directly reported to me, but I would review and
5 concur in the evaluations of other employees that
6 had intermediate-level supervisors.
7 Q How many direct reports did you have?
8 A It varied. I don't recall exactly.
9 Q Approximately how many?
10 A I wouldn't want to guess.
11 Q Well, you mentioned previously that you
12 supervised anywhere between 30 to 50 employees. So
13 was it 50 employees that were direct reports or
14 something less than that?
15 A Something less than 50, but I don't
16 recall.
17 Q Was it less than 30?
18 A I couldn't tell you.
19 Q Was it less than ten?
20 A Ma'am, I've already answered that I
21 don't know. You wouldn't want me to guess or lie, I
22 know.

Page 15

1 Q Was it less than ten, sir?
2 A I don't recall.
3 Q You don't recall whether it was less
4 than ten?
5 A No, ma'am.
6 Q Okay. But you can say with certainty
7 that it was not 50?
8 A Yes, I think that's fair.
9 Q All right. Was it 40?
10 A I don't recall exactly.
11 Q You don't recall?
12 A That's my answer.
13 Q You can't say whether it was
14 approximately between a certain number?
15 A No, I can't. I don't recall.
16 Q Were you involved in the evaluation of
17 all indirect reports, review and concurrence with
18 the intermediate employees?
19 A Can you say that again, please?
20 Q Were you involved in the review and
21 concurrence in all other employees who were not
22 direct reports to you?

Page 16

1 A I was involved in the review. I do not
2 recall whether I had to concur or not.
3 Q So you reviewed evaluations of all 30
4 to 50 some-odd employees that were under your
5 management?
6 A That would be the general approach,
7 yes. I don't know whether I specifically and always
8 reviewed every single one or not. I couldn't tell
9 you.
10 Q Do you know Ms. Elaine Walls?
11 A I do.
12 Q How do you know Ms. Walls?
13 A Ms. Walls and I worked together in the
14 Office of Chief Counsel in the Federal Motor Carrier
15 Safety Administration.
16 Q How long have you known her?
17 A I guess since I started working for
18 FMCSA.
19 Q So that would be since July 2003?
20 A That's correct.
21 Q What were Ms. Walls's job duties and
22 responsibilities?

Page 17

1    A    Ms. Walls was a staff attorney
2  within -- I believe, at the time, it was the reg --
3  well, a staff attorney in the reg -- let's see. I'm
4  trying to recall the exact name of it. The
5  regulations division. The regulatory affairs
6  division.
7    Q    What do you know about Ms. Elaine's
8  performance as a staff attorney?
9    A    I'm sorry, I don't understand the
10  question.
11    Q    How was her job performance?
12    A    Her job performance was adequate.
13    Q    And on what do you base that? On what
14  do you base your knowledge?
15    A    The interaction I had with her over the
16  period.
17    Q    Anything else?
18    A    Sure, and the remarks of her
19  supervisors.
20    Q    And who were her supervisors?
21    A    Ms. Suzanne O'Malley would be her
22  first-line supervisor, Ms. Judy Rutledge would be

Page 18

1  her second-line supervisor, and I would be her
2  third-line supervisor.
3    Q    Other than your interactions with
4  Ms. Walls and the remarks of her supervisors, was
5  there anything else that you based your
6  understanding of her job performance?
7    A    I guess our interaction would include a
8  review of her work product.
9    Q    Anything else?
10    A    Not that I can think of at the moment.
11    Q    What specific projects, if any, did you
12  work on with Ms. Walls?
13    A    Work on with me? That's kind of a
14  relative term. I mean, I'm aware of the projects
15  she worked on in general, and that would be
16  regulatory matters, regulations, NEPA-oriented
17  regulations, I believe she provided some work on
18  NAFTA-related matters, and -- I think I already said
19  regulations, so yeah.
20    Q    Anything else?
21    A    Not that I can think of.
22    Q    Regulations, NEPA-oriented regulations,

Page 19

1  and NAFTA-related matters; is that correct?
2    A    Well, and regulations in general.
3    Q    Is that what you mean by regulation
4  matters?
5    A    Yes.
6    Q    Were you aware of Ms. Walls's
7  experience and background prior to her employment
8  with the motor carriers?
9    A    No, other than to the extent that she's
10  been a lawyer with the Department of Transportation
11  previous to motor carriers being established.
12    Q    Do you know anything about how much
13  seniority she had with the federal government?
14    A    No.
15    Q    At the time you worked with Ms. Walls,
16  did you know whether or not she had worked with the
17  now defunct ICC, the Interstate Commerce Commission,
18  since the late '80s? Were you aware of that?
19    A    I was aware that she had worked for the
20  ICC. I'm not aware of any specific dates.
21    Q    Do you recall having any conversations
22  with Ms. Walls concerning her work or her job

Page 20

1  performance?
2    A    Yes.
3    Q    What do you recall about these
4  conversations?
5    A    I recall that Ms. Walls was interested
6  in being promoted and was interested in nominating
7  herself for a career program.
8    Q    Anything else?
9    A    Not that I can think of.
10    Q    What do you recall about the
11  conversations where Walls indicated to you that she
12  was interested in being promoted?
13    A    She had expressed an interest in being
14  promoted to a GS-15 level and felt that she was
15  entitled to a promotion.
16    Q    Did she ever use the word entitle or
17  entitlement when she talked to you about being
18  promoted to a 15?
19    A    I think so. Or if not the word itself,
20  you know, she had said to me that she had been here
21  a long time and was, you know, entitled to be
22  promoted. She had worked for DOT for a very long

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM McCOWN
OCTOBER 19, 2005

Page 21

1  time.
2      Q    Do you recall her specifically using
3  the word entitle?
4      A    You know, I think she did, but I can't
5  be 100 percent sure.  But that's at least the
6  meaning I got out of the conversation.
7      Q    How did this conversation come up?
8  What was the context of it?
9      A    I believe she approached -- I believe
10  she approached me.  Me and/or -- I think
11  Ms. Rutledge may have been there also.
12      Q    Which conversation took place first,
13  the one concerning her nomination to a career
14  program or her interest in being promoted?
15      A    The best I remember, I think they were
16  part of the same conversation.
17      Q    What was said during the conversation
18  about her interest in being nominated to a career
19  program?
20      A    You know, the program, I think, was
21  called an EPP program.  That's what I recall.  I
22  think it's Executive -- Executive Potential Program,

Page 22

1  something like that, and she had expressed interest
2  in being nominated to attend this program over the
3  next year.
4      Q    Did she seek to nominate herself or was
5  she trying to get your approval to have either
6  yourself or Rutledge nominate her for the EPP?
7      A    You know, I don't really recall.  I
8  think the end result was she wanted to be nominated
9  for this program.
10      Q    Okay.  Could she nominate herself or
11  did she rely upon her management or supervisors to
12  nominate her for the EPP?
13      A    I mean, I think that's semantics, but I
14  think she wanted to be nominated.  I don't recall
15  exactly how that worked, but I assume that we would
16  have to fill out the paperwork, meaning management.
17  But she wanted to be nominated.
18      Q    So she was asking management to
19  nominate her for the EPP; is that correct?
20      A    I think that's a fair statement.
21      Q    Were you aware of any other employees
22  in motor carrier who had been selected for the EPP

Page 23

1  program?
2      A    I don't know who was ultimately
3  selected that year.  Gosh, I don't even remember
4  what year that is.  But I do know the year before,
5  Joe Solomey had been -- had been picked for that
6  program.
7      Q    What response did you have to her
8  request or her interest in being promoted to a GS-15
9  position?
10      A    Well, I believe we went and spoke with
11  management, her first- and second-line supervisor,
12  to see what their opinions were.  But I also told
13  her at the time that the GS-14 level was the
14  journeyman level for most lawyers in the
15  department.
16      Q    What do you mean by that?
17      A    Well, the policy at that time was that
18  you had to either be a supervisor or be a recognized
19  expert in some specialized field to be promoted to
20  GS-15.  Otherwise, the billeting -- the billets
21  maxed out at a GS-14.  The journeyman level was the
22  highest level you could achieve.

Page 24

1      Q    So if I understand you correctly, in
2  response to her interest in wanting to be promoted,
3  you told her you would talk to her first- and
4  second-line supervisors?
5      A    True.
6      Q    Tell me about those conversations with
7  her first- and second-line supervisors.
8      A    To my-- well, to my knowledge, neither
9  Ms. O'Malley or Ms. Rutledge felt that under the
10  guidelines her performance warranted an increase.
11      Q    And what did they base that upon?
12      A    On her performance and their working
13  relations with her.
14      Q    Now, you mentioned that at that time in
15  order to be promoted to a GS-15, you either had to
16  be a supervisor or a recognized expert.
17          On what do you base your understanding
18  of what was necessary to be promoted?
19      A    That's just my understanding of the
20  department policy -- long-standing department policy
21  that was in effect at the time, and that was also
22  the policy within our agency that applied to

ELAINE WALLS                                          BRIGHAM McCOWN
vs. NORMAN Y. MINETA                                OCTOBER 19, 2005

| Page 25 | Page 27 |
|---|---|
| 1 everyone. | 1 journeyman level, the career ladder stopped at 14 at |
| 2     Q   All right. By department -- I'm sorry, | 2 that time. |
| 3 what do you mean by department? | 3     Q   And what were your discussions with |
| 4     A   I believe that was the agency and/or | 4 general counsel? |
| 5 the Department of Transportation's policy. | 5     A   I think it was on the same levels, to |
| 6     Q   Did you also mean the motor carrier | 6 understand what the journeyman-level position was |
| 7 policy as well? | 7 and how attorneys were graded within the |
| 8     A   Yes. | 8 department. |
| 9     Q   So you're saying the motor carrier and | 9     Q   You said that was the policy at the |
| 10 the Department of Transportation both had the same | 10 time. |
| 11 policy? | 11          Has the policy changed since then? |
| 12     A   Well, we always try to, yes. | 12     A   I don't know that the policy has |
| 13     Q   Did you ever discuss this policy with | 13 changed so much as it has been clarified by the -- |
| 14 any other employees in motor carrier? | 14 by the Secretary. |
| 15     A   Yes. | 15     Q   How did the Secretary clarify the |
| 16     Q   Who did you discuss it with? | 16 policy? |
| 17     A   I discussed it with Judy Rutledge. | 17     A   He -- well, he published a written |
| 18     Q   Who else? | 18 policy, but I don't recall exactly when. |
| 19     A   I believe I discussed it with HR. | 19     Q   When O'Malley and Rutledge indicated |
| 20     Q   Anyone else? | 20 that they did not feel Ms. Walls's performance |
| 21     A   And I believe at the time, I discussed | 21 merited a promotion, did you try to find out more |
| 22 it with the Office of General Counsel. | 22 specifics? |

| Page 26 | Page 28 |
|---|---|
| 1     Q   What were your discussions with Judy | 1     A   Yes. |
| 2 Rutledge? | 2     Q   What did you do? |
| 3     A   Just to understand the background of | 3     A   Well, we talked. |
| 4 the agency policy and the department policy. | 4     Q   The three of you talked? |
| 5     Q   What were your discussions with HR? | 5     A   Yes. |
| 6     A   I think the HR discussions revolved | 6     Q   How many times did you talk? |
| 7 around the actual billet itself and how it was | 7     A   I don't recall. |
| 8 classified and the GS level that it was classified | 8     Q   Do you remember how long the |
| 9 at. | 9 conversation lasted? |
| 10     Q   What do you mean by that, how it was | 10     A   No, I don't. |
| 11 classified? | 11     Q   Did you have more than five |
| 12     A   Well, I -- billets are classified in a | 12 conversations with them about this? |
| 13 GS grade range, and I don't recall exactly the | 13     A   I wouldn't be able to guess on that. |
| 14 numbers. A billet had to be classified with | 14     Q   Did you ever review any of Ms. Walls's |
| 15 promotion potential to 15 for you to fill it to a | 15 performance evaluations? |
| 16 15, and I don't believe hers was. And absent a desk | 16     A   As I sit here today, I don't recall. |
| 17 audit or some other mechanism, I don't know that | 17     Q   Did you do anything or make any efforts |
| 18 that alone allowed promotion. | 18 to find out why O'Malley or Rutledge felt her |
| 19     Q   So you're saying her billet or the | 19 performance did not warrant an increase? |
| 20 position that she occupied was not a career ladder | 20     A   Yes. |
| 21 position? | 21     Q   And that consisted of what, the |
| 22     A   It was a career ladder. But the | 22 conversations you had? |

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM McCOWN
OCTOBER 19, 2005

Page 29

1    A    Yes, and we met with Ms. Walls.  And I
2  directed Ms. Rutledge, Ms. O'Malley, and Ms. Walls
3  to meet to discuss the matter, because there seemed
4  to be a difference in perception between management
5  and the employee on how well they were doing.
6    Q    How did you determine that there was a
7  difference between management and what Ms. Walls's
8  perception of her performance was?
9    A    Because when we met with Ms. Walls -- I
10 think that was Ms. Rutledge and I -- Ms. Walls was
11 visibly moved when we told her that neither
12 Ms. O'Malley or Ms. Rutledge thought that her
13 current performance level was indicative of
14 performance of a GS-15 or that the work and scope
15 was of sufficient complexity.
16   Q    You say she was visibly moved.  Was she
17 upset?
18   A    She was upset, yes.
19   Q    How was she upset?  Can you describe
20 that?
21   A    I believe she was tearful, because I
22 think I gave her some tissues, but I don't really

Page 30

1  recall anything beyond that.
2    Q    Did Ms. Walls ever state that her
3  first-line supervisor, O'Malley, had told her that
4  she had recommended her for a promotion?
5    A    I don't recall that.
6    Q    Do you know whether or not her
7  first-line supervisor had, in fact, recommended her
8  for a promotion?
9    A    To my knowledge, no.
10   Q    Did Ms. Walls explain how her scope of
11 work -- how she felt it was significant in terms of
12 being promoted to a GS-15?
13   A    Discussed with me?
14   Q    During this meeting that you're talking
15 about.
16   A    I don't believe so.
17   Q    Did O'Malley or Rutledge give any
18 specific examples of how her scope of work did not
19 meet the criteria for the promotion?
20   A    Yes.  I think that -- that was part and
21 parcel of the discussion that we had.
22   Q    What did they say?

Page 31

1    A    Well, that she does adequate work as a
2  GS-14, does not exhibit the independence and
3  proactiveness of a GS-15, that most of the work that
4  she does is not specialized to the point of a GS-15,
5  and I recall a conversation at some point about if
6  she felt that were the case she could ask for a desk
7  audit but did not want to.
8    Q    Do you remember anything else?
9    A    No, just other than she thought she
10 should be a GS-15.
11   Q    Did they have any written documentation
12 with respect to what you just mentioned?
13   A    I don't know.
14   Q    What do you mean you don't know?
15   A    I don't know.
16   Q    At the meeting when you had this
17 conversation, was there any written documentation
18 that was produced that --
19   A    I don't believe so.  I'm sorry, go
20 ahead.
21   Q    Was there any written documentation
22 that was produced to support what O'Malley and

Page 32

1  Rutledge were saying?
2    A    I believe this was just a conversation
3  between us.
4    Q    So are you saying there was no written
5  documentation?
6    A    At that meeting, not that I recall.
7    Q    Do you recall there ever being any
8  written documentation to that effect?
9    A    I don't recall.
10   Q    Do you know whether or not Ms. Walls's
11 performance evaluations reflected that same
12 sentiment that you just expressed?
13   A    I don't recall.
14   Q    Did you ever take a look at Ms. Walls's
15 performance evaluations to determine whether it was
16 consistent with what Ms. O'Malley and Ms. Rutledge
17 were saying?
18   A    I don't recall.
19   Q    The promotion policy that you talked
20 about earlier, is that written anywhere?
21   A    Before the Secretary's memo, I don't
22 know that it was.

