# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **ELAINE WALLS** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1259 (TFH) |
| | ) | |
| | ) | |
| **MARY E. PETERS,** | ) | |
| **SECRETARY** | ) | |
| **U.S. DEPARTMENT OF TRANSPORTATION** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Elaine Walls ("Plaintiff Walls" or "Ms. Walls"), by and through her undersigned counsel, hereby opposes and responds to Defendant's Motion for Summary Judgment. Defendant's unlawful denial of Ms. Walls' career-ladder promotion to a GS-15 level, the denial of a promotion to the Supervisory Attorney Advisor ("Assistant Chief Counsel") position in the Office of Chief Counsel, Enforcement and Litigation Division, GS-15, as well as other adverse actions, violated her rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000-e, *et seq*. (hereafter "Title VII"). These actions by the Agency discriminated against Ms. Walls because of her race (African-American), sex (Female), and in retaliation for engaging in activities protected by Title VII. In support thereof, Plaintiff Walls submits this Memorandum.

## I.    Introduction

In its Motion, Defendant grossly misstates Plaintiff's claims and asserts that Plaintiff is seeking damages for issues which, while central to her case, constitute only background information on the pervasive discriminatory environment in the Chief Counsel's Office.

To be clear, Ms. Walls' claims in this action relate to the discriminatory denial of a career ladder, non-competitive promotion to the GS-15 level for her Attorney Advisor position in the Chief Counsel's Office for FMCSA because of her race and sex.  Ms. Walls was both eligible for, and qualified, to be non-competitively placed in the GS-15 position.  Ms. Walls has extensive and significant legal experience having developed an expertise in transportation and enforcement regulations relating to the Motor Carrier Act for approximately 25 years.

Furthermore, as will be set forth in greater detail below, the Chief Counsel's Office hindered and blocked Ms. Walls' career growth at every turn, thereby making her ascension to the GS-15 level all the more difficult.  For example, they artificially deflated her ratings on her performance evaluations, failed to give her the same recognition, awards and bonuses as similarly situated male colleagues and denied her training opportunities, such as the Executive Potential Program ("EPP").  They also prevented her from gaining long-standing experience on significant projects and assignments; yet chastised and punished her for supposedly not developing what they recognized as an expertise that would be supportive of her GS-15 aspirations.  Ms. Walls was not the only female in the Chief Counsel's Office who experienced disparate treatment and several other co-workers were also subjected to discrimination and/or witnessed inequitable

treatment of other minorities and females.  In sum, the denial of her career growth and development by the Chief Counsel's Office was unjustified and based on subjective, biased decision-making.

In addition to failing to provide Ms. Walls with a career ladder promotion, Defendant also denied her a competitive promotion to the Assistant Chief Counsel position in the Office of Chief Counsel, GS-15, in retaliation for her participation in protected activities.  Despite Ms. Walls' significant experience as an attorney in Federal transportation regulations, litigation matters and enforcement of motor carrier safety laws, Defendant completely ignored these salient attributes.  Instead, the Chief Counsel's Office unfairly manipulated the selection process in order to pre-select a candidate. When the candidate that they wanted for the position declined the job offer, the Chief Counsel's office selected an individual who had absolutely no experience whatsoever in transportation regulatory matters.  By failing to select the person in FMCSA who had the most experience in enforcement transportation regulations, namely Ms. Walls, the Chief Counsel's Office sent an unmistakable message to its employees that those who file complaints would be disparaged and denied career advancement in the office.[1]

---

[1] The other adverse personnel actions which comprise Ms. Walls' EEO complaints, and which are not part of her claim for damages, are nonetheless relevant and provide crucial context to Ms. Walls' case. These other actions demonstrate the pervasiveness of the FMCSA's unwillingness to provide Ms. Walls with the career growth opportunities that she needs to advance and flourish.  It also demonstrates FMCSA's long-standing discriminatory treatment of Ms. Walls and other female minorities.

For these reasons, Ms. Walls should be allowed to introduce evidence on these matters not only to prove her claims, but also to provide the necessary context to the pervasive discrimination and retaliation she faced in attempting to advance her career at FMCSA.  See United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1997)("a discriminatory act which is not made the basis of a timely charge … may constitute relevant background evidence"); Campbell v. AMTRAK, 163 F.Supp.2d 19, 27 (D.D.C. 2001)(allegations of discrimination which do not constitute a separate claim may still be used to establish the existence of systematic discrimination); Villines v. United Brotherhood of Carpenters & Joiners, 999 F.Supp. 97 (D.D.C. 1998)("the court's elimination of these untimely events does not preclude their admissibility in later proceedings"); Aka v. Washington Hospital Center, 116 F.3d 876 (D.C. Cir. 1997) (noting that although the plaintiff could not present specific hiring decisions as separate grounds for relief, he may nevertheless introduce evidence regarding these later job applications in pressing those claims that survive

## II.    Facts

### A.    Procedural Background

#### 1.    EEO Procedural Background

Defendant erroneously states in its Motion that Plaintiff filed her formal EEO Complaint on May 13, 2004.  Def. Mot. Sum. Jud. at 5.  This is incorrect.

Plaintiff's initial contact with an EEO Counselor actually occurred on February 12, 2004 regarding her non-selection for a career-ladder GS-15 position, the Agency's denial of the opportunity to participate in the Executive Potential Program ("EPP") and other opportunities for professional development that were denied her in the Chief Counsel's Office.  PEX#1.  February 12, 2004, then, is the date of Plaintiff's informal EEO Complaint with the Agency.  Id.

Plaintiff then had her EEO Intake, or Pre-Complaint Intake Interview, with an EEO Counselor on February 18, 2004 for her previously filed informal Complaint with the Agency.  PEX#1.  The Agency's EEO Office attempted informal resolution with the Agency, which was unsuccessful, and held a final interview with Ms. Walls on April 2, 2004, where it advised Ms. Walls of her right to file a formal EEO Complaint.  Id.  That same day, April 2, 2004, Ms. Walls filed her formal EEO Complaint which was accepted for investigation by the Agency on May 13, 2004.  PEX#2.

Shortly thereafter, Plaintiff learned that she was not selected for the Assistant Chief Counsel position and that the Chief Counsel's Office selected Ms. Sue Lawless. Defendant once again incorrectly states in its Motion that "Plaintiff did not seek EEO

Washington Hospital's summary judgment motion); Derrickson v. Circuit City Stores, Inc., 84 F. Supp. 2d 679, 685 (D.Md. 2000)(acts of prior discrimination may be relevant to plaintiff's proof that defendant's articulated reasons for its actions are pretextual).

counseling" when in fact she did.  Def. Mot. Sum. Jud. at 5.  The EEO counseling of Plaintiff's retaliation claim for the non-selection for the Assistant Chief Counsel position is clearly supported by evidence in the record.

Specifically, upon learning from Judith Rutledge of her non-selection on July 13, 2004, Plaintiff quickly amended her EEO Complaint by initially contacting the Agency's EEO Counselor via e-mail on July 20, 2004.  PEX#3.  The selectee, Ms. Lawless, did not accept the job offer.

Ms. Walls then amended her EEO complaint again after learning on September 14, 2004 that the Agency selected Mr. Yonish for the position she sought.  PEX#4.

The Agency then waited until November 22, 2004 to acknowledge receipt of Plaintiff's Amended Formal EEO Complaint, which included her complaint for retaliatory non-selection for the Assistant Chief Counsel position.  PEX#5.

### 2.    Court Proceedings

Plaintiff filed the Complaint that is the subject of this action on July 13, 2006. Defendant filed an Answer, and not a Motion to Dismiss, on September 28, 2006.  The Honorable Judge Richard W. Roberts was originally assigned to this case and the initial scheduling conference was held on November 26, 2006.  According to the Scheduling Order, discovery was stayed until January 23, 2007 and the first discovery deadline was May 21, 2007.  After the scheduling conference, the parties unsuccessfully attempted to settle the case.  The last deadline for discovery was set for October 22, 2007.

Plaintiff moved to extend the time to complete discovery on October 3, 2007.  In response, Defendant moved to stay discovery and filed a Motion for Summary Judgment on October 16, 2007.  When Defendant filed its Motion for Summary Judgment, the case

was still in the discovery phase. Plaintiff did not anticipate that such a Motion would be filed at that stage in the proceedings and Plaintiff needed additional time to gather the necessary information to respond adequately to Defendant's Motion. On November 9, 2007, the Court denied Plaintiff's motion to extend discovery and denied Defendant's motion to stay discovery as moot.

### B.    Factual Background

Ms. Walls is currently an Attorney-Advisor, GS-0905-14 with the U.S. Department of Transportation,(hereinafter "The Agency" or "FMCSA") in the Office of Chief Counsel. Complaint at ¶ 4.

After graduating from the Thurgood Marshall School of Law in 1980, Ms. Walls joined the Interstate Commerce Commission ("ICC") as an Attorney Advisor. PEX#6. In that capacity, Ms. Walls was responsible for analyzing factual and legal issues relating to railroads, water carriers, motor carriers, freight forwarders and buses and she gained extensive legal knowledge on a wide variety of transportation issues within the regulatory and legislative arena. Id. She also served as a Senior Trial Attorney and investigated violations of the Interstate Commerce Act. Id. During this time period, from 1993-1994, Ms. Walls was detailed to the misdemeanor trial section of the United States Attorney's Office as a Special Assistant United States Attorney. Id.

In 1996, when the ICC terminated and merged its functions with DOT, Ms. Walls continued her work on transportation issues with the Federal Highway Administration ("FHWA"). She initially worked in the Office of Motor Carrier Research and then transferred to the Legislation and Regulations Division of the Chief Counsel's Office in October 1996. PEX#6. As an Attorney-Advisor, GS-14 with FHWA, Ms. Walls was

responsible for reviewing and coordinating FHWA rulemaking and policy statements relating to motor carrier safety and enforcement proceedings. Id.

During her tenure in FHWA, Ms. Walls' then supervisor, Mr. Thomas Holian, recommended Ms. Walls for a promotion to the GS-15 level. PEX#7, p. 2. See also Deposition of Elaine Walls, dated August 11, 2005, p. 17 ("Walls Dep."), attached hereto as PEX #8. However, at the time, FHWA was going through a restructuring and Congress had created a new agency, the Federal Motor Carrier Safety Administration, to handle Motor Carrier safety issues. Walls Dep. at 21. As a result, Ms. Walls' promotion to the GS-15 level was in the initial stage when Ms. Judith Rutledge, Deputy Chief Counsel in the Counsel's Office for FMCSA, approached Ms. Walls about joining FMCSA. PEX#7, p. 2. In response, Ms. Walls explained to Ms. Rutledge that Mr. Holian had recommended her to be promoted to the GS-15 level. Id. Accordingly, Ms. Walls asked Ms. Rutledge if she would honor her promotion if she transferred to FMCSA. Id. See also Walls Dep. at 24. Ms. Rutledge responded that she would honor that promotion if Ms. Walls transferred. Id.; Walls Dep. at 25. At no point in time did Ms. Rutledge indicate that she would not promote Ms. Walls to the GS-15 level. Id.

