# PLAINTIFF'S EXHIBIT 8

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
1801 L Street, N.W., Suite 100
Washington, D.C. 20507

- - - - - - - - - - - - - - - - - x
                                  :
ELAINE WALLS,                     :
                                  :
            Complainant,          :
                                  :
      v.                          : EEOC No. 100-2005-
                                  :      00093X
                                  : Agency No. DOT 2-
                                  :      04-2061
NORMAN Y. MINETA, Secretary,      :
U.S. DEPARTMENT OF TRANSPORTATION,:
                                  :
            Agency.               :
                                  :
- - - - - - - - - - - - - - - - - x

Washington, D.C.

Thursday, August 11, 2005

Deposition of

ELAINE WALLS

a witness of lawful age, taken on behalf of the Agency

in the above-entitled action, before Rita Hemphill,

Notary Public in and for the District of Columbia, in

Conference Room 8442, U.S. Department of

Transportation, 400 7th Street, S.W., Washington, D.C.,

commencing at 9:00 a.m.

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW Second Floor
Washington, DC 20036
(202) 467-9200

17

1   A   He was very supportive.

2   Q   And did you trust him?

3   A   Yes.

4   Q   You thought he had integrity and was a good
5   character?

6   A   Yes I did.

7   Q   In your complaint, you contend that Mr. Holian
8   had told you that he was making a recommendation to Ed
9   Kussy for a promotion for you to the GS-15 level. Is
10  that correct?

11  A   That's correct.

12  Q   When did he tell you this?

13  A   He told me this a couple of months before we
14  transferred to the FMCSA.

15  Q   And what was the context of him telling you
16  that? How did it arise?

17  A   How did it arise?

18  Q   Yes.

19  A   Basically, we talked about my promotion, and
20  he indicated that he certainly would talk to Mr. Kussy
21  about it, and he thought I deserved it.

22  Q   Did the conversation begin when you asked him

21

1  Holian when he told you that he was going to recommend
2  you?  Do you think you could have misunderstood his
3  trying to support you in your goals, that maybe he
4  didn't actually say he was going to recommend you?
5      A    No.
6      Q    It was a misunderstanding?
7      A    No.
8      Q    Now you talked a little bit about the transfer
9  from Federal Highway to Motor Carriers.  Can you
10 explain how that happened?  Why did you transfer?  Was
11 there another restructuring?  What happened?
12     A    Well, Congress created a new agency, FMCSA, to
13 handle all Motor Carrier safety issues.  Everyone,
14 every attorney who was working at Federal Highway on
15 Motor Carrier issues had a right to transfer.  There
16 was a percentage level of work, Motor Carrier work,
17 that you had to be performing, and if you were
18 performing at that level, you had a right to transfer.
19     Q    What do you mean, you had a right to transfer?
20     A    Normally in a restructuring or its functions
21 are moved from one agency to another, those employees
22 have a right to transfer to the new agency.

24

1    affidavit you had a conversation with Ms. Rutledge
2    before transferring to Motor Carriers. Can you tell me
3    about that conversation?
4        A    Ms. Rutledge came to see all of the attorneys
5    who were designated to transfer to the new agency,
6    FMCSA, and their chief counsel's office. At that time
7    that Ms. Rutledge and I talked, she asked me what I
8    would be interested in doing if I transferred, and I
9    told her I would still like to work on the regulatory
10   work, but I also had an interest in general law.
11           And then we talked about my promotion to the
12   GS-15 level.
13       Q    How did that subject come up?
14       A    I brought it up.
15       Q    What did you say?
16       A    I told her that Mr. Holian had recommended me
17   to be promoted to the GS-15 level, and I asked her if
18   she would honor that if the transfer was made to Motor
19   Carrier.
20       Q    Did you tell her that Mr. Kussy had declined
21   to promote you?
22       A    Mr. Kussy did not decline to promote me.

