# PLAINTIFF'S EXHIBIT 11

# TRANSCRIPT OF PROCEEDINGS

1

1    U. S. Equal Employment Opportunity Commission

2                Washington Field Office

3  -------------------------------x
                                  :

4  Elaine Walls                  :

5      Complainant,           :

6        v.              :   NO.

7  Norman Y. Mineta, Secretary    :
    Department of Transportation,  :

8                        :
       Agency

9                        :
  -------------------------------x

10

11              Tuesday, August 23, 2005

12  **DEPOSITION OF:**

13           Judith Rutledge,

14  a witness, called by counsel pursuant to notice,

15  commencing at 9:45 a.m., which was taken at Department

16  of Transportation, 400 7th Street, S.W., Washington,

17  D.C.

18

19  This transcript has been completely indexed for your
      convenience. It will help you locate the testimony
      you want FAST. The index is located in the back
20  pages of this volume.

21

**Overnite**
Court Reporting Service
Serving Washington, D.C. metro area      (301) 593-0671

Page 269

1  A. Yes.
2  Q. What do you mean -- were there three
3  people that were interviewed or two people? What
4  was his involvement?
5  A. He sat in on the interviews with Mr.
6  McCown and myself.
7  Q. Which interviews did he sit in?
8  A. The one I specifically remember was Ms.
9  Walls.
10  Q. Why did he sit in on some of the
11  interviews?
12  A. I suspect, he was Acting Assistant Chief
13  Counsel of the Enforcement Division and had some
14  good insight as to what that division was like and
15  it was growing up, beginning to take root. He was
16  going to be able to observe the candidates and
17  provide some insight. But I don't -- strangely
18  enough, I don't remember who he sat in on beside Ms.
19  Walls.
20  Q. Why didn't he sit in for all the
21  candidates?

Page 270

1  A. I don't know. Unless it was a scheduling
2  thing. It would typically have been uniform.
3  Although the other possibility is that Mr. McCown
4  and I locked on Mrs. Lawless after the first round
5  and we are perhaps seeking his input in the second
6  round to make sure that he was -- we were so clearly
7  impressed with Ms. Lawless, maybe it was a gut
8  check, maybe it was somebody else to confirm what
9  our opinion was. I don't know. That is just
10  something I don't remember.
11  Q. What do you mean first round -- first and
12  second round interviews?
13  A. Yes. In some cases there were three.
14  Q. Some people were invited back more than
15  once?
16  A. It's here someplace, where I answered
17  that -- in number 19 of the interrogatories -- I
18  don't mention Mike Falk in this answer at all.
19  Q. Why was Falk present during Ms. Walls'
20  interview?
21  A. Was he present during her interview?

Page 271

1  Q. Why was he? I believe you already said he
2  was present. Why was he present?
3  A. No. The one I thought he was at was
4  Miss Lawless. Now I'm beginning to question my own
5  memory.
6  Q. I thought you testified he was present --
7  Falk was present at Walls --
8  A. The one that stands out that Lawless -- I
9  don't know. What I'm recalling is, that after the
10  interview, when she left, Mike Falk said, it seems
11  to me, you know, she's the best candidate, you know,
12  far and away. Why would you go any further?
13  That's what I remember clearly. I haven't
14  checked that with Mr. Falk. I didn't put it down
15  here. I have a memory he was in on at least that
16  one. If he was on that one, I don't understand why
17  he wasn't in on others. Typically our process is to
18  try to keep it the same, as much as we can. I don't
19  know.
20  Q. Why didn't you put in your interrogatories
21  answers that Mr. Falk was involved in interviews?

Page 272

1  A. Because it just hit me that I remember
2  that. Maybe I'm wrong. Maybe he wasn't in on any
3  of them. When we were talking about it, it just hit
4  me. Certainly something I could go back to him and
5  find out about. We can clarify this so we get the
6  right picture. That is a memory thing.
7  Q. Under what context would Falk have said,
8  why are you interviewing anyone else unless? He was
9  at the interview. Why else would he have made a
10  statement like that?
11  A. I'm picturing him making that statement
12  after the interview. He was there. It was over
13  with. It was a great interview. That was the
14  opinion.
15  Q. Was Ms. Lawless on the certification list?
16  A. No, she was not.
17  Q. How did she end up being interviewed?
18  A. She applied for the position after the
19  certification list, after it closed. And we put her
20  resume in the pot.
21  Q. Why did you put her resume in the pot?

