# PLAINTIFF'S EXHIBIT 23

UNITED STATES DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
DEPARTMENTAL OFFICE OF CIVIL RIGHTS

AFFIDAVIT

===========================================================================

**DISTRICT OF COLUMBIA**

===========================================================================

**CITY OF WASHINGTON**

===========================================================================

I, **Jackie Cho**, being first duly sworn on oath, make the following statement freely and voluntarily to **Lisa C. Hetrick** who has identified herself to me as an EEO Investigator, for the U.S. Department of Transportation, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who has an official interest.

_____

**Allegation:**
The Complainant, **Elaine Walls**, is alleging that she was discriminated against based on her **race (African American), color (Black), sex (female), age (49, DOB 03-11-55)** and **reprisal (EEO activity)** when: 1) in February 2004, she was denied a promotion to the GS-15 level; 2) management denied her participation into the Executive Potential Program (EPP); 3) she learned that her Caucasian male counterparts received higher performance ratings, awards, and bonuses; 4) on September 14, 2004, she was not selected for the position of Assistant Chief Counsel of Enforcement; and 5) pre-approved training was cancelled for her and two female co-workers while the training for their male counterparts was permitted one month before.

===========================================================================

1.  For record, please state your race, color, age, sex, position, series and grade and how long you had been with the FMCSA.

    **Race: Asian**
    **Age: 30**
    **Sex: Female**
    **Position: Attorney-Advisor**
    **Series: 0905**
    **Grade: 13**
    **Employed by FMCSA since October 2002.**

2. For the record, please list your chain of command.

   **Brian G. Yonish, Assistant Chief Counsel for Enforcement and Litigation**
   **Judith A. Rutledge, Deputy Chief Counsel**
   **Brigham A. McCown, Chief Counsel**
   **John H. Hill, Assistant Administrator**
   **Warren E. Hoemann, Deputy Administrator**
   **Annette M. Sandberg, Administrator**

3. For the record, please explain if have had any prior EEO activity. Also, please identify if the Complainant was a party to or involved in any way in your prior EEO activity.

   **I have not had any prior EEO activity. However, I submitted interrogatories for Rosemary Dettling's case, DOT-2-04-2031. Ms. Walls also submitted interrogatories for Ms. Dettling's case.**

4. Please identify in what capacity you know or have known the Complainant and for how long.

   **Ms. Walls has been a colleague for over two years. When I began employment at FMCSA, we were both in the Enforcement and Regulatory Affairs division. Since January of 2004, our division was split into Enforcement and Litigation, where I now work, and Regulatory Affairs, where Ms. Walls now works. Recently, Ms. Walls and I worked closely together on a rulemaking project.**

5. The Complainant states in her complaint that you can provide information regarding the following:

   A.   In 2003, male employees were permitted to telecommute while female employees who performed the exact job duties were not permitted to telecommute. Please explain in detail.

   **Telecommuting for the MC-CC office was suspended indefinitely before Ms. Dettling, Ms. Ottman and I were ever permitted to telecommute. However, Mike Falk continued to telecommute. The rationale for this exception was that he was detailed to Adjudications, which did not require the same "in-office" presence as the rest of Counsel's office. We were told that specific requests for telecommuting would be granted ad hoc.**

   **I was detailed to the office of the Adjudications Counsel from December 2002 through January 2004. Mr. Falk was also detailed to the same office at that time. Mr. Falk telecommuted every Wednesday until January 2004, when he and I were**

moved back to headquarters as the Enforcement and Litigation division. I was told by Suzanne O'Malley, my then first-line supervisor, that while I was on detail to Adjudications, I would be permitted to telecommute despite the temporary suspension of all telecommuting in the office with the exception of Michael Falk. Ms. O'Malley instructed me to forward a copy of a telecommuting agreement to be approved by Judy Rutledge. I forwarded such an agreement via e-mail on October 9, 2003. I never received approval nor heard back again about telecommuting.

On September 29, 2003, I requested to telecommute during the week of September 30, 2003 – October 3, 2003 due to my father's illness and hospitalization. I was detailed to work for Steve Farbman, Adjudications Counsel, and my day-to-day supervisor at the time. Mr. Farbman agreed to let me telecommute for the week, but I was still required to clear it with Suzanne O'Malley, who was my first-line supervisor. I was told by Ms. O'Malley via e-mail that I would not be permitted to telecommute for the week because the request was not project-driven, but for personal reasons. However, it does not make sense to me how at that same point in time, Mr. Falk was permitted to telecommute every single week, regardless of whether the need was "project-driven," when we essentially did the same kind of work, which was to draft adjudications decisions.