Page 33

1    Q    So you don't recall there being a
2  written policy before the Secretary's memo?
3    A    I don't recall one way or the other.
4    Q    You didn't feel it was necessary to
5  take a look at Ms. Walls's performance evaluations
6  to determine whether or not she had potential for
7  the GS-15 position?
8    A    No, I'm not saying that at all. I'm
9  saying I don't recall whether I looked at it or
10  not.
11    Q    So you're saying that you may have?
12    A    I may have. I may not have. I don't
13  recall.
14    Q    Would that be something that you would
15  have done?
16    A    Perhaps, but there are lots of things.
17  I think speaking to her managers that had the most
18  direct supervision, you know, I would rely on what
19  they tell me, and I would rely on my own interaction
20  with Ms. Walls. It certainly couldn't hurt to look
21  at them, but I don't recall whether I did or not.
22    Q    I believe you stated that Ms. Walls did

Page 34

1  not want a desk audit.
2       Is that what you said?
3    A    Yes. That's my understanding.
4    Q    So a desk audit was never performed or
5  requested?
6    A    To my knowledge, no, but that's
7  something an employee has a right to request. Most
8  often, my understanding is they don't request it,
9  because more often than not they result in
10  downgrades.
11    Q    Do you believe it would have resulted
12  in a downgrade in this particular case?
13    A    I don't know.
14    Q    So why did you make that statement?
15  What's the relevance of that statement to
16  Ms. Walls's specific case? Do you believe, again,
17  whether or not her position would have been
18  downgraded if she asked for a desk audit?
19    A    I don't know. All I can tell you is my
20  history and experience has been that more times than
21  not, they do not result in an upgrade and can result
22  in downgrades or affect other people -- other job

Page 35

1  positions as well.
2    Q    Ms. Walls is a staff attorney; is that
3  correct?
4    A    Yes.
5    Q    Do you know of any staff attorneys who
6  requested a desk audit and their GS level was
7  downgraded in the motor carrier?
8    A    In -- yes.
9    Q    Who?
10    A    What was -- I don't recall the name,
11  but it was not in the Chief Counsel's Office. It
12  was in one of the program offices. I think it may
13  have been in the policy office.
14    Q    You don't remember the person's name?
15    A    No, I don't.
16    Q    How long ago was this?
17    A    Sometime between 2003 and 2005, but
18  I --
19    Q    Do you have -- I'm sorry.
20    A    I was going to say that that is also
21  based on conversations with HR just over time,
22  because I've looked at the possibility of using desk

Page 36

1  audits as a way to increase the grade structure of
2  employees and have been told that is not a good
3  idea. But ultimately, it's up to the employee if
4  they really want one.
5    Q    Do you know whether or not this person
6  that you mentioned who was in the program office,
7  whether or not they were an attorney?
8    A    No, no.
9    Q    Are you aware of any attorneys whose
10  positions were downgraded as a result of a desk
11  audit?
12    A    No, I'm not, but I don't know that it
13  would be any different.
14    Q    Why?
15    A    A GS level is a GS level.
16    Q    The work that attorneys do is very
17  different than what other GS-level employees do; is
18  that correct?
19    A    I think that's a fair statement for all
20  GS employees.
21    Q    Do you have any evidence or any
22  knowledge whatsoever that Ms. Walls's position would

ELAINE WALLS                                    BRIGHAM MCCOWN
vs. NORMAN Y. MINETA                            OCTOBER 19, 2005

Page 37

1  be downgraded if she asked for a desk audit?
2      A   Oh, no, no.
3      Q   So you have no basis for making that
4  statement?
5      A   Just my experience and what I've heard
6  in the agency.
7      Q   And you have no experience with an
8  attorney being downgraded?
9      A   Specifically an attorney position, no,
10 not to my knowledge.
11     Q   You also mentioned that the EPP program
12 came up during this same meeting?
13     A   I believe so, yes.
14     Q   What did management decide to do with
15 respect to nominating Ms. Walls for the position?
16     A   We decided not to nominate her or
17 anyone from the office for that program.
18     Q   Why?
19     A   Well, I think a combination of
20 factors. The most serious factor was that nobody --
21 nobody warranted, in management's view,
22 participation in the program.

Page 38

1      I think -- you know, I want to be clear
2  on that. There were -- we had just had somebody get
3  the program the year before and we were very
4  short-staffed. But regardless, if I had somebody
5  who was that high-caliber quality to be nominated
6  for the program, we would nominate them, but we
7  didn't.
8      And to be clear, that's a nomination
9  amongst one office in an entire agency who all then
10 compete together, and the administrator decides who,
11 if anyone, will be nominated for the agency to
12 actually participate. So my nomination has --
13 doesn't mean that anybody gets into the program.
14     Q   On what do you base your assertion that
15 the person who would be nominated by motor carrier
16 had to be of high caliber?
17     A   Well, that's the whole point of the
18 program. It's an Executive Potential Program for
19 people aspiring to become leaders and/or members of
20 the Senior Executive Service.
21     Q   So you're saying that you had no one on
22 your staff in motor carrier who would have had the

Page 39

1  potential to be essentially -- who had the potential
2  to become an SES? Is that what you're saying?
3      A   I am saying there was no one in
4  counsel's office that year who we thought was ready
5  for that program.
6      Q   Right. And that program, as you said,
7  was for senior management. So are you saying that
8  you felt no one was of the caliber to be groomed or
9  to be promoted to senior level -- senior executive
10 level?
11     A   I'm just trying to make sure that that
12 sounds right. I mean, I -- that sounds right to me,
13 yes.
14     Q   How long had you been with motor
15 carrier when you made that determination? Was it
16 less than a year?
17     A   I don't -- I don't recall. Like I said
18 earlier, I can't tell you exactly what year that
19 was. I don't want to guess.
20     Q   Do you recall whether you had newly
21 obtained your position as chief counsel?
22     A   I don't recall.

Page 40

1      Q   So you don't recall whether or not you
2  had been in that position for less than a year when
3  you had these conversations with Ms. Walls,
4  Ms. Rutledge, and Ms. O'Malley that we've just been
5  talking about?
6      A   I believe it was in the first year, but
7  I don't recall exactly as I'm sitting here today.
8      Q   Do you recall whether any discussions
9  were had with Ms. Walls to help her understand what
10 she needed to do to get her promotion?
11     A   It's my understanding that those
12 conversations occurred, yes, that she was urged to
13 seek out greater responsibilities, to cross-train,
14 and to even potentially look for other
15 opportunities.
16     Q   What do you mean look for other
17 opportunities?
18     A   Sometimes it's good for people within
19 the department to take different positions within
20 the department in different agencies or even
21 different positions within the same agency to expand
22 their knowledge.

ELAINE WALLS                                          BRIGHAM McCOWN
vs. NORMAN Y. MINETA                                 OCTOBER 19, 2005

---

Page 41

1    Q    What do you mean by cross-train?
2    A    To expand their knowledge into new
3  programs, to become more specialized, or to pick up
4  other areas of expertise.
5    Q    Are you saying Ms. Walls's only area of
6  expertise was in the regulatory affairs area?
7    A    I'm saying her -- to my knowledge, her
8  main area of expertise is a general regulatory-based
9  practice.
10        There are certain things -- more is
11  coming to mind now. I think she -- she may be the
12  person in the regs division that does executive
13  order compliance and some other things, but those
14  aren't really -- those may be considered niches, but
15  they're not -- they're not highly-technical, complex
16  issues. Small Business -- I think she may do some
17  of the Small Business Act evaluations also.
18    Q    Do you know whether or not -- let me
19  ask this first: Do you know whether or not
20  Ms. Walls was with motor carrier when it was first
21  established as a new agency?
22    A    I don't know that.

---

Page 42

1    Q    When was motor carriers established as
2  a new agency?
3    A    I don't recall that exactly.
4    Q    Do you recall how long motor carriers
5  had been in existence by the time you joined?
6    A    I don't. Two or three years.
7    Q    How was Ms. Walls supposed to get this
8  cross-training and this greater responsibility? How
9  was she supposed to go about doing that?
10    A    To seek out additional opportunities,
11  to volunteer to do more, to apply for other -- to
12  compete for other positions in the department of the
13  government. There's lots of different ways to do
14  it. I mean, that's kind of up to the individual,
15  though.
16    Q    The EPP, isn't that similar to what
17  you're talking about in terms of taking on greater
18  responsibility?
19    A    I don't know that it takes on greater
20  responsibility. I think that's a -- that's a --
21  that's a training class that at management's
22  discretion they can put somebody in that program.

---

Page 43

1        That's not a -- that's not a CLE
2  program that just anybody can go out and do. I
3  mean, that's not an entitlement or anything.
4    Q    Is the EPP program or EPP set up so
5  that the person selected rotates or does different
6  work in different divisions or departments within
7  the Department of Transportation?
8    A    Well, I think they do -- I think they
9  do different rotations within the Executive Branch,
10  not necessarily the Department of Transportation.
11    Q    Okay. So isn't that then like getting
12  different positions within the agency?
13    A    Well, what I'm referring to is a
14  permanent change of positions or a permanent change
15  of authority. This is -- this is a temporary
16  training program.
17    Q    But wouldn't it have expanded her
18  knowledge giving her some different responsibilities
19  that would have assisted her with her interest in
20  being promoted?
21    A    That's true.
22    Q    Are you saying that you felt it was

---

Page 44

1  best for Ms. Walls to apply for a job elsewhere
2  outside of general counsel?
3    A    No, I'm not saying that at all. I'm
4  saying to look for opportunities to expand your
5  horizons. And when I talk about additional
6  training, I don't mean -- I don't mean a program
7  that one in twenty-five hundred people get to do,
8  and that's the EPP program. I'm talking about CLE
9  or to volunteer to take on additional assignments or
10  to -- you know, to figure out -- to be proactive,
11  independent, and to kind of make it happen.
12    Q    Doesn't Ms. Walls have to get
13  management's approval -- if she volunteers for a
14  particular project, she still has to get
15  management's approval to work on that project, does
16  she not?
17    A    I think that's generally true.
18    Q    And if she wants to take a position or
19  work somewhere else outside of motor carriers, I
20  believe you mentioned that she still would have to
21  get approval by someone for that, wouldn't she?
22    A    Well, yeah. I mean, she would have to

---

Page 45

1  either compete for another position or she could do
2  a rotational detail assignment or it could be as
3  simple as nothing outside of the agency.  It could
4  be going to your manager and saying I know we have
5  this really complex thing coming up, I want to be
6  your point person, let me have it, I'll stay and
7  work and make it happen.
8      Q    Do you know whether or not Ms. Walls
9  did, in fact, make those kinds of requests to her
10 supervisors?
11     A    To my knowledge, she didn't.  I mean,
12 I -- to my knowledge, she was -- my recollection is,
13 you know, it was kind of like, well, give me these
14 things to work on.  And my recollection is, no,
15 that's the whole point.  You have to go figure this
16 out and go get it.  It just doesn't land in your
17 lap.
18     Q    But if someone is asking give me these
19 things to work on, aren't they asking for it?  I
20 mean, that sounds to me to be equivalent.  Are you
21 saying it's not?
22     A    No.  I'm saying it is.  I'm saying, to

Page 46

1  my knowledge, she didn't proactively go out and seek
2  to do those things.
3      Q    So you're saying she didn't go out and
4  say give me these projects to work on?
5      A    Well, I don't want to be argumentative
6  about one thing.  A project is one of -- this is
7  just an example -- many different things that you
8  can do to try to improve yourself.
9           And to my knowledge, she did not go out
10 and volunteer for the really hard things or to say
11 send me to this three-week CLE class on how to be
12 the expert NEPA lawyer or anything like that, no.
13     Q    How are the work assignments made in
14 motor carrier?  Who is responsible for that?
15     A    By the assistant chief counsels.
16     Q    Who were the assistant chief counsel --
17 in this case, was it Ms. O'Malley?
18     A    Yes.
19     Q    What was your role and/or
20 Ms. Rutledge's role in making assignments to
21 employees?
22     A    Typically, I don't make assignments to

Page 47

1  employees.  I can't speak for Ms. Rutledge.  That's
2  generally the discretion of the first-line
3  supervisor.  That's management.
4      Q    Did that ever happen, though?  Did you
5  ever make any assignments to employees?
6      A    I don't recall.
7      Q    Do you recall whether Ms. Rutledge made
8  any assignments to any employees?
9      A    I don't recall.
10     Q    If there was a very high-profile
11 project or a project that was very important to the
12 administrator, would you or Ms. Rutledge be involved
13 in making the assignment of that project?
14     A    It would be -- we would be, to some
15 extent, involved in the project.  Actually staffing
16 it, not to my knowledge or not that I can think of.
17     Q    Are you familiar with the Part 386
18 Rules of Practice?
19     A    I am.
20     Q    What is that?
21     A    That is the rules of practice and
22 procedure contained in Part -- I'm sorry, 49 C.F.R.

Page 48

1  that govern our APA enforcement actions.
2      Q    Do you know whether or not there was a
3  project that Ms. Walls worked on with respect to
4  that regulation?
5      A    Yes.  She participated in the drafting
6  of that regulation.
7      Q    What do you recall about her
8  participation in the drafting of that regulation?
9      A    She was one of four or five people that
10 worked with me on that regulation, a regulation
11 which had been floundering, frankly, in the agency
12 for close to ten years that I was adamant was going
13 to get published and finished.
14     Q    Was it, in fact, published and
15 finished?
16     A    It was.
17     Q    And I'm sorry, I'm asking
18 specifically.  What was Ms. Walls's participation on
19 that project?
20     A    She was one of the team of staff
21 lawyers involved in drafting the regulation.
22     Q    Who else was involved in this project?

Page 49

1     A    Ms. Suzanne Newhouse, Ms. Jackie Cho,
2  Ms. Rutledge, Ms. O'Malley, and myself.  And maybe
3  others, but that's what I can -- oh, Mr. Farbman and
4  Mr. Vining.
5     Q    Percentage-wise, who did the most work
6  on the project?
7     A    Frankly, probably I did.
8     Q    All right.  After you, who else did the
9  most work on the project?
10    A    Probably Ms. Rutledge.
11    Q    And after you -- and after
12  Ms. Rutledge, I'm sorry, who did the most work on
13  the project?
14    A    Probably Ms. Cho.
15    Q    And after Ms. Cho, who did the most
16  work on the project?
17    A    Probably Ms. Walls.
18    Q    You and Ms. Rutledge, did you do more
19  than 50 percent of the project?
20    A    I would say that's fair, I guess.
21    Q    And what did you do specifically?
22    A    Well, I did numerous and numerous

Page 50

1  redrafts of the regulations.  I was responsible for
2  taking the -- really establishing the framework and
3  the procedures to be used under the new
4  regulations.  I significantly drafted portions of
5  the regulation text itself.
6     Q    So you didn't assign the drafting of
7  the regulation to someone else?
8     A    Well, there was a draft already in
9  place, like I said, that had been around for a very
10  long period of time, but it was significantly
11  overhauled.  There were portions of the reg text and
12  the introduction -- it's called something else, but
13  I can't remember what that is at the moment -- that
14  other people drafted.  But there were probably 15 or
15  20 draftings and revisions of this by the time it
16  was completed.
17    Q    Is that unusual for a regulation?
18    A    No, I don't really think so.
19    Q    Who wrote the draftings that you
20  revised?  Was it Ms. Cho?
21    A    Ms. Cho did.
22    Q    Was it Ms. Walls?

Page 51

1     A    Ms. Walls did some.
2          Ms. -- there's another attorney who
3  is -- gosh, I can't remember her name, but she did
4  the -- she actually did the -- I believe a team of
5  lawyers, that's right, did a lot of the drafting.
6  Ms. Sanders from Fort Worth worked extensively on
7  it, as did enforcement attorneys in the field.
8          I mean, this was a -- this was a huge
9  effort, and we sought the input of -- the list is
10  growing now -- at least a dozen different people
11  probably.
12    Q    How much work did Ms. Sanders do?
13    A    I don't -- I don't recall the exact
14  percentages.  She was -- she was involved, and she
15  was fairly significantly involved in the writings
16  through the late '90s, because I think this had been
17  on the books as a regulation undergoing development
18  since '95 or '98, something to that effect.
19    Q    Okay.  So the people that you're
20  mentioning worked on this project were people that
21  had been working on it for the past ten years?
22    A    Yes.

Page 52

1     Q    All right.  Let's limit the question to
2  who was working on it at the time you came into the
3  agency.
4          At the time you came into the agency
5  and it finally got published and finished, who was
6  working on the project with you during that time
7  period, not going back into history?
8     A    To my knowledge, all the same people:
9  myself, Ms. Rutledge, Ms. Newhouse, Ms. Cho,
10  Ms. Walls, Ms. O'Malley, Mr. Farbman, Mr. Vining,
11  Ms. -- I can't remember her name now, but one of the
12  eastern region field attorneys, Tony whose last name
13  escapes me, a Midwestern field service attorney, all
14  of the field attorneys, all eight of them,
15  participated in comments.  I mean, this was a large
16  effort by a lot of people.
17    Q    So this was an important or significant
18  project?
19    A    Yes.
20    Q    And Ms. Walls worked on this?
21    A    Yes.
22    Q    Were Ms. Walls and Ms. Cho principally

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM McCOWN
OCTOBER 19, 2005

---

Page 53

1 responsible for drafting the regulation?
2      A    They were responsible for a couple of
3 the drafts in the three to four months before it was
4 published, yes, that's correct.
5      Q    Sanders, was she involved in the
6 project when you were working on it in early 2000 --
7 I'm sorry, early 2003?
8      A    Well, no. I think we're up to 2004,
9 maybe even 2005, by now.
10     Q    All right. Was Sanders involved in it
11 at that time?
12     A    I believe she was but not as heavily as
13 she had been, primarily because she is not located
14 here. She's located in Fort Worth, Texas, and I
15 wanted people in the room with me instead of on the
16 telephone.
17     Q    Rutledge, did she do any drafting or
18 did she do commenting on the regulation?
19     A    Well, she did -- we all did pretty
20 serious commenting and drafting revisions to the
21 regulation.
22     Q    I understand, but did she do the

---

Page 54

1 original drafting for the regulation, Rutledge?
2      A    Well, I doubt it.
3      Q    Newhouse, did he do original drafting
4 of --
5      A    She.
6      Q    Did she do original drafting for the
7 regulations?
8      A    No.
9      Q    O'Malley, did she do original drafting
10 for the regulations?
11     A    I don't know.
12     Q    Why don't you know?
13     A    I don't know if she did or not.
14     Q    Farbman, did he do original drafting
15 for the regulations?
16     A    I believe probably he did.
17     Q    How much original drafting did he do?
18     A    I don't know. But, you know, I should
19 tell you that the original drafting wasn't all that
20 hot.
21     Q    And Vining, did that person do any
22 original drafting?