Relying upon these assurances, Ms. Walls transferred to FMCSA in October 2000. PEX#6. In FMCSA, Ms. Walls' first line supervisor was Ms. Suzanne O'Malley, the Assistant Chief Counsel of the Regulations Affairs Division. In 2001 and 2002, Ms. Walls inquired about being promoted to the GS-15 level, but each time was told that promotions would not occur due to budget constraints. Complaint at ¶¶ 16-17.

In or about December 2003, Ms. Walls approached her immediate supervisor, Ms. O'Malley about being nominated as a participant in the Executive Potential Program

("EPP").  PEX#7, p. 3.  Ms. Walls hoped that her participation in EPP would broaden her professional development and assist her in obtaining the GS-15 level.  Ms. O'Malley concurred and believed it would be a great opportunity for Ms. Walls.  Id.  EPP is a DOT management program that gives employees an opportunity to be detailed to other agencies throughout the Washington, D.C. metropolitan area to gain management experience.  Walls Dep. at 27.  Mr. Joseph Solomey, a similarly situated Caucasian male attorney in FMCSA, had been selected for EPP the previous year.  PEX#7, p. 3.

Shortly after speaking to Ms. O'Malley about her career goals and interest in EPP, Ms. Rutledge informed Ms. Walls that the Counsel's Office would not recommend her for EPP in 2004.  PEX#7, p. 4.  Ms. Rutledge told Ms. Walls that they could not recommend her because they had recommended Mr. Solomey the previous year.  Id.  However, management denied Ms. Walls' request because they did not want female attorneys to advance professionally.  Id.

Seeking further clarification on this issue, Ms. Walls then approached Mr. McCown about the EPP program and advancement opportunities.  PEX#7, p. 4.  See also Complaint at ¶ 23.  When Ms. Walls spoke to Mr. McCown, he told her that he didn't know much about the issues she raised and that he would check into the matters and get back to her.  Id.  See also Walls Dep. at 49.  He never did.  Id.

In January 2004, Mr. McCown offered to promote Mr. Solomey to a GS-15 level.  PEX#7, p. 3.  See also Walls Dep. at 33.  Mr. Solomey declined the offer because he took a job at another agency, RSPA.  Id.

On February 6, 2004, Ms. Walls met with Ms. Rutledge and Mr. McCown about being nominated for participation in the EPP program and about her career ladder, non-

competitive promotion to the GS-15 level. PEX#7, p. 4. At this meeting, Ms. Rutledge and Mr. McCown denied Ms. Walls' career ladder promotion and refused to recommend her for EPP. Id. See also Complaint at ¶ 26. Ms. Rutledge indicated that Ms. Walls was "almost" performing at a GS-15, but she failed to inform Ms. Walls what she had to do to obtain a GS-15 given the fact that Ms. Walls had over twenty (20) years of legal experience in the transportation field. PEX#7, p. 4. Mr. McCown also indicated that Ms. O'Malley had expressed her belief that Ms. Walls was not qualified for a promotion to the GS-15 level. Complaint at ¶ 26. Mr. McCown suggested that Ms. Walls, Ms. O'Malley and Ms. Rutledge continue to discuss Ms. Walls' promotion. Id. Mr. McCown also stated that he would follow-up personally with Ms. Walls, but he never spoke with Ms. Walls about her promotion again, nor did he ever provide any assistance whatsoever. Id.

On February 10, 2004, Ms. Walls again met with Ms. Rutledge and Ms. O'Malley to discuss these issues again. PEX#7, p. 4-5. Part of the purpose of the meeting was to clarify that Ms. O'Malley never said that Ms. Walls should not be promoted to the GS-15 level. Walls Dep. at 55. Ms. O'Malley was upset that Mr. McCown and Ms. Rutledge had misquoted her because she never told them that Ms. Walls not qualified for a GS-15 career ladder promotion. PEX#7, p. 5. See also Complaint at ¶ 28.

When asked about her promotion at this meeting, Ms. Rutledge initially indicated that while Ms. Walls was close to getting a GS-15 level, non-competitive promotion, Ms. Rutledge believed she was not quite there. PEX#7, p. 5. See also Walls Dep. at 56. Ms. Rutledge hinted at developing a plan to get Ms. Walls to the GS-15 level. Id. However, no such plan was ever developed. Id. See also Complaint at ¶ 28.

9

Then, later in the same meeting, Ms. Rutledge abruptly reversed her position. She then made it clear that she did not intend to promote Ms. Walls to the GS-15 level. PEX#7, p. 4-5. <u>See also</u> Walls Dep. at 56. Ms. Rutledge then told Ms. Walls that she would no longer "sugar coat" the issue and would call a "spade a spade." <u>Id</u>. In her view, Ms. Walls was nothing more than a high paid GS-14 level attorney and she would never promote Ms. Walls. <u>Id</u>.

Thereafter, seeking to protect her rights, on February 12, 2004, Ms. Walls made her initial contact with an EEO counselor regarding the denial of her career ladder promotion and other discriminatory treatment. PEX#1.

On or about March 18, 2004, in retaliation for Ms. Walls' EEO complaint, management in the Office of Chief counsel gave Ms. Walls a "Meets or Exceeds Requirements" rating for her 2003 Performance Evaluation despite the fact that Ms. Walls' performance, as well as Ms. O'Malley's evaluation comments, supported an Outstanding rating. Complaint at ¶ 32. <u>See also</u> PEX#9. Mr. McCown was aware that Ms. Walls had filed her EEO complaint when they gave her a retaliatory low performance rating because he had turned down her request to mediate the EEO claims on March 10, 2004. Complaint at ¶ 31.

On March 22, 2004, the Agency posted a Vacancy Announcement, No. HM4823EX, for the Assistant Chief Counsel position, Office of Chief Counsel, Enforcement and Litigation Division with a closing date of April 12, 2004. PEX#10. Ms. Walls applied for the position on April 12, 2004. PEX#6.

Sometime after the closing date of the Vacancy Announcement, Ms. Rutledge approached an Agency employee, Ms. Sue Lawless, and encouraged Ms. Lawless to

apply even though the closing date for the position had passed. Deposition of Judith Rutledge, dated August 23, 2005, p. 276-77 ("Rutledge Dep."), attached hereto as PEX #11. Clearly, management had pre-selected Ms. Lawless and therefore allowed her to apply despite the closing date.

On July 9, 2004, Mr. McCown submitted Ms. Lawless' name as the selectee for the Assistant Chief Counsel position. PEX#12. As alternatives, Mr. McCown suggested David F. Snyder and Dennis D. Kirk. Id. Mr. Yonish was not listed as an alternative candidate in this first Memorandum. Id.

On July 13, 2004, Ms. Rutledge informed Ms. Walls that she was not selected for the position. PEX3. On July 20, 2004, Ms. Walls contacted the EEO Office of the Agency to amend her EEO Complaint to add a claim of retaliation for her non-selection. Id.

On August 3, 2004, Mr. McCown and Ms. Rutledge were informed that Ms. Lawless declined the job offer. PEX#13. Accordingly, they reviewed the candidates and, once again, ignored Ms. Walls for the position. On August 6, 2004, Mr. McCown recommended Mr. David F. Snyder for the Assistant Chief Counsel position. PEX#14. As an alternative, Mr. Kirk and Mr. Yonish were proposed. Apparently, Mr. Snyder and Mr. Kirk declined the offer and the fourth choice, Mr. Yonish, was selected. In an E-mail dated August 25, 2004, Mr. McCown and Ms. Rutledge were informed that Mr. Yonish accepted the job offer. PEX#15.

On September 14, 2004, Mr. McCown issued his Monthly Chief Counsel Report. PEX#16. In this Report, on the last page, Mr. McCown informed FMCSA that Mr. Yonish had accepted the position and would be starting on October 4, 2004. Mr.

Yonish's appointment to the Assistant Chief Counsel position was approved on October 6, 2004. PEX#17.

Immediately upon learning of Mr. Yonish's selection, Mr. Walls again contacted the EEO office to amend her complaint. See PEX#4. In an e-mail dated November 22, 2004 to Ms. Walls, the Agency's EEO Office acknowledged receipt of the amended complaint as well as acceptance of the claims for administrative processing. See PEX#5. The Agency investigated these claims and made them part of the EEO Report of Investigation.

On or about October 28, 2004, Ms. Walls was informed that she was selected to receive the Secretary's Team Award. See PEX#18 and 19. This award is the highest award given within the Department of Transportation and receipt of the Secretary's Award is a distinct honor. See PEX#19. Ms. Walls was selected to receive this honor based upon her work on both the Mandamus Regulatory Development Team, as well as her work on the NAFTA Litigation Team. See PEX#18 and See PEX#20.

Although receiving the Secretary's Team Award was a high honor, in previous years, Ms. Walls had been passed over for such awards and she did not receive the same level of recognition or bonuses as her male colleagues. PEX#7, p. 10-12. See also Complaint at ¶ 34.

## III.    Standard of Review

### A.    Motion for Summary Judgment.

A motion for summary judgment should only be granted when "there is no genuine issue as to any material fact". Rule 56(c). A genuine issue is one which could establish a claim or a defense and thus effect the outcome of the action. Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The "material" facts in a civil action are determined by the substantive law of the claims presented.  Id., at 248.

    Further, in considering the summary judgment issue, the court must view all evidence in the light most favorable to the non-movant.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(citations omitted); Anderson v. Zubieta, 180 F.3d 329, 338 (D.C. Cir. 1999).  Summary judgment should not be sustained unless the record, when considered as a whole, precludes a rational trier-of-fact from a finding for the non-moving party.  Liberty Lobby, Inc., 477 U.S. at 248-249.  The role of the trial court at the summary judgment stage is limited to discerning whether there are genuine issues of fact, not to deciding those issues.  Lafond v. General Physics Corp., 50 F.3d 165, 172 (2d Cir. 1995)("district court erred by resolving a disputed issue of fact and [drawing] inferences in favor of the movant.").  A summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences.  Windon Third Oil and Gas v. Federal Deposit Ins., 805 F.2d 342, 346 (10th Cir. 1986), cert. denied, 480 U.S. 947 (1987).