Diversified Reporting Services, Inc.
1101 Sixteenth Street, NW Second Floor
Washington, DC 20036
(202) 467-9200

1   Q   I thought you testified earlier that Mr. Kussy
2   had told Mr. Holian that he wasn't going to promote
3   you.
4   A   Because was going to the new agency. But
5   that's not a decline in promotion. That's just saying
6   that because you're going somewhere else, the promotion
7   will not go through. It's different from I agree that
8   she should be promoted or I decline to promote you.
9   Q   Okay. So you told Ms. Rutledge that Mr.
10  Holian had recommended you?
11  A   Yes I did.
12  Q   And what did she say?
13  A   She said she would honor that promotion if I
14  transferred.
15  Q   Didn't she say she'd honor it if you had
16  already been promoted?
17  A   No. She said she would honor the promotion if
18  I would transfer to Motor Carriers.
19  Q   You mean she would honor the recommendation?
20  A   The recommendation to promote me.
21  Q   Did anybody witness this conversation?
22  A   It was just Ms. Rutledge and I.

1    Q    You don't for sure whether he would have
2    granted it?
3    A    No, I don't know for sure.  But I only know
4    that one of the lawyers who was designated to transfer
5    did not, and he said the reason why he was able to stay
6    at Federal Highway was because he had a conversation
7    with Mr. Kussy, and he told Mr. Kussy that he did not
8    want to transfer.
9    Q    At the time Ms. Rutledge came to speak to you,
10   your position had already been identified.  Is that
11   right?  To transfer?
12   A    Yes.
13   Q    Let's move on.  Can you tell me what the EPP
14   is?
15   A    The EPP is an Executive Potential Program, a
16   management program that is offered to employees of
17   Federal Motor Carrier Safety Administration, I think if
18   they're within the grades of a GS-13 and above.  It
19   gives them the opportunity to take management courses
20   and to be detailed to other agencies throughout the
21   Washington, D.C. metropolitan area, to gain management
22   experience.

28

1     Q    Is this a chief counsel program or an agency-
2  wide program?
3     A    It was an agency-wide program.
4     Q    And how are people chosen to participate?
5     A    You would have to ask management about that.
6     Q    How many persons in a year are chosen?
7     A    You still would have to ask management.
8     Q    You don't know that?
9     A    No.
10    Q    Didn't you ask to participate in the program?
11    A    Yes I did.
12    Q    But you didn't know how the nominations or how
13 participants were chosen?
14    A    I know how they're chosen by their different
15 offices. Management usually determines who would
16 participate in the program.
17    Q    And you didn't know how many people were
18 chosen from the whole agency?
19    A    No I didn't.
20    Q    In the previous years, had anyone been chosen
21 from the agency to participate?
22    A    From the agency --

Diversified Reporting Services, Inc.
1101 Sixteenth Street, NW Second Floor
Washington, DC 20036
(202) 467-9200

33

1  Q  She never at that meeting or at any other
2  meeting indicated that a future nomination was a
3  possibility?
4  A  No she didn't.
5  Q  You also contend in your complaint that the
6  denial of your request to be promoted to a GS-15 was
7  based upon discrimination. Can you explain the bases
8  for that allegation?
9  A  The bases for that allegation is the fact that
10 management had offered promotion to the GS-15 attorney
11 level to Mr. Joe Solomey.
12 Q  How do you know that?
13 A  Because he told me.
14 Q  What did he tell you?
15 A  That management had offered him a promotion to
16 the GS-15 level.
17 Q  When did he tell you that?
18 A  After the offer was made.
19 Q  And what did he say exactly?
20 A  He basically said that management had offered
21 him a promotion to the GS-15 level if he would not take
22 the job at RSPA.