Page 273

1  A. Because she wanted to be considered. She
2 said the reason that she hadn't applied was that she
3 heard the position was wired. When I said it's not
4 wired, and I told her that before we had started any
5 interviewing or even making the cut, when I told her
6 that, she said, is it too late to apply? It was
7 after the closing date but before we -- I said let
8 me check with HR.
9     HR said she can send in her application.
10 We will accept it under another announcement which
11 was open, the legislation announcement. And then
12 you can consider it for whatever positions you want
13 to. So with that advice from HR, I told her to
14 apply. She did. We considered her. And she was
15 far and away the best pick.
16  Q. What does it mean that she heard the
17 position was wired?
18  A. She heard apparently from somebody that
19 the chief counsel already knew who he wanted for the
20 position.
21  Q. Who did the -- who did she hear the chief

Page 274

1 counsel wanted?
2  A. I didn't ask her.
3  Q. Where did she hear that from?
4  A. I didn't ask her. It was false so it
5 really didn't matter.
6  Q. Is it your testimony that he did not have
7 somebody in mind for the position?
8  A. It's my testimony, as far as I know, he
9 didn't have anybody in mind. As it played out, he
10 never gave any reason to think he had anybody in
11 mind.
12  Q. What about Solomey? Did he have
13 Mr. Solomey in mind for the position?
14  A. Mr. Solomey was gone by this time.
15  Q. Prior to Mr. Solomey leaving, did Mr.
16 McCown have him in mind?
17  A. I already told you that what I was told it
18 was not about any particular position. And I wasn't
19 privy to that conversation.
20  Q. So Lawless didn't apply for the position
21 for the enforcement position. You said she applied

Page 275

1 for the legislation position?
2  A. She submitted her application for the
3 enforcement position. We filed it under the
4 application, I made the announcement for the
5 legislation position. And then we pulled it out and
6 considered it for the Enforcement Division. All in
7 line with what our HR department told us we could
8 do.
9  Q. Did you encourage Miss Lawless to apply?
10  A. I told her it was not wired. If she was
11 interested, she could apply. HR is the one that had
12 to tell her whether it could happen or not.
13  Q. Did you approach Ms. Lawless or call her
14 concerning the position and ask her to apply?
15  A. No, I did not.
16  Q. Did she approach you about the position?
17  A. No, she did not.
18  Q. How did it happen that you had this
19 conversation about whether or not the position was
20 wired?
21  A. Before, when the position was first

Page 276

1 advertised, one of the enforcement managers from the
2 Eastern Service Center, Ron Ashby, who was her
3 supervisor, dropped by my office one day when he was
4 at headquarters. And we were talking about
5 enforcement issues. And he said that Sue Lawless
6 had indicated that she might apply for that
7 position. And I said great. When I saw the
8 certificate list, and went through the applications,
9 it was obvious she hadn't applied.
10     One day in the building I was walking down
11 the hall, and Ms. Lawless was walking down the hall.
12 I said hello. She was there from over from the
13 Eastern Service Center office in Glen Burnie,
14 Maryland. And she's working on some project. She
15 was there walking down the hall. Hi. I thought you
16 were going to apply for the position. Ron told me
17 you were going to apply. She said, I heard it was
18 wired. So I decided not to; it's a waste of time.
19     I said it's not wired. So whoever the
20 best candidate is. She said, is it too late for me
21 to apply? I said, I don't know. I will check with

Page 277

1  HR. That's when I checked with HR. Called her
2  back. Said exactly what HR said. Send in your
3  application.
4      Q. Was anyone present when you had this
5  conversation with Miss Lawless in the hallway?
6      A. No.
7      Q. Your first selection was Miss Lawless?
8      A. That's correct.
9      Q. Why did you interview her on more than one
10 occasion?
11     A. We interviewed everybody on more than one
12 occasion. That was Mr. McCown's way of doing
13 things.
14     Q. Did you interview Ms. Walls on more than
15 one occasion?
16     A. No.
17     Q. Why not?
18     A. Because she didn't make the final cut.
19     Q. Why didn't she make the final cut?
20     A. Because we had four people that we thought
21 had qualifications that exceeded hers.