B.   In 2004, Joe Solomey, male Caucasian, was offered a promotion to the GS-15 level, while the Complainant with similar qualification was denied a promotion to the GS-15 level. Please explain in detail.

Mr. Solomey was offered a promotion to the GS-15 level once he made it known that another mode at DOT offered him a supervisory position as a GS-15 and that he planned on leaving FMCSA.

C.   Male attorneys hired in late 2003/early 2004 were allowed to take Regular Days Off (RDOs) immediately, while female attorneys hired in 2002 were told they could not take RDOs until they had worked in the office for four (4) months. Please explain in detail.

Rosemary Dettling, Annmarie Ottman and I were all hired at the same time. Ms. Ottman and I started work on the same day. We were told that we could work a compressed schedule and have a regular day off, but we would have to wait a few months before beginning the RDO schedule. I discovered that the two male attorneys who began work in late 2003/early 2004 began taking RDOs immediately upon their start date. For whatever reason, they were later instructed to stop working a compressed schedule and that they would have to wait a few months before getting RDOs back.

D.   Management hires less qualified male employees from outside FMCSA for

supervisory positions and rejects more qualified female applicants within FMCSA. Please explain in detail.

**Ms. Walls applied for the position of Assistant Chief Counsel for Enforcement and Litigation. Of the candidates interviewed, I believe Ms. Walls was the only candidate with FMCSA enforcement experience. Ms. Walls was not offered the position. However, the candidate who was selected had no enforcement background whatsoever, and was brand new to the agency. Instead, it appears his background was entirely in general law.**

E.      Management hires men at mid-level GS-14 and GS-15 Attorney positions, but refuses to hire similarly situated female Attorneys at the commensurate salary and grade level. Please explain in detail.

**Bryan Downey and Kenneth William were each hired as GS-14s when they have had less work experience than Rosemary Dettling, a female attorney, who was hired as a GS-13.**

F.      Management gives signing bonuses and moving expenses to male Attorneys, but not to female Attorneys. Please explain in detail.

**It is my understanding that both Messrs. Downey and William received signing bonuses when they accepted employment at FMSCA. Mr. William also received a stipend for moving expenses to move from Atlanta, Georgia to Washington, DC. Marc Rigrodsky, Assistant Chief Counsel for General Law, also received a signing bonus when he accepted employment.**

G.      Management gives male employees more favorable performance ratings, higher performance bonuses, including "signing bonuses," greater training opportunities, more frequent performance and incentive awards, moving expenses, etc., than female employees. Please explain in detail.

**When I received my first performance review, I was told by my then supervisor Ms. O'Malley that on a scale that went from "Outstanding," to "Meets or exceeds," to "Unsatisfactory," no one received an "Outstanding" and that most employees fell in the "Meets or exceeds" category. I later discovered that Mike Falk, Joe Solomey, and Charles Medalen, all male attorneys in my division, received Outstanding performance ratings, while Ms. Ottman, Ms. Walls and I all received "Meets or exceeds." I was told by Mr. Falk that he has always received an "Outstanding" performance rating. If you receive an "Outstanding" rating, you receive greater monetary compensation for awards and bonuses.**

    H.    Management officials nominate male Attorneys to the Executive Performance Program, but not female attorneys. Please explain in detail.

**Mr. Solomey was nominated in 2002 for EPP and was accepted into the program. Ms. Walls expressed interest in being nominated as the MC-CC candidate for the following year, however, she was told that no one from this office would participate in EPP again since Mr. Solomey had already participated.**

6.    Complainant also states that at an MC-CC staff meeting, Ms. Dettling and Ms. Cho also heard Mr. Yonish say that he was on a "big learning curve" and had to "get up to speed" for the Assistant Chief Counsel's position he was hired to fill over Ms. Walls. Please explain in detail.

**I was out of the office on that occasion and did not attend the meeting.**

7.    The Complainant contends that on September 14, 2004, Rutledge and McCown abruptly cancelled a pre-approved trip to Destin, Florida for training for her and two other female employees.
        A.    What reason was given for the training to be abruptly cancelled? Please explain in detail.