---

Page 55

1      A    Not that I recall, but I don't know
2 that I would know one way or the other.
3      Q    All right. The people in the field
4 that you mentioned, their role was limited to
5 essentially commenting on the drafts; is that
6 correct?
7      A    That's probably a fair statement.
8      Q    Cho, was she involved in the original
9 drafting of the regulations?
10     A    I believe so, yes.
11     Q    And Walls, was she involved in the
12 original drafting of the regulation?
13     A    Yes.
14     Q    Was there a difference between the role
15 that Ms. Cho played and Ms. Walls played in terms of
16 drafting the Part 386 rule?
17     A    I don't recall who specifically wrote
18 what sections. I think Ms. Cho became more involved
19 toward the end of the process.
20     Q    Why did she become more involved at the
21 end of the project?
22     A    I don't know, other than we were

---

Page 56

1 working a lot of fairly long hours, but I'm not
2 sure -- I'm not sure why that is.
3      Q    Did you ever ask anyone why Ms. Cho
4 became more involved than Ms. Walls at the end of
5 the project?
6      A    You know, I didn't, but -- I didn't, to
7 my knowledge, but, frankly, my sense is that Ms. Cho
8 is more -- Ms. Cho had greater initiative.
9      Q    Do you know whether or not Ms. Walls
10 asked to continue to work on the project?
11     A    You know, I don't recall, and I also
12 don't recall what other regulations were being
13 worked on at the time.
14     Q    Why do you believe Cho had more
15 initiative?
16     A    Because -- because her input was more
17 proactive, seeking out problems in the regulation,
18 willing to stay late after to get them fixed, and
19 she took the initiative.
20           Ms. Walls is very passive, just -- she
21 was -- she did decent work when you asked her to do
22 something, but she was not volunteering to get out

---

ELAINE WALLS                                    BRIGHAM McCOWN
vs. NORMAN Y. MINETA                          OCTOBER 19, 2005

Case 1:06-cv-01259-TFH-DAR     Document 17-12     Filed 10/17/2007     Page 17 of 46

Page 57

1    there and make it happen.
2        Q    You're saying Ms. Walls didn't work
3    late hours on the project?
4        A    No. I'm saying that I believe Ms. Cho
5    put more time in at the end -- and that consisted of
6    day and evening hours -- than Ms. Walls did.
7        Q    But Ms. Walls did a significant amount
8    of work on the project in the beginning; would that
9    be true?
10       A    Define beginning.
11       Q    Well, you said she did less work toward
12   the end, but did she do a significant amount of work
13   on the project in the beginning?
14       A    I don't -- I don't know.
15       Q    Do you know whether or not she was
16   taken off the project by her manager, O'Malley?
17       A    I don't recall that one way or the
18   other.
19       Q    Did Ms. Cho receive a promotion shortly
20   after working on this project?
21       A    I don't recall the exact timing. I
22   know she was promoted.

Page 58

1        Q    Do you know whether or not Ms. Cho's
2    involvement on this project contributed to her being
3    promoted?
4        A    I would assume it did.
5        Q    Do you know that for a fact?
6        A    Well, we promoted her because of her
7    performance. One of her performance items was
8    working really hard on this regulation. So,
9    therefore, I assume, yes, it was considered.
10       Q    Was Ms. Walls promoted as a result of
11   working on this project?
12       A    No.
13       Q    Why not?
14       A    Because she did not fit the criteria
15   for a GS-15. This regulation was not -- you know,
16   this was a procedural enforcement rule. This was a
17   run-of-the-mill, frankly, probably easier regulation
18   than most.
19       Q    If it was an easy regulation, why had
20   it been sitting dormant for ten years before you
21   came on board?
22       A    Well, that's exactly the same question

Page 59

1    I asked, and that's why we got it done.
2        Q    But prior to you coming on board, it
3    hadn't been done; is that correct?
4        A    That's correct. It had languished due
5    to other priorities, and there were policy decisions
6    that no one seemed to want to make, which was --
7    which was required as a prerequisite to completing
8    the rule.
9        Q    This work on the Part 386 -- never
10   mind. Strike that.
11           Was Ms. Walls removed from the Part 386
12   project so that she wouldn't get credit for the
13   ultimate result?
14       A    Not to my knowledge.
15       Q    Do you know whether any of her
16   second-line or first-line supervisors did that?
17       A    I don't know if she was ever removed
18   from the project. And I don't know that removing
19   her from the project, if it did occur, had anything
20   to do with 386. I mean, we had a lot of regulations
21   that we were working on at the same time.
22       Q    Was this one of the more high-profile

Page 60

1    regulations that you worked on at that time?
2        A    No, no. I would say it's actually
3    not. It's a nonsignificant rule not requiring
4    further administration review.
5        Q    So you're saying a rule that deals with
6    APA enforcement actions is not a significant rule?
7        A    No. According to OMB classification,
8    it is not. It's purely a procedural rule which
9    arguably doesn't even have to go out for notice and
10   comment, although we did.
11       Q    Why put it out for notice and comment
12   if you didn't have to do that? That takes a
13   significant amount of time and resources to do that,
14   doesn't it?
15       A    It was decided long before I got here.
16       Q    So why was it sent out for notice and
17   comment?
18       A    I can't tell you. I'm just saying it
19   doesn't have to be.
20       Q    But it was?
21       A    I think we've established that.
22       Q    So if it was sent out for notice and

ELAINE WALLS                                          BRIGHAM McCOWN
vs. NORMAN Y. MINETA                              OCTOBER 19, 2005

Page 61

1 comment, wouldn't that be part of the significance
2 of the rule?
3      A    No, not necessarily.  There are many
4 nonsignificant rules put out for notice and
5 comment.
6      Q    And you don't know why it was put out
7 for notice and comment because that was done prior
8 to you coming there?
9      A    I don't know.
10     Q    So you don't know whether it was
11 decided that it had to go out for notice and comment
12 because of the importance of the significance of the
13 rule?
14     A    That's not a true statement.  It is a
15 nonsignificant rule under OMB classifications.
16     Q    That's not my question.
17         My question is:  You don't know whether
18 or not the reason it was designated for notice and
19 comment was because one of your successors decided
20 it was significant enough that it should go out for
21 notice and comment?
22     A    I believe the rule in the department is

Page 62

1 everything goes out for notice and comment whether
2 it needs it or not.
3      Q    What are some of the significant rules
4 or projects, then, that you worked on at that time?
5      A    We worked on the hours of service
6 regulation.  That would probably be the most
7 high-profile regulation.
8      Q    I'm sorry, hours of what?
9      A    Hours of service regulation.
10     Q    What is that?
11     A    That is a regulation governing how long
12 drivers of commercial motor vehicles may drive in a
13 given time period.  There was that rule, and there
14 were several NAFTA-related rules that were also of
15 fairly high significance.
16         I believe before I left, there was a
17 commercial regulation regarding registration fees
18 that was a litigation issue that went to the U.S.
19 Supreme Court, and there were many other rules that
20 we've been sued on for different reasons, and I
21 can't really remember them all.
22     Q    Did Ms. Walls work on the hours of

Page 63

1 service regulation?
2      A    I don't recall.  Primarily, that was
3 handled by Charles Medalen, one of our staff
4 attorneys, and another staff attorney whose name
5 escapes me at the moment.  But those two staff
6 attorneys were put on it full time and, in fact,
7 were moved from their offices to go to another part
8 of the agency to work on the rule.
9      Q    Do you know whether or not Ms. Walls
10 worked on the mandamus rules for the hours of
11 service regulation?
12     A    I don't know.  I don't recall.
13     Q    Do you know whether or not Ms. Walls
14 was the EA for the hours of service regulation?
15     A    By EA, do you mean environmental
16 assessment?
17     Q    Yes.
18     A    She may very well have been the person
19 that did the EA on that rule.  I don't know.
20     Q    You don't know?
21     A    No.
22     Q    You don't recall whether or not she was

Page 64

1 an EA?
2      A    I don't recall.
3      Q    Who else would have been the EA on that
4 rule?
5      A    I don't know.
6      Q    Who else in motor carrier did EA work?
7 Who else would have been involved in doing that
8 assessment?
9      A    Typically, Ms. Walls does the NEPA
10 compliance, but I don't know.  It doesn't mean she's
11 the only one.  I just really don't know.
12     Q    Who else does NEPA compliance if
13 Ms. Walls is not the only one?
14     A    That's what I'm trying to tell you.  I
15 don't know.  It's really not complicated work, so
16 I'm not sure who does it.
17     Q    Why do you think it's not complicated
18 work?
19     A    Because the EAs typically are
20 boilerplate language that -- the program office, not
21 counsel's office, actually conducts the EA.  We
22 simply use standard formatting language to issue a

ELAINE WALLS
vs. NORMAN Y. MINETA

Page 65

1  finding of no significant impact, and it's pretty
2  much cookie cutter.
3       Q    Do you know whether or not Ms. Walls
4  was a go-to person for EA assessments?
5       A    She was the -- she was the designated
6  NEPA primary lead, so I assume that she would be the
7  primary person for the EA.
8       Q    Was there anyone else in motor carrier
9  who handled environmental issues other than
10 Ms. Walls?
11      A    I don't know.
12      Q    Was Ms. Walls the go-to person for
13 environmental issues?
14      A    For environmental issues within
15 counsel's office, she was the NEPA compliance
16 person. That's as much as I know.
17      Q    Tell me about the NAFTA-related rules.
18 What was that about?
19      A    Three separate rules governing the
20 entrance of Mexican motor vehicles to long-haul
21 trucking operations within the United States.
22      Q    No. I meant NAFTA in respect to what

Page 66

1  you did when you were chief counsel. What were the
2  issues that came up?
3       A    Those three rules had been previously
4  written and overturned unanimously by the Ninth
5  Circuit Court of Appeals in San Francisco. My job
6  was to lead an effort to file certiorari review with
7  the U.S. Supreme Court, which was granted, and then
8  to be the lead for the agency in mounting a legal
9  challenge to the Ninth Circuit decision, and to at
10 the same time conduct an environmental --
11 programmatic environmental impact statement as well
12 as a Clean Air Act conformity evaluation while the
13 appeal was pending.
14      Q    What else was involved?
15      A    Oh, I think that pretty much does it.
16      Q    What was Ms. Walls's role in this
17 particular NAFTA project -- NAFTA EIS project?
18      A    Minimal, if any, really.
19      Q    She didn't do any work on the NAFTA
20 EIS?
21      A    I mean, she may have done some staff
22 work. At one point, there were probably 200

Page 67

1  contractors and feds working on this, but she did
2  not play a significant role, no.
3            We had to -- we had to contract with an
4  outside contractor and bring in lawyer and policy
5  people from outside of the agency to run this
6  process, because nobody within the agency had any
7  kind of experience or background to run a project of
8  this size.
9       Q    I just want to make sure I understand
10 you. You said Ms. Walls had no responsibility with
11 respect to the NAFTA project?
12      A    No significant responsibility with
13 regard to the environmental impact statement under
14 NEPA or the general conformity evaluation under the
15 Clean Air Act or, to my knowledge, the Supreme Court
16 litigation.
17      Q    Well, you said she did staff work.
18 What kind of staff work did she do?
19      A    I said she could or may have done staff
20 work.
21      Q    Are you aware of what staff work she
22 did do?

Page 68

1       A    No, I'm not. And since I ran the
2  project directly, had she had significant
3  involvement, I would be aware of that. And I'm not,
4  so she didn't.
5       Q    Do you know whether or not she had any
6  involvement in the project before you took it over?
7       A    Well, I was always in charge of the
8  project. She initially had some involvement, but
9  she does not have the background in preparing
10 environmental impact statements, and we quickly
11 looked to the department to provide us with the
12 expertise and personnel to take on this project.
13      Q    Well, that's what I'm asking you. What
14 was her initial involvement? You said she had some
15 initial involvement. What was that involvement?
16      A    I don't know. I don't -- I mean, I
17 can't tell you. I don't know if she had any titles
18 or different things. But if she did, the
19 involvement would have lasted a few weeks or maybe a
20 month. I mean, this was a -- this was a 12- to
21 16-month-long project.
22      Q    Okay. But she definitely did not have

ELAINE WALLS                                          BRIGHAM MCCOWN
vs. NORMAN Y. MINETA                                 OCTOBER 19, 2005

Page 69

1  any involvement in the project when you ran it or
2  when you were involved in it? That's what you're
3  saying?
4      A    I believe my testimony is that she had
5  no significant involvement in the project. That's
6  what I've said now three times.
7      Q    Right. But I'm asking, during the time
8  that you worked on the project, did she have any
9  involvement in it at all?
10     A    And I'm saying I worked on the project
11 the entire time, and she may have had some
12 staff-level involvement but no significant
13 involvement to my knowledge.
14     Q    Who was involved in the project?
15     A    The project was -- the project
16 leader -- the project manager was Ms. April Marchese
17 from the Federal Highway Administration, and the --
18 Robert Mariner took over as the COTR.
19         Now that I say Robert Mariner's name,
20 Ms. Walls may have done some of the contract
21 coordinating functions early on in the project. I
22 can't be for sure on that one way or the other,

Page 70

1  though.
2      Q    Marches, was she under motor carriers
3  or did she come from another agency?
4      A    No. Ms. Marchese came from the Federal
5  Highway Administration.
6      Q    Why did you pick someone to work on the
7  project from outside of motor carrier?
8      A    Because no one within motor carrier
9  possessed the necessary expertise or technical
10 knowledge to complete the project.
11     Q    What expertise and technical knowledge
12 did Ms. Marchese have that made her qualified for
13 the project?
14     A    Ms. Marchese is probably the preeminent
15 or at least in the top couple environmental lawyers
16 within the entire Department of Transportation and
17 routinely oversees NEPA compliance on major highway
18 construction projects throughout the United States.
19     Q    Had she ever been involved in doing an
20 environmental impact study prior to this?
21     A    I'm sure she's done lots of them.
22     Q    But did she do one prior to this?

Page 71

1      A    I would put money on it. She's
2  probably done lots of them.
3      Q    Right. But I'm saying, do you have any
4  knowledge?
5      A    Yes, she has done EISs before.
6      Q    And Robert -- I'm sorry, I don't have
7  his last name.
8      A    Mariner, M-a-r-i-n-e-r.
9      Q    Was he part of motor carrier?
10     A    No. He actually works for -- within
11 the Office of the Secretary of Transportation for
12 transportation policy, I believe.
13     Q    You said he was the COTR. For the
14 record, what does COTR stand for?
15     A    It's the contracting officer.
16     Q    Why was he selected to be the
17 contracting officer?
18     A    Well, we had a problem -- we had a lot
19 of problems with the contracts. The contractor was
20 blowing through money like there was no tomorrow.
21 And I can't remember who was doing the COTR stuff,
22 whether it was in counsel's office or -- I seem to

Page 72

1  recall another person whose name -- I can picture
2  him, but his name escapes me at the moment, but he
3  was also involved with doing the COTR stuff in motor
4  carriers.
5          We were unsuccessful in getting a
6  handle on the contractor, how much money they were
7  spending, what we were getting for that money, and
8  his help was sought out not only on the COTR
9  functions but also just dealing with a lot of
10 different issues associated with this project.
11     Q    Is there any particular reason why no
12 one in motor carriers worked on the project as the
13 COTR?
14     A    Well, again, I don't remember who they
15 are. That was the exact problem. We were doing a
16 lousy job as the COTR and were blowing through
17 millions of dollars practically overnight. We
18 needed to get a handle on it, so we went outside for
19 somebody who had better technical expertise.
20     Q    The individuals who worked on this
21 project, were they given an award for their
22 participation?

ELAINE WALLS                                         BRIGHAM McCOWN
vs. NORMAN Y. MINETA                                 OCTOBER 19, 2005

---

Page 73

1       A    I believe so.
2       Q    Was this project considered successful?
3       A    The litigation was considered
4    successful in that we had a unanimous Supreme Court
5    that took a case at first impression and unanimously
6    reversed the Ninth Circuit.  The EIS itself was
7    never completed because of the court victory.
8       Q    How were the people who worked on this
9    project rewarded?
10      A    Gosh, I think we turned in a list of
11   names of probably 20 or 30 different people.
12   Anybody that even touched the project got a little
13   recognition in front of the Secretary and a little
14   plaque or a plastic thing or some kind of an award
15   which was split between the Secretary's -- I mean,
16   we had people from the Secretary's general counsel's
17   office, policy office, Federal Highway, Federal
18   Motor Carrier, and even, I think, some people from
19   the Bureau of Transportation Statistics.  So it was
20   a team effort -- it was a team award that we turned
21   everybody in for.
22      Q    Did any individuals receive a monetary

---

Page 74

1    award?
2       A    Yes.
3       Q    What was the range of the monetary
4    award, or approximately how much on average was the
5    monetary award?
6       A    Boy, I don't -- thousands of dollars
7    for some folks.  I don't recall the exact numbers.
8       Q    Was Ms. Walls among those that was
9    given recognition in an award?
10      A    She might have been.  I don't recall
11   exactly.  I mean, like I say, the award was
12   distributed pretty widely.  It was a team-building
13   type of exercise for anybody that, you know, did
14   anything on the project.
15          I think it also may have included
16   people that wrote the original rules, and I can't
17   tell you -- that were litigated, and I can't even
18   tell you who that was.  That was before I got here.
19      Q    All right.  If you're not -- if you
20   said that Ms. Walls's involvement on the project was
21   not significant, why was she receiving an award?
22      A    Well, I don't know that she did, but

---

Page 75

1    I'm saying -- I think my testimony has been that we
2    included a large number of people on this award, 20
3    or 30-some folks, maybe.  The government loves to
4    give out awards to lots of people.
5       Q    Do you know whether or not Ms. Walls
6    had worked with the people that were assigned on the
7    NAFTA in the past on this same project?
8       A    Worked with them in the past?  No, I
9    don't know.
10      Q    Do you know whether she had worked with
11   Marchese on the project?
12      A    She may have.  I mean, April worked
13   with pretty much our entire staff.  I would be
14   surprised if they didn't cross paths at some point.
15      Q    Do you know whether or not she worked
16   with Robert Mariner?
17      A    Yes, daily.
18      Q    Did she work with Robert Mariner
19   particularly on this project, Ms. Walls?
20      A    Yes, daily.  Oh, Ms. Walls?
21      Q    Yes, Ms. Walls.
22      A    I don't know that.  I don't.