    Recognizing its "drastic nature," the Courts of Appeal have consistently cautioned against granting summary judgment "unless it is perfectly clear that there are no genuine issues of material fact in the case" and, especially in employment discrimination cases, as here, when the "state of mind is a decisive element of a claim... " Ballinger v. North Carolina Agricultural Extension Service, 815 F.2d 1001, 1004-05 (4th Cir. 1987) (internal citations omitted).  Accord Young In Hong v. Children's Mem. Hosp., 993 F.2d 1257, 1261 (7th Cir. 1993)(Summary judgment is "often an inappropriate method of

13

resolving Title VII claims in which the issue of intent . . . is the central issue."); Hardin v. Hussmann Corp., 45 F.3d 262, 264 (8th Cir. 1995)("Summary judgments should only be used sparingly in employment discrimination cases."); Gallo v. Prudential Residential Services, 22 F.3d 1219, 1223-24 (2d Cir. 1994)("A trial court must be cautious about granting summary judgment [in a discrimination case] when . . . the central issue is intent . . ."). Moreover, where there are a number of discrepancies in the facts asserted by the parties, as here, summary judgment should not be used at all. Reeves v. Sanderson Plumbing Co., 530 U.S. 133 (2000).

By virtue of the fact that well-established case law supports Ms. Walls' case, and the numerous material facts in genuine dispute, as set forth *infra*, it is clear that the Defendant's motion for summary disposition should be denied. This matter should proceed to a trial and/or continue with discovery so that Ms. Walls can obtain additional evidence and facts to support her claims as set forth in the accompanying Rule 56(f) Affidavit.

**B.**    **Legal Principles Governing Evidentiary Matters Raised In Employment Discrimination Cases.**

Because of its variety and depth, a plaintiff alleging discrimination may present evidence in support of her case pursuant to the guidelines set out in the D.C. Circuit's *en banc* decision in Aka v. Washington Hospital Center, 156 F.3d 1284, 1289 (D.C. Cir. 1998)(*en* banc). There, the Court categorized data supportive of a plaintiff's claims into three areas: plaintiff's prima facie case, evidence of pretext regarding the employer's proffered reason for its action and other evidence regarding the defendant's behavior that may be relevant to the ultimate determination.

14

Reliance on circumstantial evidence and inference is commonly required because there is seldom "'eyewitness' testimony as to the employer's mental processes." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000). See also Hunt v. Cromartie, 526 U.S. 541, 553 (1999) ("Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely on other evidence.").

In applying these precepts to a motion for summary judgment, the D.C. Circuit instructed that a plaintiff must present sufficient evidence so that "a reasonable jury could conclude that she was terminated for a discriminatory reason." Waterhouse v. District of Columbia, 298 F.3d 989, 992 (D.C. Cir. 2002), citing Aka, 156 F.3d at 1290. As the Court pointed out there, the question is:

> [W]hether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)....
> Id. at citing Aka at 1289; see Reeves, 530 U.S. at 151.

Circumstantial evidence, then, is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence. Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 330-331 (1960)(permitting case to go to jury by confirming that circumstantial evidence could be more persuasive than direct evidence). See also Higbee v. Billington, 246 F.Supp.2d. 10 (D.D.C. 2003)(each discriminatory act must not in itself, meet some standard of substantiality before the accumulation of them is actionable); McGinest v. GTE Service Corp. 360 F.3d 1103, 1124 (9th Cir. 2004) (acknowledging circumstantial evidence cast doubt upon employer's proffered explanation for its failure to promote employee); Stegall v. Citadel Broadcasting Co., 350 F.3d 1061, 1068-1069 (9th

Cir. 2003) (court denied employer summary judgment based on employee's myriad of circumstantial evidence to show that employer's reason for termination was pretextual and asserted that lower court erred in examining each piece of evidence in isolation).

### C. Summary Judgment Should Be Denied Where There Has Been Insufficient Opportunity to Take Discovery.[2]

In the present case, Defendant filed its Motion for Summary Judgment prior to the close of discovery and discovery had not been completed. Indeed, just before Defendant filed its Motion for Summary Judgment, Plaintiff had filed a Motion for Extension of Time to Complete Discovery which the Court subsequently denied. Nonetheless, as set forth herein, the Court should permit Ms. Walls to develop facts supportive of her claims of pretext through the appropriate vehicle of discovery. Indeed, courts have routinely denied motions for summary judgment outright so that the parties could properly take discovery. The general rule is that summary judgment is improper if the non-movant has not had an adequate opportunity for discovery. See Plott v. Gen. Motors Corp., 71 F.3d 1190, 1195 (6th Cir. 1995).

Summary disposition is especially disfavored where, like here, Plaintiff's ability to prove pretext is heavily dependent upon witness testimony, credibility issues and other evidence requiring discovery. Indeed, the significance of discovery is a well accepted concept by the courts. See Anderson v. Liberty Lobby, 477 U.S. 242, 250 n.5 (1986)(explaining that Rule 56(f) provides that summary judgment must be denied where the nonmoving party has not had the opportunity to discover information that is essential to his opposition); Reed v. Lawrence Chevrolet, Inc., 2001 WL 838404 (7th Cir. 2001)(denying motion for summary judgment where employee reasonably could not be

---

[2] See also Rule 56(f) Affidavit in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment Motion, attached hereto as PEX#28.

expected to challenge the sincerity of the defendant's proffered reasons (i.e., lack of experience, no long-term interest in sales, gaps in the plaintiff's employment record) without having, at least, the opportunity to conduct discovery regarding whether the selecting official applied the same standards to Caucasian applicants).

Here, Defendant erroneously contends that Plaintiff has had sufficient discovery because several depositions of management officials were taken during the EEOC administrative processing of Ms. Walls' case.  Def. Mot. Sum. Jud. at 1.  However, the filing a civil complaint in federal Court is *de novo* with respect to the EEOC administrative processing.   See Chandler v. Roudebush, 425 U.S. 840, 845-846 (1976)(acknowledging that since the civil action provided in § 706 is a trial *de novo*, federal-sector employees are entitled to a trial *de novo* of their employment discrimination claims).  See also Farrell v. Principi, 366 F.3d 1066, 1067 (9th Cir. 2004) (confirming that the claimant may seek *de novo* review of the disposition of his administrative complaint by filing a civil action in district court); Doe v. United States, 821 F.2d 694, 697-98 (D.C.Cir.1987) (holding that "[d]e novo means here, as it ordinarily does, a fresh, independent determination of 'the matter' at stake; the court's inquiry is not limited to or constricted by the administrative record, nor is any deference due the agency's conclusion.")   As such, any facts relevant to Ms. Walls' Complaint arising from the administrative case should be considered anew and Ms. Walls should have the opportunity to pursue, as well as introduce, new evidence and legal theories to support her claims.

Thus, Ms. Walls' Complaint should not be dismissed without allowing her to seek a more developed record.  Permitting additional time for discovery will not substantially

prejudice Defendant who is well aware of Ms. Walls' claims.  In sum, it is in the interest of justice to allow additional discovery before reaching an ultimate decision on the merits.

IV.    **Argument**

    A.    **Defendant Discriminated Against Ms. Walls on the Basis of Her Race and Sex When It Failed to Give Her A Career Ladder Promotion to GS-15.**

Title VII provides, in relevant part, that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... or national origin." *42 U.S.C. § 2000e-2(a)(1).*

Applying the familiar test of <u>McDonnell Douglas v. Green</u>, 411 U.S. 792, 802, (1973), the court in <u>Brown v. Brody</u>, 199 F.3d 446 (D.C. Cir. 1999) stated that to establish a prima facie case for disparate treatment discrimination "in federal as in private employment cases ... the plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." <u>Brown v. Brody</u>, 199 F.3d at 452; <u>see</u> <u>also</u> <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Ballinger v. North Carolina Apr. Extension Serv.</u>, 815 F.2d 1001 (4th Cir.), <u>cert</u>. <u>denied</u>, 484 U.S. 897 (1987).

Courts have emphasized the significance in not interpreting these elements rigidly.  For instance, the defendant in <u>Laudenslager v. Loral Corp.</u>, 1996 U.S. Dist. LEXIS 16632 (E.D. Va. 1996) asserted that the plaintiff had failed to produce any evidence to satisfy prongs three and four and therefore had failed to establish a prima

facie case. The court noted that defendant erroneously portrayed the elements of the prima facie case as rigid and inflexible. It explained that the federal courts, including the Supreme Court, have historically construed these elements as flexible and dependent on the facts of the case. Id. at *8. For instance, the Court in McDonnell Douglas stated that "the facts necessarily will vary in [employment discrimination], and the specification above of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n.13; see also Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 n.6 (1981); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)(the McDonnell Douglas model of the prima facie case is not intended to be "rigid, mechanized, or ritualistic" and that its requirements can vary depending upon the factual context); Alvarado v. Board of Trustees, 928 F.2d 118 (4th Cir. 1991) (acknowledged that it was permissible to modify the McDonnell Douglas test in recognition of the Supreme Court's statement that the test should vary with differing applications of Title VII).

Thus, the plaintiff's burden of establishing a *prima facie* case "is not onerous." Burdine, 450 U.S. at 253. See also, Cones v. Shalala, 199 F.3d 512, 516 (D.C. Cir. 2000) ("of particular significance to this case, the burden of establishing *prima facie* case is "not onerous"); Holmes v. Bevilacqua, 794 F.2d 142, 147 (4th Cir. 1986)(at bottom, the importance of the prima facie case is to "point toward illegal discrimination"); Fernandes v. Costa Brothers Masonry, Inc., 199 F.3d 572, 580 (1st Cir. 1999)(described *prima facie* case as a "modest hurdle"); Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000)(stating that burden of establishing a *prima facie* case is "minimal"); Weinstock v. Columbia University, 224 F.3d 33, 42 (2d Cir. 2000)(burden of establishing *prima facie*

case is "de minimis"); Graham v. Long Island R.R., 230 F.3d 34, 43 (2d Cir. 2000)(reversing lower court's grant of summary judgment to the Title VII defendant because it had "applied an unduly inflexible standard" in evaluating plaintiff's *prima facie* case); Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660 (6th Cir. 1999)(*prima facie* requirement is "not onerous" and poses a "burden easily met"); Bellaver v. Quanex Corp., 200 F.3d 485, 493 (7th Cir. 2000)(reversing grant of summary judgment to the Title VII defendant because plaintiff's evidence on the *prima facie* case need not be overwhelming or even destined to prevail . . . plaintiff's burden is a "low burden").

In sum, the function of the *prima facie* case is essentially to eliminate a plaintiff's "lack of qualifications" or "the absence of a vacancy in the job sought" as the most common nondiscriminatory reasons for a plaintiff's rejection. See, e.g., International Board of Teamsters v. United States, 431 U.S. 324, 358, n.44 (1977); Cones v. Shalala, 199 F.3d 512, 516 (D.C. Cir. 2000)(confirming same). "Elimination of these reasons for the refusal to hire," the Supreme Court has explained, "is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one." Teamsters, 431 U.S. at 358.