38

1   A   Yes. I have numerous years of experience in
2   transportation law and Motor Carrier law, hazardous
3   materials law and commercial regulations law. I've
4   worked on numerous projects of an international and
5   national nature within the office. I've done a good
6   job on those projects, and I've received awards for
7   them as well.
8       And based on this work experience and my
9   commendations within my division, I feel like I should
10  be promoted to the GS-15 level.
11  Q   Let's talk about specific projects or
12  assignments that you just mentioned that supported your
13  request to be promoted. Can you identify some specific
14  work or assignments that you've done that you believe
15  qualify you for a 15?
16  A   For example, I worked on the NAFTA litigation
17  team, helped develop the NAFTA rules, and helped
18  develop the NAFTA environmental impact statement that
19  was required by the court.
20  Q   Anything else?
21  A   Yes. I helped develop the environmental
22  procedures for the National Environmental Policy Act of

39

1    1969. It took me two-and-a-half years to get those
2    procedures done, but they're essential in our NAFTA
3    litigation, and furthermore in our rulemaking
4    development efforts because CEQ was insistent that the
5    agency have those procedures so that they could justify
6    environmental consequences of all of their actions. Do
7    you want me to continue?
8        Q    Yes.
9        A    In the NAFTA litigation arena, we also had to
10   develop an environmental planning report called the
11   REPA report for the deputy secretary within a week.
12   This was required because the deputy secretary wanted
13   to know how much money and time it would take for the
14   agency to develop a NAFTA EIS. And I was instrumental
15   in that procurement of a contractor to do that work, as
16   well as the documents that were -- the review of the
17   documents that were produced for the Secretary's
18   purposes.
19       Q    Did you write the report?
20       A    No, I didn't write the report. But I had to
21   review the report for legal sufficiency.
22       Q    On the NAFTA litigation team, you also said

                                                                    40

1    that you helped develop rules in the EIS. Did you

2    write the rules in the EIS?

3        A    I did not specifically write the rules, but I

4    had to review the rules. The rules are normally

5    written by the program staff, and then when they come

6    to our office, I help review them and help develop some

7    of the issues contained in those rules. Ms. Rutledge

8    put a team of lawyers together for that particular

9    project, and I was on that team.

10       Q    Did you have a specific area that you focused

11   on in developing the rules?

12       A    No. I didn't have a specific area. I

13   reviewed the rules in every aspect of regulatory

14   development in that particular instance. I was not

15   limited in my review.

16       Q    Is there any other specific assignments that

17   you wanted to identify as being representative of GS-15

18   work?

19       A    I also helped develop a NAFTA litigation task

20   force that consisted of a multi-modal administration

21   team. OSC was on that team, representatives from the

22   GC's office, my office, Federal Highway Administration,

41

1  EPA and several other agency representatives throughout
2  the Washington metropolitan area, Washington, D.C.
3  metropolitan area.
4       On that team, our responsibility was to help
5  and develop issues that would be covered in that NAFTA
6  litigation. And we worked on that particular team for
7  numerous months.
8     Q   Did you head up the team?
9     A   Yes.
10    Q   You were the --
11    A   I was the head.
12    Q   -- head of that team?
13    A   Mm-hmm.
14    Q   What type of -- did you have any written work
15 product that resulted from this that you drafted?
16    A   Yes I did.
17    Q   What was that?
18    A   The work product consisted of several things;
19 how we were going to pursue litigation, some of the
20 issues we discussed in terms of how we would start to
21 develop the EIS and what should be covered, various
22 charts and tables and things were created on that

42

1 project.

2     Q    You were the head of the team?

3     A    Yes.

4     Q    Any other items?

5     A    Did I discuss development of environmental
6 procedures?

7     Q    You said that you did that, yes.

8     A    Okay. I also worked on the mandamus rules,
9 basically to review and help develop the safety
10 performance rule making.

11     Q    Is that the documents that you provided to my
12 document request, there were some e-mails relating to
13 FMPRM or the rules of practice? Or is that something
14 else?

15     A    That's something different.

16     Q    Oh, okay. Excuse me. Tell me about what you
17 did for the mandamus rules.

18     A    I helped review and develop the safety
19 performance for drivers rulemaking. That was one of
20 the mandamus rules.