Page 278

1      Q. Who made the final cut?
2      A. Miss Wallace, Snyder, Yonish and Kirk.
3  When I said we interviewed everybody twice, we
4  interviewed those who made the cut twice. We don't
5  hire without interviewing twice.
6      Q. So these four individuals were interviewed
7  at least twice?
8      A. That's correct.
9      Q. Why didn't Ms. Walls make the cut?
10     A. The Assistant Chief Counsel position is
11 about leadership, interacting with Agency leaders,
12 the associate administrator at that level. It's
13 about litigation working in the Department of
14 Justice and General Counsel's office defending the
15 Agency.
16         It's about enforcement policy, the overlay
17 of policy with whatever the program office is trying
18 to implement in the way of new programs. It's about
19 understanding the investigator enforcement construct
20 and enforcement Agency. It's about providing advice
21 to leaders and being accepted as, you know, credible

Page 279

1  knowledgeable, someone that can reach out and build
2  bridges.
3          Those sorts of attributes are what the
4  Assistant Chief Counsel was being looked to do. And
5  with Ms. Walls we felt like she has not demonstrated
6  an ability to communicate well with the Agency
7  heads. She doesn't have the experience in
8  litigation with working with the Department of
9  Justice and dealing with the kind of litigation
10 issues that in the collaborative Agency, General
11 Counsel, Department of Justice, triumph that has to
12 work, she's not been involved in that.
13         She's not perceived by the Agency as
14 someone who can lead a program, can recognize key
15 issues. I don't view her -- I don't view her as
16 having demonstrated the ability to understand the
17 scope of the Agency and how to take strategic plans,
18 policies and ensure they are furthered in a program
19 context.
20         Those are the sorts of things. Then you
21 add to that, that she has no particular expertise in

Page 280

1  the enforcement area. No good grasp of MCSAP, CDL,
2  drug and alcohol. There was nothing that gave her a
3  clear advantage either in the management,
4  leadership, communication arena or in the
5  substantive arena.
6          I'm sure there is a more articulate way of
7  evaluating that and assessing that in one of my
8  affidavits or interrogatories. The fact is, there
9  wasn't so much of a strength on either of those
10 sides that it took her to the final cut.
11     Q. So substantive area, knowledge of
12 enforcement issues as it relates to Motor Carrier.
13 Is that an important part of the person that you
14 wanted for the position?
15     A. The person we wanted, the ideal person,
16 the Sue Lawless person is the one who has all the
17 program stuff and the policy stuff. But also has
18 demonstrated the leadership, the impressing, the
19 assistant administrator because she knows the
20 enforcement program and she knows the policy and she
21 can articulate how one overlays as a practical

Page 289

of the other candidates, it was far from being so much as to clearly make her an authority. So that suddenly when you're balancing management versus substantive knowledge, you got the sufficient knowledge way up on the scale. So those are the kind of things that play into --

Q. That was based of your knowledge of her experience and working with her. That was some of the factors that played into your decision making?

A. Yes.

Q. Lawless was with Department of Transportation. She was an employee of DOT; right?

A. That's correct.

Q. Snyder was not?

A. That's correct.

Q. And Yonish was not?

A. Right.

Q. And I think you said Kirk was from private practice. So he was not.

A. Right.

Q. Why did you select someone from outside

Page 290

the Agency?

A. Mr. Yonish?

Q. Of the four people that made the cut, if you will, the only person from the Agency was Lawless. Why were you more impressed with people outside the Agency?

A. She had the skills. They demonstrated the skills and abilities that we thought were important.

Q. You mean they had the substantive knowledge?

A. They had the management, communication, ability to advise, agency leadership, experience working with, talking about Mr. Yonish, experience working with investigators. All the stuff that I went over in another question explaining why he was the right person for the job.

Q. But he didn't have the substantive knowledge?

A. He did not know the Motor Carrier program. That is correct.

Q. When he attended his first staff meeting,

Page 291

do you know whether or not he said he was on a big learning curve?

A. I am familiar. I do think he said that yes.

Q. What did he mean by that?

A. That he was going to learn the Agency and the program.

Q. He told the staff he would need to learn Agency and the program. He told his staff at this staff meeting he needed to learn the Agency and the program?

A. I believe he said he was in a big learning curve. That's what he said. That's what I responded to that he said.

Q. He basically told his staff that he needed to learn the Motor Carrier law and the program. By making that statement he made it clear to his staff he needed to learn those areas. Is that correct?

A. He made a statement he was on a big learning curve. I think you can take that to mean what you would.

Page 292

Q. What did you understand it to mean?

A. That he was learning the program and the Agency.

Q. You said at the same time you were also selecting candidates for legislation position?

A. I think the position was advertised. Weren't interviewing or anything at that particular time.

Q. That's the -- you weren't actively seeking candidates for the legislation position at that time?

A. The legislative position was open and advertised, meaning we were soliciting applications for it. That's what open and advertised is. So yes, the position was open. We were soliciting candidates for it until the position announcement closed and we received whatever applications were coming in for the position.

Q. We already talked about who was selected for that. What was his name again?

A. Rich Logazino.