**I received approval without incident on May 19, 2004 from Mr. Falk, my acting supervisor, and from Ms. Rutledge on June 3, 2004 to attend the training. However, I was never informed directly why management decided to cancel the training. The trip had been postponed due to the hurricanes on the west coast of Florida. The training was rescheduled to the second week of October. I discovered that Ms. Walls, Ms. Dettling, and I would not be approved to attend the rescheduled training. Trina Boyce, an administrative assistant for MC-CC, would be the only one permitted to attend the rescheduled session. In the end, the USDA Graduate School decided to cancel the training altogether due to hurricane damage and offered refunds for all participants, which is fortunate for Ms. Rutledge since she did not want any of us to attend anyway.**

        B.    Why were the male colleagues allowed to go to their training and the females not? Please explain in detail.

**The training Mr. Falk and Mr. Medalen attended was held the week of July 20, 2004 in New Orleans. Thus, their training session occurred before ours. After they returned from their trip, Mr. Falk stated that the attendees were mostly female administrative professionals and that it was not geared toward attorneys. Nonetheless, the training brochure never advertised that the**

course was only for administrative professionals, or that it would be unsuitable for attorneys. It was presented as a training opportunity available to all employees in MC-CC who wanted to attend. However, Messrs. Falk and Medalen attended their training, while our training would have been cancelled had the weather permitted.

8. Based on the allegations accepted for investigation, do you believe that the Complainant was discriminated against?

    **Yes.**

9. Are there any other comments you would like to make at this time?

    **Of the last eight new hires for attorney positions in this office, only one was female. Of the last eight new hires, none are members of a minority group.**

    **This statistic may not be conclusive of hiring practices of this office as a whole, however, I will offer my personal opinion from my one experience with the MC-CC hiring process. I was asked to participate on a hiring committee to screen applicants for attorney positions in each of our Enforcement and Regulatory Affairs divisions. We reviewed over 150 resumes. Of those 150 applicants, we chose approximately 10 to be interviewed for each division. I sat in on all the interviews, for both Enforcement and Regulations. As a result of the preliminary interview process, the committee chose our top three candidates for the Enforcement position. The top three on our list were as follows: one white female attorney, one black female attorney, and one white male attorney. Ms. Rutledge and Mr. McCown interviewed these applicants. They hired one of our recommended candidates, Cheryl Walker, the sole female attorney recently hired, who is Caucasian, age 40, as a GS-14 step 6. Ms. Walker has practiced law for roughly ten years, while Ms. Walls has practiced for over twenty years. Ms. Walker worked part time and has had no previous time in government service, yet she is earning nearly as much as Ms. Walls.**

    **Ms. Rutledge and Mr. McCown then hired Kyle Levine, white male, age 26, as a GS-12 for the Enforcement division. Mr. Levine graduated law school in 2003 and had roughly six months of experience practicing law when his resume was personally referred to Mr. McCown. Annmarie Ottman, who was hired at the same time I was hired, had five years of experience practicing law but was only offered a GS-12, step 1.**

    **On another note, when FMCSA offered an introductory training course for new employees several months ago, Ms. Rutledge recommended that Jackie Cambridge, Rosemary Dettling and I attend the training. However, she did not recommend that**

Page 6 of 9                                                                 Initials JKC

Kenneth William and Bryan Downey attend. Both Messrs. William and Downey had been with the agency less than six months at the time, and were the newest hires to counsel's office. I believe Ms. Cambridge has been with the agency since it began in 2000; I have been with FMCSA since October 2002; and Ms. Dettling has been with FMCSA since November 2002; yet we were considered to be ideal candidates for "new employee" training.

I HEREBY SOLEMNLY ___Swear___ THAT:
(SWEAR OR AFFIRM)

I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN THE ABOVE PAGES IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION. SEE 28 U.S.C. ' 1746. I UNDERSTAND THAT THE INFORMATION I HAVE PROVIDED HEREIN IS NOT TO BE CONFIDENTIAL AND THAT AGENCY REPRESENTATIVES MAY SHOW IT TO THE INTERESTED PARTIES. HOWEVER, I ALSO UNDERSTAND THAT I AM NOT TO PERSONALLY DISSEMINATE THE INFORMATION CONTAINED IN THIS AFFIDAVIT AS SUCH ACTION COULD INTERFERE WITH THE PROCESSING OF THE INVESTIGATION AND COULD VIOLATE PROVISIONS OF THE PRIVACY ACT AND AGENCY POLICIES.

Signature: ___[signature]___   Date: 12-13-04
(Affiant's Signature)

Page 9 of 9                                           Initials JKC