---

Page 76

1       Q    Do you know whether or not Ms. Walls
2    expressed any interest in working on this project,
3    this NAFTA project we've been discussing?
4       A    I don't recall.
5       Q    If Ms. Walls was working on
6    environmental issues for motor carrier, why wasn't
7    she included on this project?
8       A    This was out of her league.  And to be
9    fair to Ms. Walls, this was out of anyone in our
10   league in motor carrier, and we hired the experts we
11   needed to hire.  And the rest of the work of the
12   agency has to go on, so I can't have everybody
13   working on a single project.
14      Q    Do you know whether there were
15   different phases?  I understand that one of the
16   phases that had to be done was to do the EIS, which
17   obviously never occurred because the litigation was
18   resolved.  But was there a phase that occurred prior
19   to the EIS?
20      A    Well, the EIS was undertaken and was
21   probably substantially completed.  It was just never
22   issued.  So most of the work involved the EIS and

ELAINE WALLS                                              BRIGHAM McCOWN
vs. NORMAN Y. MINETA                                      OCTOBER 19, 2005

Page 77

1  the Clean Air Act analysis. I mean, that's what
2  most of the work was.
3      Q    Okay. Was there a phase prior to the
4  EIS?
5      A    I don't know. It would be helpful if
6  you can -- if there's one, tell me what it is. I
7  can't think of it as I'm sitting here.
8      Q    All right. So it's your understanding
9  that the project started when you hired the
10  contractor to do the EIS? That's your
11  understanding?
12     MS. ROSEN: I object. This is getting
13  very -- if you understand the question, that's fine,
14  but I thought -- what project are you talking
15  about?
16     MS. McKINNEY: The NAFTA project that
17  we've been talking about.
18     MS. ROSEN: I think he's testified
19  quite differently. Maybe he can --
20     THE WITNESS: I mean, there is no
21  single NAFTA project. There's NAFTA rules, there's
22  NAFTA litigation --

Page 78

1      BY MS. McKINNEY:
2      Q    I'm talking about this particular
3  project that we've been talking about that
4  resulted -- that did not result in an environmental
5  impact study because the litigation resolved it.
6      A    That's four projects in one. I'm
7  saying that there are different -- there is NAFTA,
8  and --
9      Q    I'm not talking about NAFTA generally.
10  We've been talking about, in particular, the project
11  that you worked on with Marchese.
12     A    Right.
13     Q    What I'm asking you is whether or not
14  there were other phases to that project other than
15  the part that you worked on with Marchese and
16  Mariner.
17     A    I don't understand. I mean, no. The
18  EIS is the EIS. It has multiple chapters and
19  components, but the EIS is the EIS. It is the
20  project. The project is the EIS and the Clean Air
21  Act conformity study. It's two projects in one.
22     MS. McKINNEY: Let's take a five-minute

Page 79

1  break.
2      (Recess.)
3      BY MS. McKINNEY:
4      Q    How many promotion processes were you
5  involved in when you were chief counsel?
6      A    Can I borrow a pen and a pad for a
7  second to write this down?
8      MS. ROSEN: Sure.
9      THE WITNESS: Let me think about this
10  for a second.
11     BY MS. McKINNEY:
12     Q    Let me give you a blank sheet of
13  paper. Write them down on here (indicating).
14     A    Sure. I can't remember names now.
15     Q    Do you remember positions?
16     A    Okay.
17     Q    May I see the document, please?
18     A    Sure.
19     Q    Are you through?
20     A    You can look at it for a second, but
21  I'll need it to refer to.
22     MS. McKINNEY: All right. Can you mark

Page 80

1  this as Deposition Exhibit 1, please?
2      (Thereupon, Exhibit
3      No. 1 was marked for
4      identification.)
5      MS. McKINNEY: I just had the court
6  reporter mark as Deposition Exhibit Number 1 a
7  document that Mr. McCown has written out concerning
8  promotions while he was chief counsel.
9      BY MS. McKINNEY:
10     Q    I'm sorry, how many promotions were you
11  involved in?
12     A    Approximately nine or ten.
13     Q    How many of those involved attorney
14  promotions?
15     A    Well, let me see. About eight of
16  them. There may have been a couple people promoted
17  twice, and I can't remember that exactly, but about
18  approximately eight. Eight of the ten or twelve.
19     Q    Who were you responsible for promoting,
20  what employees?
21     A    Well, all of them.
22     Q    The names of the employees?

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM McCOWN
OCTOBER 19, 2005

---

Page 81

1    A    Delores Hodge was promoted. She was
2  our administrative officer. I'm just going down the
3  list here.
4        Trina Boyce was promoted,
5  administrative assistance.
6        Jackie Cho was promoted, I think,
7  twice -- once or twice. I think she was promoted to
8  13 and promoted to 14 while I was there.
9        Ann Marie Ottman was promoted once or
10  twice while I was there.
11        Judy Rutledge was promoted while I was
12  there.
13        Suzanne Newhouse was promoted while I
14  was there.
15        Rose Mary Dettling was eligible but not
16  promoted while I was there.
17        Julie Bergling was promoted while I'm
18  there.
19        And then one or two of the field
20  attorneys or paralegals were promoted while I was
21  there, but I can't remember their names. I think
22  they were females, but I can't remember their

Page 82

1  names.
2    Q    Were you involved in any promotion
3  process for assistant chief positions?
4    A    Yes. I hired several assistant chief
5  counsels.
6    Q    Who did you hire?
7    A    I hired -- I hired Mark Rigrodsky as
8  the assistant chief counsel of the general law
9  division; I hired Brian Yonish as the assistant
10  chief counsel of the enforcement division; and I
11  think I probably hired the assistant chief counsel
12  for legislation before I left, but I don't remember
13  his name because I don't think he reported until
14  after I had left. I wish I could tell you his name,
15  but I can't remember.
16    Q    Other than Rigrodsky, Yonish, and the
17  individual who went to legislation as the assistant
18  chief counsel, were you involved in hiring anyone
19  else, attorneys?
20    A    Yes.
21    Q    What other attorneys were you involved
22  in hiring?

Page 83

1    A    Allen Strasser, Cheryl Walker, another
2  lawyer in the enforcement division whose name is
3  Allen -- did I say Allen Strasser yet? I did.
4  Chuck Fromm and Suzanne Newhouse. Let's see. Who
5  else?
6        And then to a lesser extent, I -- the
7  detailees, it was my responsibility whether or not
8  to pick them up as temporary hires, and that
9  would -- oh, April Marchese, Robert Mariner, Catia
10  Sairvoni (ph), Jomar Maldinado (ph), and Michelle --
11  my memory is pretty bad -- Evans.
12    Q    Anyone else?
13    A    Yes. A couple of the field attorneys.
14  Both of the field attorneys for the Western Service
15  Center, but I don't recall their names off the top
16  of my head. And I hired a lawyer in the Midwest
17  Service Center, but I don't recall her name either
18  at the moment.
19        I may have forgotten one somewhere, but
20  I think that pretty much covers it.
21    Q    You mentioned Delores Hodge and Trina
22  Boyce?

Page 84

1    A    Boyce, yes.
2    Q    They are not attorneys; is that
3  correct?
4    A    That is correct.
5    Q    You mentioned someone else, but I don't
6  think I have their name. Bergling?
7    A    Oh, Julie Bergling?
8    Q    Yes. Is she a --
9    A    That's a promotion.
10    Q    Was that an attorney promotion?
11    A    No. She's a legislative specialist
12  nonlawyer within the counsel's office. One of the
13  four divisions within counsel's office is mostly
14  composed of nonlawyer legislation folks.
15    Q    You mentioned Jackie Cho as one of the
16  persons that was promoted. I assume that's a
17  female?
18    A    Yes.
19    Q    What's her race?
20    A    Asian, I guess. That's -- I mean, I
21  guess I shouldn't throw that out there. I don't
22  know for sure.

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM MCCOWN
OCTOBER 19, 2005

---

Page 85

1    Q    Ottman, I assume that's a female?
2    A    Ann Marie Ottman, yes.
3    Q    And what is her race?
4    A    I don't know.
5    Q    Rutledge, I assume that's a female?
6    A    Yes.
7    Q    What is her race?
8    A    I don't know.
9    Q    All right.  So are you going to answer
10   that you don't know these people's race?
11   A    No.  I don't really care, and it's not
12   a required disclosure, I don't believe.
13   Q    Well, this is a race discrimination
14   case, sir, so I'm asking you what the race is of
15   these individuals that you were responsible for
16   promoting and/or hiring, and it is relevant to the
17   case.
18   A    Okay.  It doesn't change my answer.  I
19   don't know.
20   Q    Any of these individuals that you just
21   named that you hired or promoted, were any of them
22   African-American?

---

Page 86

1    A    Sure.
2    Q    Who?
3    A    Delores Hodge is.
4    Q    The attorneys?
5    A    Trina Boyce is.
6    Q    I'm just asking you about attorneys.
7    A    Attorneys?  Not that I know of.
8    Q    What was the process for hiring Brian
9    Yonish?
10   A    Well, generically, we had a vacancy.
11   Q    Specifically, what occurred with
12   respect to the promotion process for Brian Yonish?
13   A    We created a new division; we
14   constructed a PD, position description, for that
15   supervisory position; we went through HR and it was
16   classified; and HR did the vacancy listing as an
17   accepted service appointment; and it was published.
18        It also goes to the Office of the
19   General Counsel where it is distributed widely to
20   various groups principally for diversity purposes.
21   It's posted on USA Jobs.  A bunch of people apply.
22   We establish a panel, and we cull through the --

---

Page 87

1    cull through the resumes.  Some we get in -- some we
2    get from -- through whatever source we get them
3    from, and then some make the cut to be interviewed
4    by a panel.
5         There is an interview panel, and there
6    is a second interview panel.  Folks make their
7    recommendations to Judy Rutledge and I, and we
8    discuss it.  I propose a selectee, and that selectee
9    goes up to be signed off on by the Office of the
10   General Counsel by the general counsel himself.
11   That then comes back down, and the paperwork is
12   submitted to the administrator.  The administrator
13   signs off or doesn't sign off on the package, and
14   then it's then given to HR.
15        HR contacts the employee and sees if
16   they're interested and will accept.  They negotiate
17   salary and do whatever HR does, they agree on a
18   reporting date, and then they show up.  That's sort
19   of the process we use for our positions.
20   Q    My question was what specifically
21   happened with respect to the Yonish promotion
22   process.  How was he selected?

---

Page 88

1    A    Well, I'm sorry.  I guess I don't
2    understand the question then, because I thought I
3    responded to it.
4    Q    How did you go about the process of
5    selecting Brian Yonish?
6    A    He was selected from all the candidates
7    that had been submitted.  He was interviewed by a
8    bunch of different folks, and I don't think he
9    emerged at the end of the day as the person that got
10   the job.  I think the first person accepted and then
11   later declined the position, and then the position
12   was offered to Mr. Yonish.
13   Q    Who was the first person that was
14   offered the position?
15   A    Sue Lawless.  She is a GS-15, I
16   believe.  Well, I think she's a 15.  Enforcement --
17   no, I'm sorry.  She must be a -- she's either a 14
18   or a 15.  I can't tell you.  She's in the Eastern
19   Service Center region that -- she's an enforcement
20   attorney for the agency.
21   Q    Why was Lawless selected?
22   A    She was -- we decided that she had the

---

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM MCCOWN
OCTOBER 19, 2005

Page 89

1 best credentials and represented herself the best
2 during the interview and had just a wealth of
3 background in the enforcement area.
4    Q    Could you be more specific?
5    A    She was the best all-around qualified
6 candidate. That's why we picked her.
7    Q    What are the job duties and
8 responsibilities of the assistant chief for the
9 enforcement division?
10    A    Well, I suppose first and foremost it's
11 a management position, like all the assistant chief
12 counsel positions, and that person is responsible
13 for supervising a quarter -- well, I take that
14 back. They're responsible for supervising almost
15 half of the Office of Chief Counsel. They oversee
16 the headquarters and field enforcement of all cases
17 against commercial motor vehicle carriers, trucking
18 and bus companies. They are responsible for
19 coordinating all litigation with the Office of
20 General Counsel in representing the agency before
21 the Department of Justice and other agencies.
22        The assistant chief counsel is also

Page 90

1 responsible for managing the field enforcement staff
2 of eight lawyers and four paralegals in addition to
3 a staff of four or five at headquarters and is
4 responsible for providing enforcement guidance and
5 regulatory guidance to the associate administrator
6 for enforcement, and primarily oversees -- oversees
7 all of the work done in that division. It's a big
8 job.
9    Q    So part of the job duties and
10 responsibilities are basically management and
11 enforcement guidance of commercial motor carriers --
12 enforcement and regulatory guidance for the
13 commercial motor carriers?
14    A    Well, not regulatory guidance.
15 Regulatory guidance as it applies to enforcement
16 regulations. The regulatory affairs division is
17 responsible for interpreting the regulations.
18    Q    So essentially they have to give
19 enforcement guidance for the commercial motor
20 carriers; is that what you're saying?
21    A    Yes, in addition to, as you said, the
22 management/supervisory function of the position.

Page 91

1    Q    Lawless, did she have any experience
2 with motor carriers?
3    A    Yes.
4    Q    What experience did she have with motor
5 carriers?
6    A    She worked for FMCSA for a fairly
7 substantial period of time and was the senior
8 attorney overseeing the eastern region, which is a
9 quarter of the United States. She is the senior
10 attorney responsible for bringing all enforcement
11 actions for the eastern part of the United States
12 and oversees the junior attorney and the paralegal
13 there.
14    Q    The eastern region is comprised of how
15 many -- well, strike that.
16        How many staff did she supervise?
17    A    Well, the legal staff in each region is
18 the same. It's two attorneys and a paralegal, so
19 she was the senior lawyer.
20    Q    So she was one of two and the senior
21 attorney?
22    A    She was one of three on the legal staff

Page 92

1 and the senior attorney, and she's responsible for
2 giving guidance to the enforcement officials as well
3 as the supervisory personnel, enforcement
4 coordinator, and field administrator for the eastern
5 region. I believe she was also in private practice
6 before coming to the government and was a partner or
7 a shareholder in a firm.
8    Q    Do you know whether or not Ms. Lawless
9 submitted her resume for this position?
10    A    She did.
11    Q    How did she submit her resume?
12    A    I don't know. I don't know if she
13 submitted it through the -- I mean, we get resumes
14 from all over the place. We get them directly from
15 applicants, we get them through the mail, we get
16 them on-line. I don't know how she submitted her
17 application.
18    Q    Do you recall whether or not she was on
19 the certification list that was sent to you?
20    A    No, but I don't think that really
21 matters.
22    Q    Why doesn't that matter?

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM McCOWN
OCTOBER 19, 2005

Page 93

1    A    The certification list only reflects
2 resumes or packages submitted through one means,
3 through the -- through the USA Jobs on-line
4 version. We're not bound by that list.
5    Q    Why not?
6    A    Because we're not.
7    Q    Is there a policy or regulation that
8 says you're not bound to follow -- to only interview
9 candidates from the certification list?
10    A    I don't know that there is, but I'm not
11 aware of one that says the converse of that either.
12    Q    So you're saying the certification list
13 has no significance?
14    A    I'm saying the certification list is
15 one means by how we look at things. For example,
16 one of the things I said is that the Office of
17 General Counsel pushes out the vacancy listing to
18 historically black colleges and universities, for
19 example, and to other areas. They may very well get
20 an application straight back from one of those
21 institutions, and we still consider it.
22        You know, we consider every application

Page 94

1 I get whether it's airmailed in, dropped by a bird,
2 or shows up on my door. I'm after the best
3 qualified candidate and the largest pool of
4 candidates I can get.
5    Q    Did you get any applicants from any
6 historically black colleges or universities?
7    A    At that time, no, we didn't, and we
8 oftentimes don't. But we keep trying, and we always
9 do that.
10    Q    Did you actually send any resumes (sic)
11 out to any historically black colleges or
12 universities in this particular instance?
13    A    Send resumes? I don't --
14    Q    I'm sorry, announcements.
15    A    Yes. The Office of General Counsel
16 handles that for us. It is standard DOT procedure.
17    Q    Specifically in this particular vacancy
18 announcement, was that sent out?
19    A    In accordance with standard DOT
20 policies, I'm assuming it is. I don't send them
21 out. The Office of General Counsel does.
22    Q    So you don't know whether or not it was

Page 95

1 actually sent out in this case?
2    A    No. You would have to ask them.
3    Q    The certification list, isn't that a
4 list where you have the minimally-qualified
5 individuals?
6    A    For those that are received through
7 the -- through the on-line means, yes.
8    Q    So if you received thousands of
9 applicants, you would consider all of them?
10    A    Absolutely.
11    Q    And it's not necessary to have a
12 certification list to pair down and determine who
13 meets the minimum eligibility requirements?
14    A    No. I'll tell you that certification
15 list is developed by the Federal Highway
16 Administration, and I think it probably has more
17 relevance in a competitive service hiring. But my
18 experience has shown that Federal Highway HR doesn't
19 really certify much of anything other than simply
20 transcribe all of the people and their applications
21 over.
22        There are many people on that

Page 96

1 certification list that, in my opinion, are not
2 qualified to be interviewed for the position. I
3 don't know that there's any scrubbing that goes on
4 with those lists.
5    Q    So, again, you don't need to have any
6 cut made? You interview anyone that applies for the
7 position, eligible for -- eligible for employment or
8 not?
9    A    I think you're twisting my testimony.
10 What I said is --
11    Q    Well, you said that you would consider
12 any resumes whether it was brought to you by a
13 courier bird or Fed-Ex or anything, so I'm trying to
14 understand whether or not any particular cut or
15 eligibility is determined before you look at the
16 candidates.
17    A    No. In fact, I would prefer to see the
18 entire list raw, which my understanding is pretty
19 much what happens. I don't -- unless maybe somebody
20 doesn't have a law degree, I don't know that HR down
21 in Federal Highway makes any cut on a cert list
22 before I see it.