Given the flexibility of the prima facie case, Plaintiff Walls undoubtedly fulfills her prima facie burden.

### 1. Ms. Walls Can Establish A Prima Facie Case of Race and Sex Discrimination for Defendant's Failure to Give Her A Career Ladder Promotion to GS-15.

There is no dispute that Ms. Walls satisfies the first two elements of the prima facie case. Ms. Walls is an African-American female who was eligible for, and should have been given, a non-competitive career ladder promotion to the GS-15 level. She

20

suffered an adverse action when Defendant failed to give her the career ladder promotion that she earned and deserved. Furthermore, an inference of discrimination is raised from the fact that Ms. Walls was qualified and eligible for a career ladder promotion and has been unsuccessfully seeking advancement within her job series since at least 2000 for the purposes of the Opposition. Additional inferences of discrimination are also set forth in the pretext argument section, below, which rebuts Defendant's so-called legitimate business reason for failing to allow Ms. Walls to attain the full performance level for the position to which she was hired.

To attack Ms. Walls' unassailable prima facie case, Defendant cites a three pronged prima facie test articulated in Taylor v. Small, 350 F.3d 1286, 1294 (D.C. Cir. 2003) and attempts to argue that Ms. Walls must show that other employees of similar qualifications were promoted at the time her request for a promotion was denied. Def.Mot.Sum.Jud. at 17.

Defendant's argument is ludicrous. By definition, a career ladder promotion is a promotion where there is no competition and therefore, an employee seeking an advance in their grade would have no comparators. Thus, Defendant's assertions that Plaintiff cannot meet her prima facie case because she has no evidence that other employees of similar qualifications were promoted makes absolutely no sense. See Bryant v. Aiken, Inc., 308 F.3d 536 (4th Cir. 2003) (a plaintiff is not required, as a matter of law, to point to a similarly situated white comparator in order to succeed on a race discrimination claim…")

Moreover, federal employees are appointed into career ladder positions with the express intent that the position will prepare the employee for promotion to a higher grade. It does not make sense that an employee serving in a career ladder position, whose

21

performance is consistently rated fully successful or better, and who receives cash awards and accolades for her work, fails to be timely promoted to the next higher grade level. If the intention of a career ladder position is to arm the employee with the tools to be successfully appointed to the next higher grade level, and that appointment does not occur, then clearly, something is amiss.

The Agency has also argued that it has never promoted any employee to a non-supervisory GS-15 position. Def.Mot.Sum.Jud. at 17. Even if true, this assertion is irrelevant. As mentioned *supra*, Plaintiff does not need to show that someone else was promoted. She is not required to produce a comparator. If the Court were to require her to produce a comparator, it would essentially isolate Defendant, and any other employer for that matter, who refused to promote for discriminatory reasons, from judicial review simply because no employee outside the protected class had happened to be promoted to the next higher grade during the time frame in question. Indeed, the issue of identifying comparators, for a non-competitive position, is counter-intuitive to the purpose of advancing in a career ladder position.

Accordingly, Ms. Walls has undoubtedly fulfilled her prima facie burden. She is an African-American female who was eligible for, and should have been given, a non-competitive career ladder promotion to the GS-15 level.

2.      **Ms. Walls Can Rebut the Defendant's So-Called Legitimate, Nondiscriminatory Reason For Failing to Allow Her to Obtain the Full Performance Level in Her Position By Proffering Evidence That Shows That: a) Defendant's Standards Were Too Subjective, b) Unequal and Shifting Performance Standards Were Applied and c) Defendant Failed to Provide Ms. Walls With the Opportunities Necessary to Obtain a Non-Competitive Promotion.**

Once a prima facie case is established, the burden shifts to the Defendant to articulate with clarity and reasonable specificity a legitimate, nondiscriminatory reason(s) for the action it took.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254-56 (1981); Bundy v. Jackson, 641 F.2d 934 (D.C. Cir. 1981).  To satisfy this "intermediate burden," the defendant is obliged to produce evidence "which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Burdine, 450 U.S. at 257; St. Peter v. Secretary of the Army, 659 F.2d 1133, 1139 (D.C. Cir. 1981).

If the defendant is able to articulate a legitimate business reason(s) for its actions, the plaintiff must be provided the opportunity to show that defendant's articulations are pretext.  In other words, the plaintiff must show either that 1) a discriminatory reason more likely motivated defendant or that 2) the defendant's proffered explanation is unworthy of credence and more than likely not the real reasons for the decision(s) at issue.  McDonnell-Douglas Co., 411 U.S. at 805; Reeves v. Sanderson Plumbing Corp., 530 U.S. 133 (2000)(plaintiff need not prove that discrimination motivated the employer, but merely that the reason offered by the defendant is not worthy of credence.)

Here, Defendant asserts that it had high standards for promotion to the GS-15 level which it supposedly applied to all attorneys in the Chief Counsel's Office. Def.Mot.Sum.Jud. at 18.  As will be set forth below, the standards articulated by Defendant are too subjective and an expert witness will be able to prove that FMCSA's standards violate the Office of Personnel Management (OPM) regulations.  In short, FMCSA's policies fail to allow employees to reach the full performance level for the attorney position which is the GS-15 level.  Moreover, FMCSA's standards are unequally

applied and employees are not held to the same standard.  In fact, Ms. Walls was held to

a higher and more burdensome standard, and expected to achieve unrealistic goals, to

obtain the full performance level for her position.  Additionally, Ms. Walls was held back

and not provided with opportunities which would have showcased her abilities and allowed

her become "truly distinguished" in her field.

Ms. Walls was eminently qualified for a non-competitive promotion to the GS-15

level and Defendant purposefully held her to a higher criterion and overlooked her

qualifications so that it could prevent her from obtaining the full performance level

because of her race and sex.

> **i.     Defendant's Criteria for Career Ladder Promotion Are Too Subjective and An Expert Witness Will Be Able to Prove that FMCSA's Standards Violate OPM Regulations.**

The Agency's reliance on its impossibility high standards for promoting

Attorneys to the GS-15 level serves as pretext for the discriminatory reasons that Ms.

Walls was not promoted to the GS-15 level.  Plaintiff believes that she can identify,

through further expert discovery, that FMCSA's policies do not meet the standards

mandated by OPM.  Plaintiff is confident that an expert witness would conclude that the

FMCSA failed to follow the standards set by OPM for promotions of employees in career

ladder positions.  Indeed, if the express intent of a career ladder position is to prepare an

employee for promotion to a higher grade, then FMSCA acted illegally when it

repeatedly failed to prepare Ms. Walls for promotion to the next higher level.

When the Agency hired Ms. Walls into the career ladder position she currently

occupies, it did so with the promise or the expectation that she would be promoted to the

higher level after completing the necessary time in grade.  Ms. Walls, in turn,

competitively competed for the position, and accepted the job, knowing that she would be promoted to the higher level when she was eligible, i.e., when she performed her duties and responsibilities in a fully successful manner.  For at least four (4) years or more, for the purposes of this Opposition, the Agency's repeated failure to promote Ms. Walls in accordance with the terms of her career ladder position is a violation of OPM policy and is illegal.  Plaintiff is certain that an expert witness who is qualified to evaluate and attest to OPM policies and procedures will be able to show that FMSCA acted illegally and failed to follow OPM regulations.

In addition to the foregoing, Plaintiff believes that numerous Caucasian male attorneys were promoted non-competitively to the GS-15 level in the Federal Highway Administration (FHWA), the predecessor organization to FMCSA.  Walls Dep. at 21. Discovery on this issue would further demonstrate that FMSCA applied standards that were not only inconsistent with OPM regulations, but also differed from that of other, similar agencies with DOT.  Accordingly, allowing Plaintiff additional discovery on this issue will help to support her claims that FHWA had different standards than FMSCA for promotion to the GS-15 level and that Plaintiff was held to a higher standard than the male attorneys who were promoted in FHWA.

Therefore, it would be premature for the Court to award Summary Judgment as Plaintiff is certain that further discovery on this point would reveal that Defendant's failure to follow OPM's policies was motivated by its discriminatory animus.

> ii.    **Defendant's Criteria for Career Ladder Promotion and Other Personnel Actions Are Unequally and Discriminatorily Applied.**

Defendant claims that its standards for a non-competitive, career ladder promotion to the GS-15 level are applied "equally and fairly to all attorneys in the office." Nothing could be further from the truth. Def. Mot. Sum. Judg. at 18. As a point of fact, Joseph Solomey was offered a career ladder promotion without meeting Defendant's so-called stringent standards. PEX#7, p. 3. See also Walls Dep. at 33. The fact of the matter is that the standards for promotion to a GS-15 are not so stringent. Subjective, yes, stringent no.

Equally telling is the Secretary's concern and awareness of this same issue. Specifically, in 2005, Norman Mineta, the Secretary for DOT, released a Memorandum to all Heads of Operating Administrations, Chief Counsels informing them that he was concerned that inconsistent implementation of the policies and practices regarding attorney promotions was having an adverse impact on the department's ability to recruit and retain a strong legal workforce. PEX#21. Thus, his Memorandum directs the Chief Counsels to adopt a uniform attorney promotion policy that permits qualified attorneys to be eligible for promotion to the GS-15 level. Id. FMCSA failed to adopt the Secretary's directive.

The pervasive discrimination in FMCSA is not limited to its treatment of Ms. Walls or to its uneven application of standards for obtaining a higher grade by a career ladder promotion. Rather, there are numerous instances of biased personnel actions being taken against females and minorities which points to the discriminatory nature of the Office of Chief Counsel's decision-making. The record is clear that not only did management subject Ms. Walls to disparate treatment, but they also targeted other females in Chief Counsel's office. As set forth in Ms. Walls' EEO Complaint,

management treated women less favorably with respect to hiring, promotion, bonuses, training, career opportunities, and assignments. This crucial and important background evidence proves that management's penchant to apply different rules to the female attorneys at the FMSCA was blatantly obvious.

For example, during 2003, Mike Faulk and Steve Farbum were allowed to telecommute but the female attorneys in the office, namely Jackie Cho, Rosemarie Dettling and AnnMarie Ottman, were not allowed to telecommute. PEX#22, p. 2. When Ms. Dettling, Ms. Ottman and Ms. Cho complained to the Agency's EEO Office regarding the blatant favoritism towards the males in the Chief Counsel's Office, management claims it suspended all telecommuting. Id. Not allowing employees to telecommute is counter to the DOT/FMSCA policy that the Agency was pro-telecommuting. Id.