21     Q    What did you do when you say you helped?

22     A    Well, the program staff originally will do the

1     A    Yes.

2     Q    What did you do for that?

3     A    Those were the three NAFTA rules that were
4    developed to open the U.S.-Mexico border.

5     Q    And so that was part of NAFTA?

6     A    That was the initial project, right.  And I
7    worked on that team to help develop those rules,
8    because the President wanted to open the border within
9    a specific time.

10    Q    So the President's initiative to open the
11   U.S.-Mexico border, the agency's NAFTA EIS, and the
12   REPA report, that was all part of NAFTA?

13    A    It was all part of it, but they were separate
14   projects.

15    Q    Is there anything else you can identify to
16   support your ability to work at a GS-15 level?

17    A    I helped -- I worked on a team to rewrite our
18   rules of practice under Part 386.

19    Q    Is that what I was just referring to?

20    A    Yes.

21    Q    The, what's that, Supplemental MPRM for Part
22   386 rules?

49

1   A   Just at various agencies.

2   Q   Can you identify a few of the agencies?

3   A   I can't remember.

4   Q   So would you say since 2000 you've applied for
5   ten different GS-15 positions?

6   A   I've applied for some, yes.

7   Q   Let's talk about the various meetings you had
8   with your management to discuss your request for the
9   EPP and the GS-15 promotion. You had a number of
10  meetings that you talk about in your complaint. Did
11  you meet with Mr. McCown, Brigham McCown, separately at
12  any time to discuss either of those issues, EPP or 15?

13  A   I believe I may have met with him separately.

14  Q   And what was the context of that meeting?

15  A   I don't remember. I know we talked about my
16  promotion and we talked about the EPP program.

17  Q   And what did he tell you?

18  A   He told me he was under the belief that Ms.
19  O'Malley did not recommend me to be promoted to the GS-
20  15, and he didn't know much about the EPP program, but
21  he told me he would get back to me on that.

22  Q   And what did you say to him when he told you

55

1    A    With Suzanne and Judy, yes, I met with them.

2    Q    Okay. Let's talk about that meeting. How did
3    that meeting arise?

4    A    I think the purpose of that meeting was for
5    Suzanne to clarify some things with Ms. Rutledge.

6    Q    What things?

7    A    The fact that she never said that I should not
8    be promoted to the GS-15 attorney level, and to discuss
9    with Judy about my participation in the EPP and why
10    they were not recommending me this year to participate
11    in that program.

12    Q    Did Suzanne clarify the issue?

13    A    I think she tried to?

14    Q    What did she say?

15    A    She basically said that she at no point ever
16    said that I should not be promoted to the GS-15 level.

17    Q    In her affidavit, doesn't she say that she did
18    not recommend you for promotion to the 15?

19    A    Not to my knowledge.

20    Q    Okay. So during that meeting, your testimony
21    is Suzanne indicated that she believed you should be
22    promoted to a 15?

Diversified Reporting Services, Inc.
1101 Sixteenth Street, NW Second Floor
Washington, DC 20036
(202) 467-9200

56

```
1    A    Yes.
2    Q    And what did -- did Judy agree with her?
3    A    No.
4    Q    Did they have a discussion about --
5    A    We all had a discussion.
6    Q    What did you discuss?
7    A    Well, Ms. Rutledge basically said that she
8  wasn't going to sugar coat anything and she was going
9  to call a spade a spade, and I was nothing more than a
10 high level paid GS-14 attorney.
11   Q    She said that and Suzanne witnessed her saying
12 that.  Is that correct?
13   A    Yes.
14   Q    Did Judy and Suzanne, or just Judy, did they
15 offer to work with you at that point to work on some
16 areas so you could qualify for a 15?
17   A    Ms. Rutledge indicated that while I was close
18 to getting my 15, I wasn't quite there.  And she
19 offered to develop a plan for me to get my promotion to
20 the GS-15 level.
21   Q    And what did you say to that offer?
22   A    I told her that I didn't need a plan.  I
```