24 (Pages 93 to 96)

ELAINE WALLS                                           BRIGHAM McCOWN
vs. NORMAN Y. MINETA                                   OCTOBER 19, 2005

---

Page 97

1      Q    Well, doesn't a certification list
2   indicate people who have applied by the vacancy
3   announcement deadline?
4      A    I suppose it does.
5      Q    You don't think that the vacancy
6   announcement deadline has any significance, that
7   anyone can apply even beyond that deadline?
8      A    I think as long as the applications are
9   generally all considered at the same time, I don't
10  think that that date matters for a competitive
11  service appointment.  I don't think that date
12  matters -- it's not a -- it's not a bright line in
13  an accepted service, no.
14     Q    So someone could still apply for a
15  position even after the vacancy announcement is
16  closed and still be considered?
17     A    That was the policy in FMCSA, yes.
18     Q    Okay.  So that's, in your opinion, fair
19  to allow individuals who haven't met that deadline
20  to compete?
21     A    It is fair so long as, as I've already
22  said and I'll say it again for you, they're all

---

Page 98

1   considered at the same time when the scrub starts,
2   and that's what's done.
3      Q    All right.  When you start doing the
4   scrub, as you mentioned, do you check to see if the
5   individuals that you're looking at have passed the
6   bar?
7      A    Initially, we rely simply on the -- on
8   what their resume says.  If they're axed because
9   there's just too many -- I mean, oftentimes I'll get
10  hundreds of applications for a position, and there's
11  just simply not enough personnel resources to look
12  into each one, which is why I seriously doubt
13  anybody else looks at it either.  And once we get
14  down to a candidate, it's my understanding that HR,
15  based on a selected candidate, will go back and
16  verify things such as that.
17     Q    Do you know whether HR looks to see
18  whether or not the individuals have passed the bar
19  prior to them being sent to you on the certification
20  list?
21     A    I don't know if they do or not.  I'm
22  guessing they don't.

---

Page 99

1      Q    How did Ms. Lawless find out about the
2   position?
3      A    Probably through word of mouth.  I
4   mean, we tell everybody that will listen to us that
5   we have a position open.  I mean, that's part of the
6   openness of the procedure.
7      Q    Did you tell her the position was open
8   yourself?
9      A    No, I don't believe so.  I don't think
10  we had those conversations.  I typically wouldn't
11  interact directly with her.
12     Q    Do you know whether anyone else had
13  conversations with Ms. Lawless concerning the
14  opening?
15     A    I don't know.  But if they did, I think
16  that's fine.  I mean, I had conversations with
17  anybody that would listen to me that, hey, I'm
18  trying to fill this position, do you know anybody
19  who is interested.
20     Q    Do you know whether Ms. Rutledge had
21  conversations with Ms. Lawless concerning the
22  position?

---

Page 100

1      A    No, I wouldn't know that.
2      Q    Why did Ms. Lawless decline the
3   position?
4      A    The official reason she gave me
5   personally was for health reasons.
6      Q    What health reasons did she have?
7      A    She said that she had recently found
8   out that she was pregnant and didn't want to
9   relocate.
10     Q    Who did you select for the position
11  after Ms. Lawless?
12     A    Mr. Yonish.
13     Q    Did you make a recommendation for
14  anyone else other than Yonish and Lawless for the
15  position?
16     A    Typically, each recommendation we make
17  carries one or two alternates to the list.  I don't
18  recall.  I mean, I think at one point we were
19  seriously considering another candidate, but he fell
20  out.
21     Q    Who was the other candidate that you
22  were seriously considering?

---

ELAINE WALLS                                    BRIGHAM MCCOWN
vs. NORMAN Y. MINETA                            OCTOBER 19, 2005

---

Page 101

1       A    I think his name was Snyder. I don't
2   remember his first name.
3            And there was another person that kind
4   of made it to the -- there were about, I'll say,
5   four or five people that made it kind of to the
6   semifinal round that all came together, but I don't
7   remember his name either. I think he was a former
8   ICC attorney.
9       Q    Was Mr. Yonish the last person that you
10  recommended or selected for this position?
11      A    Yes, because he accepted the position.
12      Q    My question is: How many people were
13  recommended for the position before Yonish?
14      A    I don't recall. I just know that
15  Mr. Yonish and Ms. Lawless were the only two that
16  were offered the position, so I don't know what you
17  mean by that.
18      Q    You mentioned earlier that as part of
19  the selection process, a recommendation is made by
20  you and Rutledge.
21           So what I'm asking is: Did you make a
22  recommendation for candidates other than Lawless and

---

Page 102

1   Yonish for this position?
2       A    I'm saying I don't recall, but I'm sure
3   that would have been -- those memos are probably in
4   your possession. I don't know.
5       Q    Why did the others that you offered the
6   position to decline?
7       A    I didn't offer the position to anybody
8   else.
9       Q    Snyder -- you were considering Snyder.
10  Why was his name withdrawn for consideration?
11      A    He actually came in and -- following
12  a -- following one of the interviews, he asked to
13  come back in and talk to Ms. Rutledge and myself and
14  formally withdrew his name saying that he thought it
15  probably wasn't the right fit for him and no longer
16  wished to be considered.
17           He actually wanted to be considered, I
18  think, for a different position, the assistant chief
19  counsel for legislation, which was also, I think,
20  either about to begin or had already begun the
21  interview process for.
22      Q    Was he, in fact, ultimately selected

---

Page 103

1   for that position?
2       A    No.
3       Q    Do you know whether or not Lawless had
4   applied for the legislative affairs position?
5       A    I may have known that at one time. I
6   don't -- I don't recall. I don't think she did,
7   though.
8       Q    Do you know whether Lawless applied for
9   the legislative affairs position prior to her being
10  considered -- since she never applied, prior to her
11  being considered for the enforcement position?
12      A    I'm saying I don't know if she applied
13  for the legislation position.
14      Q    Why did you think Snyder -- you said
15  you were seriously considering Snyder for the
16  position. Why was he being seriously considered?
17  What qualifications did he possess?
18      A    I don't recall now. It's been a long
19  time ago.
20      Q    Do you know whether Ms. Walls applied
21  for this position?
22      A    She did. I think we encouraged her to

---

Page 104

1   apply.
2       Q    Was she interviewed for the position?
3       A    She was.
4       Q    Why was she not selected for the
5   position?
6       A    She was not the best qualified
7   candidate, in my opinion, to lead the -- lead that
8   division.
9       Q    Why not?
10      A    She did not have the management
11  experience. I didn't feel that she possessed the
12  senior leadership skills or the initiative. I
13  thought Mr. Yonish or Ms. Lawless, for that matter,
14  would make a better assistant chief counsel.
15      Q    Snyder was not -- you testified earlier
16  that he was not part of the agency? He was not a
17  government employee?
18      A    That's correct.
19      Q    What experience did Yonish have with
20  the enforcement of motor carrier regulations?
21      A    He did not have any direct experience
22  with the enforcement of Federal Motor Carrier

---

Page 105

1  regulations.
2      Q    So how was he qualified to do this job?
3      A    Well, as I said earlier, management --
4  the management position I considered the key facet
5  of that hiring process. Mr. Yonish holds the
6  commission of Captain in the United States Navy.
7  It's an 06. It's a GS-15 equivalent. There's a
8  long history of supervision both in the military as
9  well as in the civilian application. He was at the
10  time he was hired already a GS-15 in the Office of
11  the Inspector General, I believe, at the Department
12  of Defense. He had the management and the
13  leadership training. He had the small-P political
14  sensitivity of how to deal and work with people.
15      I think his record established himself
16  as an excellent candidate. And for many years while
17  working in the Office of the General Counsel at DoD
18  and working for the inspector general, he has worked
19  on a lot of different things and had the leadership
20  and management qualities that we were looking for.
21      Q    How was he going to enforce motor
22  carrier regulations if he had no knowledge of that

Page 106

1  area?
2      A    That's why we have a staff. I mean,
3  look at me. I got hired from private practice to
4  come in. I got paid to be a manager. These
5  assistant chief counsels are paid to manage. That's
6  why you have a staff of qualified experts. They're
7  the conductor of the orchestra. They don't have to
8  play the instrument. It helps if they do, but in
9  this case we couldn't find somebody that had all of
10  those qualities together.
11      Q    So you're saying that learning these
12  management -- I'm sorry, let me rephrase that.
13      Someone can't learn on the job how to
14  be a supervisor or a manager?
15      A    I don't think it's wise.
16      Q    So how is anyone ever going to become a
17  supervisor or a manager unless they're given an
18  opportunity to learn on the job?
19      A    That's a tough question, but Mr. Yonish
20  had figured out ways to do it. He had supervised
21  people and had been successful in that.
22      Even if you take somebody that doesn't

Page 107

1  have a lot of direct management, there are people
2  that you can look at to decide whether or not you
3  think they would make good managers. Some people
4  are born leaders.
5      Q    So you just look at people and
6  determine whether or not they're a born leader?
7      A    No. I think you're trying to twist my
8  testimony.
9      What I'm saying is, there are people
10  that are proactive that you can look at to say based
11  on their life experiences -- and being a Captain in
12  the U.S. Navy certainly makes one a leader -- you've
13  got those leadership qualities. That's why he was
14  hired.
15      Q    Did you and Yonish ever serve together
16  in the Navy?
17      A    No. I had never met the man before.
18      Q    Did you or Yonish go to the same
19  school?
20      A    No.
21      Q    If Mr. Yonish was such an exceptional
22  leader, why wasn't he your first choice?

Page 108

1      A    Ms. Lawless was a really good
2  candidate, and I'll tell you it was neck and neck.
3  It was a difficult decision to decide which one we
4  wanted to offer the position to.
5      Q    So you're saying it was a close call
6  between Yonish and Lawless?
7      A    I thought it was a close call.
8      Q    Did any -- I'm sorry.
9      A    But the point of this is that
10  Ms. Lawless probably was in the top five, six, seven
11  people. So it doesn't matter whether I hired
12  Ms. Lawless or Mr. Yonish.
13      Q    Did anyone during the interview process
14  say Ms. Lawless was far and away the best candidate?
15      A    I think that sentiment was expressed by
16  some on the interview panel. I think Mr. Falk
17  believed that.
18      Q    So how -- I'm sorry. I'm confused
19  then. How is it that you felt it was a close call
20  between Yonish and Lawless?
21      A    You're an attorney. Everybody has an
22  opinion. I get paid to make the decision.

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM McCOWN
OCTOBER 19, 2005

Page 109

1    Q    So in your opinion, it was a close
2  call?
3    A    In my opinion, it was a difficult
4  decision.
5    Q    Someone on the panel disagreed with
6  you?
7    A    I don't know that they disagreed.  Some
8  people preferred candidate A over candidate B.  I
9  mean, that's why you have an interview panel, but
10  everybody has an opinion.  Some people think they
11  should be hired.  That's the way it works.
12        MS. McKINNEY:  Can you mark this as a
13  deposition exhibit?
14            (Thereupon, Exhibit
15            No. 2 was marked for
16            identification.)
17        BY MS. McKINNEY:
18    Q    I've just had the court reporter mark
19  as Deposition Exhibit 2 a memorandum dated August 6,
20  2004 regarding Supervisory Attorney Selection,
21  Assistant Chief Counsel of the Enforcement &
22  Litigation Division.

Page 110

1            Do you recognize this memorandum?
2    A    I do.
3    Q    You mentioned Falk earlier being on the
4  panel.
5            Was he offered the position of
6  assistant chief counsel?
7    A    No.  He didn't want it.  He was the
8  acting assistant chief counsel.
9    Q    I understand he was the acting, but my
10  question is whether or not he was offered the
11  position.
12            Since he was acting in it, was he
13  offered the position?
14    A    And I answered that he didn't apply.
15    Q    Right.  Applying and being offered are
16  different things.
17            Do you know whether or not Rutledge or
18  someone else in your office offered him the position
19  and he declined?
20    A    No.
21    Q    So no one offered him the position?
22    A    Nobody offered him the position.  You

Page 111

1  can't be offered the position if you don't apply.
2  And if somebody did, they didn't have the authority
3  to do that.
4    Q    All right.  In Deposition Exhibit
5  Number 2, it states that you are -- that your
6  recommendation is to select Snyder for the
7  position.
8            So isn't it true that you wanted to
9  select Snyder over Yonish, that he was your
10  preferred candidate over Yonish?
11    A    On this particular day, that's what the
12  memo says, although it also requests for concurrent
13  authority to hire Kirk, Yonish, or Snyder.
14    Q    Right.  But that was an alternate
15  selection for Kirk or Yonish?
16    A    That's what it says.
17    Q    So Yonish, then, actually was your
18  third choice for this position; is that correct?
19    A    At this day, yes, it was.  But shortly
20  after this, as I've previously testified, we changed
21  our mind.  I believe it says that Snyder is the
22  preferred candidate.  But if we're unable to reach

Page 112

1  an agreement with Mr. Snyder, we believe Yonish or
2  Kirk are both qualified and we'll pursue them for
3  the position.
4    Q    What happened with Kirk's selection for
5  the position?  Was he offered the position before
6  Yonish?
7    A    He was not.
8    Q    Was Yonish offered the position before
9  Kirk?
10    A    Yes.  Kirk was never offered the
11  position.  I previously testified only two people
12  were offered the position.
13    Q    Well, this memorandum would seem to
14  indicate that Snyder was offered the position.
15    A    This is an internal memorandum which
16  was never used, and this does not establish -- I
17  don't see anything in here -- maybe you can point it
18  out for me -- that says that Mr. Snyder was, in
19  fact, offered the position.
20    Q    Right.  But you wanted to -- I'm sorry,
21  could you repeat what you just said?
22    A    I said I don't see anything in this

ELAINE WALLS                                    BRIGHAM McCOWN
vs. NORMAN Y. MINETA                            OCTOBER 19, 2005

Page 113

1  memo that says Mr. Snyder was offered the position,
2  and it's my testimony he was never offered the
3  position.
4      Q    Right.  But you wanted to offer him the
5  position as of the date of this memorandum?
6      A    As of the date of this memo, apparently
7  so.
8      Q    Do you know whether or not there was
9  any negative publicity about Snyder in the news that
10 changed your mind about selecting him?
11     A    There was later some news that made me
12 question whether or not we should consider him for
13 the legislation position, and that is because he is
14 a -- let me think.  Is this the guy?  Mr. Snyder --
15 Mr. Snyder, I believe, is also on the city council
16 for the City of Falls Church.  And I think at some
17 point, that became a negative, but I don't believe
18 in this case.  I think it was when we were
19 considering him for a different position.
20     Q    Does Mr. Snyder have any experience in
21 motor carrier regulations?
22     A    I believe he does.  I believe he has

Page 114

1  experience in motor carrier regulations through his
2  work with the American Insurance Association.
3      Q    Does he have any experience with motor
4  carrier regulations on the federal level with
5  respect to the regulations that the motor carrier
6  agency enforces?
7      A    Yeah, he does.  Both our insurance
8  regulations, and he had -- he had experience with
9  motor carrier issues.
10     Q    Working on the insurance, that's not
11 the same as what you do as a federal government
12 agency, is it?
13     A    Well, it is.  We have insurance
14 regulations and we have motor carrier regulations
15 that deal with commercial law stuff, and he had
16 background in that.  And I believe as part of his
17 being the assistant general counsel for the
18 insurance association, tort law comes up in our
19 regulations, and I believe he had experience in
20 motor carrier transportation issues.
21     Q    You're not answering my question, I
22 don't believe.

Page 115

1          What I'm asking is:  Did he have
2  specific experience, federal-level experience,
3  enforcing Federal Motor Carrier regulations?
4      A    Well, if he had never worked for the
5  government, no, he didn't have experience in
6  prosecuting.  But I think he had, as I've testified,
7  knowledge of Federal Motor Carrier regulations.
8      Q    So obviously just having knowledge of
9  Federal Motor Carrier regulations is not the same
10 thing as enforcing it?
11         MS. ROSEN:  Is that a question?  I
12 object to that.  Are you -- is that a question?
13         BY MS. McKINNEY:
14     Q    That's not the same thing, is it?
15 Having knowledge of the regulations is not the same
16 thing as having experience enforcing it?
17     A    I don't know how to answer that.
18     Q    Would you like me to rephrase it?
19     A    Yes, please.
20     Q    Having general knowledge about a
21 regulation is not the same thing as enforcing it, is
22 it?