Management, however, did not suspend all telecommuting and, in fact, Mike Faulk continued to telecommute. Management's rationale for allowing Mr. Faulk to continue to telecommute while he was detailed to the Adjudications section was that the office supposedly did not require the same "in office" presence as the rest of the Chief Counsel's Office. PEX#23, p. 2. Such a justification barely seems plausible given that Ms. Cho, who was also detailed to the Adjudications Counsel's office, was not allowed to telecommute while assigned to that office. Id. Indeed, even when her father was ill and hospitalized, management would not allow her to telecommute, claiming that telecommuting was only allowed if the request was "project driven". Id. Again, this is implausible. Management allowed Mr. Faulk to telecommute every week regardless of whether it was "project driven." Id.

Management also chose to apply the Agency's leave policy very strictly to the female attorneys in the office but not the males. For example, when Ms. Dettling and Ms. Ottman began working at FMCSA, they were told that they could work a compressed schedule and have a regular day off (RDO) but that they would have to wait a few months before beginning the RDO schedule. PEX#23, p. 3. Management, however, allowed male attorneys to begin taking RDOs immediately upon their hire. Id.

Management's proclivity for favoring males and subjecting the female attorneys to disparate treatment at FMSCA was prevalent and certainly not isolated to the incidents mentioned *supra*. For example, when management gave Ms. Cho her first performance review, Ms. O'Malley informed her that most employees received "Meets or Exceeds" and that no one received "Outstanding". PEX#23, p. 4. Shortly thereafter, however, Ms. Cho became aware that Ms. Faulk, Mr. Solomey and Charles Medalen were all rated "Outstanding" while she, Ms. Walls and Ms. Ottman were rated as "Meets or Exceeds." Id. Mr. Faulk also informed Ms. Cho that he always received an "Outstanding" rating. Id. As each individual's compensation is tied into the rating given by management, it is reasonable to infer that the males were compensated much more than the female attorneys. Id.

Last, but certainly not least, is management's affinity for hiring male attorneys at a higher grade than the female attorneys in the FMSCA even though they have considerably less experience. For example, Bryan Downey and Kenneth William were each hired as GS-14s despite the fact that they had considerably less experience than Ms. Dettling who was hired as a GS-13 and who had even previously been a GS-14. PEX#22, p. 5. Indeed, before she came to DOT, Ms. Dettling was already working at

Department of Justice before Mr. William had even graduated from law school.  Id.  And, Mr. Bob Brown was hired as a GS-14 attorney even though he had less experience than Ms. Dettling.  Id.  Yet when Ms. Dettling asked for a promotion, management required that she draft a promotion memorandum justifying her request to a GS-14.  Management, however, did not make the same request of Mr. Brown or any other male attorney for that matter.  Id.

In another instance, Ms. Ottman was hired as a GS-12 even though she had more experience than Mr. Downey and Mr. William.  PEX#22, p. 5.  As a point of fact, 2000 to 2004, management hired less experienced male attorneys yet awarded them higher GS levels than their more experienced female counterparts.  Id.

These and other blatant discriminatory acts by Defendant buttress or provide additional circumstantial evidence of discriminatory motive.  Combined with the other evidence of discrimination proffered by Ms. Walls, a reasonable trier of fact would be able to conclude that Defendant did not have legitimate reasons for its actions.  See e.g., Waterhouse v. District of Columbia, 298 F.3d 989, 992 (D.C. Cir. 2002)(whether the jury could infer discrimination depends on the combination of any further evidence of discrimination that may be available to the plaintiff such as independent evidence of discriminatory statements or attitudes on the part of the employer.)

**iii.  Defendant Failed to Provide Ms. Walls With the Opportunities Necessary to Obtain a Non-Competitive Promotion.**

Defendant also claims that Ms. Walls' performance supposedly did not justify a non-competitive promotion to the GS-15 level.  Def. Mot. Sum. Jud. at 18-19.  However, blatantly absent from this withering and unjustified condemnation of Ms. Walls'

performance and qualifications is the significant body of work Ms. Walls achieved on environmental issues within FMCSA.

In particular, Ms. Walls was a critical member of the North American Free Trade Agreement (NAFTA) litigation team.  Walls Dep. at 38-40.  As such, Ms. Walls developed NAFTA rules and helped to develop a NAFTA environmental impact statement which DOT was required to create as the result of a court action.  Id.  And, as part of the NAFTA litigation team, Ms. Walls was also responsible for developing an environmental planning report called the REPA report for the Deputy Secretary in an extremely short time frame so that the Deputy Secretary could determine how much funding was necessary for the Agency to develop a NAFTA Environmental Impact Statement ("EIS").  Id.  Ms. Walls was also responsible for reviewing and developing the rules in the EIS.  Walls Dep. at 41.

Ms. Walls also helped develop a NAFTA litigation task force that consisted of a multi-module administration team. Walls Dep. at 40.  Management appointed her to be head of the team. Walls Dep. at 41-42.  The team consisted of representatives from OSC, GC's office, FMSCA, FHWA, EPA and several other agency representatives throughout the Washington, D.C. metropolitan area and was tasked with the responsibility to help and develop issues that would be covered in NAFTA litigation.  Id.

Another monumental project assigned to Ms. Walls was developing three NAFTA rules to open the border between the United States and Mexico.  Ms. Walls was an integral part of the team that helped develop those rules, especially since the President wanted it accomplished within a specific time. Walls Dep. at 44.

Additionally, Ms. Walls was a member of the Mandamus Regulatory Development Team and developed environmental procedures for FMCSA to ensure that the Agency was in compliance with the National Environmental Policy Act of 1969. Walls Dep. at 42. She aided in the development and reviewed the safety performance for rulemaking impacting drivers. Id. As the only attorney in her group tasked with this responsibility, Ms. Walls made significant rewrites to the rules and developed other legal issues that were later expanded upon by the agency. Id. These were momentous projects for which Defendant even admits that Ms. Walls' accomplishments deserved special recognition. Def. Mot. Sum. Judg. at 9.

Unfortunately, just as Ms. Walls began to establish herself as a specialist in the environmental area, and was becoming recognized throughout the agency as the "go-to" person on these issues, Defendant abruptly removed her from these projects and gave her other assignments. Management sought to pigeonhole Ms. Walls by placing her in a generalist role rather than giving her the opportunity to establish herself as an expert in the environmental field. In short, by intentionally thwarting Ms. Walls' efforts to gain an expertise, Defendant blocked any chance she would have had to accomplish the standards which Defendant now claims was supposedly necessary to achieve full performance at the GS-15 level for her attorney position.

In addition to denying Ms. Walls assignments that would be career enhancing, Chief Counsel's Office also did not recommend Ms. Walls for the Executive Potential Program ("EPP"). EPP gives the selectees the opportunity to take management courses and to be detailed to other agencies. Walls Dep. at 28. In other words, participation in the EPP grooms these individuals for advancement to the next GS-level or advancement

to management.  By failing to support Ms. Walls with such activities, the Chief Counsel's Office prevented her from being able to realize her full potential.  It is undisputed that management recommended Joseph Solomey, a Caucasian male, for the EPP the previous year despite being short staffed.  Clearly, the Chief Counsel's Office reasoning for preventing Ms. Walls' nomination for this program was merely a smoke screen for its discriminatory animus.

Thus, Defendant's assertions that Ms. Walls' performance did not merit a career ladder promotion are disingenuous at best.  Her experience was extensive and recognized by management in her performance appraisals, awards and bonuses.  As a point of fact, in her General Workforce Performance Appraisal Record, dated from October 1, 2003 to June 30, 2004, management indicates that Ms. Walls provided highly effective service during the rated year.  PEX#9.  Management praised her for her contributions to the Regulatory Affairs Division and for her leadership in the highly significant FMSCA National Environment Policy Act (NEPA) Policy Statement and for numerous other accomplishments.  Id.  Management also awarded Ms. Walls with bonuses.  Such a performance evaluation is hardly reflective of an employee who is undeserving of a career ladder promotion.

It is very obvious that management is grasping at any excuse to cloak its discriminatory treatment of Ms. Walls.  Management has repeatedly given Ms. Walls "Meets or Exceeds" ratings on her performance evaluations. PEX#9.  Management has trusted her with important projects and assignments. PEX#6.  Now, at the eleventh hour, when Ms. Walls seeks to be placed at the next higher grade, the Chief Counsel's Office

suddenly posits that she developed performance issues and that she lacks the skills to be promoted to the GS-15 level.  Such after the fact rationalizations are not believable at all.

Indeed, Dolores Hodge, the Administrative Officer (AO) at FMCSA, gave sworn testimony in her affidavit during the EEO investigation.  As the AO, Ms. Hodge had first hand knowledge of employee recruitment and recognition initiatives.  Based on her observations during her tenure, the Chief Counsel's Office hired seven (7) attorneys who were all Caucasian males save two (2) Caucasian females.  PEX#24, p. 3.  Ms. Hodge found it difficult to fathom how, over the years, the Chief Counsel's Office deemed that the only qualified attorneys were Caucasian and male, especially since the applicant pools for posted positions were so large.  Id.  Moreover, Ms. Hodge could not understand how Ms. Walls was not promoted given that Ms. Walls had performed well in her position for multiple years, had experience within the department and was familiar with the mission, programs and goals of the agency.  Id.

In sum, all of this evidence, combined, demonstrates that Defendant's supposed legitimate business reasons for not promoting Plaintiff to a GS-15 level was pretext for discrimination. The bottom line is that management preferred to pick and choose who it selected for a promotion based on its own subjective and discriminatory criteria rather than by merit.

    B.    **Defendant Retaliated Against Ms. Walls When It Failed to Select Her for the Assistant Chief Counsel for Enforcement and Litigation Section Position.**

To state a *prima facie* case of retaliation under Title VII, a plaintiff must show that: (1) she engaged in activity protected by Title VII; (2) that a reasonable employee would have found the challenged action so materially adverse that she would have been

dissuaded from engaging in the protected activity, and (3) that there was a causal connection between the protected activity and the challenged retaliatory act. <u>Pegues v. Mineta</u>, 2006 WL 2434936 (D.D.C. August 22, 2006); <u>Rochon v. Gonzalez</u>, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006); <u>Cones v. Shalala</u>, 199 F.3d 512, 521 (D.C. Cir. 2000) (a *prima facie* case of retaliation is established by the employee showing that the "employer took an adverse employment action against him, and that the adverse action was causally related to the exercise of his rights."); <u>Forkkio v. Powell</u>, 306 F.3d 1127, 1130 (D.C. Cir. 2002); <u>Brown v. Brody</u>, 199 F.3d 446, 452-53 (D.C. Cir. 1999).

Whereas the anti-discrimination provisions of the statute seeks a workplace where individuals are not discriminated against, the "anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 548 U.S. 53 (2006).