Page 116

1      A    It can be.
2      Q    How is having general knowledge about
3  something the same thing as enforcing it?  As a
4  federal agency, you're charged with enforcing
5  certain regulations.  How is his experience working
6  with the insurance association anywhere near the
7  same as what you do as a federal government agency?
8      A    He also worked for the State of
9  Pennsylvania insurance department that deals with
10 enforcement.  He has that experience.  Whether it's
11 state or federal level, he had some of that
12 experience.
13     Q    If he worked with the Pennsylvania
14 insurance, that's not the same as enforcing motor
15 carrier regulations, is it?
16     A    Yes, it is.
17     Q    How?
18     A    The motor carrier regulations include
19 insurance and commercial regulations.
20     Q    So you're comparing what you do on the
21 federal level to what a state like Pennsylvania
22 would do on a state level?

ELAINE WALLS                                    BRIGHAM McCOWN
vs. NORMAN Y. MINETA                            OCTOBER 19, 2005

Page 117

1    A    No. I'm saying it's similar. You're
2  saying it's not similar. I'm saying it can be
3  similar.
4    Q    Well, my question is: Was it similar?
5    A    I believe I've already answered you.
6    Q    Was it similar?
7    A    (No response.)
8    Q    Was it similar?
9    A    I believe it is similar, yes.
10   Q    What experience in motor carrier
11 regulations did Kirk have?
12   A    Kirk actually used to represent clients
13 before administrative agencies, including DOT. He
14 practiced before the Interstate Commerce Commission,
15 which is the predecessor to our agency, he
16 represented clients in front of our agency on
17 enforcement matters, and he had a pretty extensive
18 background. Because remember I said that not only
19 do you have to be a manager but you have to enforce
20 our regulations, and you also are the primary
21 liaison with the Department of Justice. He had vast
22 experience in civil and criminal litigation matters

Page 118

1  before federal courts as well as our predecessor
2  agency.
3    Q    Who handles the litigation for your
4  agency?
5    A    All in-house work is done by our agency
6  as well as the brief writing, and the actual court
7  appearances are generally argued by Department of
8  Justice lawyers. However, our lawyers often sit in
9  close proximity and will work on these cases and are
10 involved in every step of the enforcement process.
11   Q    Isn't it true that the Department of
12 Justice handles all of the litigation that's in the
13 courts?
14   A    I think I just testified to that.
15   Q    Isn't that true?
16   A    The Department of Justice is the
17 physical representative in court that argues the
18 case. It is not true that they are the exclusive
19 agency. My name and other staff lawyers' names
20 appear as co-counsel on these cases. The
21 insinuation you're making is that we play no role,
22 and I'm saying that is incorrect.

Page 119

1    Q    Right. But the Department of Justice
2  brings the litigation on the agency's behalf; is
3  that correct?
4    A    Along with the agency, yes. This
5  agency also has independent litigation authority,
6  which we haven't chosen to exercise but could.
7    Q    And, again, my question is: Isn't it
8  correct that the Department of Justice handles your
9  litigation on your behalf?
10   A    Along with us as co-counsel, yes. Same
11 answer.
12   Q    Okay. So Kirk did not have any
13 specific experience enforcing? He represented
14 clients in enforcement actions?
15   A    That's true.
16       THE WITNESS: Can we take a break?
17       MS. ROSEN: Yes.
18       (Recess.)
19       BY MS. McKINNEY:
20   Q    All right. Earlier when we were
21 talking about the selection of Brian Yonish to the
22 position, you mentioned that he worked for the

Page 120

1  Department of Defense?
2    A    Yes.
3    Q    What did he do specifically at the
4  Department of Defense?
5    A    He worked in the Office of General
6  Counsel and also, I believe, worked on the staff of
7  the Inspector General of the Department of Defense,
8  and also had 20 to 30 years of military service, I
9  believe.
10   Q    What I was asking about was what he did
11 specifically prior to being hired. What did he do
12 in the Office of General Counsel for the Department
13 of Defense?
14   A    I believe he dealt with inspector
15 general-oriented issues and investigations
16 involving -- espionage pops out of my mind. I can't
17 remember all of the other issues that he was doing.
18   Q    I'm sorry?
19   A    According to the memo marked Exhibit 2,
20 he was the associate deputy general counsel in the
21 Office of the Inspector General at the Department of
22 Defense. He supervises investigations, including

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM McCOWN
OCTOBER 19, 2005

Page 121

1  military aircraft safety, espionage, SES misconduct,
2  standards of conduct and ethics, whistle-blower
3  protection, and also has legislative and
4  Congressional affairs experience for 11 years.
5      Q    All right. But my question -- I can
6  read the exhibit. What I wanted to know is what you
7  remembered about his experience in the Office of
8  Chief Counsel for the Department of Defense.
9      A    In the Office of General Counsel? I
10 mean, I have no independent recollection other than
11 if I were to review his resume and other than what
12 we've already discussed.
13     Q    Do you know whether he supervised any
14 employees in the Office of General Counsel for DoD?
15     A    At the time he was hired, I do not
16 know.
17     Q    Other than the supervisory experience
18 that you mentioned that he had from being in the
19 Department of Navy, do you know what other jobs that
20 he held where he had management or supervisory
21 experience?
22     A    I don't recall.

Page 122

1      Q    Do you recall during one of
2  Mr. Yonish's first staff meetings that he said he
3  was on a big learning curve in the enforcement
4  area? Do you recall him making that statement?
5      A    I do.
6      Q    What do you recall about that
7  statement?
8      A    I thought it was pretty courageous, and
9  it was an honest assessment that by not being a
10 member of FMCSA he had some things to learn.
11     Q    Why do you think it was courageous?
12     A    Because I think it takes more for
13 somebody to admit what they know or don't know than
14 it does for somebody that tries to act like they
15 know everything. That's a leader.
16     Q    So he admitted to his staff the first
17 day that he was going to lead them even though he
18 had no substantive knowledge of the subject matter
19 area?
20     A    Well, I think we've already talked
21 about that. I said that he is the conductor of the
22 orchestra. He doesn't have to know how to play all

Page 123

1  the -- I don't see what -- I don't see what bearing
2  that has on whether or not he was qualified to lead
3  that division.
4      Q    Right. But my question is:  He
5  admitted to the staff that he was about to manage
6  and supervise but he had no knowledge or experience
7  in the subject matter?
8      A    No. I think what he said is, "I have a
9  learning curve." I don't want you to put words into
10 his mouth.
11     Q    Earlier when you were mentioning some
12 of the individuals that had been hired, you said
13 someone was hired for the legislative division.
14     Do you recall who that person is?
15     A    No. As I said earlier, I don't recall
16 his name.
17     Q    Was it Richard Logazino?
18     A    Logazino, yes, that is who it is.
19     Q    Is that person an attorney?
20     A    Yes.
21     Q    Were you involved in hiring that
22 individual?

Page 124

1      A    Yes.
2      Q    How is it that you had openings for
3  three of the divisions in motor carrier?
4      A    We hired a lot of people in motor
5  carrier. We reorganized, we created new positions,
6  we obtained additional resources from the
7  administrator. I was the first chief counsel of
8  this agency. It had not been set up yet. That's
9  what I got hired to do, was to organizationally set
10 this thing up.
11     Q    Why did you reorganize motor carrier?
12     A    Because the current thing wasn't
13 working, and it had never been -- it had never been
14 organized. That's part of the problem.
15     Q    Why did you reorganize it? What were
16 the concerns that you had?
17     A    Well, number one, I had -- I had a
18 division in chief counsel's office that was placed
19 in the Office of Chief Counsel several months before
20 I arrived that had no lawyers in it. It's a little
21 hard to do legal work in the Office of Chief Counsel
22 with nonlawyers.

ELAINE WALLS                                    BRIGHAM MCCOWN
vs. NORMAN Y. MINETA                            OCTOBER 19, 2005

Page 125

1    Q    What division had no lawyers?
2    A    The legislation division.
3    Q    Okay. What other concerns did you
4  have?
5    A    We were inadequately staffed, didn't
6  have sufficient resources, and that, in particular,
7  the enforcement litigation functions of the office
8  were being disparately affected by the regulation
9  side of the office, which is why we split the
10  enforcement and regulations division into two
11  divisions.
12       And I don't know -- boy, there are lots
13  of things. There were no policies or procedures set
14  up in the office. To be fair to the people before
15  me, you know, this was still a relatively new
16  agency, it had not been adequately staffed by the
17  previous administrator, and the acting administrator
18  didn't like lawyers. We had a lot going on.
19    Q    So the regulatory affairs and
20  enforcement division had previously been one
21  division?
22    A    They had been one division, but the

Page 126

1  attorneys were sort of broken out into different
2  functions. That doesn't mean to imply that every
3  lawyer in that division did enforcement and
4  regulations. For example, I don't know that
5  Ms. Walls did enforcement. Mike Falk was in that
6  division. He did mostly enforcement, although he
7  also did the NAFTA -- some of the NAFTA
8  regulations.
9       But no attention was being paid to
10  enforcement, and the field attorneys were not
11  currently aligned to the Office of Chief Counsel,
12  and that was another thing we changed.
13    Q    How do you know Ms. Walls did not work
14  on any enforcement issues when she was employed in
15  the regulatory affairs and enforcement division?
16    A    Well, because when I first got here, it
17  was the enforcement and regulatory affairs division,
18  and she was working on regulations and working on
19  executive order compliance and the SBA and a myriad
20  of other regulatory things we talked about.
21    Q    All right. But prior to you coming on
22  board, do you know whether or not -- do you have

Page 127

1  specific knowledge of whether or not she worked on
2  enforcement matters or not?
3    A    Not without looking at her resume, no,
4  I wouldn't.
5    Q    You said you made a lot of changes and
6  had to hire a lot of staff.
7       Did you offer any bonus or incentives
8  to any employees to come on board?
9    A    We offered one single hiring bonus to a
10  candidate -- an exceptionally qualified candidate
11  who had a competing offer from another department.
12  To my knowledge, that single instance is the only
13  time a hiring bonus had been authorized by the
14  administrator.
15    Q    And who was that hiring bonus for?
16    A    Brian Downey, who was coming off active
17  duty with, I think, the U.S. Army. He was a Major,
18  which is a GS-14 equivalent. I'm sorry, a GS --
19  no. He was a -- okay. Yeah, that's right.
20    Q    And what position was he being hired
21  for?
22    A    He had expertise in procurement law and

Page 128

1  government contracting, so he was hired in the
2  general law division to be the contracting and
3  procurement attorney.
4    Q    Looking at Deposition Exhibit Number 1,
5  I don't believe he's listed there, is he?
6    A    You're right, he's not, because that's
7  not the hiring list. That's the promotion list.
8    Q    Did you mention him as part of the
9  people that you hired?
10    A    Yes, I believe so. I know she doesn't
11  want to read it back, though.
12       There were so many that we hired, and I
13  may have left him off, but it wasn't intentional if
14  I did.
15    Q    What GS level was he hired into?
16    A    HR determined that he was a GS-14, and
17  I believe -- well, I know that's exactly what the
18  competing offer from the Department of Homeland
19  Security was as well, which is why the hiring bonus
20  was offered.
21    Q    How much was the hiring bonus that was
22  being offered to him?

Page 129

1    A    I don't remember.  It wasn't -- it
2  was -- it wasn't like ten or twenty grand or
3  anything like that.  I think it was five or less,
4  but I don't -- I don't specifically recall.
5    Q    Okay.  You mentioned that a number of
6  employees were detailed or came on on a temporary
7  basis.
8        Were any of those employees given a
9  bonus?
10    A    They may have been considered for a
11  performance or a special -- yeah.  In fact, some of
12  them were considered for -- not as a -- they were
13  not given a bonus to show up as in a hiring bonus,
14  but they were considered with the rest of the
15  employees for annual awards or specific act awards.
16    Q    Do you recall an employee named Ken
17  Williams?
18    A    I do.
19    Q    Was he given relocation expenses?
20    A    I don't recall.  But since he was
21  already a GS-14 employee of the government, I'm sure
22  he would be entitled to a relocation under OPM

Page 130

1  regulations if he wanted to claim it.  That's an HR
2  question.  I believe government people are entitled
3  to that kind of benefit.
4    Q    Who is the authority for determining
5  the awards and special act recognition that's given
6  to employees in motor carrier?
7    A    Well, I think it varies by office
8  location.  Typically, it's -- in my case, it would
9  be myself as well as Ms. Rutledge with the
10  concurrence of the administrator.
11    Q    So you and Ms. Rutledge make the
12  decision as to who receives awards and special act
13  recognition?
14    A    Sure, based on input from the other
15  supervisors as well as our own experience, and then
16  we submit that to the administration -- to the
17  administrator for her consideration.
18    Q    What's the process for determining
19  awards and special act recognition?
20    A    Each year I ask during a division chief
21  meeting, which is all of the supervisory personnel
22  of the office, to go rate their individual

Page 131

1  employees.  It coincides with annual appraisals to
2  decide -- typically if one gets an outstanding
3  rating, there's usually a performance award that
4  goes with that.  And at the same time, they think of
5  special act awards that have occurred during the
6  year where they want to reward an employee not for
7  sustained outstanding performance but for a
8  particular project or something they've worked on.
9        And then we all sit back down and go
10  through that list, and I may ask questions back and
11  forth, and then Judy and I work on it a little bit,
12  and then I make the final determination, I suppose,
13  and it goes to the administrator.
14    Q    How do you determine how much to give
15  the employees?
16    A    Well, it's -- it's based on -- the
17  monetary pool is established by the agency as a
18  particular percentage of salary times the number of
19  employees in the office.  So I have a set working
20  fund, and then we -- it's up to our broad discretion
21  to award bonuses, and we do that based on merit and
22  performance.

Page 132

1    Q    All right.  So I understand you have a
2  fund -- a certain amount that you can distribute.
3        So how do you make the actual
4  distributions?  How do you determine the amount that
5  you're going to give to each employee?
6    A    Well, I give -- like I said before, the
7  individual managers of the divisions are asked to
8  turn in what they think their employees have done
9  and to recommend award figures to Judy and I, and
10  then we discuss those with the supervisor, and then
11  we see how it all shakes out.
12        I mean, they have a general target
13  range that they're looking for in their division
14  based on the number of employees in their division.
15  I mean, the bonus -- a bonus is for outstanding
16  work.  I mean, paychecks are what you get for
17  showing up, and these bonuses are either for
18  outstanding performance throughout the year or for
19  special acts.
20    Q    Do you recall whether or not Ms. Walls
21  was recommended for an award?
22    A    Which year?

ELAINE WALLS                                              BRIGHAM McCOWN
vs. NORMAN Y. MINETA                                      OCTOBER 19, 2005

---

Page 133

1    Q    During the time you were -- the two
2   years that you were chief.
3    A    I believe so.
4    Q    What award was she recommended for?
5    A    I don't recall, but I -- my knowledge
6   seems to be at least -- my recollection is she got a
7   fairly substantial award compared to some of the
8   other employees, but I don't recall the exact
9   number. I think it was a thousand or fifteen
10  hundred bucks or so one year, and I don't -- I'm not
11  sure what it was the other year, but it seems like
12  she got a pretty good bonus one year.
13    Q    You don't recall what that bonus was
14  for?
15    A    No, I don't. And I don't -- I don't
16  know that that was -- I'm thinking it was for a -- I
17  don't know if that was performance or special act.
18  I mean, we try to -- the policy, frankly, is that
19  they try to spread these bonuses out to everybody.
20       It's a policy I personally disagree
21  with, but pretty much everybody gets a little
22  something at the end of the day. But my

Page 134

1   recollection is that Ms. Walls's was higher than a
2   lot of folks.
3    Q    Do you recall whether or not -- when
4   you're talking about the process, whether or not
5   Ms. O'Malley had recommended a certain amount for
6   Ms. Walls and it was later reduced by either you or
7   Rutledge?
8    A    I don't recall that, but that's quite
9   possible. Part of the problem with the system is
10  that you have four division chiefs making these
11  determinations in a vacuum. And I know at least one
12  year when you added up all of the totals
13  recommended, it exceeded the pot of money. So folks
14  had to be cut back a little bit, but specifically I
15  don't remember whether that happened with
16  Ms. O'Malley or not.
17    Q    Do you recall any of the employees who
18  were to receive bonuses but their bonuses were
19  reduced?
20    A    Yes. Well, I know that -- let me
21  rephrase. I know that supervisors put people in for
22  bonuses that were later reduced because there was

Page 135

1   not enough money to go around to pay all of these
2   bonuses, and so I know it's happened somewhere. I
3   just don't remember where.
4    Q    All right. You mentioned earlier that
5   Brian Downey was given a recruitment bonus because
6   he had a competing offer from homeland security.
7       How did you determine that he had a
8   competing offer from homeland security?
9    A    I believe he told us, and I think
10  somebody verified that. I think HR may have looked
11  into that.
12    Q    How did HR verify that?
13    A    You'll have to ask them or ask
14  Mr. Downey.
15    Q    All right. Mr. Joe Solomey's name came
16  up once before with respect to the EPP program or --
17  yes, EPP program, I believe.
18       Did you ever have any conversations or
19  discussions with him concerning promotions? You
20  didn't mention him as one of the employees that was
21  promoted.
22    A    Right. Yes, we did discuss a promotion

Page 136

1   for him.
2    Q    Can you tell me about that
3   conversation?
4    A    He felt sour that he had not been
5   promoted to a 15. I explained the policy, the same
6   policy that applies to everybody, and he, in
7   essence, said, well, I've got to get a 15. If you
8   guys won't give it to me, I'm going to go
9   elsewhere. And he went out and got an offer from
10  another agency, and we discussed it afterwards.
11       He had told us that he had gotten the
12  offer, and we did explore with him what it would
13  take to make him stay, but, you know, that was just
14  preliminary conversation. I don't really have the
15  authority to do that, but I was concerned that --
16  you had mentioned before the enforcement and
17  regulatory affairs division being the same. Well,
18  Joe was the enforcement program at Federal Motor
19  Carrier, and I was concerned about him leaving and
20  what kind of a hole that would leave for us. But
21  that's the general gist of it.
22    Q    Who was involved in these

ELAINE WALLS                                         BRIGHAM MCCOWN
vs. NORMAN Y. MINETA                                 OCTOBER 19, 2005

---

Page 137

1  conversations?
2      A    Just Joe and I. I don't know if he
3  talked to Judy or not, but I think it was just the
4  two of us.
5      Q    When was the first time and you Solomey
6  had a conversation?
7      A    I don't -- I couldn't give you a date.
8      Q    Did Mr. Solomey go to you saying he
9  wanted to be promoted?
10     A    Yes. He made that clear several
11 times. He was -- he was -- I think he -- well, he
12 felt like he had to be a 15.
13     Q    And what was your response when he
14 asked to be promoted?
15     A    Well, in general, the same thing. We
16 didn't have a position 15 to put him in, and we
17 didn't have a billet that went to 15. I didn't have
18 an opening to a 15, and I did tell him that, you
19 know, down the road we were going to split the one
20 division into two -- that was common knowledge --
21 and that there would be a 15 position, and I hoped
22 he would stick around to consider competing for it.