For this reason, retaliation does not have to be the primary cause for the challenged employment decision; rather, it must merely play a role or be a *motivating factor* for the adverse action and plaintiff need only demonstrate that an employer used a forbidden consideration with respect to any employment practice. <u>See</u> <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003)(a plaintiff may prove a defendant violated Title VII by demonstrating that discrimination was a *motivating factor* in the employment action at issue)(emphasis added); <u>Arthur Young & Co. v. Sutherland</u>, 631 A.2d 354, 370 (D.C.App. 1993)(Plaintiff bears the ultimate burden of proving, by a preponderance of the evidence, that Defendant's adverse actions were improperly motivated, i.e., that, more likely than not, a desire to penalize the assertion of protected rights was a *substantial*

*contributing factor* in Defendant's decision to engage in the challenged acts)(emphasis added); <u>Davis v. State University of New York</u>, 802 F.2d 638, 642 (2d Cir. 1986) ("Title VII is violated *if a retaliatory motive played a part* in the adverse employment actions, even if it was not the sole cause.").

Here, Defendant does not challenge Ms. Walls' prima facie case and instead focuses its arguments on the rather absurd notion that, despite clearly being part of the EEO Report of Investigation, Ms. Walls somehow failed to exhaust administrative remedies for this claim. Def. Mot. Sum. Jud. at 29-30. Accordingly, Ms. Walls will treat her *prima facie* burden as conceded by Defendant and will address the exhaustion argument as well as demonstrate that Defendant's so-called legitimate business reasons for not selecting her for the disputed position are pretext for retaliation.

> 1. **Ms. Walls Filed an EEO Charge of Discrimination for the Assistant Chief Counsel for Enforcement and Litigation Position Well Within Forty-Five Days of Learning that Defendant Selected Brian Yonish.**

In its Motion, Defendant makes the rather confusing claim that Ms. Walls failed to obtain EEO counseling for her non-selection for the Assistant Chief Counsel for Enforcement and Litigation position. Def. Mot. Sum. Jud. at 29-30. This is incorrect and the record does not support Defendant. Indeed, this assertion appears to be based on Defendant's Exhibits 3, 4 and 5, documents which were submitted during the Agency's EEO process to support Ms. Walls' claims. Def. Mot. Sum. Jud. at 30; Def. SOF 3-5. While Defendant is correct that Exhibits 3, 4 and 5 fail to make any mention of the non-selection at dispute, Defendant inaccurately relies on the wrong EEO documentation.

As a point of fact, the Assistant Chief position was not filled until September 2004. As such, it should have been apparent on the face of Defendant's Exhibits 3, 4 and

5 that these documents were unrelated to the Assistant Chief position because these Exhibits plainly pre-date the non-selection. Specifically, Exhibit 3 is dated February 2004; Exhibit 4 is dated March 2004; and Exhibit 5 is dated April 2004.

The record undeniably demonstrates that Ms. Walls filed an Amended EEO Complaint promptly upon learning of the selection of Mr. Yonish on September 14, 2004 when Mr. McCown made the announcement in FMCSA's report to the General Counsel. See PEX#4. See also September 2004 Monthly Chief Counsel Report, PEX#16. The Agency investigated these claims and made them part of the EEO Report of Investigation. In fact, the Agency's EEO office sent an e-mail to Ms. Walls on November 22, 2004 which acknowledged receipt of the amended complaint as well as acceptance of the claims for administrative processing. See PEX#5.

Defendant may attempt to argue in its Reply that, although these documents clearly show that the non-selection claim was administratively processed, Ms. Walls has not shown that she filed her EEO complaint within 45-days of learning of the adverse action. Defendant, however, cannot blame Ms. Walls and put the burden on her to prove timely filing when she, indeed, did file on time, as is apparent from the Agency's acknowledgment and acceptance letter dated November 22, 2004. See PEX#5. If Defendant, who accepted Ms. Walls' claims on November 22, 2004, now suddenly wants to reverse its position and claim this was in error, Defendant has the burden to prove this assertion. Rizas v. USPS, 2008 WL 320037, EEOC DOC 0120073659 (where there is an issue of timeliness, an agency always bears the burden of obtaining sufficient information to support a reasoned determination as to timelines)(internal quotations omitted.) Defendant simply cannot put forward any evidence or documents whatsoever that Ms.

36

Walls' amendment was untimely and has failed to proffer any such evidentiary support in its Motion.

Moreover, Ms. Walls acted promptly to amend her claims and can rely on the fact that the Agency accepted her claims. See PEX#5. If claims were filed outside the 45-day period, which Defendant may contend but which is untrue, then the Agency's EEO office should not have accepted claims. Because the Agency's EEO office did accept the claims, equitable tolling principles allow Ms. Walls to rely on the Agency's representations concerning the acceptance and timely filing of her claims. See e.g., Bowdre v. Richardson, 131 F. Supp.2d. 179 (D.D.C. 2001)(under the equitable tolling doctrine, affirmative misconduct or imparting of misinformation on the government's part justifies tolling); Whitley v. Frank, 1991 WL 1188519, EEOC DOC 01913883 (it is equitable to accept appellant's EEO claim and not penalize the appellant for relying on improper advice obtained from the agency); Wilkinson v. USPS, 1997 WL 542003, EEOC DOC 01970200 (holding that an agency cannot dismiss a complaint based on untimely EEO counselor contact where the complainant's delay is caused by misinformation from the agency or where the complainant reasonably relied upon the advice of the agency).

In the alternative, if the Court finds that Ms. Walls did not contact the EEO Counselor within the prescribed 45-day time limit, her claim of retaliation should still be considered timely because it is "like or related" to her prior EEO Charge such that there is no requirement that the amendment be subject to counseling. See 29 CFR §1614.106(d). A claim is like or related to the initial complaint if it adds to or clarifies it, or could reasonably be expected to grow out of the initial complaint. See Scher v. United

States Postal Service, 1995 WL 17214376 , EEOC DOC 05940702 (citing Calhoun v. United States Postal Service, 1990 WL 711428, EEOC DOC 05891068; Webber v. Department of Health and Human Services, 1990 WL 10067560, EEOC DOC 01900902); Arnold v. John E. Potter, Postmaster General, United States Postal Service, EEOC DOC 01A54695, 2005 WL 2708103 (the claim of retaliation that was raised by the Plaintiff is like or related to the original claim that was filed, because it grew out of the investigation into that claim.)

Here, Ms. Walls alleges that she lost out when she was not selected for the Assistant Chief position because she had engaged in a protected activity.  Accordingly, by definition, although Ms. Walls did timely file, she was under no obligation to meet the 45-day criteria because her claim of retaliation is the very type of claim that can be reasonably expected to grow out of the original complaint.

> **C.    Ms. Walls Can Rebut the Defendant's So-Called Legitimate, Nondiscriminatory Reason For Not Selecting Her For the Assistant Chief Counsel for Enforcement and Litigation Position.**

Once plaintiff has established a prima facie case, the burden shifts to the defendant to articulate with clarity and reasonable specificity a legitimate, nondiscriminatory reason(s) for the action it took.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 253, 256 (1981); Bundy v. Jackson, 641 F.2d 934 (D.C.Cir.1981).  To satisfy this "intermediate burden," the defendant is obliged to produce evidence "which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Burdine at 257; St. Peter v. Secretary of the Army, 659 F.2d 1133, 1139 (D.C. Cir.1981 ).

If the defendant is able to articulate a legitimate business reason(s) for its actions, plaintiff must be provided the opportunity to show that defendant's articulations are pretext.  In other words, plaintiff must show either that 1) a discriminatory reason more likely motivated defendant or that 2) the defendant's proffered explanation is unworthy of credence and more than likely not the real reasons for the decision(s) at issue. McDonnell Douglas v. Green, 411 U.S. 792, 805 (1973).

### 1.    Temporal Proximity Raises an Inference of Retaliatory Intent.

Here, Defendant seeks to convince the Court that it had supposedly valid reasons for not selecting Ms. Walls and that she was purportedly not the top candidate for the position.  Def. Mot. Sum. Jud. at 30.  Notwithstanding these assertions, simply put, the facts undeniably show that Defendant failed to select Ms. Walls for the disputed position within months of her EEO complaint.  Specifically, Ms. Walls' initial counseling with the EEO office was on February 12, 2004, and Ms. Walls subsequently filed her formal EEO Complaint on April 2, 2004.  PEX#1.  Within approximately six (6) months, Ms. Walls learned that Mr. Yonish, an unqualified candidate from outside the Agency, was selected and that Defendant had passed her over.  PEX#16.[3]

Evidence that shows a close proximity in time between the protected activity and the adverse action can be used to raise an inference of retaliatory motive to rebut defendant's stated reasons for its actions.  See Clark County School District v. Breeden, 532 U.S. 268, 273-274 (2001)(evidence establishing a close temporal proximity between the employer's knowledge of protected activity and the adverse employment action has long been regarded as particularly probative in establishing the causal connection element

---

[3]  Although Ms. Walls did not learn of Mr. Yonish's selection until September 14, 2004, Defendant had made the decision to select him by August 25, 2004.  PEX#15.

for a claim of retaliation; <u>Buggs v. Powell</u>, 293 F.Supp.2d 135, 149 (D.D.C. 2003) ("Evidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection"); <u>Miller v. Fairchild Indus., Inc.</u>, 797 F.2d 727, 731 (9th Cir. 1986) ("causation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge"); <u>Carter v. Ball</u>, 33 F.3d 450, 460 (4th Cir. 1994) (finding a *prima facie* case of retaliation where a demotion occurred less than two years after filing of first complaint and approximately six months after second complaint); <u>DiCarlo v. Potter</u>, 358 F.3d 408 (6th Cir. 2004)("the temporal proximity between" the filing of the EEO complaint and the supervisor's initiation of the termination proceedings within a short period of time thereafter, "[was] significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.").

Given the close temporal proximity between Ms. Wall's EEO complaint and its selection of a vastly inferior candidate for the disputed position, a jury could reasonably conclude that a discriminatory reason more likely motivated the Defendant than its supposed legitimate reason.

> **2. Ms. Walls Can Rebut the Defendant's So-Called Legitimate, Nondiscriminatory Reason By Proffering Evidence That Shows That Defendant Not Only Selected a Candidate Who Was Less Qualified, But Also Engaged in Pre-Selection During the Selection Process.**

Plaintiff may also rebut Defendant by showing that Defendant's actions lack credence, are unworthy of belief, that disparate and inexplicable treatment occurred after exercising protected rights, or any other method of proof which tends to show that the

40

Agency's explanation is not the real reason for the decision-making.  See Aka v. Washington Hospital Center, 156 F.3d 1284, 1289 (D.C. Cir. 1998)(*en* banc).