Page 138

1          After he got an offer in hand, I asked
2  him if he wanted me to go to the administrator to
3  see if based on that offer she was willing to do
4  anything. But I think he took a day or two and he
5  talked to several of his folks and mentors, and
6  those conversations never occurred. And, frankly, I
7  don't know if he would have been promoted anyway,
8  but he ended up saying he just needed a change and
9  wanted to move to a different agency, so he left.
10     Q    What agency did he move to?
11     A    He went to the Research & Special
12 Projects Administration to run their HAZMAT
13 enforcement program.
14     Q    Okay. When you had the conversation
15 with Mr. Solomey where you indicated you would go to
16 the administrator to see if she was willing to give
17 him a position, did you promise Mr. Solomey that you
18 would give him a promotion to GS-15?
19     A    No, because I don't have that
20 authority, and I didn't promise to take him to the
21 administrator. I asked him if he was interested in
22 pursuing that opportunity to gauge whether or not he

Page 139

1  would seriously consider staying, but, you know,
2  that wasn't based on any authority I had. I was
3  just trying to figure out what his deal was.
4      Q    Did you promise him a GS-15 position
5  once the reorganization occurred?
6      A    No. He would have to compete like
7  everybody else.
8      Q    Research and special projects, is that
9  where you are currently employed?
10     A    I'm employed by the successor agency to
11 that, yes.
12     Q    So you and Mr. Solomey are now in the
13 same agency?
14     A    That's correct. I would be his fourth-
15 or fifth-line supervisor.
16     Q    What were you willing to do to make
17 Mr. Solomey stay?
18     A    You know, in retrospect, I don't know
19 that we would have done anything. Certainly, no
20 decision had been made. Joe had a lot of sour
21 grapes over not getting to -- over the DOT and
22 agency policy, and I think it was probably best that

Page 140

1  he just moved on.
2      Q    At the time when this was occurring,
3  contemporaneous at the time, what were you willing
4  to do to have him stay on?
5      A    I think I just answered that. I'm not
6  sure that I was willing, because he had a little bit
7  of a chip on his shoulder from things, and I don't
8  know if it would have been best for him to stay.
9      Q    Right. I know. But when you
10 testified, you said in retrospect you believe he had
11 a chip, and I'm asking you --
12     A    Oh, at the time he did too, because I
13 remember he specifically said, you know, I don't
14 want to leave this agency. Joe didn't leave this
15 agency, but this agency left Joe. I specifically
16 recall that as if it was yesterday.
17          I mean, he -- based on that, it was --
18 you know, I probably would not have argued very
19 strongly, if at all, for the administrator to see --
20 and, frankly, I don't know that the administrator
21 could have promoted him.
22     Q    Why did he have a chip on his shoulder

Page 141

1    other than the fact that he wanted to be promoted?
2    What else was going on?
3        A    That's it. I think he wanted to be
4    promoted. He was frustrated by the journeyman level
5    being a 14.
6        Q    Did his supervisors recommend him for a
7    promotion to GS-15?
8        A    I don't know. I don't recall. He left
9    fairly early. I mean, I may have known that at one
10   time, but I don't recall today.
11       Q    Why hadn't he been promoted to a GS-15;
12   do you know?
13       A    There was no position to go to a 15 to
14   put him in or he wasn't recommended. I don't know.
15       Q    How long had you been in your position
16   as chief counsel when all of this occurred?
17       A    I don't remember.
18       Q    Was it less than a year?
19       A    I don't remember.
20       Q    Now, you mentioned agency regulations.
21       MS. McKINNEY: Can you mark this,
22   please?

Page 142

1            (Thereupon, Exhibit
2            No. 3 was marked for
3            identification.)
4        BY MS. McKINNEY:
5        Q    I've just had the court reporter mark
6    as Deposition Exhibit Number 3 a memorandum from
7    General Counsel Kaplan dated May 6, 1994 regarding
8    promotion policy.
9            Do you recognize this document?
10       A    No.
11       Q    Is this the policy -- the written
12   policy that you were talking about earlier with
13   respect to the promotion policy for attorneys?
14       A    No.
15       Q    Have you ever seen this document
16   before?
17       A    No.
18       Q    Do you know whether or not this is the
19   promotion policy that was in effect at the time you
20   were chief counsel?
21       A    I do not, but typically general
22   counsels are political appointees. This is at least

Page 143

1    one or two administrations ago. I don't know
2    that -- I doubt that this is still effective,
3    because I've never seen it before.
4            But, you know, I think the first page
5    talks about a promotion to GS-15 wherever
6    working-level positions exist. I mean, that seems
7    fairly consistent. That's what we've been saying.
8        Q    So this policy seems to be consistent
9    with what you were saying?
10       A    Well, I'm saying this policy -- I mean,
11   I haven't read this. I don't know if this policy is
12   still effective, but it specifically caveats GS-15
13   positions as promotion is appropriate after two
14   years where positions exist on both the front page
15   and the last page.
16           Yeah. Nonsupervisory GS-15 attorneys
17   must be expert in their areas and have demonstrated
18   exceptional or outstanding performance. For an
19   attorney to be promoted to a GS-15 either as a
20   supervisory or a nonsupervisory attorney, that
21   attorney must be truly distinguished. I don't know
22   if it's effective, but it seems to be fairly

Page 144

1    consistent with what I've always thought the policy
2    was.
3        Q    Well, how does an attorney demonstrate
4    that they're expert in their area?
5        A    To be an expert in a particular area
6    that -- I mean, that's like saying one is a country
7    doctor and the other guy is a brain surgeon. I
8    mean, that's the kind of thing to me that this memo
9    means.
10       Q    Right. But what does it mean
11   specifically to be an expert in their area? How do
12   you obtain that?
13       A    Well, you obtain that by having a
14   reputation as being the go-to person to do something
15   that not just any attorney could do. That's why it
16   says must be truly distinguished. I mean, that's --
17   it seems like a pretty high bar to me.
18       Q    What does it mean to be truly
19   distinguished?
20       A    I think it means that not everybody
21   gets to do this and that you have to be seen not
22   only as the go-to person but recognized by

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM MCCOWN
OCTOBER 19, 2005

---

Page 145

1  management and peers as somebody that has a skill
2  set that other people just don't have.
3      Q   How does an attorney specifically go
4  about establishing that kind of reputation?
5      A   I think that's up to the individual,
6  and that's the great thing about America. It's all
7  about people going out and having the opportunity to
8  go make it happen. I can't tell them how to do it.
9  It may be different for each attorney.
10      I mean, for example, April Marchese has
11  distinguished herself as an environmental law
12  expert. Charles Medalen has established himself as
13  a legislative and Constitutional scholar. It's just
14  something you go do.
15      Q   Marchese, did she apply for her work
16  that she did on the NAFTA EIS or was she selected by
17  someone?
18      A   Well, there's no position. This is an
19  internal detailing within the department.
20      Q   So management selected her for that
21  position?
22      A   Yeah. I mean, that happens all the

---

Page 146

1  time. I mean, she wasn't promoted and she didn't
2  get any prestige out of it. There are
3  cross-assignments within this building all the
4  time. It's not a promotion or an entitlement or
5  anything.
6      I'm just saying that she's a 15 and
7  Charles Medalen is a 15, and they got there before I
8  ever got here, by the way, as distinguishing
9  themselves as a subject matter expert, a skill that
10  no one else has.
11      Q   But you don't know how they got that
12  skill, what steps they took?
13      A   No, but I completely agree that they
14  are 15s, because they are head and shoulders above
15  other people.
16      MS. McKINNEY: Would you mark this as
17  the next deposition exhibit?
18          (Thereupon, Exhibit
19          No. 4 was marked for
20          identification.)
21      BY MS. McKINNEY:
22      Q   I just had marked as Deposition Exhibit

---

Page 147

1  Number 4 -- actually, it's two documents. It's a
2  memorandum dated October 17, 2000 from Knapp, Acting
3  General Counsel, regarding promotion policy for
4  attorneys. And on the second page, there's another
5  memorandum from Norman Mineta dated January 13, 2005
6  regarding attorney promotion policy in DOT.
7      Does Deposition Exhibit 4, either of
8  those documents, represent the policy that you're
9  talking about, the promotion policy?
10      A   4 -- well, there's two different -- oh,
11  yeah. Okay. I see what you're saying. I mean,
12  Ms. Deputy -- now Deputy General Counsel Knapp's
13  memorandum simply says you have to be a year in
14  grade to be considered at management's discretion.
15  I think that's policy we still have.
16      And the Secretary's memo --
17      Q   Have you ever seen that document
18  before?
19      A   Absolutely, yeah.
20      The Secretary's memo, I think, simply
21  builds on this Exhibit 3 memo. The only change to
22  me that I see in here is that it says there's an

---

Page 148

1  express admonition that you don't have to be a
2  manager to get promoted to 15, but I don't see that
3  it really changes anything.
4      Q   Doesn't this memorandum discuss a
5  concern with inconsistent implementation in policies
6  regarding attorney promotions?
7      A   Yeah. Yes. Some offices were giving
8  anybody 15s, and some like us were following the
9  more traditional policy. But the fact is, this
10  policy we're following was the DOT policy and it
11  applied everyone equally in the office, you know, as
12  evidenced by my discussions with Joe Solomey.
13      Q   Again, my question to you with respect
14  to Mr. Solomey was that you did want to assist him
15  in -- initially when he came to you about promotion,
16  you did want to assist him by going down to the
17  administrator to see if a GS-15 position could be
18  given to him?
19      A   No. I said I discussed the possibility
20  of going down to the administrator.
21      Q   Okay. Let me rephrase the question.
22      I'm saying you did want to assist him?

---

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM McCOWN
OCTOBER 19, 2005

Page 149

1   You wanted to offer him some sort of assistance so
2   that he could become a GS-15 once he had established
3   that at another division or agency?
4       A    No.  I was gauging his interest in
5   trying to see how serious he was about staying at
6   our agency by offering to potentially talk to the
7   administrator.
8       Q    But the potentiality of talking to the
9   administrator, isn't that assistance?
10      A    Only if acted upon, and it was never
11  acted upon.  So I don't know that -- even if he
12  said, yep, let's go right now, I don't know that I
13  would have.
14          I mean, it's in our interest -- I would
15  love to see everybody be such an outstanding scholar
16  that they're all GS-15s.  I mean, I think that would
17  be great, but I can't do it for them.  They have to
18  get them themselves.
19      Q    Going back to Deposition Exhibit
20  Number 4, you did see the first memorandum, the one
21  that was put out by Knapp?  You've seen that
22  before?

Page 150

1       A    No, I have not, actually.  But that's
2   when she was acting general counsel before the
3   current general counsel came in, so I'm not sure if
4   it's still effective or not.
5       Q    All right.  Considering, as you've
6   testified, that you had a number of individuals that
7   you needed to hire or place into positions, did you
8   ever have any written documentation as to how you
9   were going to, you know, go about putting people --
10  you know, assigning resources?
11      A    Yes.  There's an FMCSA organizational
12  manual.
13      Q    What else is there?
14      A    There are position descriptions for
15  each lawyer that talk about the promotion potential
16  and what their jobs and responsibilities are, and
17  then there would be the vacancy listings
18  themselves.  And that's pretty much all I can think
19  of.
20      Q    Does the manual have anything in it
21  which talks about promotion policies?
22      A    I don't know if it does.

Page 151

1       Q    Did you ever articulate to the
2   employees in your office what the promotion policies
3   were -- what the promotion policies were for the
4   GS-15 position?
5       A    I don't know if I articulated it to
6   everyone in the agency.  I know Ms. Walls and I
7   specifically talked about it and said that --
8   because I know I told her point blank that I thought
9   she was a decent GS-14.  I didn't have a GS-15
10  position at the time to put her in.  But even if I
11  did, I probably wouldn't, because even though she's
12  a decent GS-14, she doesn't exhibit those qualities
13  of a GS-15.
14      Q    Right.  But did you explain to her what
15  the qualities are of a GS-15, assuming that such a
16  conversation took place?
17      A    Yes.
18      Q    What did you tell her?
19      A    I told her that it requires complete
20  independence of thought, proactiveness, leadership,
21  to be a subject matter expert in the field, to be
22  the go-to person, to have independent thought, to

Page 152

1   have work product that never needs to be rewritten.
2   I mean, those are the types of things that I've
3   consistently told her and other people that have
4   inquired.
5       Q    But you did not make a general
6   announcement to the group?
7       A    No.
8       Q    You only told people on a one-on-one
9   basis?
10      A    No.  I didn't know I was required to.
11      Q    I'm just trying to understand, sir, how
12  this policy that you've been talking about with
13  respect to promotions to GS-15, how it was
14  articulated or communicated to your staff.
15      A    You know, if somebody asked, you know,
16  we talked about it.  But to my knowledge, there
17  wasn't any clamoring of everybody wanting to know
18  what it took to be a GS-15.
19          I mean, these were -- I'm glad you
20  showed me these, because I had always heard about
21  this policy, and I think there's a general awareness
22  by people in the department of what it takes to be a

Page 153

1 GS-15. I wasn't sure that these things even existed
2 in written form, but here they are (indicating).
3      Q    So when you were making decisions when
4 you were chief counsel, you weren't aware at that
5 time of written policies?
6      A    I was -- I had not seen written
7 policies, but I had discussed things not only with
8 our HR but with the Office of General Counsel on
9 what it takes to be a GS-15, and what I was told is
10 exactly what's in these memos here. And that's --
11 you know, because of -- that's why I think the
12 Secretary wrote his memo in '05, was to clarify and
13 make sure everybody knew what those policies were,
14 and there they are (indicating).
15     Q    Right. But the policies, I'm saying at
16 the time, were based on conversations that you just
17 mentioned and, as you testified earlier, were not
18 based on anything written that you had seen?
19     A    That I had seen, no.
20     Q    When did this conversation take place
21 with Ms. Walls where you indicated what was
22 necessary to become a GS-15?

Page 154

1      A    I believe it was the same conversation
2 I had with her and Ms. Rutledge in the room when we
3 talked about her opportunities and promotion and we
4 encouraged her to do those different things.
5      Q    The training in the office -- who has
6 the authority of approving training requests?
7      A    It's typically the first-line
8 supervisor who would have input, and the deputy
9 chief counsel would have the final decision on that.
10     Q    So that would be Rutledge?
11     A    Yes.
12     Q    Are you involved at all in that
13 decision making?
14     A    Generally, no. Occasionally, perhaps.
15     Q    On what occasions are you involved?
16     A    Just if -- you know, when it comes down
17 to budget, the budget of the office is ultimately my
18 responsibility. And Judy has occasionally come to
19 me to say, hey, do you want to send -- you know, do
20 we have the money to send these folks on training,
21 or I'm concerned about money, or I'm going to tell
22 these people no because the same class may be

Page 155

1 offered locally instead of going on a boondoggle
2 somewhere. I would have general awareness of issues
3 like that. But the actual, you know, decisions are
4 generally Ms. Rutledge's to make.
5      Q    Have you ever been involved in
6 approving management training for any employees?
7      A    I think we sent some folks to
8 management training.
9      Q    Who did you send to management
10 training?
11     A    I don't remember.
12     Q    Do you recall whether or not Yonish was
13 sent to management training?
14     A    I think he may have been. I think he
15 may have gone somewhere for management training. I
16 know he's gone on training. I seem to recall that,
17 but I don't remember the where or when or what it
18 was. I think a lot of -- I think other folks have
19 gone to management training.
20     Q    Do you know whether Ken Williams was
21 recommended for management training?
22     A    No, I don't know.

Page 156

1      Q    What about Cheryl Walker?
2      A    I think she may have been. I think
3 she -- I recall her going on training. I don't --
4 you know, whether it was management training or some
5 other kind of training, I don't remember.
6      Q    Do you recall what this management
7 training entailed --
8      A    No.
9      Q    -- or what kind of courses it
10 involved?
11     A    No, I really don't.
12     Q    Was it an out-of-town course provided
13 by an outside vendor?
14     A    You know, I don't remember, because at
15 times we explored in-town as well as out-of-town
16 training. I don't recall how that shook out.
17          I think there was some concern -- I
18 don't remember if it was the out-of-town or in-town
19 training, but with one of those courses, there was a
20 concern about whether it was really quality training
21 or not.
22     Q    Were you involved at all in that

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM McCOWN
OCTOBER 19, 2005

Page 157

1  decision making for the training you just
2  mentioned?
3      A  I don't think so, unless I, as a
4  routine matter, signed off on travel reimbursements
5  or travel orders perhaps, but I don't --
6      Q  You were not involved in that to your
7  recollection?
8      A  To my memory, I don't -- I don't
9  remember making a substantive decision whether or
10  not somebody could go to training.
11      MS. McKINNEY:  Let me just take a
12  one-minute break.
13      (Recess.)
14      BY MS. McKINNEY:
15      Q  All right.  We were talking about some
16  of the promotions of some of the employees in the
17  office.
18      You said that Ottman was denied a
19  promotion; is that correct?
20      A  No, I did not.  Dettling.
21      Q  I'm sorry, Dettling was denied a
22  promotion.