Reliance on circumstantial evidence and inference is commonly required because there is seldom "'eyewitness' testimony as to the employer's mental processes." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).  See also Hunt v. Cromartie, 526 U.S. 541, 553 (1999) ("Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely on other evidence.").

> **i.    Evidence That the Selection Process Was Tainted by the Pre-Selection of Ms. Sue Lawless Raises an Inference of Impermissible Retaliatory Motive.**

Noticeably absent from Defendant's Motion is any explanation for the blatant and retaliatory manipulation of the selection process by Mr. McCown and Ms. Rutledge to prevent Ms. Walls from being selected for position.  The evidence clearly shows that, contrary to Defendant's assertions, the decision-making was not based on objective measurements of the relative qualifications of the candidates for the position.  Rather, Mr. McCown and Ms. Rutledge made subjective determinations based on their own personal and biased view of who they believed would "fit" the Assistant Chief position.

Numerous courts have held that an employer's pre-selection of a job candidate, in violation of its own procedures requiring fair consideration of qualified applicants, is "undeniably relevant to the question of discriminatory intent," Krodel v. Young, 748 F.2d 701, 709 (D.C. Cir. 1984), and "operates to discredit the employer's proffered explanation for its employment decision," Shelborne v. Runyon, 1997 WL 527352, *10 (D.D.C. 1997).  Accordingly, pre-selection, as an improper selection procedure, is relevant evidence of the employer's motivation that goes to the question of whether the

employer's nondiscriminatory explanation is unworthy of belief. See Goostree v. State of Tenn., 796 F.2d 854, 861-862 (6th Cir. 1986). As such, evidence of pre-selection operates to discredit the employer's proffered explanation for its employment decision. Coble v. Hot Springs School District No. 6, 682 F.2d 721, 728-29 (8th Cir. 1982).

Here, before Mr. McCown and Ms. Rutledge settled upon Brian Yonish, who was the Agency's third or fourth choice for the Assistant Chief position, they had their sights set on selecting Sue Lawless. See PEX#14. Defendant brazenly ignored its own selection policies to bring about the result it intended and to hold Ms. Walls back from career advancement.

First, Mr. McCown and Ms. Rutledge manipulated the closing date of the Vacancy Announcement. Specifically, the disputed position was set to close on April 12, 2004 and no further applications were supposed to be accepted beyond that date. PEX#10. Ms. Walls followed procedure and submitted her resume on the closing date for Vacancy Announcement, No. HM4823EX. PEX#6.

Defendant, however, ignored policy and allowed Ms. Lawless to apply after the position closed. PEX#25. Indeed, the fact that Ms. Lawless applied after the closing date is apparent from the Summary Review of Applications Received. Id. Specifically, the certificate states that a total of 43 total qualified candidates applied. Id. Ms. Walls and Mr. Yonish are listed in this document and there are a total of 43 candidates. Id. Ms. Lawless name does not appear anywhere on the list except at the very end of the document and her name is handwritten. Id. Plainly, she was not among the 43 applicants.

Additionally, the resume submitted for Ms. Lawless indicates that it was submitted for Vacancy Announcement No. HM4830EX. PEX#26. The Vacancy Announcement for the disputed position is No. HM4823EX. Compare PEX#26 and PEX#10.

Furthermore, Ms. Rutledge also admitted that Ms. Lawless "applied for the position after the certification list, after it closed. And we put her resume in the pot." Rutledge Dep. at 272.

Ms. Rutledge testified that one of the reasons Ms. Lawless initially did not apply was because Ms. Lawless understood that the selection process was rigged and that applying would be futile. Rutledge Dep. at 273.

Thus, the second manipulation of the selection process occurred when Ms. Rutledge assured Ms. Lawless that the process would not be wired against her; encouraged her to apply after the Vacancy Announcement closed and then convinced Human Resources to buy into this pre-selection scheme by allowing Ms. Lawless to submit her resume for the Assistant Chief position under a wholly separate Vacancy Announcement.

> Q. How did it happen that you had this conversation about whether or not the position was wired?
> A. Before, when the position was first advertised, one of the enforcement managers from the Eastern Service Center, Ron Ashby, who was [Ms. Lawless'] supervisor, dropped by my office one day when he was at headquarters. And we were talking about enforcement issues. And he said that Sue Lawless had indicated that she might apply for that position. And I said great. When I saw the certificate list, and went through the applications, it was obvious she hadn't applied. One day in the building I was walking down the hall, and Ms. Lawless was walking down the hall. I said hello. She was there from over from the Eastern Service Center office in Glen Burnie, Maryland. And she's working on some project. She was there walking down the hall. Hi. I thought you were going to apply for the position. Ron told me you were going to apply. She said, I heard it was wired. So, I decided not to; it's a waste of time. I said it's not wired.

> So whoever the best candidate is. She said, is it too late for me to apply? I said, I don't know. I will check with HR. That's when I checked with HR. Called her back. Said exactly what HR said. Send in your application. Rutledge Dep. at 276-77.

Clearly, this exchange supports the fact that pre-selection permeated the selection process. Indeed, just before Ms. Rutledge was supposedly "just walking down the hall" and coincidently "bumped" into her favorite candidate, she had reviewed the certification list and knew that the candidate she wanted, Ms. Lawless, had not applied. Ms. Rutledge was so concerned about this that she allegedly had a "chance" and "innocent" encounter with Ms. Lawless in the hallway during which Ms. Rutledge buttonholed Ms. Lawless into applying.

Of particular significance is the fact that Ms. Rutledge also knew, when she approached Ms. Lawless, that Ms. Walls had applied for the position. Unlike Ms. Lawless, Ms. Walls submitted her resume before the closing of the vacancy and her name was most certainly on the certification list. Defendant cannot deny, and does not even attempt to argue in its Motion, that Ms. Walls was among the best qualified for the position. This is borne out by the fact that Ms. Walls was on the list of qualified applicants. PEX#25.

Plainly, there is an undeniable inference that Ms. Rutledge had no intention of hiring Ms. Walls and was seeking to fill the position with other candidates after the closing date, despite Ms. Walls' expressed interest. A jury could therefore reasonably infer that Ms. Lawless was correct about the position being wired – It just was wired against Ms. Walls and in favor of Ms. Lawless.

The bias was, in fact, so deliberate and manifest that others in FMCSA observed that the selection process was retaliatory. In particular, Ms. Rosemary Dettling, one of Ms. Walls' co-workers, made the following statement in her EEO affidavit:

> Management retaliated against Complainant when they hired Brian Yonish for the supervisor of enforcement position. It is common knowledge in the office that he is less qualified than Complainant for the position. Complainant was not hired because she is a black woman and she filed an EEO complaint against Mr. McCown. When Mr. McCown received the list of eligibles, I'm sure he saw Complainant was the most qualified applicant on the list. He was determined not to hire her. He instead offered the position to a female candidate, Sue Lawless, who did not even apply for the position. She wasn't even on the cert. list. Mr. McCown asked Ms. Lawless if she would accept the position. He did that because he did not want to hire Complainant and he knew Ms. Lawless, unlike the applicants on the list, had some enforcement experience. When Ms. Lawless rejected the position, Mr. McCown offered it to two or three unqualified male candidates. They had absolutely no enforcement or motor carrier experience. I have been litigating federal employment law cases for many years and I have never seen a more egregious, clear-cut case of retaliation. PEX#22, p. 3.

Similar to this case, evidence of pre-selection was critical for the court in Kolstad v. American Dental Ass'n, 108 F.3d 1431, 1436 (D.C. Cir. 1997), vacated and remanded on issue of punitive damages by 527 U.S. 526 (1999). In that case, the plaintiff produced evidence that the supervisor who made the pre-selection had "cut-and-paste" the selectee's job responsibilities into the position description for the job at dispute. Id. Given this evidence, the court determined that the jury could conclude that the employer had pre-selected a candidate to succeed the incumbent before the posting of the position. See also Morgan v. Postmaster General, EEOC DOC 01883540, 1989 WL 1004107 (E.E.O.C. January 27, 1989)(evidence that Complainant was the best qualified applicant, that there was pre-selection, that the agency violated its own procedures in effecting the selections, and that there was subjectivity in the process established that Complainant's non-selection was discriminatory.)

By allowing Ms, Lawless to apply after the closing date, Defendant illegally gave Ms. Lawless an unfair advantage over Ms. Walls, who had timely filed.  This also allowed Defendant to rig the process to favor Ms. Lawless, the candidate who apparently had been chosen for the job from the very start of the selection process.

Why should the Court be concerned when, as here, pre-selection taints a selection process?  Pre-selection means that Defendant has deviated from stated policies and/or has filled a position by using inconsistent application of its own standards.  Once allowed to stray from established procedures, it is permissible to infer that the selecting officials, in this case Mr. McCown and Ms. Rutledge, utilized their unrestricted subjectivity to act with discriminatory intent.  This same unfettered discretion allows managers, like Mr. McCown and Ms. Rutledge, to take retaliatory actions against employees like Ms. Walls who dare to stand up and challenge the system by engaging in protected activities.

In sum, the intent and motives of the decision-makers, Mr. McCown and Ms. Rutledge, are at the core of this dispute, particularly given the fact that the pre-selection influenced the process.  Because such credibility determinations should not be made on the pleadings alone, dismissal of the case at this stage would be premature.

ii.    **Ms. Walls Was The Superior Candidate Whose Experience Was Far More Extensive Than Mr. Yonish.**

Although initially selected for the position, Ms. Lawless declined the offer.  This left Mr. McCown and Ms. Rutledge once again searching for a candidate and, as they had before, they all but ignored Ms. Walls' application because she had engaged in protected activity.

In its motion, Defendant essentially contends that Ms. Walls, although qualified, was not the best qualified, and that Mr. Yonish was more qualified.  Def. Mot. Sum. Jud.

at 31.  Plaintiff finds this statement to be inaccurate and is evidence of Defendant's intention to impermissibly bolster Mr. Yonish's qualifications in order to justify its illegal and discriminatory motive.   The law is clear that when Plaintiff's qualifications are superior to those of the selectee, as is the case here, an inference of discrimination is raised.  See Ash v. Tysons Foods, Inc., 546 U.S. 454, 457 (2006) ("qualifications evidence may suffice, at least in some circumstances, to show pretext."); Patterson v. McClean Credit Union, 491 U.S. 164, 187-188, (1989), superseded on other grounds by 42 U.S.C. 1981(b)(indicating that a plaintiff "might seek to demonstrate that respondent's claim to have promoted a better qualified applicant was pretextual by showing that she was in fact better qualified than the person chosen for the position); Lathram v. Snow, 336 F.3d 1085, 1091-92 (D.C. Cir. 2003)(a reasonable jury could conclude that there was a "wide and inexplicable gulf" between the qualifications of plaintiff and the selectee such that one could reasonably infer discrimination from the agency's choice).