Page 158

1      Let me ask you separately.  Was Ottman
2  denied a promotion?
3      A  No.
4      Q  She was never denied a promotion?
5      A  Not to my knowledge.
6      Q  Cho, was she ever denied a promotion
7  before she was promoted?
8      A  No, not to my knowledge.
9      Q  All right.  You mentioned that some
10  employees are head and shoulders above others.  What
11  do you mean by that?  How do you tell whether
12  someone is head and shoulders above someone else?
13      A  I'm saying that based on -- based on
14  their work product, based on their initiative, based
15  on their knowledge, there are certain people that
16  you just tend to go to as the go-to experts in the
17  agency.
18      Q  But what makes that person someone that
19  you tend to go to as the go-to person?  I mean, you
20  have to kind of establish that reputation in the
21  first place.  So I'm trying to understand why do you
22  have certain people that you go to and other people

Page 159

1  that you don't?
2      A  I mean, you'll have to ask them.  I
3  mean, the fact is, it's not just with me, but
4  everyone in the office would say, wow, this person
5  is the person that is the expert in a subject
6  matter.  That's the whole point of individual
7  initiative and drive that makes somebody truly
8  outstanding.  It's that hunger for them to be the
9  best people.
10      I mean, I've got some people that
11  e-mail me at midnight because they just -- you know,
12  they're after it all the time.  I've got some people
13  that at five minutes until 5:00, they're shutting
14  down the computer and checking the clock.  I mean, I
15  wish I could tell you what motivates people.
16      Q  Okay.  So you're saying that it's based
17  on someone's reputation then?  Essentially, it's
18  reputation?
19      A  Yeah, reputation, and that reputation
20  also includes direct observation interaction.  I
21  mean, that's -- reputation and observation is what
22  makes -- that's how you evaluate things.  That's how

Page 160

1  people decide whether they like you or don't like
2  you or think you're competent or not competent.  I
3  mean, that's the world.
4      MS. McKINNEY:  I think that's it.
5      Do you have any redirect?
6      MS. ROSEN:  Yes, I do.
7      EXAMINATION BY COUNSEL FOR AGENCY
8      BY MS. ROSEN:
9      Q  Following up on this last topic, is
10  Charles Medalen one of those outstanding,
11  distinguished performers in Federal Motor Carriers
12  Chief Counsel's Office?
13      A  Yes.
14      Q  Can you maybe tell us why he is
15  considered one of those distinguished, outstanding
16  performers?
17      A  Charles is the type of person that
18  would work 24/7, seven days a week.  That's not the
19  prerequisite, but he has a thirst for knowledge.
20  The man is a walking encyclopedia of knowledge.  He
21  has -- he is an expert in darn near everything that
22  motor carriers does, and he's just the type of

Page 161

1   person that -- you know, single-handedly, he could
2   probably -- if there were more hours in the day, he
3   would probably -- he probably puts out the work of
4   two or three average staff lawyers, and it's always
5   correct, it's right, it doesn't need to be
6   rewritten, he's punctual, every comma is where it's
7   supposed to be, he's checked his cross-references.
8   You know, he's a little bit cocky, but he's earned
9   the right to be. The man knows what he's doing.
10      Q    Earlier in the deposition, you talked
11  about -- you were asked about the Part 386 Rules of
12  Practice?
13      A    Right.
14      Q    You worked on that personally; is that
15  correct?
16      A    Yes.
17      Q    Okay. Is it true that both Elaine Cho
18  and Ms. Walls worked on -- were two of many people
19  who worked on this regulation?
20      A    Yes.
21      Q    Okay. Was there one time when they
22  both worked on this regulation?

Page 162

1       A    Yes.
2       Q    Were there times when both Cho and
3   Ms. Walls were at meetings that you held to discuss
4   matters relating to this regulation?
5       A    Yes.
6       Q    Okay. Can you describe how the two
7   attorneys, Cho and Walls, compared in terms of their
8   participation in the meeting and how they
9   demonstrated their knowledge to you?
10      A    Yes.
11           And it's pronounced Cho.
12      Q    Cho, excuse me. I'm sorry.
13      A    There's no W, just so we all know we're
14  talking about the same person.
15           I mean, Jackie is a junior lawyer, but
16  she's very ambitious. She asks a lot of questions.
17  She has that initiative. She -- you know, she's
18  enthusiastic. She goes after it. She thinks of
19  nuances without having been told to look.
20           She understands that if you change --
21  you know, a lot of attorneys, if you change
22  something in a particular section, they just change

Page 163

1   it in the section. They don't have that initiative
2   to go back through the entire document 200 pages
3   earlier and figure out if there are cross-references
4   and matches. She's thorough. She's good.
5       Q    And how did she compare to Ms. Walls in
6   some of the meetings that they both attended with
7   you?
8       A    I would say Ms. Cho is more energetic,
9   more dynamic, more aggressive, more proactive. But,
10  you know, to be fair to Ms. Walls too, she's more
11  laid back. That doesn't mean that she doesn't care,
12  but Ms. Cho has got that I want to learn it now and
13  I'll stay here until midnight to get it done.
14           MS. ROSEN: I don't have any other
15  questions.
16           MS. McKINNEY: I'll just follow up on
17  one or two things.
18  FURTHER EXAMINATION BY COUNSEL FOR COMPLAINANT
19           BY MS. McKINNEY:
20      Q    Charles Medalen, who you mentioned
21  earlier, is he a GS-15?
22      A    He is.

Page 164

1       Q    Was he promoted into that position or
2   hired into that position?
3       A    I don't know. He was a GS-15 when I
4   came to the agency. To my knowledge, he was a GS-15
5   before Federal Motor Carriers was even formed, but I
6   don't know how he got there. I assume he got
7   promoted at some point.
8       Q    So you've never had to consider whether
9   to promote Mr. Medalen?
10      A    That's correct.
11      Q    Does everyone need to be a Charles
12  Medalen, if you will, to be promoted to a GS-15?
13      A    No. I'm saying that somebody has to
14  have not necessarily all of his personal or any of
15  his personal qualities, but somebody has to -- I was
16  using him to illustrate that he is a subject matter
17  expert that people in DOT and people in General
18  Counsel's Office and the administrator and anybody
19  else in the building goes to as an expert in many
20  different areas of regulations and legislation.
21      Q    You said by your own testimony that
22  he's been employed with the agency for a long period

ELAINE WALLS                                    BRIGHAM McCOWN
vs. NORMAN Y. MINETA                            OCTOBER 19, 2005

Page 165

1  of time. He's a pretty senior attorney; is that
2  correct?
3      A    I don't know how senior he is. I don't
4  know how many years he's been out of law school.
5      Q    Does an employee have to be perfect, if
6  you will, in order to be promoted to a GS-15, put
7  the comma in every place right, not have any
8  revisions to their drafts?
9      A    No, no. There's nobody perfect on the
10  earth as far as I know, but I'm just saying that
11  somebody has to be very thorough, very
12  conscientious, very good, and they have to produce
13  quality work. And whether you're in the government
14  or the private sector, you know, those are the
15  people that everybody wants.
16      Q    Do you have any knowledge that
17  Ms. Walls is not thorough and detailed in her work?
18      A    I think she's average. I think she's a
19  good 14. I think -- as I said before, I don't think
20  she has that initiative of a Charles Medalen. I
21  don't think -- I think she's very good at doing what
22  she does when she's given direction. I don't think

Page 166

1  she has that independent drive like a Charles
2  Medalen or even like I was talking about Ms. Cho,
3  absent, you know, being asked to engage.
4      Q    All right. My question was: Does she
5  have -- does she put a lot of detail and
6  thoroughness into her work? Are you aware of
7  whether she does that or not?
8      A    Yeah. I mean, I think it's decent work
9  as a GS-14.
10      Q    You said that Cho asked a lot of
11  questions and she wanted to learn.
12          She's a relatively junior attorney or
13  was at that time, correct?
14      A    Yeah. She's still -- I assume by total
15  years out of law school, she has less years than
16  Ms. Walls, absolutely.
17      Q    Was her drive or initiative, if you
18  will, because she didn't know the area and wanted to
19  learn it and was asking questions in that regard?
20      A    Well, sure. I mean, that's part of
21  it. I'm sure it is.
22      Q    Do you know whether or not Ms. Walls

Page 167

1  works late at night -- works long hours in order to
2  complete her projects?
3      A    There have been -- there have been
4  times when she has stayed late to do things,
5  absolutely, but I don't think she works as long or
6  late hours as other attorneys in the office. I say
7  that based on the fact that when I was there, I was
8  routinely in the office until 8:00 or 9:00 at night
9  or up in the morning or on e-mail.
10          That's not a prerequisite for somebody
11  to be a 15. You know, this is government service.
12  It's not private sector, but I'm just using that as
13  an example of initiative. I think that's probably
14  the term I'm looking for, that initiative and
15  drive.
16      Q    Initiative and drive, again, are just
17  something that you can identify? You just know it?
18      A    Well, no. I think you see it. You see
19  it in the work product. I mean, you know people
20  that -- you know people that are very successful and
21  people that are happy just to get by.
22      Q    Are there any objective criteria that

Page 168

1  you can determine or utilize to figure out whether
2  someone has initiative or independent drive?
3      A    Yeah, sure. Whether I get something
4  that is quality -- that you take pride in ownership,
5  that is quality work product, somebody that has a
6  thirst to learn more, or somebody that's just happy
7  to get by or somebody that wants -- that wants you
8  to give them a promotion.
9      Q    So you believe Ms. Walls just wants to
10  get by and wants you to give her a promotion?
11      A    I think she would like to get a
12  promotion because she thinks that she's deserved a
13  promotion, and I'm saying that we have to disagree
14  on that fact.
15      Q    But what I'm asking you more
16  specifically is: Are you saying that she's someone
17  that doesn't have -- I don't remember exactly what
18  you said in your testimony, but you're saying that
19  she's someone that doesn't present a quality work
20  product?
21      A    I'm saying that she is not a -- she is
22  not somebody that independently can be turned loose

ELAINE WALLS
vs. NORMAN Y. MINETA

BRIGHAM MCCOWN
OCTOBER 19, 2005

---

Page 169

1  on a large project. She is not somebody that is a
2  subject matter expert in her field. She is not a
3  recognized go-to person on something of speciality
4  in the agency.
5      Q    Has she ever been given a project in
6  which she was just able to let go and take control
7  and have ownership over it?
8      A    Yeah. I think initially, the 386 rule
9  was a good example, and it really -- as I said
10 before, it wasn't done that hot.
11     Q    All right. So you're saying that you
12 gave her that project, and she could just run with
13 it and take over?
14     A    I'm saying that she had certain parts
15 of that project that were, in essence, her work
16 product. It was okay, but it had problems that I
17 had to fix.
18         And the same would be said of Jackie
19 Cho, but, you know, Jackie Cho was a 13 at the time,
20 and Ms. Walls was a 14. You know, a lot of that is
21 the leadership of knowing when a project needs to be
22 done, when it's got to be gotten to you, and it's

---

Page 170

1  got to be right, and, you know, those are the
2  qualities of a 15 typically.
3      Q    Okay. Other than the 386 or 286
4  project or whatever that is, were there any other
5  projects that you gave her that she could just run
6  with, as you mentioned in your testimony?
7      A    I don't recall that one way or the
8  other, but, see, that's a two-way street. You can
9  ask, you know, why don't you give me this project
10 and let me go run with this too, and I think
11 that's -- that's the initiative part. And whether
12 that was done or not, I don't know.
13     Q    Was Ms. Walls removed or told not to
14 work on that project after a certain point in the
15 Part 386?
16     A    I think you asked me that before, and I
17 said I don't remember. Not to my knowledge, but I
18 don't know.
19     Q    All right. So all Ms. Walls has to do,
20 from what I understand, is to say she wants to work
21 on a project, and then she'll be given a project and
22 she can run with it?

---

Page 171

1      A    Well, that's not what I'm saying, and
2  I'm not in that position anymore, so --
3      Q    Right. But I'm saying at the time when
4  you were in that position, all the employee has to
5  do to show initiative is say that they want to work
6  on a particular project, and they'll be given that
7  project and can run with it?
8      A    No. I think that's way overly
9  simplistic.
10     Q    Okay. Well, what do you mean by that
11 then?
12     A    I mean somebody that consistently shows
13 that go-getter attitude, that wants to learn more,
14 that wants to learn a -- you know, again, we're
15 talking about a GS-15. You have to be a recognized
16 subject matter expert. You can't do that by doing
17 run-of-the-mill general practitioner legal stuff.
18         If you want to specialize in an area,
19 you want to train yourself, you want to seek out
20 opportunities to go make it happen, I think
21 government service allows for those kinds of people
22 to thrive. But absent that --

---

Page 172

1      Q    What I'm trying to figure out, sir, is
2  exactly what opportunities are available. How do
3  you go out and take an opportunity? I mean, don't
4  you have to get management's approval to get that
5  opportunity?
6      A    Well, I think you have to have
7  management's approval and plan, but that's -- the
8  whole point is that it's up to the individual to
9  figure out their own plan. The government is not
10 here to hand me out things.
11     Q    I'm not talking about a handout, sir.
12 I'm not asking you that.
13         What I'm asking you is: Don't you have
14 to get approval or authority by management before
15 you start working on a project or assignment?
16     A    Sure.
17     Q    Ms. Walls, by the time you came on
18 board in 2000 (sic), had approximately 10 or 15
19 years of experience in the government.
20         Are you saying she wasn't knowledgeable
21 about motor carrier issues?
22     A    I'm saying for somebody with 10 or 15

---

43 (Pages 169 to 172)

---

**Page 173**

1    years of experience as of when I arrived in 2003,
2    she was not a subject matter expert in any area of
3    complexity in regulations, no.
4         She's a good all-around lawyer, but she
5    is not a person that has achieved and distinguished
6    herself as the people that these memos talk about.
7    And it's hard to do.  I mean, that's why the memo
8    said it's truly exceptional.  Not everybody gets to
9    do it.  That doesn't make it discrimination or
10   unfair.
11        Q    Well, that's going to be decided by a
12   judge in this case.
13        A    Absolutely.
14        MS. McKINNEY:  I think that's it.
15   Thank you.
16        THE WITNESS:  Thank you.
17        (Thereupon, signature not having been
18        waived, the deposition concluded at
19        5:30 p.m.)
20
21
22

---

**Page 174**

1    CASE:  Walls v. Department of Transportation
2    DATE:  October 19, 2005
3         ACKNOWLEDGMENT OF DEPONENT
4         I, Brigham McCown, do hereby
5    acknowledge that I have read and examined pages 4
6    through 173, inclusive, of the transcript of my
7    deposition and that:
8    (Check appropriate box)
9
10        [ ]  The same is a true, correct, and
     complete transcript of the answers given by me to
11   the questions therein recorded.
12        [ ]  Except for the changes noted in the
     attached Errata sheet, the same is a true, correct,
13   and complete transcription of the answers given by
     me to the questions therein recorded.
14
15
     Date            Signature
16
17
18        Sworn to and subscribed to before me on
19   this    day of          , 200 .
20
21
          NOTARY PUBLIC
22
     My Commission expires:

---

**Page 175**

1         SLR REPORTING
          12208 SELINE WAY
2         POTOMAC, MARYLAND  20854
          (301) 340-0042
3
     CASE:  WALLS V. DEPARTMENT OF TRANSPORTATION
4    DEPOSITION OF:  BRIGHAM McCOWN
5         Enclosed is the transcript of your
     deposition testimony.  Please review the transcript,
6    complete and distribute the signed errata sheet and
     acknowledgment page to all parties, including this
7    office, within 30 days.  Any changes and/or
     corrections should be listed below and not made upon
8    the transcript itself.
9    PAGE  LINE  CHANGE OR CORRECTION          REASON
10
11
12
13
14
15
16
17
18
19
20   DATE:          SIGNATURE:
21
22

---

**Page 176**

1         CERTIFICATE OF NOTARY PUBLIC
2         I, Marney Alena Mederos, the officer
3    before whom the foregoing deposition was taken, do
4    hereby certify that the witness whose testimony
5    appears in the foregoing deposition was duly sworn
6    by me to testify to the truth, the whole truth, and
7    nothing but the truth concerning the matters in this
8    case.
9         I further certify that the testimony of
10   said witness was taken by me in stenotype and
11   thereafter reduced to typewriting under my
12   direction; that said deposition is a true record of
13   the testimony given by said witness.
14        I further certify that I am neither
15   attorney nor counsel, nor related to or employed by
16   any of the parties to the action in which this
17   deposition is taken; and furthermore, that I am not
18   a relative or employee of any attorney or counsel
19   employed by the parties hereto, nor financially or
20   otherwise interested in the outcome of this action.
21
22         Marney Alena Mederos
           Notary Public for D.C.
     My commission expires:  August 14, 2007