Here, the wide and inexplicable gulf between Mr. Yonish and Ms. Walls is her vastly superior knowledge of DOT's Motor Carrier Program and her expertise in DOT's regulations since she began her employment with the Interstate Commerce Commission, which merged with DOT, as an Attorney Advisor in 1980.  PEX#6.

Indeed, Mr. Yonish was not the first choice.  On July 9, 2004, when Mr. McCown submitted Ms. Lawless' name as the selectee for the Assistant Chief Counsel position, he listed David F. Snyder and Dennis D. Kirk as alternatives to Ms. Lawless.   PEX#12. When Ms. Lawless declined the job offer, Mr. McCown and Ms. Rutledge then extended to position to David Synder.  PEX#13.  Apparently, however, Mr. Synder declined the job

offer like Ms. Lawless.  This left Mr. McCown and Ms. Rutledge settling for Mr. Yonish

who was clearly the fourth choice and least favorite candidate for the position.  Id.

Although Defendant will likely assert in its Reply that litigation experience was

more important than Ms. Walls' vast knowledge of the Motor Carrier Program, any such

arguments fail to consider the centrality of DOT regulations to carrying out the job duties

and responsibilities of the Assistant Chief Counsel position.  Indeed, the Vacancy

Announcement itself, in summarizing the duties of the position, states the following:

> Prominent areas of subject matter responsibility include statutes and regulations
> related to (1) commercial drivers' licenses, (2) alcohol and controlled substance
> testing, (3) the Motor Carrier Safety Assistance Program, (4) driver qualifications,
> (5) financial responsibility, (6) vehicle equipment and inspections, (7) drivers' hours
> of service, (8) commercial regulation, (9) rules of practice for motor carrier and
> hazardous material proceedings, and (10) rulemaking under the Administrative
> Procedures Act.  The incumbent must provide legal services for implementing the
> national motor carrier safety policy and the national goals of the FMCSA to promote
> and regulate commercial vehicle safety on the highway, in accordance with Title 49,
> U.S. Code.  PEX#10.

In this regard, Ms. Walls' experience is stellar and Mr. Yonish's experience is non-

existent.  Compare Resume of Ms. Walls to Mr. Yonish, PEX#27 and PEX#6, respectively.

Specifically, Ms. Walls has held a series of positions in the transportation regulation

field, and had experience working in the Agency's Regulatory Affairs Division, which, until

March 2004, handled all of FMCSA's legal enforcement and regulatory affairs issues.  Ms.

Walls also served as the Agency's principal contact for the National Environmental Policy

of 1969 (NEPA) issues on environmental matters.  Significantly, she prepared and

developed the Agency's final NEPA Order to ensure that FMCSA considered

environmental impacts, including Clean Air Act impacts, in all of its decision making.

Additionally, Ms. Walls created the NAFTA Programmatic Environmental Impact

Statement (PEIS) interagency task force, a team of experts to assess the agency's

48

environmental study needs in response to a decision by the U.S. Court of Appeals for the Ninth Circuit which set aside NAFTA implementing rules. Ms. Walls has also been recognized for her achievements by the Agency. In appreciation of her diligent work in these subject areas, she has received two Special Act cash awards, a Secretary's Team Award, and the Secretary's "Thanks a Million Award."

In contrast, Mr. Yonish's resume has none of the experiences and he had absolutely no Motor Carrier Program experience whatsoever at the time he was hired. See Rutledge Dep. at 290 (admitting that it was correct that Mr. Yonish "did not know the Motor Carrier Program.")

Mr. Yonish, whose has a legal background as a litigator for the United States Navy, has approximately two years, and not over twenty years like Ms. Walls, of regulatory law experience. Furthermore, Mr. Yonish's regulatory experience is limited to working with the Federal Aviation Administration, not the FMCSA, the Motor Carrier Act or even DOT. See PEX#27. In contrast, Ms. Walls has undeniably superior experience working on Motor-Carrier regulations directly related to the type of experience that is required for the position she sought.

As a point of fact, Mr. Yonish's failings in this regard were so blatant that, upon accepting the position, he told his staff at his first meeting that "he was on a big learning curve." Rutledge Dep. at 291. This was interpreted by Ms. Rutledge as meaning that "he was going to learn the Agency and the program." Id.

Others on the staff whom he was to supervise, however, interpreted this differently. Many felt that Mr. McCown and Ms. Rutledge had hired someone who did not have the requisite experience and that they discriminated against Ms. Walls by not

49

selecting someone who easily understood the regulations and programs central to

FMCSA.

> Specifically, Ms. Dettling testified as follows in her EEO affidavit:

> It was well-known throughout the office that the male attorney hired by Mr.
> McCown for the GS-15 Enforcement position had no experience in motor carrier
> issues. Everyone became aware Mr. Yonish was not familiar with the workings
> of the Agency and had no prior experience working on enforcement or motor
> carrier issues because he openly told people. Mr. Yonish previously worked for
> the Department of Defense on General Law issues. He would have been qualified
> for a General Law position at FMCSA, but he certainly was not qualified for a
> supervisory Enforcement position. He even admitted at a staff meeting in front of
> everyone that he was on a "big learning curve." He had no idea what FMCSA
> did. As I recall, at the meeting he asked everyone to be patient with him. It's
> nonsensical to hire someone who has no enforcement or supervisory experience
> for a "supervisory enforcement position." Complainant had the best experience
> out of all the applicants. She should have been hired for that position. She was
> not hired because she was female and engaged in prior EEO activity. PEX#22, p.
> 3.

> In a similar manner, Ms. Jackie Cho also expressed similar sentiments as Ms.

Dettling:

> Ms. Walls applied for the position of Assistant Chief Counsel for Enforcement
> and Litigation. Of the candidates interviewed, I believe Ms. Walls was the only
> candidate with FMCSA enforcement experience. Ms. Walls was not offered the
> position. However, the candidate who was selected had no enforcement
> background whatsoever, and was brand new to the agency. Instead, it appears his
> background was entirely in general law. PEX#23, p 4.

> Lastly, Ms. Dolores Hodge additionally testified that it was manifestly apparent

that a travesty of justice occurred when Ms. Walls was not selected for the Assistant

Chief position:

> Ms. Walls worked on the Counsel Enforcement division from the Agency's
> inception in 2000 until our recent reorganization of this year. … Ms. Walls
> applied for the [Enforcement division head], but was not selected. Three
> candidates declined the position before the fourth and final selectee accepted.
> Once again, a blatant slight in my view, with no credible or supporting rationale.
> It is essentially impossible for any of the candidates to be more qualified than Ms.
> Walls who was a sitting member of the Enforcement legal team for many months.

It would appear that rather than select black female Walls, any other person was preferred, even the fourth choice, who just happens to be a white male. PEX#24, p. 4.

Subjectivity in the selection process is a relevant consideration to prove discriminatory motive and the methods of assessment of the candidates for a promotion actually becomes a core issue regarding pretext. See, e.g., Equal Employment Opportunity Commission v. Town & Country Toyota, Inc., 7 Fed.Appx. 226, 2001 WL 369675 (4th Cir. 2001), 2001 U.S. App. LEXIS 6425, *2, *8 (4th Cir. 2001) (employer's reasons for deeming the plaintiff not qualified are relevant, but its subjective criticisms should not be evaluated until after the plaintiff establishes his prima facie case); EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1194 (10th Cir. 2000)(stating that "subjective qualifications... are more properly considered at the second stage of the McDonnell Douglas analysis."); Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3rd Cir. 1995) (The question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to consideration of whether the employer's nondiscriminatory reason for discharge is a pretext.)

Here, Defendant's highly subjective assessment of Ms. Wall's qualifications do not support that it had a legitimate business reason for selecting Mr. Yonish who had no substantive knowledge whatsoever of FMCSA's programs.  Given this wide disparity in relative qualifications, dismissal of the case at this stage would be premature.  See Danville v. Regional Lab Corp., 292 F.3d 1246, 1252 (10th Cir. 2002)(grant of summary judgment reversed where one could draw a reasonable inference that the selectee's qualifications were unreasonably inflated by the committee, while the plaintiff's were unreasonably denigrated.)

In sum, an inference of discrimination is raised given the wide and inexplicable gulf between the qualifications of Ms. Walls and Mr. Yonish. Coupled with the procedural irregularities of the selection process that allowed Ms. Lawless to apply after the Vacancy Announcement closed, and which demonstrates pre-selection, a reasonable trier of fact could conclude that Defendant acted with retaliatory motive by failing to select Ms. Walls. See e.g., White v. Secretary of Veterans Affairs, 1998 WL 36914 (E.E.O.C. January 29, 1998), EEOC DOC 01960701 (superior qualifications of the complainant combined with other indicia of pretext is sufficient for a finding of discrimination.) The intent and motives of the decision-makers are at the core of this dispute and such credibility determinations should not be made on the pleadings alone.

**V.  Conclusion**

For all of the foregoing reasons, and given the numerous issues of material fact, this Court should deny Defendant's Motion for Summary Judgment in its entirety and Plaintiff's case should be allowed to proceed to trial and/or continue with discovery.

Dated:  February 21, 2008                    Respectfully submitted,


                          _____/s/_____
                          Camilla C. McKinney, Esq.
                          McKinney & Associates, PLLC
                          1100 Fifteenth Street, N.W., Suite 300
                          Washington, D.C.  20005
                          (202) 861-2934/(202) 517-9111 (fax)
                          Attorneys for Plaintiff Elaine Walls

## CERTIFICATE OF SERVICE

I hereby certify that, on this 21st day of February, 2008, I caused a true and correct copy of the foregoing Plaintiff's Opposition to Defendant's Motion for Summary Judgment, to be served electronically, to:

Kenneth Adebonojo
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
Phone: (202) 514-7157
Facsimile: (202) 514-8780
kenneth.adebonojo@usdoj.gov

                                    _____/s/_____
                                    Camilla C. McKinney

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ELAINE WALLS** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 06-1259 (TFH) |
| | ) |
| | ) |
| **MARY E. PETERS,** | **)** |
| **SECRETARY** | ) |
| **U.S. DEPARTMENT OF TRANSPORTATION** | **)** |
| | ) |
| Defendant. | ) |
| _____ | ) |

**ORDER**

Upon consideration of the Defendant's Motion for Summary Judgment, Plaintiff's Opposition, and the entire record herein, it is hereby ORDERED that the Motion is DENIED and that this matter shall proceed to trial and/or continue with discovery so that Plaintiff seek additional discovery on her claims.

It is so ORDERED this _____ day of _____, 2008.


_____
United States District Judge

54